# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF MISSOURI
# EASTERN DIVISION

| | |
|---|---|
| In re:<br><br>23ANDME HOLDING CO., *et al.*,[1] | Case No. 25-40976-357<br>Chapter 11<br><br>(Jointly Administered) |
| THE PEOPLE OF THE STATE OF CALIFORNIA,<br><br>            Appellant,<br><br>v.<br><br>23ANDME HOLDING CO., *d/b/a* VG ACQUISITION CORP.,<br><br>            Appellee. | Case No. 25-cv-0999-MTS<br><br>Hon. Matthew T. Schelp<br><br><br><br><br><br>Hearing Date: July 10, 2025<br>Hearing Time: 2:00 p.m. CDT<br>Hearing Location: Courtroom 16 South |

## DEBTORS' OPPOSITION TO THE PEOPLE OF THE STATE OF CALIFORNIA'S EMERGENCY MOTION FOR A STAY PENDING APPEAL

---

[1] The Debtors in each of these cases, along with the last four digits of each Debtor's federal tax identification number, are: 23andMe Holding Co. (0344), 23andMe, Inc. (7371), 23andMe Pharmacy Holdings, Inc. (4690), Lemonaid Community Pharmacy, Inc. (7330), Lemonaid Health, Inc. (6739), Lemonaid Pharmacy Holdings Inc. (6500), LPharm CS LLC (1125), LPharm INS LLC (9800), LPharm RX LLC (7746), LPRXOne LLC (3447), LPRXThree LLC (3852), and LPRXTwo LLC (1595).  The Debtors' service address for purposes of these chapter 11 cases is: 870 Market Street, Room 415, San Francisco, CA 94102.

# Table of Contents

**Page**

Preliminary Statement .................................................................................1

Background ...............................................................................................6

Argument...................................................................................................10

    A.    The Bankruptcy Court Did Not Abuse Its Discretion........................10

        (i)    California Fails to Demonstrate a Strong Showing of Likelihood of Success on Appeal ............................................10

            (a)    California Lacks Standing to Appeal ............................11

            (b)    California Is Unlikely to Succeed on the Merits ............12

            (c)    California's Arguments Regarding Section 363(m) Are Irrelevant......................................................................16

        (ii)    California Fails to Demonstrate Irreparable Injury .................17

        (iii)    A Stay Would Cause Substantive Harm to the Debtors ..........19

            (a)    A Stay Jeopardizes Stakeholder Recovery by Threatening to Derail the TTAM Sale Closing .............19

            (b)    A Stay Will Significantly Increase the Costs of the Chapter 11 Cases ........................................................20

        (iv)    Public Interest Weighs Against a Stay......................................21

    B.    Any Stay Should Be Secured by a Bond of No Less than $325 Million ...............................................................................................21

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*In re Eletson Holdings Inc.*,
2025 WL 726248 (Bankr. S.D.N.Y. 2025) ........................................................ 18

*Iowa Utils. Bd.* v. *F.C.C.*,
109 F.3d 418 (8th Cir. 1996) ................................................................. 17

*In re Lionel Corp.*,
722 F.2d 1063 (2d Cir. 1983) ................................................................ 16

*In re Motors Liquidation Co.*,
539 B.R. 676 (Bankr. S.D.N.Y. 2015) ....................................................... 22

*In re Mount Moriah Elevator, Inc.*,
146 B.R. 451 (W.D. Mo. 1992) .............................................................. 17

*In re O & S Trucking, Inc.*,
811 F.3d 1020 (8th Cir. 2016) .............................................................. 11

*Packard Elevator* v. *I.C.C.*,
782 F.2d 112 (8th Cir. 1986) ............................................................... 17

*Pamida, Inc.* v. *E.S. Originals, Inc.*,
281 F.3d 726 (8th Cir. 2002) ................................................................. 9

*In re Patriot Co.*,
303 B.R. 811 (B.A.P. 8th Cir. 2004) ....................................................... 11

*Ratcliff* v. *Rancher's Legacy Meat Co.*,
2020 WL 4048509 .......................................................................... 22

*In re Savage & Assocs., P.C.*,
2005 WL 488643 (S.D.N.Y. Feb. 28, 2005) ............................................... 21

*In re Sindesmos Hellinikes-Kinotitos of Chicago*,
607 B.R. 913 (Bankr. N.D. Ill. 2019) ...................................................... 22

*In re Stratford Hotel Co.*,
    120 B.R. 515 (E.D. Mo. 1990) .............................................................................9

*TRW Inc.* v. *Andrews*,
    534 U.S. 19 (2001)................................................................................................14

*Kansas* v. *United States*,
    124 F.4th 529 (8th Cir. 2024) .............................................................................10

*In re Wigley*,
    886 F.3d 681 (8th Cir. 2018) ..............................................................................11

**Statutes**

11 U.S.C. § 363(b) ........................................................................................*passim*

11 U.S.C. § 363(m) ...............................................................................................16

Cal. Civ. Code § 56.181(a)(2)(D) ....................................................................4, 12

Cal. Civ. Code § 56.265 ........................................................................................14

Cal. Civ. Code § 798.80 ........................................................................................14

Cal. Civ. Code § 1785.16.2 ...................................................................................14

Cal. Civ. Code § 1785.20.1 ...................................................................................14

Cal. Civ. Code § 1794.4 ........................................................................................14


**Other Authorities**

Fed. R. Bankr. Pro. 2018(b) ...................................................................................3

Fed. R. Bankr. Pro. 8007........................................................................................22

The Debtors submit this opposition to the *People of the State of California's Emergency Motion for a Stay Pending Appeal* [Docket No. 8] seeking a stay of the Sale Order.[1]

## **Preliminary Statement**

California seeks an extraordinary stay of the bankruptcy order approving a sale of the Debtors' assets to TTAM Research Institute under section 363(b) of the Bankruptcy Code.  The Bankruptcy Court approved the TTAM Sale in a careful, well-reasoned 38-page Opinion following a two-day evidentiary hearing and after considering hundreds of pages of briefing from California and other parties.  After California filed a notice of appeal and a motion for a stay pending appeal, the Bankruptcy Court held an almost three-hour hearing and denied California's motion, finding that ***not a single factor*** supported California's application for a stay.  There is nothing in California's motion nor in the record that could satisfy California's heavy burden to show that the Bankruptcy Court abused its discretion in denying a stay.

California's Motion threatens to derail an extraordinarily successful bankruptcy case.  The TTAM Sale would generate $305 million for the Debtors' estates, an amount that is expected to repay all creditors' claims and potentially

---

[1]    Attached hereto as **Appendix A** is a glossary of defined terms used in this opposition.

1

return value to the Debtors' public shareholders. It is supported by *every* economic stakeholder in these proceedings. In fact, while 34 states originally filed objections in the Bankruptcy Court, California remains the only state still prosecuting an objection. The vast majority of those states—many of which have state privacy laws similar to the statute California claims is violated—stopped pressing their objections once the Debtors exercised the "Equity Toggle" and TTAM self-imposed greater privacy protections based on input from those states. California, instead, calls the new transaction structure that was central to forging widespread consensus "bad faith." Rhetoric aside, there is little mystery why 33 states stopped litigating the sale. There is no consumer protection goal to be served through continuing this litigation. No one is harmed, much less irreparably so.

Continuing the stay will impose immediate and certain harm on the Debtors and their stakeholders—including millions of customers in California and elsewhere. A stay puts at risk a $305 million transaction, and would therefore require a commensurate bond in that amount to protect against the loss of that transaction when California's arguments are rejected for the third time on appeal, as is likely. If the stay is extended, the Debtors will have no choice but to pursue the same sale to TTAM but under a plan of reorganization (rather than as a sale under section 363 of the Bankruptcy Code). California conceded at the Sale Hearing that a plan sale to TTAM would not violate California state privacy law. But it will

impose at least *$20 million* in avoidable losses on the estates, which will come out of the pocket of the Debtors' stakeholders and, as the Bankruptcy Court found, will make customers *worse off*. California has never explained how it can possibly be irreparably harmed by the fact that the TTAM sale is structured as one under section 363 of the Bankruptcy Code rather than under a plan of reorganization when the same result will ultimately be achieved either way—how can deploying a lower cost transaction to achieve the same end "irreparably harm" California?

As the Bankruptcy Court correctly found, California cannot show ***any*** of the factors necessary to impose a stay:

*First*, California has not made a "strong showing" of a likelihood of success on the merits of its appeal. California lacks standing to appeal because it cannot show that the ruling has a direct and adverse impact on its pecuniary interest. California asserts no pecuniary or financial interest related to the Sale Order. Moreover, California lacks standing under Bankruptcy Rule 2018(b), which expressly provides that where, as here, California seeks to advance the interests of consumers, a "state attorney general may not appeal from any judgment, order, or decree entered in the case." But even if California had standing, its arguments were correctly rejected twice by the Bankruptcy Court. California complains that the TTAM Sale is an "improper use" of section 363(b) of the Bankruptcy Code, but notably absent from California's motion is any reference to the statutory text of

section 363 that it claims has been violated.  The Bankruptcy Court, which specializes in evaluating transactions under section 363 and policing its limits, correctly rejected that argument.  California's state law claim that the TTAM Sale violates section 56.181(a)(2)(D) of GIPA because it involves a sale to a "third party" also fails.  The term "third party" is not defined in the California statute, and the Bankruptcy Court correctly interpreted "third party" in accordance with its ordinary, plain meaning to exclude wholly owned subsidiaries.  California has pointed to no authority that supports its statutory interpretation.

*Second*, California identifies no cognizable harm, let alone irreparable harm, that would arise if a stay is denied.  California says that the Bankruptcy Court's supposed "misinterpretation and misapplication" of California law frustrates its "sovereign interest" to "create and enforce a legal code."  But irreparable harm under Eighth Circuit law requires "actual" harm that is "certain and great and of such imminence that there is a clear and present need for equitable relief."  A state's "sovereign interest" in an alleged misapplication of its laws is not remotely enough. If California were right, irreparable harm would accompany every litigation loss by a state concerning its laws.  California also erroneously claims that its citizens may be harmed if the TTAM Sale closes.  There is no evidence in the record of any such person.  Indeed, any customer is free to delete their data before or after the sale. To the extent any customer in the future is aggrieved from the transfer of their data as

4

part of the sale to TTAM, the Sale Order **requires** that that customer can delete their data **in perpetuity**, thus remedying the harm.

*Third*, the Debtors and other parties would suffer substantial harm as a result of the stay. The unrebutted record shows that a stay threatens to derail a $305 million transaction for the benefit of the Debtors and their stakeholders—including the very consumers whose interests California purports to represent. Every day that a stay is in place costs the Debtors hundreds of thousands of dollars. A stay cannot be "limited" and apply only to California residents as California claims because the Debtors cannot "carve out" California data under the operative asset purchase agreement. The TTAM Sale is not an a la carte menu—a stay applicable to California blocks the entire transaction and will likely cause the Debtors to seek implementation of the sale via a plan of reorganization.

*Fourth*, the public interest does not favor a stay. It is no coincidence that California stands alone among states and economic stakeholders in its attempt to impede the sale—the TTAM Sale advances both the goals of the Bankruptcy Code and consumer protections. It facilitates the expedient administration of the bankruptcy cases and paves the way for prompt economic distributions to stakeholders. TTAM has agreed to special privacy protections in the TTAM APA that will be lost if the transaction does not close, and there is no meaningful dispute that the TTAM Sale makes consumers **better off** than any conceivable alternative.

*Finally*, if the Court were to extend the stay (and it should not), the Court should require California to post a bond in the amount of $325 million to ensure that the Debtors and their stakeholders are fully protected against the loss of an extraordinary outcome carefully overseen and approved by the Bankruptcy Court.

## Background

These chapter 11 cases were commenced as a result of mounting operating losses and uncertain litigation liabilities to conduct a value-maximizing sale of all or substantially all of 23andMe's assets. The Debtors conducted a highly competitive initial auction from May 14 to 16, 2025, at which Regeneron submitted the highest bid. TTAM finished second. TTAM later submitted a topping bid of $305 million and objected to Regeneron's bid. Following litigation in the Bankruptcy Court, the parties agreed to a final bidding round that took place on June 13, 2025.

TTAM emerged as the winning bidder at $305 million. Regeneron is the backup bidder at $151 million. The Debtors promptly filed a notice of the winning bidder, which attached TTAM's amended asset purchase agreement. The TTAM APA contemplated a sale of the Debtors' assets to TTAM, but also allowed the Debtors to make an election to structure the transaction in other ways, either as an equity sale (through the "Equity Sale Toggle") or as a plan sale pursuant to a chapter

6

11 plan (through the Debtors exercising the "Plan Toggle"). Ex. B, TTAM APA §§ 2.8, 11.8.[2]

The TTAM APA contains representations and warranties by the Debtors regarding the transfer of Acquired Assets, including the information targeted by California's stay request, as of the closing. *See id.* §§ 5.1(l), (w). If those requirements and warranties are breached, TTAM can terminate the APA. *Id.* §§ 9.1(a), 10.1(e). The TTAM APA also outlines closing conditions, which include that the TTAM Sale cannot close if there is (i) an order "restraining, enjoining or otherwise prohibiting . . . the Closing" or (ii) a stay of the Sale Order at the time of Closing. *See id.* §§ 9.3 (a), (b).

In advance of the Bankruptcy Court's Sale Hearing on the proposed TTAM Sale, state attorneys general from over 30 states objected. All states, including California, argued that directly selling 23andMe's operating assets under the TTAM APA violated their statutes governing the transfer of genetic data. Many of the states filed objections expressly differentiated between two types of corporate transactions that could result in a "change in ownership" of customers' genetic data: a sale of company assets (which they alleged would violate state law governing transfer of

---

[2]    The Equity Sale Toggle was disclosed in an earlier version of the TTAM APA, filed on May 19, 2025. The Plan Toggle was introduced in the version filed on June 13, 2025.

genetic data) and a sale of equity (which they acknowledged "is legally possible"). *See* Ex. C, NAAG Obj. ¶ 38.

In view of the states' position that the sale of equity (as opposed to a sale of assets) would not violate their state laws, the Debtors on June 14, 2025 elected to exercise the Equity Sale Toggle and structure the transaction to address those states' concerns. Pursuant to the Equity Sale Toggle, the Debtors would form a NewCo, a new wholly owned, non-debtor subsidiary, and then effect the transaction in two steps: *first*, the Debtors will sell Acquired Assets[3] and Assumed Liabilities to NewCo in the "NewCo Sale"; *second*, the Debtors will sell 100% of the equity interests in NewCo to TTAM. *See* Ex. D at 25–29. TTAM will then own NewCo, the entity holding the operating business and data that is the subject of California's Motion.

The Bankruptcy Court held a two-day Sale Hearing on June 18 and 20, 2025. During the Sale Hearing, 29 of the then-objecting states agreed not to further prosecute their objections as a result of the Equity Sale Toggle and additional privacy enhancements TTAM agreed to if the sale is approved. On June 27, 2025, the Bankruptcy Court overruled the remaining five states' objections, including California's, approved the sale, entered the Sale Order, and issued a 38-page Opinion.

---

[3]    The Acquired Assets include the personal information at issue in this dispute.

On July 3, 2025, California appealed the Sale Order to this Court.  On the evening of July 4, 2025, California filed a motion in the Bankruptcy Court for a stay of the Sale Order pending appeal.

On July 7, 2025, the Bankruptcy Court held the Stay Motion Hearing on California's stay motion and, following evidence and argument, denied the motion in an oral ruling on the record.

## Legal Standard

California must show that the Bankruptcy Court abused its discretion in denying California's stay motion.  *See, e.g.*, *In re Stratford Hotel Co.*, 120 B.R. 515, 516 (E.D. Mo. 1990) ("[W]here the trial court has already considered and ruled on the request for a stay pending appeal, the 'appellate' court's role is limited to determining whether the trial court abused its discretion.").  "This deferential standard means that the court has a range of choice, and its decision will not be disturbed as long as it stays within that range, is not influenced by any mistake of law or fact, or makes a clear error of judgment in balancing relevant factors." *Pamida, Inc.* v. *E.S. Originals, Inc.*, 281 F.3d 726, 729 (8th Cir. 2002) (internal quotations and citations omitted).

## <u>Argument</u>

**A.    The Bankruptcy Court Did Not Abuse Its Discretion**

A stay pending appeal requires consideration of four factors: "(1) whether the stay applicant has made a strong showing that he is likely to succeed on the merits; (2) whether the applicant will be irreparably injured absent a stay; (3) whether issuance of the stay will substantially injure the other parties interested in the proceeding; and (4) where the public interest lies." *Kansas* v. *United States*, 124 F.4th 529, 533 (8th Cir. 2024) (quoting *Nken* v. *Holder*, 556 U.S. 418, 426 (2009)). California bears the burden of showing that a balance of those factors warrants a stay. *See id.* "The most important factor is likelihood of success on the merits, *although a showing of irreparable injury without a stay is also required*." *Id.* (quoting *Brakebill* v. *Jaeger*, 905 F.3d 553, 557 (8th Cir. 2018)). All four factors weigh against a stay.

### (i)    California Fails to Demonstrate a Strong Showing of Likelihood of Success on Appeal

Section 363(b) of the Bankruptcy Code provides that "after notice and a hearing," the Debtors may "sell . . . other than in the ordinary course of business, property of the estate." The Bankruptcy Court rejected each of the objecting states' arguments that (i) the TTAM Sale violated states' (including California's) genetic privacy laws and (ii) the Equity Sale Toggle violated section 363 of the Bankruptcy Code because the first step in the transaction involved transferring genetic

information to a newly formed, wholly owned subsidiary. Ex. E, Opinion at 19–30. California is the only state now appealing that decision and seeking a stay.

(a)    California Lacks Standing to Appeal

The Bankruptcy Court correctly recognized that "California's appeal is likely to fail on the threshold question of standing." Ex. K, July 7, 2025, Hr'g Tr. at 76:23–24.

Appellate standing in bankruptcy proceedings is "more limited than Article III standing or the prudential requirements associated therewith." *In re O & S Trucking, Inc.*, 811 F.3d 1020, 1023 (8th Cir. 2016) (internal quotations and citations omitted). "[T]o have standing to appeal from an order of the bankruptcy court, the appellant must have been aggrieved. A person is aggrieved if he is directly and adversely affected ***pecuniarily*** by the order. This principle limits standing to persons with a ***financial stake*** in the bankruptcy court's order." *In re Patriot Co.*, 303 B.R. 811, 815 (B.A.P. 8th Cir. 2004) (cleaned up) (emphases added); *In re Wigley*, 886 F.3d 681, 684 (8th Cir. 2018) (appellate standing available only "if a bankruptcy court order diminishes the person's property, increases the person's burdens, or impairs the person's rights") (cleaned up). California does not assert ***any*** pecuniary or financial interest that would be adversely affected by the Sale Order and therefore lacks standing to appeal it.

11

Moreover, California's appeal asserts interests of Californian **consumer creditors**. As the Bankruptcy Court found, California is barred from appealing the Sale Order under Bankruptcy Rule 2018(b). *See* Fed. R. Bankr. Proc. 2018(b) ("[A] state attorney general may appear and be heard on behalf of **consumer creditors** . . . But the state attorney general **may not appeal from any order . . . entered in the case**." (emphases added)); Ex. K at 76:8–24.

     (b)   <u>California Is Unlikely to Succeed on the Merits</u>

California also has not made a "strong showing" that its arguments are likely to succeed. California's GIPA provides that "a direct-to-consumer genetic testing company shall . . . obtain a consumer's separate and express consent for . . . [e]ach transfer or disclosure of the consumer's genetic data or biological sample to a third party other than to a service provider." Cal. Civ. Code § 56.181(a)(2)(D). California asserts the Bankruptcy Court "misread" this law when it held that the TTAM Sale did not involve a transfer to a "third party." Mot. at 6–12. But the Bankruptcy Court properly determined that the NewCo Sale did not violate GIPA because the term "third party"—which is undefined under GIPA—"is commonly understood to exclude affiliates." Ex. E at 25. In so doing, the Bankruptcy Court gave "the words their usual, ordinary meaning," in accordance with principles of statutory construction used by California courts. *Id.* The Bankruptcy Court also reasoned that GIPA contains an "implicit exception for subsidiaries or affiliates of the company."

*Id.* at 23.   After discussing many examples of the absurd results required by California's (and other states') readings, the Bankruptcy Court concluded that "[t]o interpret these statutes to require separate express consent for every transfer to an affiliate would hamper a genetic-testing company's ability to organize itself, to operate, and, in important respects, to protect the interests of customers."  *Id.* at 23–24.  The Bankruptcy Court also held GIPA was inapplicable to the second step of the TTAM Sale—TTAM's purchase of the equity in NewCo—because on their face, the state statutes do not apply to equity sales.  *Id.* at 26.

California alleges two "legal errors" in the Bankruptcy Court's interpretation of GIPA.  Neither argument has merit.

*First*, California alleges that the Bankruptcy Court erred in creating a "loophole" by allowing a company to create a subsidiary and then sell the equity of that subsidiary to a buyer, thereby "evading" GIPA.  Mot. at 6–9.  But the Bankruptcy Court applied the plain language of the statutory text in determining that nothing in GIPA "purports to prohibit or condition a change of ownership of or sale of equity in a direct-to-consumer testing company."  Ex. E at 26.  Notably, California *conceded* that point in the Bankruptcy Court:

> THE COURT:  . . . So as I understand it, and I think this applies to all five [objecting] states, the state regulates transfers of genetic information but not ownership of the companies that hold that information; is that fair?
>
> MR. NADAL:  I believe that's fair, Your Honor.

Ex. F, June 20, 2025, Sale Hr'g Tr. at 300:15–19.

The Bankruptcy Court did not create a "loophole" but instead interpreted the scope of the statute in accordance with its plain meaning and consistent with California's ***own position***.  Nor is there any "loophole" at all.  GIPA plainly does not regulate transfers of ownership interests in a genetic testing company.  Otherwise GIPA would be violated every time the publicly traded stock of 23andMe traded on Nasdaq.

*Second*, the Bankruptcy Court twice properly rejected California's arguments that "third party" in GIPA includes a wholly owned subsidiary, and California cites no contrary caselaw.[4]  Instead, California asserts that other California state statutes, unlike GIPA, have express subsidiary or affiliate exceptions, but the statutes cited by California are easily distinguished.  Four of the five statutes do not use the term "third party" at all, much less define it.  *See* Cal. Civ. Code §§ 798.80, 1785.16.2, 1785.20.1, 1794.4.   The remaining statute, Cal. Civ. Code § 56.265, actually ***supports*** the Bankruptcy Court's ruling.  That statute prohibits disclosing certain health information to any "***affiliated or nonaffiliated third party*** for use with regard to the granting of credit."  *Id.* (emphasis added).  If "third party" always meant both "affiliated and unaffiliated" entities, as California contends, the words "affiliated

---

[4]  California's discussion of the "'separate entity theory,'"—i.e., the general principle of corporate separateness—has no bearing on whether the term "third party" in GIPA includes affiliates. Mot. at 14.

and unaffiliated" would be surplusage.  *See TRW Inc.* v. *Andrews*, 534 U.S. 19, 31 (2001).  GIPA does not modify "third party" in a this way.  California's convoluted attempt to distinguish cases cited by the Bankruptcy Court in support of its interpretation of "third party" also fail.  *See* Mot. at 10–11.  Moreover, on appeal, California must overcome alternative grounds for affirmance: the Bankruptcy Code preempts state law that would prohibit a sale that is expressly authorized under section 363, *see* Ex. G, Sale Reply ¶¶ 100–05, and GIPA by its terms does not restrict transfers ***within*** a genetic testing company—which is all the sale from the Debtors to NewCo accomplishes given the entities are under common ownership and control—it only restricts transfers ***from*** a genetic testing company."  Ex. E at 21 n.13.

California also argues that the transaction structure "is outside the bounds of what can be accomplished through [section] 363" and violates the "Bankruptcy Code's procedures and protections."  Mot. at 14–15.  California also asserts that "there are no wasting assets at issue here that would necessitate a [section] 363 sale."  Mot. at 13.

California wholly fails to explain by reference to the statutory text ***how*** section 363 prohibits the TTAM Sale, or why the Bankruptcy Court, which frequently evaluates such sales and reviewed the TTAM Sale in detail, allegedly got it wrong.  California does not argue (nor could it) that a debtor is prohibited from selling

15

substantially all of its assets under section 363, and California cites no authority supporting the claim that the NewCo Sale is an inappropriate way to structure such a sale.  The Debtors formed NewCo with the Bankruptcy Court's express authorization under section 363(b) of the Sale Order, defeating any claim that the Debtors are acting outside of the bounds of their authority in forming NewCo.  Ex. A, Sale Order ¶ 7.  Nor are California's allegations of "gamesmanship" remotely credible.  The Debtors pivoted to this transaction structure not to "violate" state law but precisely because numerous states made clear that a sale of equity *complied* with state law and would resolve their objections.  The Equity Sale Toggle was a modification that helped resolve objections from 28 states.

The Debtors can sell assets under section 363 whether they are "wasting assets" or not.  *See, e.g.*, *In re Lionel Corp.*, 722 F.2d 1063, 1069 (2d Cir. 1983) ("[W]e reject the requirement that only an emergency permits the use of § 363.").  Regardless, there *are* wasting assets here; the Debtors are not profitable and expend hundreds of thousands of dollars *per day*.  Ex. H, Kvarda Decl. ¶¶ 8–9.  An expeditious closing of the TTAM Sale is critical to economic recoveries for stakeholders.

   (c) <u>California's Arguments Regarding Section 363(m) Are Irrelevant</u>

Section 363(m) of the Bankruptcy Code protects good faith purchasers from reversal or modifications of section 363(b) sales—like the TTAM Sale—on appeal.

16

California argues that TTAM and NewCo are not entitled to these protections. But these arguments are irrelevant to success on the merits because section 363(m) only deals with the *remedies* available on appeal. It has nothing to do with California's chances of obtaining a reversal of the Sale Order on appeal. Section 363(m) simply provides that *if* the Sale Order is reversed or modified on appeal, it would not affect the validity of the sale if the purchaser is a "good faith" purchaser.

### (ii)    California Fails to Demonstrate Irreparable Injury

"[T]o demonstrate irreparable harm, a party must show that the harm is certain and great and of such imminence that there is a clear and present need for equitable relief." *Iowa Utils. Bd.* v. *F.C.C.*, 109 F.3d 418, 425 (8th Cir. 1996); *see also Packard Elevator* v. *I.C.C.*, 782 F.2d 112, 115 (8th Cir. 1986) (harm "must be actual and not theoretical," and movant must "show that the alleged harm will directly result from the action which [it] seeks to enjoin").

*First*, California contends that it suffers irreparable injury from the Bankruptcy Court's supposed "misinterpretation and misapplication of GIPA" because it has a "sovereign interest" in its laws. Mot. at 17–18. But California points to no authority that a "misinterpretation" of state law constitutes an irreparable injury to a "sovereign interest." And such an injury, even if it existed, is not irreparable. *Cf. In re Mount Moriah Elevator, Inc.*, 146 B.R. 451, 452 (W.D. Mo. 1992) (court's decision "create[ing] a precedent which might have an adverse impact on other

17

situations" not irreparable harm).  California itself argues it has recourse to impose fines for non-compliance with its laws.  Mot. at 19.  The Debtors dispute that conclusion, but California cannot argue both that it has recourse **and also** irreparable injury.

*Second*, California contends that customers who are unable to delete their data may be harmed.  Mot. at 18.  But California has offered no evidence that such customers exist in its state, let alone articulate what **irreparable** harm these hypothetical customers might suffer.  To the contrary, the unrebutted evidence at the Sale Hearing showed that, upon closing of the TTAM Sale, customers' genetic information will remain in the same place, under the same management, and under the ownership of an entity controlled by the Debtors' founder and largest pre-petition shareholder and former CEO undercutting any argument that consumers will be harmed.  Ex. E at 17.  Nor does the possibility of mootness establish irreparable harm.  *See, e.g.*, *In re Eletson Holdings Inc.*, 2025 WL 726248, at *9 (Bankr. S.D.N.Y. 2025) ("[M]erely involving equitable mootness . . . is not sufficient to demonstrate irreparable harm." (internal quotation marks and citations omitted)).

California also never explains how it can claim irreparable injury from approval of the Sale Order if the most likely alternative is for the Debtors to exercise the Plan Toggle and sell their equity to TTAM via a plan of reorganization.  That alternative will be more expensive, time consuming, and wasteful, but will put the

18

parties in exactly the same place, and California has never argued that a sale of equity in the reorganized Debtors through a chapter 11 plan implicates GIPA. Of course, an equity sale does not offend California state law, otherwise 23andMe could never have been publicly traded—which it is today.

### (iii)    A Stay Would Cause Substantive Harm to the Debtors

The harm from a stay to the Debtors and its stakeholders is real, substantial, and imminent.

### (a)    A Stay Jeopardizes Stakeholder Recovery by Threatening to Derail the TTAM Sale Closing

A stay of the Sale Order creates several risks to the transaction. The TTAM APA includes the following condition to closing: "the Sale Order . . . shall have been entered by the Bankruptcy Court **and shall not be subject to stay as of Closing**." Ex. B § 9.3(b) (emphasis added). The TTAM APA states that "this Agreement may be terminated . . . by Purchaser, . . . in the event that . . . one or more of the conditions to Purchaser's obligation to effect the Closing is or becomes impossible to satisfy at any time after the Execution Date . . . ." *Id.* § 10.1(e). Thus, as the Bankruptcy Court already found, a stay threatens to derail the TTAM Sale. Ex. K at 79:20–25. The Debtors do not have a court-approved alternative to the TTAM Sale. Even if the Backup Bid is approved, its purchase price is more than $150 million less than the TTAM Sale. Without the proceeds that would come from consummation of the TTAM Sale, the Debtors' stakeholders—creditors and shareholders—will suffer

19

substantial harm to the order of tens or hundreds of millions of dollars. Ex. E at 17. If a stay is granted, the TTAM Sale **cannot proceed**.[5]

  (b)  A Stay Will Significantly Increase the Costs of the Chapter 11 Cases

California asserts that a stay will not cause substantive harm because "Debtors must still draft, propose and try to confirm a plan regardless" and that "there is no substantiation that the Debtors will be harmed should they proceed with a Chapter 11 plan instead of a § 363 transaction." Mot. at 20. But the factual findings of the Bankruptcy Court confirm, based on an unrebutted evidentiary record, that if the Debtors are forced to exercise the Plan Toggle option to proceed with the transaction under a plan of reorganization, the Debtors' chapter 11 cases will lose **at least** $20 million, consisting of operating costs that would be avoided upon closing of the TTAM Sale, and increased professional and administrative expenses, including interest payments on the Debtors' DIP Facility. Ex. H ¶ 11. Even a limited extension of the stay would, in effect, force the Debtors to exercise the Plan Toggle immediately since, if the Debtors are to consummate a plan under the Plan Toggle,

---

[5]  A stay "limited" only to California customers would derail the TTAM Sale all the same as a stay applicable to the entire TTAM Sale because the Debtors agreed to certain representations and warranties in the TTAM APA regarding the transferability of Industry Data and Personal Information (both as defined in the TTAM APA). *See* Ex. B, §§ 5.1(l), (w). If the Debtors cannot transfer the Industry Data and Personal Information of California customers on the closing date, these representations and warranties are arguably not true and correct in all material respects. This risks termination of the entire transaction by TTAM.

the TTAM APA requires them to obtain a confirmation hearing on that plan by September 15, 2025. Ex. B § 11.8.

Moreover, the Debtors have a debtor-in-possession financing loan—the DIP Facility—that matures on September 30, 2025, Ex. H ¶ 9, by which point the plan may not yet be confirmed and effectuated, the Debtors may not have the requisite funds to repay the DIP Facility. Thus, a stay risks that the Debtors default on the DIP Facility, which would result in a foreclosure and seizure of their assets, *including customers' genetic information*.

### (iv)   Public Interest Weighs Against a Stay

The public interest disfavors stays because "the public interest favors the expedient administration of the bankruptcy proceedings." *See In re Savage & Assocs., P.C.*, 2005 WL 488643, at *2 (S.D.N.Y. Feb. 28, 2005). A stay would result in substantial delay to the Debtors' bankruptcy cases and would impose significant costs on the Debtors' estates, both delaying and directly reducing creditors' recoveries in these chapter 11 cases. Ex. H ¶¶ 8–9. A stay is even less appropriate on these facts, where, as the Bankruptcy Court recognized, customers and other constituencies will be *better off* if the TTAM Sale is effectuated. Ex. E at 17–19.

## B.   Any Stay Should Be Secured by a Bond of No Less than $325 Million

The Bankruptcy Court concluded that, if it were to grant a stay, it would require California to post a bond of either $305 million (the purchase price under the

TTAM APA) or $20 million (the estimated additional costs associated with the Plan Toggle). Ex. K at 81:3–14. Because a bond protects "against loss caused by an unsuccessful attempt to reverse the holding of the bankruptcy court," any continued stay should be conditioned on California posting a bond in the full amount of the potential harm to the Debtors: $325 million. *See In re Motors Liquidation Co.*, 539 B.R. 676, 686 (Bankr. S.D.N.Y. 2015).

California argues that "[a] bond is unnecessary and inappropriate because this appeal is not from a monetary judgment." Mot. at 20. But Bankruptcy Rule 8007 does not limit bonds to cases involving a monetary judgment, and courts routinely require bonds for appeals of bankruptcy sales. *See, e.g.*, *Ratcliff* v. *Rancher's Legacy Meat Co.*, 2020 WL 4048509, at *14–15 (imposing $6 million bond to stay bankruptcy sale of property for $5.08 million). California relies only on *In re Sindesmos Hellinikes-Kinotitos of Chicago*, but it is inapposite—there, unlike here "closing was not imminent," "alleviating" the court's concerns that the non-movant would be harmed. 607 B.R. 898, 911–12 (Bankr. N.D. Ill. 2019). And California's assertion that the Court should waive a bond because California is "acting in the public interest," Mot. at 21, should be rejected where, as discussed, the public interest weighs ***against*** a stay.

*Finally,* California has been on notice since at least the Sale Hearing that a bond may be ordered in connection with any stay. It has had ample time to prepare for that possibility.

Dated: July 9, 2025                          Respectfully submitted,
St. Louis, Missouri

**Carmody MacDonald P.C.**
*/s/ Thomas H. Riske*
Thomas H. Riske #61838MO
Nathan R. Wallace #74890MO
Jackson J. Gilkey #73716MO
120 S. Central Avenue, Suite 1800
St. Louis, Missouri 63105
Telephone:  (314) 854-8600
Facsimile:  (314) 854-8660
Email:      thr@carmodymacdonald.com
            nrw@carmodymacdonald.com
            jjg@carmodymacdonald.com

- and -

**PAUL, WEISS, RIFKIND, WHARTON
& GARRISON LLP**
Paul M. Basta (*pro hac vice* forthcoming)
Christopher Hopkins (*pro hac vice*
forthcoming)
William A. Clareman (*pro hac vice* forthcoming)
Jeffrey J. Recher (*pro hac vice* forthcoming)
Jessica I. Choi (*pro hac vice* forthcoming)
Grace C. Hotz (*pro hac vice* forthcoming)
Lyuba Shamailova (*pro hac vice* forthcoming)
1285 Avenue of the Americas
New York, New York 10019
Telephone:  (212) 373-3000
Facsimile:  (212) 757-3990
Email:      pbasta@paulweiss.com
            chopkins@paulweiss.com
            wclareman@paulweiss.com
            jrecher@paulweiss.com
            jchoi@paulweiss.com
            ghotz@paulweiss.com
            lshamailova@paulweiss.com

*Counsel to the Debtors and Debtors in
Possession*

## <u>CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMIT, TYPEFACE REQUIREMENTS, AND TYPE-STYLE REQUIREMENTS</u>

1.    This document complies with the word limit of Fed. R. Bankr. P. 8013(f)(3)(A) because, excluding the parts of the document exempted by Fed. R. Bankr. P. 8015(g), this document contains 5,194 words.

2.    This document complies with the typeface requirements of Fed. R. Bankr. P. 8015(a)(5) and the type-style requirements of Fed. R. Bankr. P. 8015(a)(6) because this document has been prepared in a proportionally spaced typeface in 14 point Times New Roman font.

Dated: July 9, 2025                    */s/ Thomas H. Riske*
                                       Thomas H. Riske #61838MO

## **CERTIFICATE OF SERVICE**

I hereby certify that on the 9th of July, 2025, I caused a true and correct copy of the foregoing to be electronically filed with the Clerk of the Court and served on all counsel of record through the Court's CM/ECF system.

Dated: St. Louis, Missouri
      July 9, 2025

                                    *_/s/ Thomas H. Riske_*
                                    Thomas H. Riske #61838MO
                                    120 S. Central Avenue, Suite 1800
                                    St. Louis, Missouri 63105
                                    Telephone:  (314) 854-8600
                                    Facsimile:   (314) 854-8660
                                    Email:         thr@carmodymacdonald.com

## Appendix A

### Glossary of Defined Terms

| Term | Definition |
| --- | --- |
| Acquired Assets | The Debtors' assets that TTAM has agreed to purchase under the TTAM APA, which include (i) all of the customer data in the Debtors' possession, including genetic data, (ii) contracts proposed to be assumed by the Debtors and assigned to TTAM in connection with the sale, and (iii) certain of the Debtors' intellectual property. |
| Assumed Liabilities | The Debtors' liabilities that TTAM has agreed to assume under the TTAM APA, which include (i) cure amounts for contracts that will be assumed by the Debtors and assigned to TTAM in connection with the sale subject to the cap set forth in the TTAM APA, (ii) liabilities related to benefits that will be assumed by TTAM in connection with the sale, and (iii) liabilities relating customer loyalty programs and promotions, among other things. |
| Bankruptcy Code | Title 11 of the United States Code. |
| Bankruptcy Court | The United States Bankruptcy Court for the Eastern District of Missouri. |
| Bankruptcy Rules | The Federal Rules of Bankruptcy Procedure. |
| Bidding Procedures Order | The *Order (I) Approving Bidding Procedures for the Sale of the Debtors' Assets, (II) Scheduling Certain Dates and Deadlines with Respect Thereto, (III) Approving the Form and Manner of the Notice Thereof, (IV) Approving Procedures Regarding Entry into Stalking Horse Agreement(s), if Any, (V) Establishing Notice and Procedures for the Assumption and Assignment of Contracts and Leases, (VI) Approving Procedures for the Sale, Transfer, or Abandonment of De Minimis Assets, and (VII) Granting* |

|  | *Related Relief* [BR ECF 125], which established procedures to govern the auction and sale processes. |
|---|---|
| Court | The United States District Court for the Eastern District of Missouri. |
| Debtors | 23andMe Holding Co. (0344), 23andMe, Inc. (7371), 23andMe Pharmacy Holdings, Inc. (4690), Lemonaid Community Pharmacy, Inc. (7330), Lemonaid Health, Inc. (6739), Lemonaid Pharmacy Holdings Inc. (6500), LPharm CS LLC (1125), LPharm INS LLC (9800), LPharm RX LLC (7746), LPRXOne LLC (3447), LPRXThree LLC (3852), and LPRXTwo LLC (1595). |
| Debtor HoldCo | The Debtor entity that owns 100% of the equity interests of NewCo. |
| DIP Facility | The Debtors' $60 million non-amortizing priming super-priority senior secured postpetition credit facility. |
| Equity Sale Toggle | An option provided for by the TTAM APA that allows the Debtors to elect to consummate the TTAM Sale through an equity sale. |
|  | The Debtors filed a notice with the Bankruptcy Court on June 14, 2025 disclosing their decision to proceed with the Equity Sale Toggle structure after several states, which initially objected to the TTAM Sale, argued that such transaction structure would comply with their state laws. |
|  | Pursuant to the Equity Sale Toggle, the Debtors will sell substantially all of the Acquired Assets and transfer substantially all of the Assumed Liabilities to NewCo and then Debtor HoldCo will sell 100% of its equity interests in NewCo to TTAM. |
|  | The Equity Sale Toggle was included in both version of the TTAM APA filed with the Bankruptcy Court on May 19, 2025 and June 13, 2025, respectively. |
|  | TTAM has agreed to provide the Privacy Enhancements if the TTAM sale is consummated through the Equity Sale Toggle structure. |

| | |
|---|---|
| Final Procedures Order | The *Order (I) Establishing Procedures for the Submission of Final Proposals From the Backup Bidder and Successful Bidder and (II) Granting Related Relief* [BR ECF 657], which approved agreed to terms (among the Debtors, TTAM, and Regeneron) of procedures to govern a final round of bidding, which occurred on June 13, 2025. |
| GIPA | California's Genetic Information Privacy Act, codified at Cal. Civ. Code §§ 56.18–56.186. |
| Kvarda Declaration | *Declaration of Matthew Kvarda in Support of the Debtors' Opposition to the Motions to Stay Sale Order Pending Appeal* [BR ECF 950], attached hereto as **Exhibit H.**  Mr. Kvarda is a Managing Director of Alvarez & Marsal North America, LLC, a restructuring advisory services firm, and the Chief Restructuring Officer of 23andMe Holding Co. |
| Motion | *The People of the State of California's Emergency Motion for a Stay Pending Appeal* [Docket No. 8]. |
| NAAG Objection | *The States' Objection to the Debtors' Proposed Sale of Customers' Assets* [BR ECR 687], which was filed by the National Association of Attorneys General ("NAAG") on behalf of several states, was not ultimately prosecuted following negotiations with the Debtors and TTAM, and is attached hereto as **Exhibit C.** |
| NewCo | A wholly owned subsidiary of Debtor HoldCo, formed pursuant to paragraph 7 of the Sale Order and with the Court's express authorization to effectuate the TTAM Sale. |
| NewCo Sale | The first step of the TTAM Sale, whereby the Debtors will sell substantially all of the under the TTAM APA to NewCo. |
| Opinion | The Bankruptcy Court's 38-page *Memorandum Opinion* [BR ECF 908], approving the TTAM Sale, attached hereto as **Exhibit E**. |

| | |
|---|---|
| Plan Toggle | An option provided for by the TTAM APA that allows the Debtors to consummate the TTAM Sale under a chapter 11 plan. |
| | The Debtors' advisors have estimated that consummating the TTAM Sale through the Plan Toggle will result in the Debtors incurring additional costs and expenses of at least $20 million. |
| | TTAM has not agreed to provide the Privacy Enhancements if the sale is consummated under a chapter 11 plan. |
| Privacy Enhancements | Certain additional privacy protections that TTAM has agreed to provide for the benefit of the Debtors' customers, including TTAM's agreement to (i) comply with applicable laws, even if it otherwise might be excused from complying with such laws because of its status as a non-profit, (ii) not to share personal information with insurance companies, (iii) form an independent consumer privacy advisory board, and (iv) provide consumers with two years of identity-theft monitoring. |
| | TTAM has agreed to provide the Privacy Enhancements only in the event the TTAM Sale is consummated under section 363 of the Bankruptcy Code. |
| | The Privacy Enhancements are listed on Exhibit D to the TTAM APA. |
| Regeneron | Regeneron Pharmaceuticals, Inc., who the Debtors selected as the backup bidder, with a bid of $151 million. |
| Sale Hearing | The two-day hearing before the Bankruptcy Court, occurring on June 18 and 20, 2025, during which the court heard extensive argument and after which the Bankruptcy Court approved the TTAM Sale. |
| Sale Order | The *Order (I) Approving (A) the Debtors' Entry into the Sale Transaction Documents, (B) the Sale to the Purchaser of the Acquired Assets Free and Clear of all Liens, Claims, Interests, and Encumbrances, and (C) the Assumption and Assignment of Certain Executory Contracts and Unexpired Leases; (II) Authorizing the Debtors to Consummate* |

|  | *Transactions in Connection Therewith; and (III) Granting Related Relief* [BR ECF No. 910], attached hereto as **<u>Exhibit A</u>**. |
|---|---|
| Sale Reply | *Debtors' Omnibus Reply in Support of Entry of the Sale Order* [BR ECF 771], attached hereto as **<u>Exhibit G.</u>** |
| Stay Motion Hearing | The July 7, 2025, hearing on California's motion for a stay pending appeal filed in the Bankruptcy Court, at which the Bankruptcy Court denied California's stay motion. |
| TTAM | TTAM Research Institute, who the Debtors selected as the winning bidder, with a  bid of $305 million.  TTAM's principal, Anne Wojcicki, is a co-founder of 23andMe, a current director, and, until the filing of these bankruptcy proceedings, was the company's chief executive officer, controlling shareholder, and chair of the board of directors. |
| TTAM APA | The asset purchase agreement governing the TTAM Sale, attached hereto as **<u>Exhibit B</u>**. |
| TTAM Sale | A sale of the Debtors' assets to TTAM pursuant to the TTAM APA, which generates $305 million in value for the Debtors' estates. |