**Exhibit F**

1        IN THE UNITED STATES BANKRUPTCY COURT
             EASTERN DISTRICT OF MISSOURI
2
   In Re:                        )  Case No. 25-40976
3                                )  St. Louis, Missouri
   23ANDME HOLDING CO., et al.   )
4                                )
        Debtors.                 )  June 20, 2025
5                                )  9:03 AM
   _____  )
6

7

                   TRANSCRIPT OF HEARING RE:
8                       SALE HEARING
   DEBTORS' MOTION FOR ENTRY OF AN ORDER (I) APPROVING BIDDING
9  PROCEDURES FOR THE SALE OF THE DEBTORS ASSETS, (II) SCHEDULING
        CERTAIN DATES AND DEADLINES WITH RESPECT THERETO, (III)
10    APPROVING THE FORM AND MANNER OF THE NOTICE THEREOF, (IV)
        APPROVING PROCEDURES REGARDING ENTRY INTO STALKING HORSE
11  AGREEMENT(S), IF ANY, (V) ESTABLISHING NOTICE AND PROCEDURES
        FOR THE ASSUMPTION AND ASSIGNMENT OF CONTRACTS AND LEASES,
12  (VI) AUTHORIZING THE SALE OF THE DEBTORS ASSETS FREE AND CLEAR
    OF LIENS, CLAIMS, INTERESTS, AND ENCUMBRANCES, (VII) APPROVING
13       PROCEDURES FOR THE SALE, TRANSFER, OR ABANDONMENT OF DE
    MINIMIS ASSETS, AND (VIII) GRANTING RELATED RELIEF. FILED BY
14        DEBTOR 23ANDME HOLDING CO. (RISKE, THOMAS) (30)
    NOTICE OF (I) POTENTIAL ASSUMPTION AND ASSIGNMENT OF CERTAIN
15   EXECUTORY CONTRACTS AND UNEXPIRED LEASES AND (II) PROPOSED
             CURE AMOUNTS (RISKE, THOMAS) (591)
16          BEFORE THE HONORABLE BRIAN C. WALSH
                UNITED STATES BANKRUPTCY COURT
17

18
   ECRO                              Kim Reitz
19

20

21
   Transcription Services:          eScribers, LLC
22                                   7227 N. 16th Avenue
                                     Suite #207
23                                   Phoenix, AZ 85020
                                     (800) 257-0885
24
   PROCEEDINGS RECORDED BY ELECTRONIC SOUND RECORDING.
25 TRANSCRIPT PRODUCED BY TRANSCRIPTION SERVICE



```
 1    APPEARANCES:

 2    For the Debtors:                THOMAS H. RISKE, ESQ.
                                      CARMODY MACDONALD P.C.
 3                                    120 South Central Avenue
                                      Suite 1800
 4                                    St. Louis, MO 63105

 5                                    PAUL M. BASTA, ESQ.
                                      WILLIAM A. CLAREMAN, ESQ.
 6                                    CHRISTOPHER HOPKINS, ESQ.
                                      JEFFREY J. RECHER, ESQ.
 7                                    PAUL, WEISS, RIFKIND,
                                      WHARTON & GARRISON LLP
 8                                    1285 Avenue of the
                                      Americas
 9                                    New York, NY 10019

10    For TTAM Research Institute:    DAVID M. UNSETH, ESQ.
                                      BRYAN CAVE LEIGHTON
11                                    PAISNER LLP
                                      211 North Broadway
12                                    Suite 3600
                                      St. Louis, MO 63102
13
                                      SUSHEEL KIRPALANI, ESQ.
14                                    QUINN EMANUEL URQUHART &
                                      SULLIVAN LLP
15                                    295 5th Avenue
                                      9th Floor
16                                    New York, NY 10016

17                                    JOSEPH O. LARKIN, ESQ.
                                      SKADDEN, ARPS, SLATE,
18                                    MEAGHER & FLOM LLP
                                      920 North King Street
19                                    Wilmington, DE 12801

20    For State of Texas:             ROMA N. DESAI, AAG
                                      LAYLA D. MILLIGAN, AAG
21                                    MONICA WADLEIGH, AAG
                                      TEXAS OFFICE OF THE
22                                    ATTORNEY GENERAL
                                      PO Box 12548
23                                    Austin, TX 78711

24

25
```



```
 1
     For JMB Capital Partners Lending,    JOSHUA WATTS, ESQ.
 2   LLC:                                  NORTON ROSE FULBRIGHT US
                                           LLP
 3                                         7676 Forsyth Boulevard
                                           Suite 2230
 4                                         St. Louis, MO 63105

 5                                         JAMES A. COPELAND, ESQ.
                                           ROBERT M. HIRSH, ESQ. (VIA
 6                                         WEBEX)
                                           NORTON ROSE FULBRIGHT US
 7                                         LLP
                                           1301 Avenue of the
 8                                         Americas
                                           New York, NY 10019
 9
     For NAAG Client States:              ABIGAIL R. RYAN, ESQ.
10                                         NATIONAL ASSOCIATION OF
                                           ATTORNEYS GENERAL
11                                         1850 M Street, Northwest
                                           12th Floor
12                                         Washington, DC 20036

13   For Data Breach Class Action         NORMAN SIEGEL, ESQ.
     Plaintiffs:                           STUEVE SIEGEL HANSON LLP
14                                         460 Nichols Road
                                           Suite 200
15                                         Kansas City, MO 64112

16                                         CARI CAMPEN LAUFENBERG,
                                           ESQ. (VIA WEBEX)
17                                         KELLER ROHRBACK LLP
                                           1201 3rd Avenue
18                                         Suite 3400
                                           Seattle, WA 98101
19
                                           GAYLE M. BLATT, ESQ. (VIA
20                                         WEBEX)
                                           CASEYGERRY
21                                         110 Laurel Street
                                           San Diego, CA 92101
22
     For State of Minnesota:              DALILA Z. JORDAN, AAG
23                                         MINNESOTA ATTORNEY
                                           GENERAL'S OFFICE
24                                         445 Minnesota Street
                                           Suite 1400
25                                         St. Paul, MN 55101
```



```
 1

 2    For Official Committee of           MIRANDA SWIFT, ESQ.
      Unsecured Creditors:                STINSON LLP
 3                                        1201 Walnut Street
                                          Suite 2900
 4                                        Kansas City, MO 64106

 5                                        JASON R. ADAMS, ESQ.
                                          MAEGHAN J. MCLOUGHLIN,
 6                                        ESQ.
                                          ERIC R. WILSON, ESQ.
 7                                        KELLEY DRYE & WARREN LLP
                                          175 Greenwich Street
 8                                        New York, NY 10007

 9    For State of Missouri:              ALISON ESBECK, ESQ.
                                          MISSOURI ATTORNEY
10                                        GENERAL'S OFFICE
                                          815 Olive Street
11                                        Suite 200
                                          St. Louis, MO 63101
12
      For State of Tennessee:             MARVIN E. CLEMENTS, ESQ.
13                                        TENNESSEE ATTORNEY
                                          GENERAL'S OFFICE
14                                        PO Box 20207
                                          Nashville, TN 37202
15
      For Oracle America, Inc.            SARAH E. TOMLINSON, ESQ.
16                                        SUMMERS COMPTON WELLS
                                          903 South Lindbergh
17                                        Boulevard
                                          Suite 200
18                                        St. Louis, MO 63131

19    For the People of the State of      DANIEL M. NADAL, ESQ.
      California:                         OFFICE OF THE ATTORNEY
20                                        GENERAL
                                          600 West Broadway
21                                        Suite 1800
                                          San Diego, CA 92101
22
                                          BERNARD ARDAVAN ESKANDARI,
23                                        ESQ. (VIA WEBEX)
                                          CALIFORNIA DEPARTMENT OF
24                                        JUSTICE
                                          300 South Spring Street
25                                        Suite 1702
```

```
 1                                        Los Angeles, CA 90013

 2
      For Regeneron Pharmaceuticals,      MICHAEL H. CASSEL, ESQ.
 3    Inc.:                               WACHTELL, LIPTON, ROSEN &
                                          KATZ
 4                                        51 West 52nd Street
                                          New York, NY 10019
 5
      For Ad Hoc Equity Group:            SPENCER P. DESAI, ESQ.
 6                                        THE DESAI LAW FIRM, LLC
                                          13321 North Outer Forty
 7                                        Road
                                          Suite 300
 8                                        St. Louis, MO 63017

 9                                        ANDREW M. CARTY, ESQ. (VIA
                                          WEBEX)
10                                        SHARON I. DWOSKIN, ESQ.
                                          (VIA WEBEX)
11                                        BROWN RUDNICK LLP
                                          7 Times Square
12                                        New York, NY 10036

13    For Office of the United States     JOSEPH SCHLOTZHAUER, ESQ.
      Trustee:                            U.S. DEPARTMENT OF JUSTICE
14                                        111 South 10th Street
                                          Suite 6.353
15                                        St. Louis, MO 63102

16    For Neil M. Richards:               ROSS E. FIRSENBAUM, ESQ.
                                          ANDREW N. GOLDMAN, ESQ.
17                                        (VIA WEBEX)
                                          WILMER CUTLER PICKERING
18                                        HALE & DORR LLP
                                          250 Greenwich Street
19                                        New York, NY 10007

20    For United States of America:       JOSHUA M. JONES, ESQ.
                                          U.S. ATTORNEY'S OFFICE
21                                        111 South 10th Street
                                          Suite 20.333
22                                        St. Louis, MO 63102

23    For BambuMeta Ventures, LLC:        STEVEN M. WALLACE, ESQ.
                                          GOLDENBERG HELLER &
24                                        ANTOGNOLI, P.C.
                                          2227 South State Route 157
25                                        Edwardsville, IL 62025
```

|    |                                                                                   |                                                                                                                   |
|----|-----------------------------------------------------------------------------------|-------------------------------------------------------------------------------------------------------------------|
| 1  |                                                                                   |                                                                                                                   |
| 2  |                                                                                   |                                                                                                                   |
| 3  | Local Counsel to Special Board of Directors:                                      | LAWRENCE E. PARRES, ESQ. LEWIS RICE LLC 600 Washington Avenue                                                     |
| 4  |                                                                                   | Suite 2500 St. Louis, MO 63101                                                                                    |
| 5  |                                                                                   |                                                                                                                   |
| 6  | For Intellectual Property, Health Law, and Bioethics Scholars:                    | STEVEN T. WATERMAN, ESQ. (VIA WEBEX) DORSEY & WHITNEY LLP                                                          |
| 7  |                                                                                   | 111 South Main Street Suite 2100                                                                                  |
| 8  |                                                                                   | Salt Lake City, UT 84111                                                                                          |
| 9  | For State of Alaska:                                                              | J. PAIGE SMOTHERS, ESQ. (VIA WEBEX)                                                                               |
| 10 |                                                                                   | ALASKA DEPARTMENT OF LAW 1031 West 4th Avenue                                                                     |
| 11 |                                                                                   | Suite 200 Anchorage, AK 99501                                                                                     |
| 12 |                                                                                   |                                                                                                                   |
| 13 | For State of Oregon:                                                              | JUSTIN D. LEONARD, AAG (VIA WEBEX)                                                                                |
| 14 |                                                                                   | OREGON DEPARTMENT OF JUSTICE                                                                                       |
| 15 |                                                                                   | 1162 Court Street, Northeast Salem, OR 97301                                                                      |
| 16 |                                                                                   |                                                                                                                   |
| 17 | For U.S. Department of Justice, National Security Division and United States Postal Service: | SETH B. SHAPIRO, ESQ. (VIA WEBEX) U.S. DEPARTMENT OF                                                    |
| 18 |                                                                                   | JUSTICE-CIVIL DIVISION 1100 L Street, Northwest                                                                   |
| 19 |                                                                                   | Room 10012 Washington, DC 20005                                                                                   |
| 20 |                                                                                   |                                                                                                                   |
| 21 | For State of Delaware:                                                            | SHELLEY A. KINSELLA, ESQ. (VIA WEBEX)                                                                             |
| 22 |                                                                                   | BRIAN CANFIELD, ESQ. (VIA WEBEX)                                                                                  |
| 23 |                                                                                   | DELAWARE DEPARTMENT OF JUSTICE                                                                                     |
| 24 |                                                                                   | 820 North French Street Wilmington, DE 19801                                                                      |
| 25 |                                                                                   |                                                                                                                   |



```
 1

 2
    For the State of Utah:              DOUGLAS J. CRAPO, ESQ.
 3                                      (VIA WEBEX)
                                        UTAH OFFICE OF THE
 4                                      ATTORNEY GENERAL
                                        160 East 300 South
 5                                      Fifth Floor
                                        Salt Lake City, UT 84114
 6
    For Commonwealth of Kentucky:       CHRISTOPHER HUNT, ESQ.
 7                                      (VIA WEBEX)
                                        KY OFFICE OF ATTORNEY
 8                                      GENERAL
                                        1024 Capital Center Drive
 9                                      Suite 200
                                        Frankfort, KY 40601
10
    For Commonwealth of Pennsylvania:   LAUREN A. MICHAELS, ESQ.
11                                      (VIA WEBEX)
                                        PA OFFICE OF ATTORNEY
12                                      GENERAL
                                        1251 Waterfront Place
13                                      Mezzanine Level
                                        Pittsburgh, PA 15222
14
    For State of New York:              CLARK RUSSELL, ESQ. (VIA
15                                      WEBEX)
                                        OFFICE OF THE NEW YORK
16                                      STATE ATTORNEY GENERAL
                                        The Capitol
17                                      Albany, NY 12224

18  For Various Amici Curiae:           JOHN TALBOT "TAL" SANT,
                                        JR., ESQ.
19                                      BECK & SANT, LLC
                                        11775 Borman Drive
20                                      Suite 216
                                        Maryland Heights, MO 63146
21
    Also Present:                       Anne Wojcicki
22                                      TTAM Research Institute

23                                      Andrew Swift
                                        Moelis & Company
24
                                        Peter Lefkowitz
25                                      Debtors' Interim Data
```



```
 1                                          Privacy Officer

 2
      Also Present (Cont'd):              Prof. Fred H. Cate
 3                                          University of Indiana

 4                                          Thomas Walper
                                            Debtors' Special Committee
 5
                                            Charles Viscito
 6                                          Class A Equity Shareholder

 7                                          Kevin Barnes
                                            Class A Shareholder
 8
                                            Anie Chang
 9                                          Class A Shareholder

10                                          Javier Luraschi
                                            Individual Investor
11
                                            Elizabeth Eichele
12                                          Pro Se, Customer of Debtor

13

14

15

16

17

18

19

20

21

22

23

24

25
```

Colloquy

1          THE CLERK:  23andMe Holding Co., et al.

2          THE COURT:  This is a continuation of our hearing

3    from the other day, so if you entered your appearance on

4    Wednesday, I don't think you need to do it again.  If there's

5    anybody newly entering an appearance in the courtroom, please

6    feel free.

7          MR. SANT:  Good morning, Your Honor.  Tal Sant, on

8    behalf of various amici curiae listed in exhibit A to the

9    brief and motion we filed at docket 807, including Linda

10   MacDonald Glenn, and a long list of names.  I won't read all

11   of them.

12         THE COURT:  All right.  Thank you, Mr. Sant.

13         MR. SANT:  Thank you.

14         THE COURT:  Anyone else in the courtroom?  New

15   appearances.

16         Anyone on the Webex with a new appearance?

17         All right.  Let's get underway.

18         MR. BARNES:  Good morning, Your Honor.  Kevin Barnes

19   (ph.), class A shareholder.

20         THE COURT:  Thank you, Mr. Barnes.

21         Please proceed, Mr. Hopkins.

22         MR. HOPKINS:  Good morning, Your Honor.  For the

23   record, Chris Hopkins of Paul Weiss as cocounsel to the

24   debtors.

25         So to start with some updates, pleased to report it



Colloquy

1   was a productive Juneteenth.  We are now down to just five

2   objecting states.  It's California, Texas, Kentucky, Tennessee

3   and Utah.  So we want to extend our thanks to the states that

4   work with us between the end of Wednesday's hearing and this

5   morning and to TTAM for helping to get those deals across the

6   finish line.

7           As we told Your Honor on Wednesday, I think we want

8   to be very efficient today.  So unless Your Honor has any

9   preliminary remarks or prefers otherwise, I would propose to

10  turn it over to my partner Jeffrey Recher to start with our

11  first witness today, who's Prof. Fred Cate, on direct.

12          THE COURT:  Sure.  Ms. Ryan may have a clarification.

13          MS. RYAN:  Sorry, guys.

14          MR. HOPKINS:  Oh, sure.

15          MS. RYAN:  I do this to you all the time.  Sorry, Mr.

16  Hopkins.

17          So while we have come and made a lot of work, it was

18  a successful Juneteenth, the NAAG states are going to stand on

19  their pleadings.  And to the extent that you overrule the next

20  state standing objection, we ask that it only be overruled as

21  to TTAM and that it stays in abatement as to Regeneron until

22  the TTAM sale closes and is final.  So if we have to come back

23  here, we already have a live objection.

24          THE COURT:  So that is a question that I had.  The

25  states are taking a different position with respect to TTAM



Colloquy

1    than they are with respect to Regeneron.  I don't know that we

2    need to figure that out at the beginning of today's hearing,

3    but we probably need to figure out before the hearing wraps up

4    how we're going to handle that.

5          MR. HOPKINS:  Your Honor, I can actually clarify

6    that.

7          THE COURT:  Okay.  Okay.

8          MR. HOPKINS:  As part of the progress we've made with

9    the states, what we, as the debtors have agreed to do is to

10   modify the sale order.  It was originally contemplated that

11   we'd be asking Your Honor to approve both the winning bid and

12   backup bid.  The way the sale order has been revised is if

13   Your Honor approves the sale order today, it will only be

14   authorizing the debtors to execute the winning bid to TTAM.

15   We don't expect anything to happen.  But if it were and we

16   were to need to pivot to the backup bid, we would have to come

17   back to Your Honor for a separate hearing to get authorization

18   to execute on the backup.

19         THE COURT:  Okay.  Well, that seems to sync well with

20   the way the states are approaching things.  So I think we'll

21   keep that in mind.  That's very helpful.

22         MS. RYAN:  And if I may, if now is the time, Your

23   Honor, or if you want me to address this later, the states do

24   want to move their exhibits into evidence.  And I believe

25   there's only one group of exhibits that have objections.  And



Colloquy

1  so I can do that now, or I can wait until it's a better time

2  for Your Honor.

3          THE COURT:  I'm trying to recall if I know what

4  your -- do you have an exhibit binder or --

5          MS. RYAN:  I do.  I do.  I have extra binders, and I

6  can bring them to you right now.

7          MR. HOPKINS:  Your Honor, if I could suggest, I

8  believe the way we'd like to proceed today, again, if it's

9  okay with Your Honor, is that we finish our evidence and then

10  we can get to all of the evidence of the other states so --

11          THE COURT:  Okay.  I think that makes sense --

12          MR. HOPKINS:  -- the objecting states, as well as

13  Matt (ph.).

14          THE COURT:  -- particularly if there are objections,

15  maybe in the -- maybe in the interim.

16          MR. HOPKINS:  That was not intentional, Your Honor.

17          THE COURT:  That's an old trick.  Come on.

18          MR. RECHER:  It's like a gavel bang, Your Honor.

19          THE COURT:  Yeah.  Ms. Ryan, why don't we wait till

20  we get into the states -- you're welcome to leave him there,

21  but why don't we wait until we get into the other states'

22  objections, and we'll deal with exhibits at that point?  And

23  like I said, maybe objections will get worked out between now

24  and then as well.

25          MR. HOPKINS:  Sure.



Colloquy

1            THE COURT:  Okay.  All right.

2            MS. RYAN:  That's a good plan.  Thank you.

3            THE COURT:  All right.  Anything else before we

4    begin?  Or resume.

5            MR. HOPKINS:  Not from the debtors, Your Honor.

6            THE COURT:  Before we resume.

7            MR. HOPKINS:  Before we resume.

8            THE COURT:  Okay.  Please proceed.

9            MR. HOPKINS:  All right.  Thank you, Your Honor.

10   I'll cede the podium to my partner Jeff Recher.

11           THE COURT:  Good morning.

12           MS. CHANG:  Hi.  Good morning.  Good morning, Your

13   Honor.  Sorry.  Sorry to interrupt.  I had myself on mute

14   earlier.  I was trying to enter an appearance.  Is that okay?

15           THE COURT:  Sure.  Go ahead.

16           MS. CHANG:  Angie Chang, a shareholder.

17           THE COURT:  Okay.  Thank you.

18           MS. CHANG:  Thank you.  Sorry about --

19           THE COURT:  Okay.  Mr. Recher.

20           MR. RECHER:  All right.  Good morning, Your Honor,

21   and for the record, Jeff Recher from Paul Weiss on behalf of

22   the debtors.  And as Mr. Hopkins mentioned, we would like to

23   begin this morning by calling Prof. Fred Cate from the

24   University of Indiana.

25           THE COURT:  All right.  Prof. Cate, would you come


www.escribers.net | 800-257-0885

Colloquy

1    forward, please?

2              Yes.  Yes.  And the nonparties will be headed to the

3    breakout room.

4              MR. RECHER:  And Your Honor, as everyone in the

5    courtroom heard, we do have a couple of binders to assist in

6    the direct examination of Prof. Cate.  If I could, I'm happy

7    to approach and hand some to you or your law clerks, as well

8    as to the other interested parties.

9              THE COURT:  I think we have your --

10             THE CLERK:  I gave you the debtors' binder.

11             THE COURT:  Yes.  Yes, I think we have the debtors'

12   binders, so I think we're --

13             MR. RECHER:  These are, I think, a binder for Prof.

14   Cate's direct testimony.

15             THE COURT:  Well, maybe we ought to take them in

16   that -- okay.

17             MR. RECHER:  All right.

18             THE COURT:  We'll take you up on that.  Thank you.

19             THE CLERK:  Mr. Cate, would you please stand and

20   raise your right hand?  Please state your name for the record.

21        (Witness sworn)

22             THE CLERK:  Thank you.  You can sit.  Please speak

23   directly into the microphone.

24   DIRECT EXAMINATION

25   BY MR. RECHER:



Fred Cate - Direct

1    Q.    Good morning, Prof. Cate.

2    A.    Good morning.

3    Q.    What's your full name, sir?

4    A.    Fred Harrison Cate.

5    Q.    And briefly, could you describe for us your educational

6    background?

7    A.    Yes.  I received my AB with honors and my law degree from

8    Stanford University.

9    Q.    Okay.  And are you currently employed by Indiana

10   University?

11   A.    I am.

12   Q.    And what position or positions do you hold at Indiana

13   University?

14   A.    I'm a distinguished professor and C. Ben Dutton Professor

15   of Law.  I'm an adjunct professor of informatics and

16   computing.  And I'm a senior fellow of the Center for Applied

17   Cybersecurity Research, which I founded.

18   Q.    What are the principal subjects of your academic research

19   and scholarship?

20   A.    Privacy, security, health privacy, and international or

21   global privacy.

22   Q.    And have you published any articles on the subject of

23   privacy or privacy law?

24   A.    I have published hundreds of articles on those subjects.

25   And I founded the Oxford University Press Journal



Fred Cate - Direct

1    International Data Privacy Law.  And I served as privacy

2    editor for the IEEE, which is the reference standard

3    organization for computer science.  As privacy editor for the

4    IEEE Journal, I have written extensively.  Yeah.

5    Q.   And have you served in any other positions you haven't

6    already mentioned relating to privacy or privacy law?

7    A.    Many other positions.  So I am the cofounder of a -- of a

8    strategic consulting company Red Barn Strategy.  I am the

9    executive director of the International Accountability of the

10   Information Accountability Foundation, which has been around

11   for twenty years dealing with privacy policy globally.  I've

12   served on a number of U.S. government committees, including

13   the Privacy Oversight Board of the National Security Agency.

14   I've served on a number of academic and other committees and

15   task forces, including being vice chair of the ABA Health Law

16   Section on Privacy & Security.

17   Q.   Have you served as an expert witness before?

18   A.    I have.

19   Q.   Approximately how many times?

20   A.    Eighteen times.

21   Q.   And in any of those cases, were you an expert or

22   qualified as an expert on the subject of privacy or privacy

23   law?

24   A.    In all of those cases.

25   Q.   Okay.  Have you ever been excluded by a court with



Fred Cate – Direct

1   respect to your opinions as to privacy?

2   A.   I have never been excluded by a court.

3   Q.   Okay.  Have you previously been appointed a consumer

4   privacy ombudsman?

5   A.   I have.

6   Q.   How many times?

7   A.   Four times.

8   Q.   And before how many different courts?

9   A.   Courts in Missouri, Indiana, and Kentucky, so three.

10   Q.   And in this case, what were you asked to do by the

11   debtors?

12   A.   I was asked to review the CPO's privacy report and to

13   analyze its conclusions and -- and analysis.

14   Q.   And did you do that?

15   A.   I did.

16   Q.   And are the opinions you reached set forth in your

17   declaration, which is in evidence at docket 772?

18   A.   Yes, they are.

19   Q.   So you mentioned a moment ago that you've served as a CPO

20   in other cases.  Did the debtors in those other cases have

21   privacy policies in place as of the petition date?

22   A.   They did.

23   Q.   And did any of those privacy policies with respect to any

24   of those debtors, where you served as a CPO, prohibit the

25   transfer of personally identifiable information?



Fred Cate - Direct

1    A.    They did not.

2    Q.    And in those circumstances, did you have occasion in

3    those other cases to consider or analyze whether the transfer

4    of personally identifiable information as part of a Section

5    363 sale violated nonbankruptcy law?

6    A.    I did not.

7    Q.    Why not?

8    A.    Under the Bankruptcy Code Section 363, it's pretty clear

9    you don't get to the question of nonbankruptcy law unless you

10   find that --

11         MS. MILLIGAN:   Objection.

12   A.    -- there was a prohibition.

13         MS. MILLIGAN:   Objection.   The witness is opining on

14   the meaning of the law.

15         THE COURT:   I'll allow counsel some leeway, subject

16   to the discussion we had on Wednesday about the appropriate

17   scope of Prof. Cate's opinions.   I'll take them for what

18   they're worth.

19         MS. MILLIGAN:   Thank you, Your Honor.

20   Q.    So Prof. Cate, and again, as we said the other day when

21   we were talking about your declaration, the debtors aren't

22   offering your testimony as evidence about what the law is or

23   how the Court should construe the law.   But based on your

24   experience, in what circumstances would a CPO need to consider

25   or apply nonbankruptcy law in a 363 sale?



Fred Cate - Direct

1    A.    Well, 363 sets out what you might think of as a -- as

2    a -- as a three-option approach to dealing with privacy

3    issues.  And one of them is where there is no prohibition on a

4    sale that has been disclosed to a -- that has been disclosed

5    to a consumer and the sale is to a third-party.  And in that

6    case, there's no consideration under the statute, as stated,

7    of -- of nonbankruptcy law.

8         And then the second tier under 363(b)(1) is if there

9    is -- is such a prohibition, but the court concludes that

10   there is not -- that otherwise it's consistent with the

11   privacy policy or in this case, that prohibition would not

12   apply, in which case there's no consideration required.

13        And then the third situation is where neither of those is

14   met.  So there must be a prohibition, and the prohibition must

15   actually apply.  There's nothing in which case then explicitly

16   under the law nonbankruptcy law may be considered.

17   Q.    And in those other cases you mentioned, where you were

18   appointed as and served as a CPO and where the policies of the

19   debtor as of the petition date didn't prohibit the transfer of

20   PII, did the court or any other interested party in those

21   cases ever suggest to you that you should be looking to

22   nonbankruptcy law?

23   A.    No.

24   Q.    So let's start then with the debtors' policies.  And did

25   you review the CPO report in this case?



Fred Cate - Direct

1    A.    In detail.

2    Q.    All right.  And did you see the CPO's conclusion, or I

3    should say opinion that he "cannot conclude with certainty

4    that the sale of the company's data in bankruptcy is otherwise

5    consistent with its privacy policies"; did you see that

6    opinion?

7    A.    I did.

8    Q.    And did you also see that he went on to say that that was

9    particularly the case, particularly the case, meaning he

10   cannot conclude, for those customers who created their

11   accounts before the 23andMe privacy statement was amended in

12   June of 2022 to expressly note the potential for the sale of

13   consumer data in bankruptcy?  Did you see that discussion in

14   his report?

15   A.    I did.

16   Q.    Okay.  And what did you make of that opinion in the CPO

17   report?

18   A.    First of all, it was surprising to me that there was no

19   conclusion, since under 363, everything turns on this.  In

20   other words, if there is -- if the -- if the CPO is not

21   advising the judge, the court, to find that there was a

22   prohibition on sale to third parties disclosed to consumers as

23   of the time of the commission of the proceeding, then there's

24   no further inquiry necessary.  Of course, you can have further

25   inquiry, but the law does not require any further inquiry,



Fred Cate – Direct

1  including further inquiry into nonbankruptcy law's

2  applicability.

3      The second observation or reaction I had to that set of

4  conclusions or assertions or lack of conclusion was the

5  suggestion that, rather than just look at bankruptcy policy,

6  which is what the -- at the policy, what we would call a

7  privacy policy of an organization that instead the CPO wanted

8  to look at the -- a broader range of -- of statements,

9  potentially oral statements, written statements, marketing

10  material, what have you, and it's something that's unusual.

11  It's unique in my experience.

12  Q.    Okay.  And I do want to ask you about that opinion as

13  well.  Let me ask.  Did you yourself and your work in this

14  case review the debtor's terms of use and privacy statement

15  that were in effect as of the petition date?

16  A.    I did.

17  Q.    Okay.  And what, if anything, did you conclude as to

18  whether the debtors' policies prohibited a transfer of PII as

19  part of a sale or change in control?

20  A.    There was no prohibition.  In fact, there was an explicit

21  grant of those rights, an affirmative grant of those rights,

22  in the policy.

23  Q.    And why don't we look at that quickly?  If you could turn

24  to I believe it's tab 4 in your binder.  And this is debtors'

25  Exhibit 3-L.  And you've seen this document before?



Fred Cate - Direct

1    A.    I have.

2    Q.    And was Exhibit 3-L, to your understanding, the privacy

3    statement in effect as of the petition date?

4    A.    Yes.

5    Q.    And could you turn, if you would, sir, to the page -- if

6    you look at the top, there's pagination.  Page 123.  Excuse

7    me.  I'll give you a new page.  Page 130 of 222.

8    A.    Right.

9    Q.    And there's a section there that is captioned, "Commonly

10   Owned Entities, Affiliates, and Change of Ownership"; do you

11   see that?

12   A.    I do.

13   Q.    And it says, "If we are involved in a bankruptcy, merger,

14   acquisition, reorganization, or sale of assets, your personal

15   information may be accessed, sold, or transferred as part of

16   that transaction, and this privacy statement will apply to

17   your personal information as transferred to the new entity."

18   That's the language you reviewed as part of your work in this

19   case?

20   A.    Yes, it is.

21   Q.    And was it relevant in any way to the opinions in your

22   declaration?

23   A.    Yes, because it eliminated any claim that the policy, in

24   effect, as of the date of the proceeding and disclosed to the

25   public, disclosed to consumers, prohibited the sale of data to



Fred Cate - Direct

1    third parties.

2    Q.   And that language, this provision in debtors' Exhibit 3-

3    L, includes the specific word "bankruptcy"; is that right?

4    A.   It does.

5    Q.   And I think you mentioned this earlier.  The CPO in his

6    report seems to draw perhaps a distinction between this policy

7    that included the specific word bankruptcy and the debtors'

8    historical policies from prior to 2022; you see that?

9    A.   Yes.

10   Q.   Okay.  And in your view, do the debtors' historical

11   policies, meaning their policies in effect for periods prior

12   to the petition date, matter in this context?

13   A.   They -- they -- they don't matter as a matter of -- of

14   law.  363 is explicit about what matters.

15           MS. MILLIGAN:  Objection, Your Honor.  Again, he's

16   opining about what 363 means and says.

17           THE COURT:  Okay.  Overruled.  You're welcome to

18   object to preserve the objection.  That's fine.  I'll allow

19   it, and take it for what it's worth.

20   A.   So 363 is explicit on this.  However, a -- you know, a

21   reasonable person might say, did they just change the policy

22   as of the last moment,  And so I, in fact, went and looked at

23   all of the prior policies.  And all of them preserve the right

24   and grant explicitly the right to sell data in connection with

25   a -- with -- with a reorganization or a sale of assets.



Fred Cate - Direct

1    Q.    So am I right, then, in understanding that, in your view,

2    none of the prior policies prohibit the transfer of PII in

3    connection with a sale or change in control?

4    A.    You are correct.

5    Q.    Okay.  So why don't we take a look at just one of those

6    historical policies?  If you could turn to tab 5 in your

7    binder, which should be debtors' Exhibit 3-B, as in boy, and

8    I'll ask if you've seen this document in connection with your

9    work in this case.

10   A.    I have.

11   Q.    Okay.  And I think this document's in evidence, and I

12   think it's equally in evidence that this is the debtors'

13   privacy statement as of June 24th, 2010.  Could you turn to

14   the page -- I believe it's page 29 of -- page 29 of 222.

15   Should be the last substantive page in the tab.

16   A.    Yes, I'm there.

17   Q.    Okay.  And there's a section there with the heading,

18   "Business Transitions".

19   A.    I see it.

20   Q.    All right.  And the policy says, "In the event that

21   23andMe goes through a business transition, such as", and it

22   goes on.  But let me let me stop there.  Do you consider a

23   Chapter 11 proceeding or a bankruptcy to be a business

24   transition?

25   A.    I do.



Fred Cate - Direct

1   Q.   And the section goes on and gives some examples of

2   business transitions, merger, acquisition by another company,

3   or a sale of all or a portion of its assets, and in those

4   circumstances, it says, your personal information will likely

5   be among the assets transferred.  What, if any relevance, did

6   this provision in this historical policy have to the opinions

7   you expressed in your declaration?

8   A.   Well, first, it eliminates the claim that as of this

9   point in time, there was any assertion of a policy that

10  prohibited the sale to third parties in connection with the

11  reorganization or transfer of assets.  And second of all, it

12  provided explicit notice that there would likely be a transfer

13  of personal data in that case.

14  Q.   And in your work in this case, did you see any historical

15  iteration of the debtors' privacy statement that did not

16  include this language about business transitions or something

17  very close to it or the provision we saw just a moment ago in

18  debtors' Exhibit 3-L?

19  A.   I didn't see any policy that did not include that

20  language or something similar to it.

21  Q.   And you touched on this a little bit earlier, but let me

22  ask you a couple more questions about the CPO's approach to

23  interpreting what a privacy policy is or might be.  And the

24  CPO says in his report, "The CPO interprets the debtors'

25  privacy policies broadly to include not just the many versions



Fred Cate - Direct

1    and revisions of the 23andMe privacy statement in terms of

2    service but also the frequent representations and promises

3    23andMe made about privacy."  You remember that discussion in

4    the CPO's report?

5    A.    I do.

6    Q.    All right.  And do you have an opinion about whether

7    that's an appropriate way of analyzing privacy policies as a

8    CPO or in considering these issues as part of a Section 363

9    sale?

10   A.    I think it is not an appropriate way, and particularly as

11   here, where you have a stated privacy policy, a privacy policy

12   that everyone was required to consent to in order to obtain a

13   service from 23andMe.  So a -- an -- an unmissable privacy

14   policy.

15   Q.    And I'm not purporting to quote it, so I'll just

16   paraphrase it.  I think the discussion in the CPO report was,

17   looking at privacy policy broadly in this way to pick up other

18   statements is scholarly or academic consensus.  Do you agree

19   with that?

20   A.    I don't agree with that.

21   Q.    Why not?

22   A.    Well, because you can point to many academic and

23   government reports that don't follow the -- follow that

24   procedure.  Of course, the Federal Trade Commission itself

25   issued a series of reports in which it examined the privacy



Fred Cate - Direct

1    practices of businesses by examining their privacy policies.

2    Those reports are again cited in my statement and are publicly

3    available.  The academic literature certainly does not

4    uniformly or even in its majoritarian way follow that

5    interpretation of what constitutes a privacy policy.

6         But it also is almost in -- it cannot be reconciled with

7    the way that the law treats privacy policies, which is

8    generally as contracts, that they make commitments that can

9    be -- you can be required to follow.  This is much talked

10   about in the literature.  It's very controversial because of

11   course, these are perhaps contracts without consideration, or

12   I mean, you can have lots of debate about should they be

13   contracts.

14        But putting that aside, the Federal Trade Commission,

15   most state Attorneys General treat a privacy policy as a

16   contract.  And you can't have a contract that can be amended

17   by -- by anything.  By any oral statement.  By any bit of

18   marketing material.  Whatever.  We usually look to the four

19   corners of a contract to know what its terms are.

20   Q.   Well, let me ask you anyways about the representations

21   and promises outside of the privacy statement.  Outside of the

22   terms of use that referenced by the CPO.  Did you see in the

23   CPO report or anywhere else in your work in this case any

24   representations or promises made by 23andMe outside of its

25   policy documents themselves that discuss or address whether

Fred Cate - Direct

1    PII would be transferred or not transferred in connection with

2    a sale or a change in control transaction?

3    A.    I did not see that, and I would say I looked for it

4    because I was convinced, since the CPO had gone to the trouble

5    of making this point, we're not just stuck with the privacy

6    policy, we can look at all of these other things, that

7    somewhere out there was going to be something that confused

8    this basic point about was there such a promise, or was there

9    not such a promise.  And so that there would be, if you will,

10   some smoking gun that -- that that CPO would point to.

11   Looking at all of the things that the CPO addressed, none of

12   them made that point or raised that issue.

13   Q.    So let me turn to the proposed sale itself.  And we heard

14   some testimony about this the other day, but could you just

15   describe for us what your understanding of TTAM is?

16   A.    So my understand -- my understanding of TTAM, it is, in

17   fact, a reconstruction of 23andMe. It's the same founder.

18   It's the founder's money.  It's the same employees.  It's the

19   same equipment.  It's the same data, depending, of course, on

20   what the Court does here.  It's the same everything.  And so

21   it's simply moving through a bankruptcy process to get from

22   an -- an insolvent setting to a hopefully solvent setting.

23   Again, with -- with no new anything added, other than things

24   that may be tax consequences or things I wouldn't otherwise

25   know about.



Fred Cate – Direct

1    Q.    And do those considerations or those facts you just

2    testified about matter to you from a consumer privacy point of

3    view?

4    A.    Yes.   Let me say, they have always mattered to me as a

5    CPO because it's -- although all that Congress requires is

6    that there not be a policy in place as of the -- as of the

7    date the proceedings commenced that prohibited the sale of --

8    of personal data in connection with a reorganization or -- or

9    a -- some -- something related to the -- to the bankruptcy.

10   It's -- it -- it seems like a reasonable person might say, I

11   want to know that the person taking the assets, buying the

12   assets, is going to have the capability of living up to that

13   privacy policy.

14        So for example, the Federal Trade Commission has said we

15   look for someone in the same line of business.   We look for

16   someone who's -- who's going to operate the same business.   We

17   look for someone who's going to take all the assets, not just

18   the data.   This is exactly that transaction.

19        You know, somebody said Wednesday in court to general

20   good humor that this was like a perfect transaction.   I

21   don't -- I don't know the first thing about the other aspects

22   of bankruptcy law, but from a privacy point of view, it kind

23   of is a perfect transaction.   You're not transferring the data

24   to a third-party.   You're not doing anything with the data.

25   No one new is going to have access to the data.   It's going to



Fred Cate - Direct

1   be used for exactly the same thing under exactly the same

2   policy.  And just to sweeten the deal, there's some additional

3   privacy protections added as part of the asset purchase

4   agreement.  It -- it seems like it could hardly be better,

5   from a privacy point of view.

6   Q.   And you mentioned a couple of, I think, privacy

7   enhancements made by TTAM that were added to the APA.  We saw

8   them on a slide the other day.  We don't need to tick through

9   all of them.  But could you just mention for us the privacy-

10   related enhancements that you thought were significant?

11   A.   Well, frankly, I think all of them are -- are

12   significant, but I'm not going to go through all of them.  But

13   for example, I think the appointment of a -- of a -- of a

14   privacy advisory board, this is something that leading edge

15   companies are starting to do.  I've served on a half a dozen

16   privacy advisory boards.  Government agencies in some cases do

17   it as well.  It's a great way to get outside perspectives.

18   It's a great way to be able to test ideas without committing

19   to them in the market and to get input from people who would

20   have different perspectives.  And the fact that there's a

21   voluntary commitment to a privacy advisory board here, I think

22   is really significant and that -- that's important.

23        I think the fact that there's a -- a recognition of a

24   perpetual right to -- to opt out, to delete your data.  Again,

25   I think this was fairly clear from the prior policy, as I read

Fred Cate - Direct

1    it, but nevertheless, it's explicit now.  There's no debate

2    over it.  TTAM has said, this is what we are.  This is what we

3    are committing to.  Of course, the new nonprofit structure,

4    the not-accepting-contributions-from-affected-parties.  The --

5    and -- and it's a -- it's a -- it's an almost checklist of how

6    you would enhance the privacy of an already strong privacy

7    policy and privacy protection program.

8    Q.    And in light of those privacy enhancements and the other

9    terms of the proposed transaction you're aware of, do you have

10   a view as to whether customers of 23andMe would be better off

11   or worse off if the proposed sale were be approved, from a

12   privacy point of view?

13   A.    I -- I do have a view.

14   Q.    And what is that view?

15   A.    I think there's no question that they would be better

16   off.  And I think you get there from either, if you will, a

17   positive or a negative perspective.  In other words, from the

18   positive, we've talked about the consistency with the FTC

19   requirements.  We've talked about the consistency with

20   congressional requirements.  We've talked about the additional

21   privacy protections.  All of these seem like good things.  In

22   some cases, legally required.  In some cases, just good

23   things.  On the other hand, if the sale doesn't go through,

24   then what happens?  The customers don't get the benefits of

25   the services they paid for.



Fred Cate - Direct

1          MS. MILLIGAN:  Objection.

2          MR. NADAL:  Objection, Your Honor.

3          MR. RECHER:  I'm sorry.  Could I ask that the witness

4    be permitted to finish his answer?  If they'd like to move to

5    strike, we can, of course, address that.  But respectfully, if

6    we could have objections after the question, and then, of

7    course, they can move to strike if they believe that's

8    appropriate.

9          THE COURT:  I think that's probably -- if the

10   question itself is objectionable, we'll have the objection

11   before the witness answers.  Otherwise, let's let the witness

12   finish, and you can strike.

13         MR. NADAL:  Okay.

14   Q.   I'm sorry, Mr. Cate.

15   A.   So -- thank you.  So the -- the risk is that the --

16   the -- the -- the company is not solvent, that the service is

17   not provided that they paid for, that the jobs are lost, that

18   the benefit to the economy is lost, the benefit to research is

19   lost, and that the data then ends up in another court

20   proceeding, not entirely unlike this one.  But the question is

21   just selling the data outright because it's an asset that now

22   has value and their creditors, who would need to be paid.

23         So it is always -- and again, this is a feature in my CPO

24   opinions and all the others that I have seen except for the

25   present one, you know, better to have a solvent purchaser who



Colloquy

1    can keep protecting the data and using it for the purpose for

2    which it was intended to be used, than it is to have a -- a --

3    a deal fall apart.

4            MR. NADAL:  Your Honor, I'd move to strike.

5            THE COURT:  Come to the microphone, please.

6            MR. NADAL:  Your Honor, I would move to strike the

7    answer on the grounds that there has been no evidence.  I do

8    not believe there's any evidence in the record stating that

9    the company would liquidate if this transaction's not

10   approved.  If counsel would like to make this a hypothetical,

11   I'll withdraw the objection for the motion.

12           MS. MILLIGAN:  And Texas objects on the basis that

13   it's pure speculation as to what would happen.  And there's

14   been no foundation for why he thinks that, but it's a

15   speculative argument.

16           THE COURT:  Response.

17           MR. RECHER:  Your Honor, Prof. Cate is an expert.

18   He's explaining the analysis and thought process he went

19   through in forming the judgments he reached.  I don't think

20   that's objectionable.  He's not testifying as a fact witness.

21   We're not submitting the testimony to prove anything other

22   than how he reached his views in the analysis he conducted.

23           THE COURT:  Mr. Nadal.

24           MR. NADAL:  Your Honor, debtors have not moved to

25   admit or present Mr. Cate as an expert.  They have not



Colloquy

1    followed any of the expert proceedings.  And so to state that

2    he is an expert at this stage without offering him as an

3    expert until just this very moment, we believe is improper.

4            MR. RECHER:  I'm happy to offer Prof. Cate.

5            THE COURT:  Why don't we -- why don't we do that?

6    And then we'll figure out what to do about this question.

7            MS. RYAN:  The debtors would offer Prof. Cate as an

8    expert witness in the areas of privacy and the CPO process.

9            THE COURT:  Any objection?

10            MR. NADAL:  Yes, Your Honor.  The People of the State

11    of California object.  There have been no disclosures that

12    have been provided for Mr. Cate.  We have not received any of

13    the requirements under FRCP 26, which I believe is

14    incorporated into this proceeding by virtue of Rule 1914.  We

15    have not received anything.

16            MR. RECHER:  Your Honor -- go ahead.

17            MS. MILLIGAN:  Your Honor, I think before admitting

18    him as an expert, we should be allowed to cross-examine him as

19    to his history and background.  I think it's only been briefly

20    mentioned by debtors' counsel.  We would posit that he should

21    not be offered as an expert as well.

22            THE COURT:  Okay.  I do think an opportunity for voir

23    dire is appropriate, but we're going to lose track of this

24    question.  So you may remember the question.  I'm not going to

25    remember the question by the time we do that.



Colloquy

```
 1          So let me say this.  If Prof. Cate is admitted as an
 2   expert witness, I'll allow the question and overrule the
 3   motion -- I'll allow the answer and overrule the motion to
 4   strike.  If he's not admitted as an expert witness, I'll
 5   reconsider it at that time.  How about that?
 6          MR. RECHER:  All right.  And I'll revisit it on
 7   redirect as necessary, Your Honor, if that's all right.
 8          THE COURT:  Okay.  Very good.  So do we have voir
 9   dire?  Texas, they say voir dire, right?
10          MS. MILLIGAN:  They do say voir dire.
11          THE COURT:  They say voir -- okay.  Would you like
12   voir dire at this point --
13          MR. RECHER:  Yes.
14          THE COURT:  -- or do you want to -- you can also hold
15   it for cross-exam.
16          MR. RECHER:  Your Honor, and I'm happy to ask the
17   State of Texas what their preference is.  I have maybe two
18   more questions.  I'm happy to let Texas do voir dire as part
19   of their cross-examination, and we can go from there.  But
20   whatever the Court prefers.
21          MS. MILLIGAN:  Yes, and I agree.  If he --
22          THE COURT:  Okay.  We'll just hold off.
23          MS. MILLIGAN:  -- wants to his questions, and then
24   we'll address it on our cross.
25          THE COURT:  Okay.  Very good.  Let's do that.
```



Fred Cate - Direct

1          MR. RECHER:   I promised two or three more questions,

2    and I'll do my best.

3    BY MR. RECHER:

4    Q.   Despite everything you just testified about in terms of

5    your perspective on the benefits of this proposed sale, we do,

6    as you know, have some objections.  And some states have

7    objected on the grounds that they believe separate affirmative

8    consent is required to transfer certain individuals' PII in

9    connection with this Section 363 sale.  Do you believe

10   separate affirmative consent is appropriate?

11   A.   I do not.

12   Q.   Why not?

13   A.   Affirmative consent, what I'm going to call opt in

14   consent, was appropriate.  It's what was used when the account

15   was opened.  We've already gotten opt in consent on the

16   record.  And so then the question is what about when is reopt

17   in consent necessary?  And here, the evidence is pretty clear

18   from studies, from academic literature, from the experience of

19   regulators, consumers don't like being asked the same question

20   repeatedly.  They're very suspicious of it.  They don't pay

21   attention to it.  They also often miss opportunities.  Post

22   office reports that fifty-two percent of unsolicited mail is

23   unopened.  And so they're not going to see the opportunity.

24         So in a case like this, it seems like you have paid for a

25   service.  You have opted in.  Eighty-one percent of people, I



Fred Cate - Direct

1   believe, from the record, have opted in to the further sharing

2   for research.  They're all in on this.  And then they're told,

3   well, you know, certain state AGs believing so strongly in

4   privacy want to ignore your prior consent and ask you for

5   consent again.  And that tends to be something that's

6   irritating to people.  And we see this in health settings.

7   And we see it in financial settings.  And I think we would see

8   it here.

9        MS. MILLIGAN:  Your Honor, objection and move to

10  strike the testimony as to what consumers intend or want and

11  what the Attorneys General believe or any legal conclusions or

12  other opinions that are based on other people's opinions and

13  are not supported in this case.  So objection as to that and a

14  request to strike that testimony.

15       MR. RECHER:  I believe the professor is explaining,

16  again, the thinking and methodology behind his perspectives as

17  expressed in his declaration.  It's not fact witness

18  testimony, or we will assert it's not fact witness testimony.

19  It's instead expert testimony.  I believe it's admissible.

20       THE COURT:  All right.  I'll -- because --

21       MS. EICHELE:  Your Honor.

22       THE COURT:  I'm sorry.

23       MS. EICHELE:  I'm sorry.  I'm sorry.  Elizabeth

24  Eichele.  I too object, Your Honor, with respect to his

25  testimony regarding what all of the consumers/customers would



Fred Cate - Direct

1    agree to or not agree to with respect to this.  This is kind

2    of a -- a big thing, releasing -- selling people's DNA like

3    this, and he didn't really cite to any studies or anything in

4    particular to make those statements.  They were just sort of

5    made.

6            THE COURT:  All right.  For the record, this is Ms.

7    Eichele?

8            MS. EICHELE:  Yes, Your Honor.

9            THE COURT:  Okay.  The objection as to consumer

10   expectations and the like is overruled.  I think it's

11   appropriate for expert testimony, if I admit him as an expert.

12   I will -- because one thing Prof. Cates said could be

13   interpreted -- I'm not saying he meant it this way.  Could be

14   interpreted to cast aspersions on the motivations of the

15   Attorneys General, I'll strike that.  I don't think that's

16   necessary.  And let's proceed.

17           MS. MILLIGAN:  Okay.

18   BY MR. RECHER:

19   Q.   And Prof. Cate, are you familiar with the academic

20   research around how consumers react to requests for consent?

21   A.   Yes, I am.

22   Q.   Okay.  And are there any downsides, from your

23   perspective, from -- with respect to requests for separate

24   affirmative consent after consumers already have opted in to a

25   particular service?



Fred Cate - Direct

1    A.    Yes.  So in addition to the ones I think I've already

2    mentioned, there's some very practical ones as well, which is

3    we fundamentally work between individuals and consumers in

4    sort of an asymmetric communications channel.  It's usually

5    easier for an individual to reach an organization, not always

6    the way we would like, not always as quickly as we would like,

7    but they tend to have 800 numbers.  They tend to have fixed

8    addresses.  They tend to have websites.  I think all of that's

9    true in this case.

10        Whereas for an organization to reach me, they've got to

11   find me.  They've -- they've got to get me.  They've got to

12   find what number I'm using now.  What email am I using now.

13   Maybe not five years ago when I opened my account, but what

14   today am I using?  And that is both a more exhaustive.  It can

15   also mean, if you got it right the first time, the next five

16   or ten attempts you send me are all just going to be perceived

17   as -- as irritating.  They're -- they're -- they're going to

18   just keep hammering me.

19        There's also a -- a great tendency, well documented in

20   the literature, not only of privacy, but of advertising and

21   many other things, we know this with recalls.  We know it in

22   many areas, motivating people to do something, even if they

23   want to do it and even if they ultimately do do it.  So most

24   of us, I only need to speak for myself, put things off.  Even

25   if we see it and say, yes, that's a great idea, we don't act



Fred Cate - Direct

1    on it quickly.

2         And so in this case, you're saying, at some point in

3    time, after you make repeated efforts, after the company makes

4    repeated efforts to reach me, we're going to shut you down.

5    We're going to delete your data.  We're going to eliminate the

6    service that you paid for because you procrastinated or you

7    didn't pay attention.  And that is a very challenging

8    environment for consumers.

9         MR. RECHER:  Thank you, Prof. Cate.  No further

10   questions from me at this time.

11        Your Honor, subject to the Court's preferences, what

12   I would propose, just in terms of the interest of good order,

13   is if the State of Texas or the State of California has voir

14   dire questions, they should ask those.  If there's any

15   remaining objection to Prof. Cate's qualifications, we can

16   discuss that.  And we can move on with cross-examination at

17   that point.

18        THE COURT:  I think that makes sense.  Let's do voir

19   dire, or voir dire, as you wish.

20        MS. MILLIGAN:  Your Honor, thank you for considering

21   the Texas pronunciation of voir dire.

22        THE COURT:  Of course.

23        MS. RYAN:  Dire.

24        THE COURT:  We try to be -- try to be welcoming here,

25   Ms. Milligan.



Fred Cate - Voir Dire

1              MS. MILLIGAN:   Thank you.

2     VOIR DIRE

3     BY MS. MILLIGAN:

4     Q.   Prof. Cate, my name is Layla Milligan.   I'm here on

5     behalf of the State of Texas.   Let's see.   You're a current

6     professor of law; is that correct?

7     A.   I -- I am currently a distinguished professor of law,

8     yes.

9     Q.   Okay.   And what courses do you teach?

10    A.   On a -- on a -- on an annual basis, or a -- they change

11    all the time, but --

12    Q.   Okay.   Currently.

13    A.   I teach --

14    Q.   How about right now?

15    A.   I teach information security.   I teach information

16    privacy.   I teach a survey course called technology.   A

17    digital -- digital law -- digital legal issues.   Oh, and I

18    teach a course in artificial intelligence.

19    Q.   Okay.   You have been, you mentioned, a consumer privacy

20    ombudsman in four cases --

21    A.   Yes, ma'am

22    Q.   -- in three states?   Were any of those dealing with

23    genetic data?

24    A.   Two of them dealt with genetic data, but that wasn't what

25    they were limited to.



Fred Cate - Voir Dire

1   Q.   Okay.  So there were two cases that you were the CPO that

2   involved the transfer of genetic data --

3   A.   Exactly.

4   Q.   -- in a sale?  Can you tell me what the names of those

5   cases are?

6   A.   Monroe County Hospital.  I can't off the top of my head.

7   It's -- it's -- it's in my CV.

8   Q.   Okay.  Monroe County hospital.  What was the genetic

9   information that was transferred in that case?

10  A.   It was held in the patient's records.

11  Q.   I'm sorry.

12  A.   It was held in the patient's records.

13  Q.   The genetic materials and the genetic data?

14  A.   Not materials, the data.

15  Q.   The data?  Okay.  Was that because -- and that was a

16  hospital?

17  A.   Yes.

18  Q.   So that was a health care provider?

19  A.   That's right.

20  Q.   Okay.  Was the other genetic case involving a health care

21  provider?

22  A.   It was.

23  Q.   So it was another hospital or some other health?

24  A.   It was.

25  Q.   That was involved with --



Fred Cate - Voir Dire

1    A.    A -- a health system, yes.

2    Q.    Okay.  And this was genetic data that would have been in

3    patient records?

4    A.    Exactly.

5    Q.    Okay.  Are you a 23andMe customer?

6    A.    I'm not.

7    Q.    Okay.  You have stated that you certainly have written a

8    number of letters, articles, publications about data security

9    and privacy; is that right?

10   A.    Yes.

11   Q.    Have any of them been -- have any of them addressed

12   genetic data or genetic materials?

13   A.    I'm just trying to think.  I mean, I've written

14   extensively about health privacy.  I've written about privacy

15   and death and organ donation so -- but I don't think any have

16   explicitly talked about genetic data, no.

17   Q.    Okay.  Have you ever taught a class that involved

18   discussion of the genetic data or the requisite laws involving

19   genetic data?

20   A.    Yes.  Health privacy.

21   Q.    Okay.  And again, that's in the concept of a health care

22   situation; is that right?  Like, related to --

23   A.    It -- it wouldn't have to be.  In other words, it -- it

24   would cover state laws dealing with genetic information,

25   which, typically, I don't have to tell you this, exclude those



Fred Cate - Voir Dire

 1    covered by HIPAA so --

 2    Q.    Okay.  Were the two CPO cases that you were involved in,

 3    did they involve HIPAA --

 4    A.    Yes.

 5    Q.    -- contemplation?  Okay.  So you have not been involved

 6    as a CPO -- and I'm using that -- consumer privacy ombudsman

 7    as the shortcut --

 8    A.    Yes.  I -- thank you.

 9    Q.    Thank you.  With a direct-to-consumer genetic testing

10    company?

11    A.    Correct.

12    Q.    Okay.  Are you familiar with the state laws related to

13    genetic testing, direct-to-genetic-testing companies?

14    A.    I mean, I have passing familiarity with most of them but

15    not detailed familiarity.

16    Q.    Okay.  You state in your report several references to

17    Congress.  What is your association with either the U.S. House

18    or U.S. Senate?

19    A.    I've testified more than a dozen times before

20    congressional committees.  I've advised congressional

21    committees on drafting legislation.  I've given both

22    classified and unclassified briefings to members of Congress

23    and to congressional committees.

24    Q.    Has any of that involved the Bankruptcy Code?

25    A.    No.



Fred Cate - Voir Dire

1   Q.   Okay.   Did any of -- okay.   And that includes the

2   Bankruptcy Abuse Prevention and Consumer Protection Act?   We

3   call it BAPCPA --

4   A.   Right.

5   Q.   -- in Texas.   Okay.

6   A.   Yeah.

7   Q.   Sorry.   Did you consult or talk to any or testify as

8   to -- I'm going to say BAPCPA.   And again, apologies if

9   that's.

10  A.   If -- yeah.

11  Q.   Did you -- I'm sorry.   No?

12  A.   I did not.

13  Q.   Okay.   Have you ever testified in front of Congress or

14  the House or the Senate about Section 363 of the Bankruptcy

15  Code?

16  A.   I have not.

17  Q.   Okay.  Okay.  Have you worked with the FTC or been

18  employed by the FTC?

19  A.   I have been an expert witness for the FTC repeatedly.

20  And I've --

21  Q.   Okay.

22  A.   -- served on FTC commissions.   And I have given keynote

23  addresses at FTC conferences.   And so yes.   I've never been

24  paid by the FTC.

25  Q.   I'm going to have more questions about your employment in



Fred Cate - Voir Dire

1    this case, but I'm focusing on voir dire questions.  I'm

2    trying.  Voir dire.  Okay.  So you have familiarity with the

3    FTC from your work with the FTC or your testimony on their

4    behalf?

5    A.    Yes.

6    Q.    You did not assist or participate in the drafting of the

7    Bankruptcy Code or BAPCPA in any way; is that right?  That's

8    what you just said, right?

9    A.    That is right.

10          MS. MILLIGAN:  Okay.  Let's see.  I think that's all

11   the questions I have.  Thank you, sir.

12          THE WITNESS:  Thank you.

13          THE COURT:  Mr. Nadal.

14          MR. NADAL:  Your Honor, I'm not sure how you'd like

15   to do this.  I don't have any voir dire questions.  I just

16   have argument as to the propriety of Mr. Cate as an expert

17   witness.

18          THE COURT:  Okay.  Let's see if there are any

19   redirect voir dire questions.

20          MR. RECHER:  No redirect, Your Honor, but we would

21   offer Prof. Cate as an expert witness on the same subjects I

22   mentioned earlier, which are in the area of privacy and the

23   process for a CPO.

24          THE COURT:  Okay.  Mr. Nadal.

25          MR. NADAL:  Yes, Your Honor.  The People of the State



Fred Cate - Voir Dire

1    of California object to the proffer of Mr. Cate as an expert

2    witness because debtors have failed to comply with the Rules

3    governing expert witness discovery.  With thanks to my

4    colleagues in Texas, they provided me -- I was not expecting

5    to have to do this, but they provided me with a copy of the

6    Codes.

7          And we know that this is a contested matter under

8    Rule 9014.  9014 incorporates Rule 7026, and Rule 7026 says

9    that Federal Rule Civil Procedure 26 applies.  This is a

10   contested matter.  The Rules governing expert disclosure

11   apply.  Federal Rule of Civil Procedure 26 requires that an

12   expert report identify the methodology and identify the data

13   review and be provided ahead of time and disclosed.

14         Mr. Cate's declaration was filed on June 17th, 2025

15   at 12:22 in the morning.  There has been no prior disclosure

16   of Mr. Cate as an expert witness for debtors.  When I landed

17   in St. Louis and while I was riding the light rail in on June

18   17th, I emailed debtors, and I asked for a list of the

19   materials that Mr. Cate relied on.  They provided me a list of

20   the materials that Mr. Cate cited.  And to their credit,

21   debtors did send me on Wednesday while we were in court or

22   shortly thereafter all of the materials that he cited and all

23   of the materials that are cited in the CPO report.

24         I again asked for a disclosure of the materials that

25   he reviewed.  Debtors refused to provide it.  I had to



Fred Cate - Voir Dire

1    specifically ask if Mr. Cate relied on a June 9th, 2025 email

2    from counsel for debtors to the CPO that is specifically

3    identified in the CPO report and a June 6th, 2025 memorandum

4    from counsel for debtors.  They confirmed he did not, but the

5    expert rules do not contemplate whack-a-mole.  I should not

6    have to review and trawl through a folder that has 566 items

7    to identify what Mr. Cate did or did not review.

8           Even then, after all that conversation, debtors did

9    not identify and state that they were going to call him as an

10   expert.  They filed this as a declaration, and that's what

11   this is.

12          For those reasons, the People would request that the

13   Court not accept Mr. Cate as an expert witness.

14          THE COURT:  Milligan.

15          MS. MILLIGAN:  In addition to the issues of Prof.

16   Cate's, I would say, lack of information or experience in the

17   genetic data context specifically, and I join California's

18   concerns.  This case has moved at extremely fast rate.  Again,

19   I think we learned about the designated expert literally hours

20   before the hearing.  And were provided no opportunity to do

21   any sort of discovery or deposition or determine his

22   qualifications or see what he relied on.  And we join

23   California's objection as well.

24          THE COURT:  Thank you.

25          Mr. Recher.



Fred Cate - Voir Dire

1      MR. RECHER:  Thank you, Your Honor.  Just starting

2   with California first.  I think there was a reference to Rule

3   9014 and this being a contested matter.  Rule 9014(c)(2) says

4   an exception in contested matters -- or let me put it this

5   way.  Rules 26(a)(1) through (a)(3) don't apply in contested

6   matters, absent a order from the court otherwise.

7           I would say in any event that the declaration the

8   debtors filed on Monday on behalf of Prof. Cate I believe

9   satisfies all of the requirements of Rule 26.  It discloses

10  his opinions.  It provides his CV.  It identifies the cases in

11  which he has testified recently.  So I think it would satisfy

12  Rule 26.

13          In any event, with respect to the State of

14  California's complaints about the materials that were cited or

15  relied upon, I think we may have a slightly different

16  perspective.  I believe we told the State of California very

17  promptly that the materials Prof. Cate relied upon were cited

18  in his report or cited in the CPO's report.  They asked us

19  specific questions about whether he reviewed particular

20  documents.  We answered those.

21          I certainly appreciate that the last couple of days

22  have been busy for everybody.  Of course, we filed old Prof.

23  Cate's declaration with our reply brief indeed in advance of

24  the deadline when that reply would be due I believe under the

25  existing order, which is the day before the hearing.  And

Fred Cate - Voir Dire

1    Prof. Cate's report obviously responded to and addressed a CPO

2    report that we did not receive until seven days before Prof.

3    Cate submitted his report.

4         So I would submit that the debtor has moved with some

5    dispatch actually in retaining Prof. Cate, having him conduct

6    his analysis, and get a report out, even where I would argue

7    that Rule 26 requirements don't apply here, before he

8    testified in this courtroom.  And --

9         THE COURT:  Oh, I'm --

10        MR. RECHER:  Sorry.  I didn't mean to interrupt you,

11   Your Honor.

12        THE COURT:  No, go ahead.

13        MR. RECHER:  I was going to move to address the State

14   of Texas' objections.

15        THE COURT:  Sure.

16        MR. RECHER:  I would just say there, I didn't hear

17   anything in that presentation that called into question his

18   qualifications or expertise with respect to the subjects for

19   which he's been offered as an expert witness.  I think there

20   was some perhaps criticism about his background in terms of

21   genetics.  We're not offering him as an expert witness in

22   genetics.

23        THE COURT:  And it is privacy and the --

24        MR. RECHER:  Privacy and the CPO process.

25        THE COURT:  -- CPO process?  Yeah.  All right.

Fred Cate - Cross

1          I'm going to accept Prof. Cate as an expert on those

2     two subjects as requested and overrule the objections.  I

3     agree with the debtors' reading of Rule 1914.  That doesn't

4     mean that litigation by ambush is acceptable, but I don't

5     think that's what has happened here.  Prof. Cate is responding

6     to a CPO report that was filed not long ago.  The CPO report,

7     although no one has described it this way, the CPO report is

8     in some respects an expert report, even though Prof. Richards

9     is not on the stand.  And I think it's appropriate that the

10    debtors, and I guess, in theory, other parties, have an

11    opportunity to respond to that, more or less in kind.

12         So I think that the states have not had a great deal

13    of time to prepare for Prof. Cate.  Neither have I.  Neither

14    has anybody else.  But this case is moving quickly, Ms.

15    Milligan.  But they do.  That's how they do.  And the debtors'

16    cash position, among other things, and their DIP lender

17    require that here.

18         So Prof. Cate will be accepted as an expert on

19    privacy law and the CPO process.

20         MR. RECHER:  Thank you, Your Honor.

21         UNIDENTIFIED SPEAKER:  Thank you, Your Honor.

22         THE COURT:  All right.  Substantive cross-

23    examination.

24    CROSS-EXAMINATION

25    BY MR. NADAL:



Fred Cate - Cross

1    Q.    Good morning, Mr. Cate.  Are you aware of who I am?

2    A.    Yes, I am.

3    Q.    If you don't know, I'm Daniel Nadal.  I represent --

4    A.    Thank you, sir.

5    Q.    -- the People of the State of California.  You were hired

6    by debtors to provide a report responding to Prof. Richards'

7    CPO report?

8    A.    Yes.

9    Q.    What date were you hired?

10   A.    Sunday before the Thursday report.

11   Q.    And what is your relationship with debtor and Paul Weiss?

12   A.    None.  I had no prior relationship.  I -- they're one of

13   the people who is an employee or a temporary employee of

14   23andMe as a privacy colleague I've worked with in the past.

15   Q.    And I apologize that I'm going to have to ask this

16   question, but due to the expedited nature of these proceedings

17   that we've just referred to, we don't have a fee application

18   on file.  So we'll get this answer at some point in the

19   future, but I'd just like to ask, how much time did you take

20   to prepare your report?

21   A.    Thirty hours.

22   Q.    All right.  Were you in the courtroom on Wednesday when

23   we discussed the admissibility of your testimony?

24   A.    I was.

25   Q.    And do you recall the Court asking about if your report

Fred Cate - Cross

1    could be submitted as an amicus brief?

2    A.    Yes, I recall.

3    Q.    Have you submitted or joined amicus briefs before?

4    A.    I have.

5    Q.    And are you aware of Federal Rule of Appellate Procedure

6    29?

7    A.    No.

8    Q.    All right.  Are you aware that there in the Federal Rules

9    of Appellate Procedure, an amicus brief has to disclose

10   different items?

11   A.    Yes.

12   Q.    And are you aware that one of those is a statement that

13   indicates whether a party's counsel authored the brief in

14   whole or in part?

15   A.    Yes.

16   Q.    All right.  If this were filed as an amicus brief, what

17   would your FRAP 29(e)(1) disclosure say?

18   A.    I wrote the brief.  Every word of it.

19   Q.    Thank you.  Let's turn to paragraph 2 of your

20   declaration.  You indicate there that you were provided with

21   facts and information.  You reviewed documents.  About how

22   many materials did you review?

23   A.    I don't -- I don't think I can put a number.  I mean,

24   some of them were vast, like the CPO report, and they had many

25   links to things.  And often, I would check the link to see if



Fred Cate - Cross

1    it said what it was being quoted for saying.  In terms of just

2    documents, I sat down and read maybe forty or thirty.

3    Q.    Okay.  Did you catalog all of the materials that you

4    reviewed?

5    A.    I cited to everything I reviewed, unless it was in the

6    CPO report.

7    Q.    All right.  Now, your statement here in paragraph 2

8    distinguishes between information provided by professionals

9    advising the debtors and debtors.  What did you mean by that?

10   And I guess I can put a finer point on this.  Did you speak

11   with nonprofessional members of debtors team?

12   A.    I did not.

13   Q.    All right.  Thank you.  Now, you just said that you

14   reviewed materials cited by the CPO, correct?

15   A.    I did.

16   Q.    And I want to specifically return to two things that the

17   CPO relied on.

18   A.    Okay.

19   Q.    Do you have the CPO report in that binder?

20   A.    Yes, I do.

21   Q.    All right.  Could you turn to ECF page 43 or report page

22   40?

23   A.    Yes.

24   Q.    I'd like to point you to footnote 160, where the CPO

25   indicates that he received a June 9th, 2025 email from counsel



Fred Cate - Cross

1   for debtors.  Did you review that email?

2   A.    Sorry.  It's not on -- I -- I'm --

3         THE COURT:  You said 160 or 116?

4         MR. NADAL:  160.  Apologies.

5         THE COURT:  Thank you.

6   A.    No.

7   Q.    All right.  So if have any reason to doubt the CPO's

8   statement that debtor's counsel reported that while there are

9   eighteen-million customers currently registered with the

10  company, nearly one third of those customers have not logged

11  in during the last three years?

12  A.    I have no knowledge of that whatsoever.

13  Q.    And that's because you don't view that as an important

14  fact in this case?

15  A.    I don't.

16  Q.    Can you turn to ECF page 101, report page 98?  On that

17  page, there's a reference to a thing in the footnotes to a

18  June 6th, 2025 memorandum from counsel for the debtors.  Did

19  you review that memorandum?

20  A.    I did not.

21  Q.    All right.  So Prof. Richards had access to information

22  that you did not?

23  A.    I'm certain that's true.

24  Q.    Did you ask anyone for that information?

25  A.    I did not.



Fred Cate - Cross

1   Q.   All right.  Now, I'm going to shift a little bit.  You

2   devote a whole section of your declaration to the proll (ph.)

3   and mechanics of consent.  That's paragraphs 34 through 46,

4   correct?

5   A.   Yes.

6   Q.   All right.  Is it fair to say that you disagree with the

7   CPO report?

8   A.   Yeah.  I -- I think it's fair to say yes.

9   Q.   And to put a finer point on it, is it your position that

10  where the law does not otherwise require it, an opt out system

11  is better?

12  A.   No.

13  Q.   Okay.  So how would you put it then?

14  A.   I would say opt out and opt in are equally good in terms

15  of the legal effect they create and that each depends on the

16  setting in which it's being used.  So to open an account, I

17  think opt in is in many cases preferable.  You have a good

18  chance to provoke the person to look at it.  You can make it

19  part of the agreement.  If you're trying to reach to change

20  something or to do something later, opt in tends to be an

21  absolute prohibition.  You might as well just say no.  And so

22  opt out tends to be a way where you can focus people's

23  attention and others can, legal officials can, press can,

24  politicians can, and then let people opt out when they wish.

25  Q.   All right.  Can you turn to paragraph 37, please?  I



Fred Cate - Cross

1    believe somewhere in there, you state, however, there is a

2    stark difference between the opt in and opt out systems in

3    terms of their cost and impact?

4    A.   Exactly.

5    Q.   And by that, you mean that opt in costs more?

6    A.   Opt in costs more, except in the situation where you're

7    opening an account.  And I say that repeatedly in here.

8    Q.   Right.  And you admit that in paragraph 38 that few

9    consumers respond to opt in opportunities?

10   A.   I don't admit it.  It's true.  I mean, yes.

11   Q.   All right.  So that means that there's a consumer

12   response difference between an opt in and opt out framework?

13   A.   Not at all.  I -- I think you would get almost no

14   responses to either an opt in or an opt out request.

15   Q.   Okay.  And then in paragraph 41, I think you say

16   something that you just said right now, which is that

17   requiring opt in is basically the same thing as a prohibition,

18   other than when you're opening an account for services?

19   A.   Exactly.

20   Q.   And then this culminates in a line in paragraph 42, where

21   you say, this is why legislatures and regulators rarely

22   require opt in consent?

23   A.   That is --

24   Q.   It's rare to require opt in consent?

25   A.   Exactly.



Fred Cate - Cross

1    Q.    And so those instances where legislatures have required

2    opt in consent, those legislatures view it as sufficiently

3    important to require it?

4    A.    Or they're misguided, in my judgment, or they -- opt in

5    is often presented as a better approach.  I don't think it is.

6    But if a legislator is given a chance to do something they

7    think's good or do something better, they may understandably

8    do the thing that they believe is better.

9    Q.    All right.  Now, so you might disagree with the

10   legislature from an economic or policy standpoint, but you'd

11   agree that when a legislature passes a law, that's the law?

12   A.    Yes.

13   Q.    All right.  Now, did you review all the different privacy

14   and genetic laws at issue in this case?

15   A.    I did not.

16   Q.    All right.  And I didn't mean that as a gotcha because I

17   haven't done it myself.

18   A.    No.

19   Q.    Now, the state laws can conceptually run the gamut here,

20   can't they?

21   A.    Yes.

22   Q.    So some states may not have relevant laws?

23   A.    Yes.

24   Q.    Some states may have laws with exceptions?

25   A.    Yes.



Fred Cate - Cross

1    Q.    And some might have opt out laws?

2    A.    Yes.

3    Q.    Now, you've been here all morning and on Wednesday,

4    correct?

5    A.    Yes.

6    Q.    And you heard this morning that various states have

7    reached a resolution of their objections in some fashion?

8    A.    Yes.

9    Q.    And you see that I'm still here, member of the California

10   Attorney General's office, objecting to the sale.  Can you

11   maybe take a guess at what California's law is in this

12   context?

13   A.    Well, I -- I mean, I know California's law is an opt in

14   law.

15   Q.    All right.  Thank you.  So you testified on direct that

16   privacy policies are treated like contracts?

17   A.    In many instances.

18   Q.    Now, when the legislature has stepped in and provided

19   specific requirements, does that go beyond a contract?

20   A.    Yes.

21   Q.    All right.  Now, debtors asked you about whether the

22   privacy policy and what TTAM are agreeing to are being the

23   same, and you described this as a perfect transaction,

24   correct?

25   A.    I did.



Fred Cate - Cross

1   Q.   Did you compare debtors' and TTAM's proposed privacy

2   enhancements to California state law?

3   A.   I did not.

4   Q.   All right.  So hypothetically, if those protections were

5   less than what California state law currently requires, would

6   that be a bonus for the sale to California residents?

7   A.   It would not matter because Congress has already said you

8   don't have to adhere to nonbankruptcy laws, and that would

9   include California's law.

10  Q.   You testified that the privacy enhancements are a benefit

11  to this transaction?

12  A.   I did.

13  Q.   If those privacy enhancements are less than what

14  California state law provides, hypothetically, would that be

15  an enhancement to the sale for California residents?

16  A.   Well, the word "less" there has virtually no meaning,

17  because that assumes that California's law could be measured

18  as better or less.  As more or less.  All I'm saying is that

19  opt in and opt out are entirely different ways of implementing

20  exactly the same legal protection.

21       So a choice that makes a more expensive way to implement

22  a legal protection or a choice that makes a less expensive

23  way, a choice that respects existing consumer choice or a

24  choice that ignores existing consumer choice, those would all

25  go into the question of is it better or is it less or is it

Fred Cate - Cross

1    more.  I'm not -- in this case, I think the privacy policy and

2    enhancements is better than requiring an opt in would be.

3    Q.    You're a law professor, correct?

4    A.    I am.

5    Q.    You're aware of hypotheticals?

6    A.    Yes.

7    Q.    So I asked you a hypothetical.

8    A.    Okay.

9    Q.    Hypothetically, the protections in these privacy

10   enhancements were less than California state law requires.

11   Would that be a benefit to the sale for California residents?

12   A.    If they offered less protection than California state law

13   would offer, that would not be a benefit.

14   Q.    All right.  And then if those protections were --

15   hypothetically, if those protections were the same as what

16   California state law required, would that be an improvement on

17   the sale for California residents?

18   A.    It would be a -- a wash.

19   Q.    It'd be a wash?  All right.  I want to return to

20   paragraph 41, and this is your idea that opt in can be the

21   equivalent of a prohibition.  Now, you have two citations here

22   in footnote 37 and 38.  And in I think it's footnote 38,

23   you're citing your 2002 and 2003 articles, Michael E. Stern,

24   and specifically a pincite at 768 to 69.  You see that?

25   A.    I do.



Fred Cate - Cross

1    Q.    Now, in that part of the article, you were discussing the

2    US West, now Qwest Communications' affirmative consent trial

3    that was conducted in 1997.  Are you familiar with that?

4    A.    Yes.

5    Q.    All right.  Qwest reached out to its customers in two

6    different ways, through telemarketing and direct mail.  And

7    the positive response rate for direct mail was between five

8    and eleven percent?

9    A.    Yes.  I'm thinking -- I mean, I don't have it in front of

10   me, so that sounds right.

11   Q.    Right.  And the telemarketing opt in rate was twenty-

12   eight percent.  But you report in there that Qwest decided it

13   was too costly to pursue this action, and so they discontinued

14   it.  Do you recall what the approximate cost was to get each

15   positive response?

16   A.    I -- I don't.

17   Q.    All right.  If I told you that the telemarketing cost was

18   twenty dollars per positive response, and the positive

19   response for the direct mail test was twenty-nine to thirty-

20   four dollars, would that probably be correct?

21   A.    That would -- that would not surprise me.

22   Q.    All right.  So based on the cost to the company, you then

23   write at page 769 that you're treating, for analytical

24   purposes, the opt in regime as effectively blocking the

25   effective forms of data sharing?  And --



Fred Cate - Cross

1    A.    Well, there's a -- that's a non sequitur.  In other

2    words, we discuss in detail, Prof. Staton and I -- he -- he's

3    an economist.  I'm a law professor.  The affect that raising

4    the cost of a transaction by a third can have on offering that

5    product or service to somebody.  That, of course, was twenty-

6    five years ago, before the proliferation of email and text and

7    all of these other things.  So it's relevant.  It's probably

8    even more relevant now, where companies spend much more to

9    actually attract a new customer in the way that Qwest was

10   trying to do.

11   Q.    Right.  And it's easier to send an email now than it was

12   back then to, like, telemarket and send direct to mail,

13   correct?

14   A.    And it's virtually certain the email will be ignored now.

15   Q.    I'd like you to confirm my hypothesis there.  What --

16   A.    It is easier to send an email.

17   Q.    It is cheaper to send an email?

18   A.    It is cheaper to send an email.

19   Q.    So it's not impossible to get opt in consent, it's just

20   costly?

21   A.    It is often impossible.  There are many studies of opt in

22   where it proved impossible.

23   Q.    Did --

24   A.    I cite -- sorry.  I'll stop.

25   Q.    No, go ahead.  I didn't mean to interrupt.



Fred Cate - Cross

1  A.    Well, I cite to a study by the National Health Council

2  talking to patients and caregivers about opt in for research.

3  And again, their number one objection was stop contacting me.

4  I've already given you my data.  I've given you my consent.

5  Why do you keep reaching out to me?  Because every time you

6  do, I think it's bad news.  And so there is a tendency to

7  respond negatively to getting the same communication over and

8  over again.

9  Q.    But it's still possible to get opt in consent?

10  A.    It is possible at the time of opening an account.  It's

11  also possible, and we have very good data on this, if a

12  consumer calls a company complaining about something, you can

13  convert that to a sale because you have their attention.

14  They're already giving you attention, even if they hate you at

15  the time that they've called.  So they call wanting to cancel,

16  and you end up selling them a -- a -- you know, another year's

17  package of something because it's getting their attention that

18  is the great challenge in the digital economy.

19  Q.    Right.  So what you're telling me is that Qwest didn't

20  get any positive opt ins?

21  A.    I'm telling you Qwest didn't get enough at a price that

22  made the service affordable to offer --

23  Q.    Thank you.

24  A.    -- or profitable.

25  Q.    Now, let's talk about bankruptcy.  Actually, we can skip



Fred Cate - Cross

1    that.  We just talked about that.  Let's go down.  Let's go

2    back to talking about bankruptcy and look at paragraph 16 --

3    A.    Okay.

4    Q.    -- where you say -- I want to talk about what an effect

5    on the date of the commencement of the case means to you.

6    I've got a series of hypotheticals for you, if that's all

7    right.  Hypo one.  Debtor has a privacy policy in 2020

8    prohibiting the sale of PII.  Customer signs up in 2021.

9    Debtor files bankruptcy in 2024.  What policy is in effect?

10   A.    Well, it depends on the policy that is currently in

11   effect on the 23andMe website.

12   Q.    No, I'm talking about hypotheticals here.

13   A.    It's on the hypothetical company's website.  Thank you

14   for clarifying.

15   Q.    All right.  So hypo 2.  Debtor has a privacy policy in

16   2020 prohibiting the sale.  Customer signs up in 2021.  And

17   debtor changes the privacy policy the next year, 2023, to

18   allow sale.  Debtor files bankruptcy in 2024.  What policy is

19   in effect?

20   A.    The policy in a -- publicly available on the website.

21   Q.    So the 2023 one?

22   A.    Right, assuming it hasn't been changed since then.

23   Q.    Right.  And can you assume in all these hypotheticals

24   that the policy doesn't change, unless I --

25   A.    I will assume.



Fred Cate - Cross

1   Q.   -- say it does?  All right.  Thank you.  Hypo 3.  Debtor

2   has a privacy policy in 2020 prohibiting the sale.  Customer

3   signs up in 2021.  Customer becomes incapacitated in 2022.

4   Debtor changes the privacy policy in 2023 to allow a sale and

5   files bankruptcy in 2024.  What policy is in effect?

6   A.   The policy on the website.

7   Q.   The 2023 policy?

8   A.   Yes.

9   Q.   All right.  Hypo number 4.  Debtor has a privacy policy

10  in 2020 prohibiting a sale.  Customer signs up in 2021.  The

11  customer dies in 2022.  Debtor changes the privacy policy in

12  2023 to allow the sale.  Debtor files bankruptcy in 2024.

13  What policy's in effect?

14  A.   The policy on the website.

15  Q.   Hypo 5.  State law prohibits the sale of PII.  Debtor has

16  a privacy policy prohibiting the sale in 2020.  Customer signs

17  up in 2021.  On January 1st, 2024, debtor changes their policy

18  to say, we can sell your PII.  The next day, debtor files

19  bankruptcy.  What policy is in effect?

20  A.   The policy in effect on the date the bankruptcy was

21  filed.

22  Q.   So that's the January 1st, 2024 policy?

23  A.   Right.

24  Q.   Even though it violates applicable state law?

25  A.   Yes.



Fred Cate - Cross

1    Q.   Now, I want to discuss what prohibit means to you.  And I
2    want to -- your analysis is that there's a three-step
3    framework and that if it doesn't prohibit, you -- if the
4    privacy policy does not prohibit the sale of PII, you don't go
5    anywhere else.  You stop right there.  Correct?
6    A.   Yes.
7    Q.   All right.  So if you recall, when we discussed in
8    paragraph 41, you contended that opt in frameworks could
9    amount to a prohibition?
10   A.   Yes.
11   Q.   So a privacy policy that required an opt in for the sale
12   of PII would, in your view, be the same thing as a policy
13   prohibiting the sale of PII?
14   A.   I believe it would operate in the same way, yes.
15   Q.   That's not the question I asked.  Would a privacy policy
16   that required opt in for the sale of PII be the same thing as
17   a policy prohibiting the sale of PII?
18   A.   It would use different words, but it would operate
19   exactly the same way.
20   Q.   And would it be treated the same way under the Bankruptcy
21   Code?
22   A.   No.
23   Q.   So would the -- so if a privacy policy has an opt in for
24   the sale of PII, that is different than a policy prohibiting
25   the sale of PII for purposes of the Bankruptcy Code?



Fred Cate - Cross

1    A.    Yes.

2    Q.    Even though, in your view, opt in is the exact same thing

3    as a prohibition?

4    A.    Yes.

5    Q.    All right.  In paragraph 29, you state, in the absence of

6    an express commitment in a privacy policy not to sell data to

7    a third-party, that type of language, that would be a

8    prohibition, correct?

9    A.    Sorry.  I'm just looking for --

10    Q.    Sorry.  Yes, I apologize.  I was moving too quickly.

11    A.    Yeah.   Paragraph 29.

12    Q.    Yeah, it's buried in the middle there.  You say, "in the

13    absence of an express commitment in a privacy policy not to

14    sell data to a third-party"?

15    A.    Right.

16    Q.    You view that as a prohibition?

17    A.    An express commitment not to sell data?  Yes.

18    Q.    Yes.  So if a company said, we do not sell personal

19    information to third parties, that would be a prohibition?

20    A.    It -- it would be.  Again, you would have to look at the

21    rest of it.  In other words, if it said, we don't sell it,

22    other than in connection with your organization, or if it said

23    it here, but then elsewhere, it said, but you are giving us

24    consent to sell it here, you have to look at the whole policy.

25    But if the policy prohibited the sale, then it would -- it



Fred Cate - Cross

1   would act as a -- a prohibition.  It would trigger a review.

2   Q.   So again, if a policy, the only thing it said was, we do

3   not sell personal information to third parties, that would be

4   a prohibition?

5   A.   If that were the only thing it said, that would be a

6   prohibition.

7   Q.   All right.  And in paragraph 17 and on direct, you talked

8   about how debtors' privacy policy, in place since 2007,

9   provides that personal data may be transferred in connection

10  with a change in control transaction?

11  A.   Yes.

12  Q.   And then on direct, you said that a reasonable person

13  would look at the previous historical policies.  And so you

14  view the continuity of policies as important?

15  A.   I view it as not necessary, but I think it -- yes, I

16  think it's important.

17  Q.   It's something that a reasonable person would do?

18  A.   Yes.

19  Q.   All right.  And now, I would like for you to get the Ms.

20  Jami Vibbert declaration binder.

21       MR. NADAL:  I don't have a copy of it.  If someone

22  could provide it to me, I would appreciate it.

23       Excuse me.  Your Honor, may I approach the witness?

24       THE COURT:  Yes.

25       THE WITNESS:  Thank you.



Fred Cate - Cross

1    MR. NADAL:  I'd like to start by thanking my

2    colleagues at Quinn Emanuel for providing the binder for Mr.

3    Cate.

4    Q.  I believe what you have before you is a Quinn Emanuel

5    trial binder, which has tab 2.  It's Ms. Jami Vibbert's

6    declaration binder.  Do you see that?

7    A.  I do.

8    Q.  Now, can you turn to exhibit 28 of that?  And I'll help

9    you here.  It's on page 324.

10   A.  Okay.  I have it.

11   Q.  All right.  Now, that's exhibit 28, correct.

12   A.  Exhibit 28, yes.

13   Q.  Yes.  Now, the next page is 325.  Do you see that it's a

14   privacy notice for California residents?

15   A.  I do.

16   Q.  Its effective date is January 1st, 2020?

17   A.  Yes.

18   Q.  And you see that in that first paragraph there, it says

19   that, "In the event of any conflict in terms of this notice

20   and the privacy statement, the terms of this notice prevail"?

21   A.  Okay.  Yes.

22   Q.  Do you see that?  Can you drop down to the bottom of the

23   page where it says, "consumer rights"?

24   A.  Yes.

25   Q.  Do you see that -- let's see here.  Consumer rights.  We



Fred Cate - Cross

1  have to turn to the next page actually and drop down to 3,

2  which is opt out of sales.  Do you see that?

3  A.   Yes.

4  Q.   And it says you have the right to opt out of sales.  I'm

5  paraphrasing there.  But then the second sentence there says,

6  "23andMe does not sell personal information to third parties"?

7  A.   Yes, I see that.

8  Q.   All right.  Let's turn to exhibit 27, which is at page

9  319.

10  A.   Got it.

11  Q.   All right.  The next page is 320.  This is a little

12  bit -- appears a little different right, but it's still a

13  privacy notice for California residents?

14  A.   Right.

15  Q.   It was last updated on August 2nd, 2022?

16  A.   Yes.

17  Q.   And it again also has that in event of any conflict, the

18  terms of this notice prevail?

19  A.   Yes.

20  Q.   Can you look at the summary section on that same first

21  page?

22  A.   Got it.

23  Q.   It says, here's a summary before we dive into the

24  details.

25  A.   I see this.



Fred Cate - Cross

1   Q.   And then in the first bullet point, "You have the right
2   to know whether we sell your personal information and opt out
3   of a sale if we do.  But rest assured, we do not sell your
4   personal information"?
5   A.   Right.
6   Q.   Same page at the very bottom.  Does it say, the very last
7   line there, "23andMe does not sell personal information to
8   third parties"?
9   A.   Yes.
10  Q.   So let's go back to your paragraph 18.  You say that
11  there are no grounds for any claim that the policy at any time
12  prohibited the transfer of PII.  We just looked at two
13  policies, yes?
14  A.   Yes.
15  Q.   And one of those policies said, we do not sell personal
16  information?
17  A.   Yes.
18  Q.   The other said, we do not sell personal information to
19  third parties?
20  A.   Yes.
21  Q.   So and these are debtors' privacy policies?
22  A.   Yes.
23  Q.   Did you review these?
24  A.   I did not.
25  Q.   All right.  Thank you.  Let's turn to paragraph 39 of



Fred Cate - Cross

1    your declaration.

2            THE COURT:  Sorry.  You said 39?

3            MR. NADAL:  39.  Yes, Your Honor.

4            THE COURT:  Thank you.

5    A.    Got it.

6    Q.    You say, "Especially in a case like the present one,

7    where consumers have already opted into the use of their data

8    that includes a sale, what are they to make of a new request

9    asking them to consent again?"  But we just looked at the

10   January 2020 California resident privacy policy, and a

11   California resident who signed up in February 2020 opted into

12   the use of -- sorry.  Excuse me.  Did a California resident

13   who signed up in February 2020 opt in during the sign up to

14   the use of their data that includes a sale?

15   A.    Well, to be honest, I don't know because I would have to

16   read the rest of the policy and know the context in which it

17   occurred.  You know, you've given me one line.  I understand

18   that line, but I'd need the rest.

19   Q.    All right.  But you didn't review this?

20   A.    Exactly, so I'm not going to answer the question because

21   I haven't reviewed it.

22   Q.    All right.  We just looked at the August 2022 California

23   privacy policy.  California resident who signed up in

24   September 2022 opted in to the use of their data that includes

25   a sale?



Fred Cate - Cross

1    A.    Well, that's the one that I think specifically talked in

2    connection with third parties.  So again, we would need to

3    know how that squares with 363.  But we'd also have to know

4    the rest of the policy.  And particularly where something says

5    summary of rights, that particularly tells me it's not the

6    whole policy.

7    Q.    All right.  Let's go back to exhibit 28.  That's again

8    page 324.  Well, actually 325 for the actual --

9    A.    Right.

10   Q.    -- privacy policy.  Again, this is a privacy notice for

11   California residents?

12   A.    Yes, but it says, "This privacy notice" -- sorry.  I'm in

13   the fourth line.

14   Q.    Yes.

15   A.    "This privacy notice for California residents supplements

16   our privacy statement."

17   Q.    Yes.  And then the -- and it goes on to say that, in the

18   term -- "In the event of a conflict, this notice prevails"?

19   A.    Right.  But there's no clear conflict here between a

20   paragraph about what happens if you're sold in a

21   reorganization and selling data to a third-party over here.

22   In fact, prior policies maintain that distinction the whole

23   way through them.

24   Q.    Um-hum.

25   A.    So unless California residents -- I mean, they're going



Fred Cate - Cross

1    to have to do the same interpreting that anyone else does to

2    say, it's not going to be sold like the way we think of a

3    sale.  For marketing.  For something like that.  But on the

4    other hand, if the business is sold, then of course my data is

5    going to be sold, as it says in the privacy policy.

6    Q.    All right.  I want to go back to your statement that

7    there's a difference between the summary and what the actual

8    rights are.

9    A.    Okay.

10   Q.    Again, on exhibit 28, we talked about the summary at

11   first, right?  There's the summary portion?

12   A.    Right.

13   Q.    And then we go down to on the bottom of the page where it

14   says, consumer rights.  Is that a summary?

15   A.    Well, it's clearly not the whole privacy policy because

16   it's much shorter than the privacy policy.  So unless people

17   in California get fewer rights than people everywhere else in

18   the country do, I assume it is still what it says it is.  A

19   supplement to the privacy policy.

20   Q.    And as part of that description of consumer rights, it

21   says, "23andMe does not sell personal information to third

22   parties"?

23   A.    Right.

24              MR. NADAL:  No further questions.

25              THE COURT:  Thank you.



Fred Cate - Cross

1          Ms. Milligan.

2     CROSS-EXAMINATION

3     BY MS. MILLIGAN:

4     Q.   Hello again, Prof. Cate.

5     A.   Hi.  How are you?

6     Q.   Again, Layla Milligan on behalf of the State of Texas.

7     First, let's see.  I think you testified the debtors'

8     professionals hired you; is that correct?

9     A.   Excuse me.  I just didn't hear the start of the --

10    Q.   Who hired you?  Was it the debtor?

11    A.   The debtor.

12    Q.   23andMe?

13    A.   Yes.

14    Q.   Okay.  And you were hired June 8th.  Does that sound

15    right?  You said the Sunday --

16    A.   Sunday, a week ago.

17    Q.   -- before Thursday -- okay.  Okay.  Have you been paid?

18    A.   No.

19    Q.   Not yet?

20    A.   No.

21    Q.   Okay.  Do you know who will pay you?

22    A.   I hate to say no.  I think the debtor will pay me.

23    Q.   Okay.  Is there someone paying your travel expenses for

24    this hearing?

25    A.   No, not yet.



Fred Cate - Cross

1    Q.    No?  Not yet.  Okay.  Is that --

2    A.    I hope they do.

3    Q.    They will be?  Okay.  And your employment and this report

4    was not -- I'm sorry.  Your employment and payment of

5    compensation is not contingent on the results in your report,

6    correct?

7    A.    No.

8    Q.    Okay.  Have you met Anne Wojcicki before?  And I'm going

9    to -- I apologize to Anne Wojcicki for mispronouncing her name

10    but --

11    A.    I had not met her until Wednesday.

12    Q.    Wednesday?  Okay.  And was that here in court?

13    A.    It was.

14    Q.    Okay.  Have you ever had any communications with her

15    outside of Wednesday?

16    A.    Not to my knowledge.

17    Q.    Okay.  Have you ever performed any work for her or

18    23andMe?

19    A.    No.

20    Q.    Okay.  Or any of her foundations?

21    A.    Again, not to my knowledge.

22    Q.    Has either Anne Wojcicki personally or through her

23    foundations or 23andMe ever paid you directly for work

24    performed?

25    A.    Never.



Fred Cate - Cross

1    Q.    Or donated funds to any organization on your behalf?

2    A.    No.

3    Q.    Are you associated with any organizations who've received

4    funds from Anne Wojcicki or her foundations or nonprofits?

5    A.    Not to my knowledge.

6    Q.    Are you associated with any organizations who have

7    received funds from 23andMe?

8    A.    No.  Again, not to my knowledge.

9    Q.    Okay.  And I say that because on your CV, you're a member

10   of many various boards, and so okay.  I'm going to start with

11   your report.  Let's see.  In your report, you're focusing a

12   lot on 363(b)(1)(A), correct, because of --

13   A.    Correct.

14   Q.    Okay.  What is your -- well, I'm going to assume your

15   familiarity, but are you familiar with 363(b)(1)(B)?

16   A.    Yeah.  Yes.

17   Q.    I'll read it.  "After appointment of a consumer privacy

18   ombudsman in accordance with Section 332 and after notice and

19   a hearing, the court approves such sale or lease, giving due

20   consideration to the facts of the sale and finding no showing

21   was made that such sale or lease would violate applicable

22   nonbankruptcy law, right?

23   A.    Yes.

24   Q.    And you're aware that a CPO has been appointed in this

25   case?



Fred Cate - Cross

1   A.    Yes.

2   Q.    Okay.  And there's no condition on that (b)(1)(B) that

3   after the appointment of a CPO, the court may take these

4   things into consideration?

5   A.    I mean, in this case, the -- the parties stipulated to a

6   range of questions or issues or topics for the CPO, and the

7   CPO has addressed them widely.

8   Q.    Okay.  So you don't contest that a CPO has been appointed

9   in this case?

10  A.    Goodness, no.  No.

11  Q.    And that the Court may consider his report?

12  A.    Absolutely not.

13  Q.    Okay.  Your comment, let's see.  You have a lot of

14  references to Congress's preference on things and sort of I

15  guess the Bankruptcy Code's feelings.  It literally said

16  Bankruptcy Code respects the choices.  Are you familiar with

17  the recent hearings of the House Appropriations committee and

18  the Senate Judiciary committee regarding 23andMe?

19  A.    I -- I am.  I mean, only from what I've read in the

20  paper, but yes.

21  Q.    Did you watch or listen to those testimony?

22  A.    I did not.

23  Q.    Okay.  Would it surprise you that members of Congress are

24  not pleased and are not expressing a preference for personal

25  data to be sold in bankruptcy?



Fred Cate - Cross

1    A.    In a hearing, nothing would surprise me.

2    Q.    Okay.  All right.  In your paragraph 7 -- let's see.  In

3    paragraph 7, the CPO, you state, and that's page 4, I'm sorry,

4    of your statement.  The CPO and some state Attorneys General

5    prefer a different approach to that laid out by Congress and

6    the FTC.  And then you go on to say, this policy preference is

7    contrary to the demonstrated behavior of the debtors'

8    customers.  Is it your opinion that a law that is passed by a

9    state legislature is a policy preference?

10   A.    It -- it -- it -- it -- it may be.  My -- I mean, my

11   opinion is that the law expresses the preference of whoever

12   enacted it.

13   Q.    Like the legislature, on behalf of its constituents,

14   which are the State of Texas --

15   A.    Yes.

16   Q.    -- and individuals?  Okay.  So when a legislature

17   represents individuals in a state and pass a law, would it be

18   safe to assume that the consumers of that state agree with the

19   law that's passed?

20   A.    No.

21   Q.    No?  Okay.

22   A.    No, it would be safe to say that the legislatures --

23   legislators and the governor agree with that law.

24   Q.    Okay.  But the legislators are elected officials,

25   correct?



Fred Cate - Cross

1   A.    Right.

2   Q.    Okay.  So let's see.  In paragraph 20, and it's on page

3   8, there's one sentence, the last sentence of paragraph 20, I

4   just want to point out to you and make sure I understand what

5   you're saying.  And I'm going to read it to you.  It says, "It

6   is untenable to argue that every future statement about

7   privacy unilaterally amended or modified the terms customers

8   previously acknowledged and accepted"?

9   A.    Yes.

10  Q.    So does that apply to consumers who may have signed a

11  privacy statement in 2010 that says something different and of

12  a later future, like, modified privacy statement?

13  A.    I'm not exactly sure I know what you mean, but --

14  Q.    I mean, would this apply to consumers?

15  A.    But -- but in other words, nobody can amend the privacy

16  statement -- the privacy policy through a statement.  Not a

17  consumer.  Not a company.

18  Q.    Okay.  I believe that you had -- in the exhibit B that

19  you were talking about, there was a privacy statement.  Let's

20  see.  This is your binder.

21  A.    My binder?  Okay.

22  Q.    This is Prof. Cate binder.  I know you've got a lot of

23  binders there.  I apologize for that.

24            THE COURT:  So we're in tab 5, exhibit B?

25            MS. MILLIGAN:  Yes.  Thank you.



Fred Cate - Cross

1        THE COURT:  Okay.

2        THE WITNESS:  Thank you.

3   A.   This is a sale hearing.  Prof. Fred H. Cate binder, tab

4   5, exhibit B.  And I'm looking at the first page says,

5   "Privacy statement"?

6   A.   Yes.

7   Q.   Can you read the first, I guess, what do you call it?

8   First indented paragraph under summary?

9   A.   "23andMe respects your privacy.  23andMe does not sell,

10  lease, or rent your individual level personal information

11  without explicit consent."

12  Q.   Okay.  Would you count that as an affirmative promise or

13  contract with the debtors -- or sorry.  The debtors.  The

14  consumers who read that that they -- that 23andMe does not

15  sell, lease, or rent your individual personal information

16  without explicit consent?

17  A.   Well, it would have to be read in context again.  So

18  first of all, it's in a paragraph labeled summary, which

19  largely makes it irrelevant to start with.  So we want the

20  actual text of the privacy policy, not just a -- not just a

21  summary of it.  So we --

22  Q.   I'm sorry.  I'm sorry.  I'm going to interrupt you really

23  quick --

24  A.   Of course.

25  Q.   -- before you move on.  So you're telling me if a



Fred Cate - Cross

1    consumer opened this privacy statement.  Read the first line.

2    They would not believe -- or it would be in, I guess -- they

3    would be confused or think that their data might be sold?

4          MR. RECHER:  Objection, Your Honor.  And I would just

5    ask --

6          THE COURT REPORTER:  Podium.

7          THE COURT:  Oh, sorry.  Come to this -- we need this

8    mic for the court reporter.

9          MR. RECHER:  Thank you, Your Honor.

10         THE COURT:  -- even though that one will broadcast

11   throughout the room.

12         MR. RECHER:  Objection.  And I would just ask that

13   counsel refrain from interrupting the witness when he's in the

14   middle of the answer and allow him to finish his answer and

15   then ask whatever follow up questions she might have.  And I

16   object to the question on that basis.

17         THE COURT:  I think, as a general rule, that's a

18   good -- I think, here, we're okay.  I think I understand we're

19   getting back to where Prof. Cate was going eventually.  And of

20   course, you can redirect.  But as a general matter, if you'd

21   let the witness answer this.

22         MS. MILLIGAN:  Sure, Your Honor.  And I apologize.  I

23   felt like he was moving off of the question.  So I apologize

24   for the interruption.

25         THE COURT:  Okay.  So what's the question currently



Fred Cate - Cross

1    pending?

2    Q.    I believe what the question was is a consumer, in your

3    opinion, would read the first line of the privacy statement

4    but would have the context of saying, well, this is a summary,

5    so it doesn't really mean what it says; is that right?

6    A.    I would say that the Federal Trade Commission for thirty

7    years has dealt with this issue.  It likes short, pithy

8    privacy policies.  And the problem is lawyers don't enforce

9    them like that.  So companies are very hesitant to say

10   something up front by way of summary, knowing that in the back

11   end, there's going to be something that, you know, could

12   appear to contradict it.

13        So for example, I'm just going to finish quickly, and

14   then you can strike it.  But you can say, we do not sell,

15   lease, or rent your individual level data.  However, almost

16   everyone knows you're going to provide it to your lawyer.

17   Your auditor.  Your -- these are all people who might get some

18   of the data.  So usually statements like that are followed in

19   the privacy policy by saying, yes, but it doesn't apply to

20   these situations.  In this case, it's followed by saying it

21   doesn't apply in the event of a -- of a reorganization or the

22   sale of assets.

23        MS. MILLIGAN:  Okay.  So thank you for that.  I will

24   ask to strike everything after the initial response.

25        THE COURT:  Overruled.  I think it's a fair response.



Fred Cate - Cross

1          MS. MILLIGAN:  Okay.  Thank you.

2     Q.    So I'm going to ask you to -- so we've talked about the

3     first sentence.  Let's turn the page to the next page.  And

4     just above, do you see the section, "Your choices"?

5     A.    I do, yes.

6     Q.    Just above that, there's a statement that says, "We will

7     not disclose your individual level personal information to any

8     third-party, except under the following circumstances."  And

9     what does the bottom bullet point say?

10    A.    You have provided explicit consent for us to do so.

11    Q.    Okay.  So again, there's a second statement in this

12    policy that assures consumers that their personal information,

13    which includes genetic information, will not be disclosed to a

14    third-party unless they have explicit consent from the

15    consumer?

16    A.    Except we're still not in the full privacy statement.

17    Q.    I mean, we're in the privacy statement, right?

18    A.    No, we're -- we're actually not.

19    Q.    Okay.

20    A.    Full privacy statement is at the bottom of that page.

21    Q.    Okay.  So --

22    A.    I mean, I'm just reading it.  I don't --

23    Q.    Okay.

24    A.    Yeah.

25    Q.    But the individuals have to click through this and review



Fred Cate - Cross

1    it, right?

2    A.    Exactly.

3    Q.    Okay.  Are you familiar with the Deceptive Trade

4    Practices Act?

5    A.    In Texas or in the --

6    Q.    I mean, I think there's a federal rule.

7    A.    I -- I know the federal one, yes.

8    Q.    Okay.  Would a statement that is made to consumers that

9    is not complied with be considered a misrepresentation?

10   A.    It would not be if it was clarified in the same document,

11   and especially if it's clarified in a equally prominent way,

12   so assuming the typefaces are the same and so forth.

13   Q.    Okay.

14   A.    And again, the Federal Trade Commission's brought close

15   to 300 cases in this area.  This is very well established law.

16   And it's designed by the Commission to try to encourage folks

17   to do what we call layered notices.  Start small, then keep

18   building out.  Keep building out.  And as long as you do it

19   all in an accessible thing, accessible place, one web page,

20   for example, it's considered appropriate.

21   Q.    So okay.  I'm kind of -- I'm working through the eyes of

22   a consumer.

23   A.    I understand.

24   Q.    A consumer opens a privacy statement.  They see the first

25   line under summary.  Then there's definitions, personal



Fred Cate - Cross

1    information, how we use your information, your choices, and

2    actually how we use your information states affirmatively that

3    you have to have explicit consent to transfer or disclose the

4    genetic data.

5        And then they continue to scroll several more pages to

6    the last page of this policy that the statement can be -- that

7    there could be a business transition.  It says, "In such a

8    case" -- I'm looking at business transactions, I'm sorry, on I

9    think it's page 29.  It's the last page of

10   A.    Yes.

11   Q.    -- that exhibit.  "In the event 23andMe goes through a

12   business transition, such as a merger, acquisition, or sale of

13   all or a portion of assets, your personal information will

14   likely be among the assets transferred.  In such a case, your

15   information would remain subject to the promises made in any

16   preexisting privacy statement."  Is it possible for a consumer

17   to infer that to mean with their explicit consent?

18   A.    I -- I don't think so.  But -- but even if they could,

19   what you would more, I think, reasonably say is they've just

20   given their explicit consent right here.  In a business -- a

21   business transaction, it may involve transferring my data.

22   What I think that line is promising is that whoever acquires

23   the data will be subject to the same privacy policy, which is

24   what the Federal Trade Commission required in Toys Mart.  And

25   it's what's provided for in this agreement.



Fred Cate - Cross

1    Q.    But I'm looking at this from a consumer's point of view.

2    You understand that --

3    A.    Okay.

4    Q.    -- we've now gone to the very last page of this privacy

5    statement, where in two other places it says, the information

6    will not be shared, sold, disclosed to any third-party without

7    explicit consent.  And then on the last page, there's a

8    statement that your information will likely be/may be among

9    the assets but are subject to the same promises in any

10   preexisting privacy.  You can acknowledge that at best there's

11   conflicting statements.  Well, I'm sorry.  At worst, there's

12   conflicting statements.  At best, a consumer would not be

13   clear as to what will happen if there is a merger or sale

14   because there is conflicting information in these privacy

15   statements?

16   A.    I don't see that as conflicting at all, so I'm --

17   Q.    Okay.

18   A.    -- I'm certainly not acknowledging that.  I would also

19   say if we're --

20   Q.    I'm sorry.  I'm sorry to interrupt you.  I'm sorry.  From

21   the aspect of a consumer was the question.  I'm sorry.

22            MR. RECHER:  Your Honor.

23            THE COURT:  Yes.  I'm going to allow Prof. Cate to

24   finish his answer to that question.

25            MS. MILLIGAN:  Thank you.



Fred Cate - Cross

1    A.    All right.  So I can go right on.  From the aspect of

2    consumer, virtually no one's reading all this anyway.

3    Q.    Um-hum.

4    A.    It's only lawyers who are reading this.  And that's why

5    the Federal Trade Commission has worked out so carefully with

6    lawyers how this is done.  This is done exactly like the

7    Federal Trade Commission seems to like.  Start with little

8    statements.  Move to more specific statements.

9         This is actually quite a tiny privacy policy.  I mean,

10   I -- I can remember the Federal Trade Commission bringing a

11   case against I think it was Sears for making a disclosure or

12   change on page 70-something of the policy.  And they said,

13   look, if you're going to do it that late, you've got to make

14   it bigger type or something.

15        But this is page 8, 9.  This doesn't seem that

16   surprising.  And moreover, it says, we're going to get your

17   consent.  And then it says, except if it's in a business

18   transaction, in which case you've just given us your consent.

19   It -- it --

20   Q.    Okay.

21   A.    -- seems clear and consistent with what federal

22   regulators here would normally expect.

23   Q.    All right.  I'm sorry.

24   A.    I'm done.  Yes.  You go ahead.

25   Q.    Okay.  I certainly don't mean to interrupt you.  But that



Fred Cate - Cross

1    business -- what you're saying is individuals are consenting,

2    when the statement that is there says, well, your personal

3    information will likely be among the assets and that it will

4    be subject to promises made in preexisting privacy statements.

5    A.    Right.

6    Q.    So why would they not potentially believe that any sale

7    or merger would involve explicit consent?  It does not say you

8    are giving explicit consent to include your personal

9    information in the assets transferred, correct?

10   A.    It -- it doesn't say that in any paragraph.

11   Q.    Okay.  And so in the other paragraphs, it says, we will

12   not sell your data without your explicit consent, correct?

13   A.    Right.

14   Q.    So this business transitions does not infer opt in

15   consent to having their data moved.  It says will likely be

16   among.

17   A.    Right.  I -- I --

18   Q.    I mean --

19   A.    -- just disagree and --

20   Q.    Okay.

21   A.    -- I hope we'll part friends, despite my disagreeing.

22   But -- but when you sign something saying, I agree to submit

23   my data, subject to this policy, if you're one of the people

24   who read it and it said, by the way, if we go bankrupt, our

25   date is going with us, I think you've agreed to that.



Fred Cate - Cross

1    Q.    In the policies -- so in this policy, I think -- I want

2    to make sure I have the date right.  Second one.  This is

3    their binder.  Okay.  This one that we're looking at, I'm

4    sorry, on the last page we were just talking about, it says,

5    this privacy statement was last updated June 24th, 2010.  So

6    if a consumer was a one -- and 23andMe involves both research

7    component --

8    A.    Right.

9    Q.    -- related to the genetic data, correct?

10   A.    Right.

11   Q.    And one time use of individuals seeking genetic

12   information or report?

13   A.    Right.

14   Q.    Okay.  And this, if someone signed this report, say, in

15   August 2010 and read this privacy statement, which says in two

16   places, we will not sell your data without explicit consent.

17   Gets their results.  Goes on about their life.  Never checks

18   the website.  Never gets an email.  Is it your position they

19   would be bound by subsequent privacy policies, even without

20   knowing that they're in existence?

21   A.    Absolutely.

22   Q.    Okay.  And that is -- and if the person deceased, if they

23   died, they would also -- their genetic data would still be

24   subject to subsequent privacy policies, as they are passed --

25   okay.  Without consent.  Without agreement.  Without



Fred Cate – Cross

1    acknowledgment.

2    A.    Well, there -- there has been consent, and the Bankruptcy

3    Code couldn't be clearer.  We care about the privacy policy in

4    place on the date as of the commencement of proceedings.  So

5    again, I think Congress has spoken here.  There may be members

6    of Congress who feel differently today, but -- but until they

7    change the law, that remains the law, I think.

8         And in addition, it's not -- you know, in this case,

9    there's going to be notice of the -- of the -- I mean, that's

10   part of the TTAM.  So I don't -- I don't see -- I mean, these

11   are hypotheticals --

12   Q.    Um-hum.

13   A.    -- but they're not -- they're not what's happening here,

14   since people will be notified, even if they haven't checked

15   the privacy policy.  And if they're deceased, if they have

16   a -- a representative or someone handling their estate, they

17   will be.  And otherwise, what was in place will control.

18   Q.    In a policy such as the one we're looking at, I think

19   that the concern might be that the consumer, and I'm talking

20   about a consumer that doesn't have your level of education and

21   expertise, would conceivably be confused or unclear about the

22   ability of a direct-to-genetic testing company to sell,

23   transfer, or disclose their data with two statements made in

24   each policy because there could be some confusion because of

25   the abject statements that are made, we will not sell your



Fred Cate - Cross

1   data; is that correct?

2   A.   I think there could always be confusion.

3   Q.   Okay.

4   A.   It's one reason why, again, people don't read privacy

5   policies.

6   Q.   I mean, even if they read the first page, the first

7   sentence, it says, in many --

8   A.   Right.

9   Q.   -- of their policies, until I think maybe the one change

10  in 2022 says, we will not sell your data without explicit

11  consent so --

12  A.   Right.  But let's -- sorry, I shouldn't interrupt you.

13  Q.   It's okay.

14  A.   I apologize.

15  Q.   Let me ask.  A company such as 23andMe would be able to

16  change their policy anytime up to a bankruptcy proceeding,

17  correct?

18  A.   That is correct.

19  Q.   And a company could change their policy in a way that

20  does not comply with federal nonbankruptcy law or state

21  nonbankruptcy law.  And if they did so, your opinion is that

22  they would not -- it doesn't matter.  That if the policy is

23  consistent with what they're trying to do, that overrides

24  federal and state law?

25  A.   I -- I -- I just -- you added things there, and I just



Fred Cate - Cross

 1    want to pull them out --

 2    Q.    Okay.

 3    A.    -- to make clear what I'm agreeing with.  But I am --

 4    Q.    Um-hum.

 5    A.    -- I am agreeing.

 6    Q.    Um-hum.

 7    A.    So in other words, if a company changes its policy in a

 8    way that violates state law, the state can bring an action

 9    right then and there.  There's -- there's nothing about

10    bankruptcy that's relevant because bankruptcy's not on the

11    table.  The moment the company files for bankruptcy, what

12    their policy says that day that has been disclosed to third

13    parties that concerns sale of data to third parties, that is

14    binding.  And then it's too late for states to come in because

15    Congress has made clear, for the moment -- it can change its

16    mind, of course, but for the moment, that's the touchstone.

17    It doesn't matter about consistency or any of that.  I -- it

18    might, to a reasonable person -- I don't mean to call Congress

19    not reasonable, but it -- it doesn't matter to Congress.

20    Q.    I'm glad you mentioned that.  In front of you is a Texas

21    binder.  I think it says, "State of Texas Exhibits in Support

22    of the State of Texas Objection".

23    A.    Yes, it's here.

24    Q.    Okay.  Fantastic.

25    A.    It's bigger than the other binder.



Fred Cate - Cross

1  Q.   Well, we are from Texas so --

2  A.   I understand.

3  Q.   At exhibit -- it's called, and we called it in Tex G, so

4  just so you know that it's Texas.  We don't want to get any --

5  there's TTAM and debtors.  And so Tex.

6  A.   Got it.

7  Q.   Tex G is a transcript of the House Oversight and

8  Government Reform Committee hearing.  That is a public

9  hearing.  And this is a transcript of that public exchange,

10 that public hearing.  And you did not watch this hearing?

11 A.   I did -- I did not.

12 Q.   Okay.  And to your knowledge, obviously not having

13 watched it, the discussion point for these two, the House and

14 the Senate committee, were related specifically to 23andMe,

15 correct?

16 A.   I don't know so --

17 Q.   You don't know?

18 A.   I didn't watch it so --

19 Q.   Okay.  Okay.  And I think you said -- your comment is, I

20 guess -- the reason I'm referencing this, and actually, Tex 8

21 is the Senate transcript, that Congress is agreed.  Congress

22 posits that the law is correct.  Congress believes that this

23 transaction should be fine.  But there are transcripts of the

24 Senate and House hearings, where obviously there are concerns

25 raised in consideration of the issues in this bankruptcy case



Fred Cate - Cross

1    involving the sale of this.  Are you familiar with that at

2    all?

3                MR. RECHER:  Objection, Your Honor.  One, I believe

4    this document is not in evidence.  Second, I believe the

5    witness already testified he's not familiar with this

6    particular proceeding.  And to the extent counsel is

7    questioning him about statements made in a congressional

8    proceeding based on a transcript, that's obviously hearsay.

9    So I would object for those reasons.

10               THE COURT:  Well, the question was would it surprise

11   the witness to learn this.  I think that's a fair question.

12   I'll overrule the objection.

13               MR. RECHER:  Thank you, Your Honor.

14   A.    It would not at all surprise me to learn that there are

15   members of Congress concerned.

16   Q.    Okay.  I would like for you to please go back to the

17   beginning of our binder.  Our very large binder.  I apologize.

18   A.    Oh, so Tex binder?  Okay.

19   Q.    Yeah.  Texas binder.  And I'll represent the Tex A is a

20   complete copy of the privacy policies in effect at different

21   times in the history of 23andMe.

22               MS. MILLIGAN:  Your Honor, I believe that almost all

23   of these have already been admitted into evidence, with the

24   exception of the policy -- that is 17?  Which one is it?

25   Number 18 in our exhibit book.  And it is the policy that was,

Fred Cate - Cross

1    in effect -- policy that was, I guess, enacted in February

2    28th of 2013.  I think it was just inadvertently not included

3    in the other exhibits.  So I would ask that that policy be

4    included as an exhibit and submitted into evidence.

5            THE COURT:  Are you offering all these or --

6            MS. MILLIGAN:  Well --

7            THE COURT:  I'm a little unclear what --

8            MS. MILLIGAN:   Here's the rub, Your Honor, and I

9    don't want to inconvenience the Court.  I believe all of these

10   have already been admitted, except that one version of the

11   privacy policy.  I don't necessarily want to admit them all

12   again --

13           THE COURT:  Okay.

14           MS. MILLIGAN:  -- and burden the Court with all of

15   these copies, but if that is preferred.

16           THE COURT:  So it's Tex A-18 --

17           MS. MILLIGAN:  Yes, Your Honor.

18           THE COURT:  -- that you're offering?

19           Any objection?

20           MS. MILLIGAN:  No objection.

21           THE COURT:  Okay.

22           MS. MILLIGAN:  Thank you.

23           THE COURT:  Tex A-18 will be admitted.

24   (2/28/2013 privacy policy was hereby received into evidence as

25   State of Texas' Exhibit A-18, as of this date.)



Fred Cate - Cross

1      MS. MILLIGAN:  Thank you.  And otherwise, what I'll

2    represent, just for ease and convenience, all of these have

3    been admitted.  But we just have them organized in a way

4    that's according to a timeline.  So if I can refer the debtor

5    to these exhibit books, with the Court's permission --

6      THE COURT:  For the witness --

7      MS. MILLIGAN:  -- rather than going back to Ms.

8    Vibbert's and like, using multiple exhibits already included.

9      THE COURT:  As a general matter, I think that's fine.

10   If there's some confusion, I'll certainly hear objection from

11   the debtor, if anyone's confused about what we're talking

12   about.

13     MS. MILLIGAN:  Okay.  And if we need to relate them

14   to the Vibbert exhibits, we can certainly do that if there's

15   any confusion.

16   BY MS. MILLIGAN:

17   Q.   We are going to work backwards and start at Tex A-22.  Do

18   you see the top of the page?  It says --

19   A.   I do.

20   Q.   -- privacy statement?

21   A.   Yes.  Thank you.

22   Q.   You have summary.  Personal information.  Uses of

23   information.  Do you see those tabs?

24   A.   Yes.

25   Q.   The next to the last tab, under "Uses of Information",



Fred Cate - Cross

1   can you read that sentence?

2   A.   "We will not release your personal information"; is that

3   the one?

4   Q.   Yes, sir.

5   A.   "We will not release your personal information to any

6   outside company without your explicit consent."

7   Q.   Okay.  And then if you would please turn the page.  And

8   the next page says, "Information Sharing and Disclosure".  Do

9   you see that page?

10  A.   Yes, I see it.

11  Q.   Under that section, there is a sentence that says,

12  "23andMe will not release your personal information"; do you

13  see that?

14  A.   Yes, I do.

15  Q.   Could you read that sentence for me or those two

16  sentences?

17  A.   23 -- "23andMe will not release your personal information

18  to any outside company without your explicit consent.

19  Q.   Okay.  If you turn the page, you'll see the last page of

20  this privacy policy, and it will say, "Changes to This Privacy

21  Statement"; do you see that?

22  A.   I do.

23  Q.   Okay.

24  A.   The very last sentence of that reflects, "In addition,

25  all customers will receive an email with notification of the



Fred Cate - Cross

1    changes."  Do you know or have any knowledge of whether emails

2    were actually sent to consumers with this updated privacy

3    policy?

4    A.    I do not, no.

5    Q.    Okay.  On the next, we'll go back to 21.  Do you see

6    "Privacy Highlights" page?

7    A.    Yes, I do.

8    Q.    Can you read the first sentence under the summary?

9    A.    "Summary.  23andMe respects your privacy.  23andMe does

10   not sell, lease, or rent your individual level personal

11   information without explicit consent."

12   Q.    Okay.  And if you'll turn two pages over, the top

13   paragraph subheading is "Web Beacons"; do you see that?

14   A.    Yes, I do.

15   Q.    And then a little bit lower down it says, "Information

16   Disclosure"?

17   A.    I see that.

18   Q.    Okay.  And that says, "As a general rule, 23andMe will

19   not disclose your individual personal information to any

20   third-party, except under the following circumstances."  And

21   what does the bottom bullet point say?

22   A.    You have provided explicit consent for us to do so.

23   Q.    Okay.  Again, on the next page, "Changes to This Privacy

24   Statement".  The last sentence says that, "In addition, all

25   customers will receive an email with notification of the



Fred Cate - Cross

1    changes."  Again, you have no information as to whether that

2    was actually emailed to customers?

3    A.    I -- I -- I don't.

4    Q.    Okay.

5    A.    I would just say the paragraph actually begins, "When

6    this privacy statement is changed in a material way".

7    Q.    Okay.  Let's go to item number 20.

8          THE COURT:  Ms. Milligan, we're probably due for a

9    recess --

10         MS. MILLIGAN:  Sure.

11         THE COURT:  -- sometime soon.  Do you anticipate a

12   bit more cross-examination, or are you --

13         MS. MILLIGAN:  I do, Your Honor.  Do you want to take

14   a break and come back?

15         THE COURT:  Okay.  Why don't we do that?  A fifteen-

16   minute recess work for everyone?

17         MS. MILLIGAN:  You bet.  Thank you.

18         THE COURT:  Okay.  We'll resume at twenty after the

19   hour.  Thank you, everyone.

20         (Recess from 11:06 a.m. until 11:21 a.m.)

21         THE COURT:  Be seated.

22         All right.  Prof. Cate, you're still under oath.

23         THE WITNESS:  Yes, sir.

24         THE COURT:  Milligan, please continue.

25         MS. MILLIGAN:  Thank you, Your Honor.



Fred Cate - Cross

1  RESUMED CROSS-EXAMINATION

2  BY MS. MILLIGAN:

3  Q.   I think we had looked at Section 20.  Is that where you

4  are on your book?

5  A.   I thought we had done 19, but --

6  Q.   Oh, okay.

7  A.   -- I'm totally --

8  Q.   We'll go to 18 then.  Don't want to make you repeat

9  yourself.  On under tab 18, "Privacy Highlights", can you read

10  the first sentence under the summary?

11  A.   "Summary.  23andMe respects your privacy.  23andMe does

12  not sell, lease, or rent your individual level personal

13  information without explicit consent."

14  Q.   Okay.  Great.  Can you go to tab 17?

15       THE COURT:  Go to where?  I'm sorry.

16       MS. MILLIGAN:  Tab 17.  I'm sorry.

17       THE COURT:  Oh, tab 17?

18       MS. MILLIGAN:  Yes, I'm going sort of backwards --

19       THE COURT:  Okay.  Okay.

20       MS. MILLIGAN:  -- because these are newest to oldest,

21  and I'm going oldest to newest.  I apologize for that

22  confusion.

23  Q.   All right.  Can you read the first sentence under the

24  summary?

25  A.   "Summary.  23andMe respects your privacy.  23andMe does



Fred Cate - Cross

1    not sell, lease, or rent your individual level personal

2    information without explicit consent."

3    Q.    Okay.  Did you --

4              MR. RECHER:  Your Honor, if I could just object very

5    briefly.  Just given where we are in these proceedings, the

6    documents in evidence, of course, say what they say.  So I

7    would object to this continued line on the grounds that it's

8    cumulative.

9              THE COURT:  Is there a dispute of fact about what the

10   privacy policies say?

11             MS. MILLIGAN:  In the pleadings that have been filed

12   and the various documents filed, there has been a focus on one

13   provision of these privacy policies and not the entirety of

14   the privacy policy.  And so we're working through to show

15   these privacy statements are in almost all of the privacy

16   policies of the debtor.  And we wanted to just confirm that

17   that is what it says with this witness.

18             THE COURT:  Is there any dispute about that?

19             MR. RECHER:  Your Honor, we can confirm that the

20   privacy policies in evidence say what they say, and of course,

21   counsel is free to argue based on the evidence.  I'd just

22   submit we don't need this witness to read all those documents.

23             THE COURT:  Can we move on to other issues, and you

24   can argue what they say, as counsel says accurately?

25   Q.    Okay.  And just to confirm, as far as what you reviewed



Fred Cate - Cross

 1    in your preparation of your report, you looked at the current

 2    policy and one prior policy; is that right?

 3    A.    I -- I think I looked at all of the policies that the CPO

 4    cited.

 5    Q.    Okay.

 6    A.    But they're substantially similar, so I can't --

 7    Q.    Okay.

 8    A.    -- claim to have read every one in detail.

 9    Q.    Okay.  Thank you.  I just wanted to be clear because I

10    think that what was in your binder was just those two, and I

11    just wanted to make sure.  Okay.

12         There was some discussion earlier about the privacy

13    enhancements that the debtors are offering the consumers of

14    all states, and then there are some enhancements that may be

15    contingent on some other issues.  And those enhancements

16    include things like additional reviews or audits.  Reports.

17    Things like that.  Many of those enhancements are already

18    required under law, correct?

19    A.    I -- I -- I don't know that many of those are.  No.

20    Q.    Okay.  Do you know if the enhancements are things that

21    the company is already doing?  Did you compare the --

22    A.    I -- I -- I don't know, no.

23    Q.    Did you compare what 23andMe is currently doing as far as

24    these privacy protections and what they're offering to do --

25    TTAM is offering to do by this agreement?



Fred Cate - Cross

1    A.    I did not.

2    Q.    Okay.  So you don't know if they're the same and they're

3    just continuing a policy, or they're actually adding some

4    enhancements?

5    A.    I don't know.

6    Q.    Okay.  And if these enhancements are already required

7    under Texas law and Texas law also requires separate express

8    consent before the disclosure of genetic data, this

9    transaction would not be a benefit to those Texas consumers;

10   is that correct?

11   A.    That is not true.

12   Q.    If they have the -- if they have a property right in this

13   genetic data and a requirement under Texas law that they give

14   separate express consent and they already have all the other

15   enhancements, it's --

16   A.    That's not all the other enhancement enhancements.  So --

17   Q.    Okay.

18   A.    -- for example, the Privacy Advisory Board.  I don't know

19   a thing about whether Texas law requires that or not, but

20   that's certainly an enhancement.  In addition, their

21   nonprivacy enhancement.  So for example, if they have a claim

22   against 23andMe for data breach, having a solvent purchaser

23   take over and be able to pay out that claim, that will be an

24   advantage of this sale.

25   Q     Do you have an opinion on whether the genetic data is



Fred Cate - Cross

1    inherently owned or property of the consumer who produced,

2    say, genetic material, their saliva, their blood?

3    A    I don't believe it's a relevant question because, like

4    all questions of property rights, it really depends on what

5    the rights are.  So like, I own my home, but the utility

6    company can trench a utility line across it anytime they want.

7    And so ownership tells me absolutely nothing about what my

8    rights are.  What I have to know is actually what the specific

9    set of rights or the bundle of sticks, as we like to teach in

10   law school, are.  And I don't know what those are in Texas.

11   Q    Okay.  Did you review any property law statutes for the

12   different states in your analysis in formulation of your

13   opinion?

14   A    I -- I didn't.  I once wrote a book chapter on property

15   rights and data, and also on body parts, and other interesting

16   things.  But no, I did not.

17   Q    And I just want to clarify.  You indicated that -- I

18   don't want to misstate your testimony, so please don't take

19   this as an attempt to do so.  But your testimony is that

20   customers generally don't open emails if they're getting

21   emails from a company like 23andMe.  Is that what you said?  I

22   don't want to misstate what you testified to.

23   A    It wasn't what I said.  My --

24   Q.   Okay.

25   A.   My company -- my testimony was that it is very hard to



Fred Cate - Cross

1   prompt people to respond to emails.

2   Q.   Okay.

3   A.   And that is true even if the email offers something

4   wonderful, like, would you like to speak at our conference?

5   And three times later they're, like, would you please respond

6   to our email; would you like to speak at our conference?  It's

7   not because I'm offended by the invitation to speak at the

8   conference; it's because I'm busy doing other things.  So it's

9   very hard to get people who aren't already interested in the

10  thing.

11  Q    And I think I heard you -- please, again, I'm not trying

12  to ask the same question; I just want to make sure I

13  understand it -- for that purpose, for that reason, or at

14  least part of that reason, often consent versus opt-out

15  consent are basically the same.

16  A.   Exactly.

17  Q.   Okay.  And if a state law required opt-in, but the

18  company's policy doesn't reference that, that policy would be

19  in violation of state law, correct?

20  A    Well, I don't -- I don't know.  It depends on what the

21  state law required and if it -- does the state care about opt-

22  in, or does it care about a policy that says opt-in?  So just

23  having a policy that didn't say opt-in might not violate it.

24  I just don't know, based on that question.

25  Q    And I guess, in fairness, the transfer or disclosure, or



Fred Cate - Cross

1    whatever, would be the violation of state law if state law

2    prohibited that --

3    A.    And if --

4    Q.    -- without express consent.

5    A.    And if state law remained relevant in a proceeding such

6    as this.

7    Q    Okay.  I may have asked this already too; I'm sorry.  Are

8    you familiar at all with the Texas Direct-to-Consumer Genetic

9    Testing Act?

10   A    I mean, I have -- I teach it in class, but I haven't read

11   it for purposes of this case.

12   Q    Okay.  All right.  So I'm impressed that you taught it in

13   your class.  I'll have to refer that back to my friends at the

14   legislature.  In your review of that, to the best of your

15   recollection, understanding you didn't read it in preparation

16   for this, that act actually grants an express property

17   interest in and control over a person's genetic data by that

18   person.  Would you agree with that, to your knowledge?

19   A.    I -- I -- I agree it says that.

20   Q.    Okay.

21   A.    It's --

22   Q.    And --

23   A.    Go ahead.  I'm sorry.

24   Q.    I'm sorry to interrupt you.  That same statute also

25   states that it cannot be transferred or disclosed without the



Fred Cate - Cross

1    individual's separate express consent.  Are you familiar with

2    that part of the act as well?

3    A    Yes, I mean, generally.

4              MS. MILLIGAN:  Sir, I thank you very much for your

5    time.  I think that's all the questions that we have.  Thank

6    you.

7              Pass the witness.

8              THE COURT:  Thank you, Ms. Milligan.

9              Additional cross-examination?

10             All right.  Before we go to redirect, I have what I

11   think will be two questions.  It's always dangerous to

12   identify how many questions there are going to be for a lawyer

13   or a judge.

14             Professor Cate, I think you said in the four cases

15   where you've served as ombudsman, you did not have a clash

16   between a privacy policy that said we may sell, and a law, a

17   nonbankruptcy law, that said, or arguably said, you may not

18   sell; is that right?

19             THE WITNESS:  That is correct.

20             THE COURT:  Are you familiar with a case in which

21   that clash has arisen, where the privacy policy said we may,

22   and the nonbankruptcy law said thou shalt not?

23             THE WITNESS:  To be honest, I -- I'm not.  It doesn't

24   arise in the published literature very often.  Someone may

25   disagree.  But in any event, because 363 is pretty clear about



Fred Cate - Cross

1    dismissing the role of nonbankruptcy laws. And so unless you

2    have that third condition, where you have a CPO and then the

3    CPO has to consider those laws, only then do you typically get

4    something in a CPO report that makes it on the record.

5             THE COURT: Okay. Thank you.

6             THE WITNESS: Thank you.

7             THE COURT: I limited it to two questions. Okay.

8             Redirect?

9             MR. HUNT: Your Honor?

10            THE COURT: Yes?

11            MR. HUNT: I'm sorry. Your Honor, I'm sorry to

12   interrupt. I was deferring to those in the courtroom. I had

13   a couple of questions, if that's okay.

14            THE COURT: Sure. Please proceed, Mr. Hunt.

15            MR. HUNT: Thank you, Your Honor.

16   CROSS-EXAMINATION

17   BY MR. HUNT:

18   Q.   Prof. Cate, my name is Christopher Hunt, and I represent

19   the Commonwealth of Kentucky. And I have just a few short

20   questions for you. You indicated that you were present

21   Wednesday for the hearing; is that correct?

22   A.   Yes, sir.

23   Q.   Were you present for Ms. Wojcicki's testimony?

24   A.   I was.

25   Q.   Okay. Have you had an opportunity to review the



Fred Cate - Cross

1   declaration that Ms. Wojcicki filed in this matter?

2   A.    I have not.

3   Q.    Okay.  Would you agree with me that 23andMe, over the

4   years that it has been in operation, has had multiple versions

5   of its privacy policy?

6   A    Well, I mean, for example, I have a binder here with

7   twenty-something different versions, so yes, but there's a

8   huge consistency among the terms over the years.

9   Q.    I understand.  But you would agree with me that that

10  policy, in some regard, has changed multiple times over the

11  years?

12  A.    Again, I have to say, for the pieces I was looking at,

13  you know, the question of sale, in connection with a

14  reorganization or dissolution of assets, it's been 100 percent

15  consistent over all the time.  If there are other provisions

16  that changed, I'm not in any way disputing you, I just am not

17  aware of it.

18  Q    Okay.  So I'll go ahead and, at great possible risk, I

19  will ask you to assume, for the purposes of my next question,

20  that there have been some other material changes in the

21  policies, whether they refer directly to the transfer of

22  assets or a bankruptcy and so forth.  So in this regard, to

23  maybe put too fine a point on it, any change at all of any

24  kind.  If that is the case, do you have any -- did you find

25  any evidence, or do you have any indication from your review,



Fred Cate - Cross

1    that the individual consumers negotiated those changes or were

2    informed of those changes and had some opportunity to engage

3    in a negotiation with 23andMe about whether those terms were

4    acceptable?

5    A    I don't know.  In other words, if I don't know about the

6    changes, I don't know about the way in which the purported --

7    I mean, again, I'm not disagreeing with you -- but the

8    asserted changes may have occurred or who was involved in

9    agreeing to those.  I'm sorry.

10    Q.    Sure.  So let me ask you -- I guess this counts as a

11    hypothetical, which I try desperately to avoid, but I'll try

12    it here.  If you and I had entered into an agreement, and for

13    the purposes of my question, the substance of the agreement,

14    at least for my part, is immaterial, but you and I have a

15    contract related to some topic.  Would it be appropriate or

16    legally enforceable for me to make a change to the terms of

17    that contract and not obtain your consent?

18    A.    Okay.  I'm a law professor, so you know I'm going to say

19    it depends.  In other words, it depends on the words of the

20    agreement.  So if the agreement says we're going to shoot for

21    a delivery date in July, but you can change the delivery date

22    up to three months without notifying me, then it would be

23    perfectly fine not to notify me.  We've agreed that.  If a

24    privacy policy says we'll notify you of material changes but

25    not of immaterial changes, then it would be fine to notify of



Fred Cate - Cross

1    only material changes.  So I'm not -- I'm not trying to be

2    difficult.  It's just it would depend on the wording of the

3    agreement.  If you and I had an agreement to have lunch today,

4    and you didn't show up, I would think you should have notified

5    me.

6    Q.    Okay.  I understand the answer, and thank you for the law

7    school flashback.

8    A.    Sorry.

9    Q.    All right.  So you have testified before -- and I'll just

10   refer to this generally and ask if you remember.  You had made

11   some comments, under some questioning, and if I understood you

12   correctly, expressed a view that it was your opinion that,

13   generally speaking, consumers have a negative reaction to

14   multiple communications or requests from a company.

15   A.    Yes, sir.

16   Q.    Okay.  To your knowledge, were any consumers ever

17   contacted about the possibility of their assets being sold or

18   otherwise transferred to an entity other than 23andMe?

19   A.    I don't know if they were notified after they agreed to

20   the privacy policy.  I mean, the privacy policy explicitly

21   discusses the possibility, but I don't know if there were

22   communications after that.

23   Q.    Okay.  As I understood it, I was listening for a reason

24   why attempting to satisfy an express consent requirement would

25   be, for lack of a better word, problematic, or objectionable.



Fred Cate - Redirect

1    As I understand it, the answer that you provided was, other

2    than the fact that you may annoy a consumer, is the

3    possibility that someone may not respond to a request seeking

4    express consent, and then later have regrets that their data

5    had been deleted because they did not respond.  Do I have that

6    right?

7    A.    Yes.  I think both of those are true.

8    Q.    Okay.  But it is possible, in that scenario, that a

9    consumer could simply resubmit a sample and have another test

10   done, correct?

11   A.    And presumably pay to be retested again, since I

12   assume -- I don't know -- that there's a cost involved in

13   testing.

14   Q.    Correct.  But in terms of the relationship, it's not

15   fatal.  In other words, that data could be recaptured,

16   theoretically, in some fashion, in the unfortunate event of

17   that scenario.

18   A.    It is not fatal.

19          MR. HUNT:  Excellent.  That's all the questions I

20   have.  Thank you, Your Honor.

21          THE COURT:  Thank you.

22          All right.  Redirect?

23   REDIRECT EXAMINATION

24   BY MR. RECHER:

25   Q.    Good morning.  Still Good morning, Prof. Cate, maybe just



Fred Cate - Redirect

1    barely.  I have a very small number of questions for you.  You

2    were shown, during cross-examination, Exhibit 27 to the

3    Vibbert declaration, which is the privacy notice.  The title

4    is "Privacy notice for California Residents, last updated

5    August 2 of 2022".  Do you have that document?

6    A.   It's not tabbed, I don't think.  It's laid in the pages.

7    Q.   It's page 320 of 332.

8    A.   Thank you very much.   Okay.  Not in this binder.

9    Q    I'd offer to supply you a new binder, but I think that

10   would just make it worse.

11   A    I think this is Texas because it's -- it's bigger.  This

12   is my binder.  It wasn't in there.

13   Q.   I'm told it may be in the Quinn Emanuel binder, tab 2.

14   Do you have that binder?

15   A.   Tab 2.  This is the Vibbert --

16   Q.   Yes, and it should be Exhibit 27 to that declaration.

17   And it should say at the top, in the ribbon, page 320 of 332.

18   A.   I have U.S. state residents.  That's 24.  So what am I

19   looking for?

20            MR. RECHER:  Could I approach?

21            THE COURT:  Sure, certainly, please do.

22            THE WITNESS:  Thank you.

23   Q    Do you recall being shown Exhibit 27 during your cross-

24   examination?

25   A.   I do.



Fred Cate - Redirect

1    Q.    And do you know that this particular policy was not in

2    effect as of the petition date?

3    A.    I do know that, yes.

4    Q.    Okay.  Well, let me ask you two things about it.  I think

5    you were shown, on direct, in the summary paragraph, the

6    portion that discusses how this particular historical privacy

7    notice supplements all privacy statements.

8    A.    Yes.

9    Q.    And you've reviewed the privacy statements; we talked

10   about that on direct.

11   A.    Yes.

12   Q.    Okay.  And could you turn to, I believe, the last page of

13   the document, page 322 of 332?

14   A.    Yes.

15   Q.    And do you see the first full paragraph on that page,

16   beneath the bullet, it says, "If you have given your explicit

17   consent, for example, via a data transfer authorization or

18   other consent document, we may share your personal information

19   for commercial purposes".  Do you see that?

20   A.    I do.

21   Q.    And you weren't shown that language during your cross-

22   examination?

23   A.    I was not.

24   Q     Okay.  And you were also shown, during cross-examination,

25   a series of historical privacy statements of the debtors,



Fred Cate - Redirect

1    right?

2    A.    Yes.

3    Q.    And we won't go back through them, but they had language

4    in them to the effect of we won't share certain information

5    absent explicit consent.  Do you remember those documents?

6    A.    Vividly.

7    Q.    Okay.  And just to be clear, every version of the privacy

8    statement of the debtors you've reviewed contains a consent

9    for the sharing or transfer of personal -- personally

10    identifiable information in the case of business transitions

11    or in the case of bankruptcy or reorganization; is that right?

12    A.    It is right.

13    Q.    Okay.  And I believe I'm right, though I'm happy to be

14    corrected by you, I don't believe anyone during cross-

15    examination showed you or asked you about the privacy

16    statement of the debtors that was actually in effect on the

17    petition date; is that right?

18    A.    I think that's correct.

19    Q.    Okay.  There were some questions from the State of Texas

20    about whether, under your view, a debtor or a potential debtor

21    could change the privacy statement on the eve of bankruptcy,

22    or something to that effect.  Do you recall those questions?

23    A.    I do.

24    Q.    Did that happen here?

25    A    That did not.



Fred Cate - Recross

1  Q    And is it the case, to your understanding, that the

2  language, as to the transfer of personally identifiable

3  information, in the case of a bankruptcy or other business

4  transition, have been in the debtors' policies, in the form

5  that it was in on the petition date, as of June 2022?

6  A.   2022, yes.

7           MR. RECHER:  All right.  No further questions.  Thank

8  you, sir.

9           THE COURT:  All right.  California, Texas, do you

10 have recross as to my questions?

11          MR. NADAL:  Yes, Your Honor.

12          THE COURT:  Okay.

13 RECROSS-EXAMINATION

14 BY MR. NADAL:

15 Q.   Good morning.  You were just asked about Exhibit 27,

16 correct?

17 A.   Yes.

18 Q.   And my colleague pointed you to, I believe, page 322 of

19 332, the bottom portion where it says we may share with third

20 parties.

21 A    Yes.

22 Q.   Does that say anything about selling?

23 A.   It does not, although it says for commercial purposes,

24 which might be thought to imply sale.

25 Q.   Does it say that we may sell?


www.escribers.net | 800-257-0885

Fred Cate - Recross

1    A.    It does not.

2    Q.    And then earlier on, I believe, the previous page, it

3    says we do not sell your personal information.  Now, forgive

4    me, this says we may be the one that says we may sell your

5    personal information to third parties, or is it the one that

6    says we do not sell your personal information?

7    A.    We do not sell your personal information.

8    Q.    Thank you.

9            THE COURT:  Ms. Milligan?

10   RECROSS-EXAMINATION

11   BY MS. MILLIGAN:

12   Q.    Q    The only question that I think that -- in response

13   to the Court's questions regarding previous cases, I just want

14   to clarify, you're not aware of any other case, or any case,

15   where state law conflicted with the Bankruptcy Code and the

16   sale was prohibited; is that the answer?

17   A.    That is correct.

18   Q.    Okay.  Have you looked for any such case?

19   A     I haven't looked specifically for where a sale was

20   prohibited.  I've looked for where reports were generated or

21   the record reflected that there was a conflict and the court

22   had to deal with it.

23   Q.    Okay.  Were you aware that there is actually an Eighth

24   Circuit case related to this?

25   A.    I am, yes.



Fred Cate - Recross

1    Q.    Okay.  Is that the In re Shower (ph.) case?

2    A.    I think that's right.

3    Q.    Is that right?  Okay.  And then I think there was also a

4    First Circuit case involving a dairy farm.  Are you familiar

5    with that case?

6    A.    Um-hum.

7    Q.    Okay.  And those two cases involved a situation where

8    state law did not provide for the sale, and the Court

9    considered that in its analysis of the approval of sale.

10   A.    Right, but those cases involved a policy in place that

11   itself would have questioned sale by the debtor.

12            MS. MILLIGAN:  Okay.  If the Court would like the

13   cites, I'm happy to give them or not.  Okay.

14            THE COURT:  Let's save that for argument.

15            MS. MILLIGAN:  Okay.  Thank you.

16            THE COURT:  All right.  Mr. Cate, thank you.  You may

17   step down.

18            THE WITNESS:  Ty.

19            MR. CLAREMAN:  It's still good morning, Your Honor.

20   Billy Clareman from Paul, Weiss, on behalf of the debtors.

21            Before we turn to our next witness, I'd actually like

22   to press a couple of housekeeping matters.

23            THE COURT:  Sure.

24            MR. CLAREMAN:  So the first is, there's been some

25   reference to the Jami Mills Vibbert's declaration and the



Fred Cate - Recross

1    exhibits thereto.  The original declaration was filed at

2    docket 777.  All of the exhibits are in evidence.  There was

3    an objection to the text of that declaration.  We've met and

4    conferred.  We've filed an amended declaration by docket Ms.

5    Vibbert.  It's at docket number 826.  There's a reference to

6    exhibits.  Those are the same as in the original version of

7    the declaration.  And I'd like to offer docket number 826, the

8    amended Vibbert declaration, into evidence.

9          THE COURT:  All right.  Is there any objection?

10          UNIDENTIFIED SPEAKER:  No, Your Honor.

11          THE COURT:  Okay.  826, the Vibbert declaration, will

12    be admitted, with the understanding that it is paired with the

13    exhibits that were attached to the previous version.

14    (Jami Mills Vibbert's declaration was hereby received into

15    evidence as of this date.)

16          MR. CLAREMAN:  Thank you, Your Honor.  I'd also like

17    to offer into evidence the notice of winning bidder.  This is

18    at docket number 739, and the attachments thereto.  It's on

19    the debtors' exhibit list, Exhibit Number 7, as well as 7A

20    through D, which are the attachments to the notes.

21          THE COURT:  All right.  Any objection to receipt of

22    the notice of winning bidder into evidence?

23          All right.  It'll be admitted.

24    (Notice of winning bidder was hereby received into evidence as

25    Debtors' Exhibit 7, 7A-7D, as of this date.)



Peter Lefkowitz - Cross

 1          MR. CLAREMAN:  Your Honor, our next witness is Mr.
 2   Peter Lefkowitz.  His declaration has been admitted into
 3   evidence at docket number 810.  We have no direct live
 4   testimony for the witness.  But Mr. Lefkowitz is available in
 5   the courtroom for cross-examination.
 6          THE COURT:  All right.  Would anyone like to cross-
 7   examine Mr. Lefkowitz?
 8          All right.  Mr. Lefkowitz, please come forward and be
 9   sworn.
10          THE CLERK:  Please raise your right hand.  State your
11   name for the record.
12          MR. LEFKOWITZ:  Paul Lefkowitz.
13          (Witness sworn)
14          THE CLERK:  Thank you.  Please be seated and speak
15   directly into the microphone.
16   CROSS-EXAMINATION
17   BY MR. NADAL:
18   Q.   Good morning.
19   A.   Good morning.
20   Q.   Hi.  My name is Daniel Nadal.  I represent the People of
21   the State of California.  And I have a couple of questions for
22   you about your declaration.  In paragraph 8 of your
23   declaration -- do you have a copy of that before you?
24   A.   I do.
25   Q.   All right.  You state that customers consent to terms of



Peter Lefkowitz – Cross

1    service and privacy statement when they register.

2    A.   Correct.

3    Q.   And more specifically, you state that a customer checks a

4    box confirming, "I have read and agreed to the terms of

5    service in the privacy statement".

6    A.   Correct.

7    Q.   And then you augment this a little bit in paragraphs 18

8    and 19.  So paragraph 18 repeats paragraph A, a consumer

9    checks the box.

10   A.   Yes.

11   Q.   And then in paragraph 19 you say there's a second

12   acknowledgment and acceptance of the privacy statement.

13   A.   Yes.

14   Q.   So there's a two-step process.  You check a box and you

15   accept and continue.  And this is important information for

16   establishing that consumers agree to a privacy statement.

17   Q.   All right.  So a California customer who signs up and

18   checks the box today, June 19th, 2025, is agreeing to the

19   privacy statement displayed today.

20   A.   I think Prof. Cate covered this.  The person who signs up

21   today is agreeing to the privacy statement that is in effect

22   today, which includes provisions regarding how that may be

23   amended over time.

24   Q.   All right.  And a California consumer who signs up and

25   checks the box on March 31st 2024, is agreeing to the privacy



Peter Lefkowitz - Cross

1   statement displayed on that date.

2   A.   Yes, they're agreeing to the privacy policy that's

3   displayed on that date that includes specific terms concerning

4   the possibility of change over time.

5   Q   And a California customer who signs up and checks the box

6   on March 31st, 2023 is agreeing to the privacy statement

7   displayed on that day?

8   A.   Same answer.

9   Q.   All right.  And this goes back each year --

10  A.   Yes.

11  Q.   -- March 31st, 2022 --

12  A.   Yes.

13  Q.   -- March 31st, 2021.

14  A.   That's -- that's --

15  Q.   And that goes all the way back to the very first customer

16  who signed up.

17  A.   All the way back.  So the very first customer that signed

18  up, in 2007 or 2008, is agreeing that the policy may be

19  changed over time; that's right.

20  Q.   Paragraph 11, you refer to "the privacy statement also

21  contains provisions that are specific to residents of certain

22  U.S. states and foreign countries which are designed to comply

23  with laws specific to those jurisdictions".  Do you see that?

24  A.   Yes, I do.

25  Q.   Does 23andMe meet the U.S. states' policy as a separate



Peter Lefkowitz - Cross

1    privacy policy or as part of the privacy statement?

2    A.    It is part of the privacy statement.

3    Q.    And I'd also like to confirm that 23andMe designed these

4    privacy policies to comply with laws in specific

5    jurisdictions.

6    A.    Correct.

7    Q.    And that would include California law?

8    A.    Yes.

9    Q.    Now, if 23andMe's privacy policy did not comply with

10   California law in some way, is it your understanding that the

11   company would follow California law, or would it follow its

12   privacy statement?

13   A.    Well, the -- the privacy policies are designed to follow

14   the law.

15   Q.    Yes, but if there is a conflict between the two, which

16   one would 23andMe follow?

17   A.    Well, the -- the company will always follow its privacy

18   statement.  If the state has a problem with the way in which

19   the privacy statement complies with state law, they have my

20   number.

21   Q.    And if there were a term in the privacy policy that

22   didn't comply with California law, would the company enforce

23   that term against a California consumer?

24   A.    As I said, you know, my job, as the privacy officer, is

25   to draft policies and make sure that the policies comply.  If



Peter Lefkowitz - Cross

1    a state feels that there is something improper, inaccurate,

2    illegal in that policy, they will let us know.

3    Q.    All right.    If a California customer files a lawsuit

4    against the company, based on terms in the privacy policy not

5    compliant with California law, would 23andMe argue that the

6    privacy statement controlled over California law?

7             MR. CLAREMAN:    Objection, Your Honor.    I think these

8    are inappropriate --

9             THE CLERK:    You need to be at the podium, sir.

10            THE COURT:    Sorry.    Grab one of the two mics here,

11    yes.

12            MR. CLAREMAN:    Objection, Your Honor.    I think these

13    are inappropriate hypothetical questions for a fact witness.

14    Calls for speculation.

15            THE COURT:    I'll let this go for a little bit because

16    he is the chief privacy officer.    So I'll allow this question.

17    A    So to recount your question, if a consumer sued, claiming

18    that the privacy policy violated state law, we would -- as we

19    do with any legal matter, we would evaluate to determine

20    whether we agreed with the consumer.

21    Q.    And that's because, as the data privacy officer, and a

22    former chief digital risk officer, chief security and trust

23    officer, you know that violating the states' privacy law could

24    potentially carry with it some serious liabilities.

25    A.    It is a bad thing.



Peter Lefkowitz - Cross

1    Q.    A bad thing to do?

2    A.    Yes.

3    Q.    Do you have an estimate about what the penalties are for

4    each violation?

5    A.    I -- I don't recall what it is under California law.

6    Q.    Do you have any idea of any law?

7    A.    I -- I recall, from my preparation for this testimony,

8    that one of the laws I looked at -- it may have been the Texas

9    genetics law -- had a 2,500 dollar per violation.  But -- but

10   again, there are a lot of laws we're dealing with.

11   Q.    Understood.  I'm going to turn to paragraph 13.  I'm sure

12   you won't be surprised, but I want to talk about your use of

13   the word "current".  Earlier, we talked about how, when a

14   customer signs up, they view -- and I think, in your view,

15   check a box agreeing to the then current privacy policy.

16   A.    As -- as I've answered, they're agreeing to the then

17   current privacy policy as may be amended over time.

18   Q.    Now, would 23andMe send notices to consumers that the

19   terms were changing?

20   A.    As we state in the privacy policy, if there is a material

21   change, as determined by the company, it would send a notice

22   to the customers.

23   Q.    And how did those notices get transmitted to the

24   customers?

25   A.    Well, so just to -- to clarify, I first joined the



Peter Lefkowitz - Cross

1    company in February of 2024.  So I cannot speak to what

2    previous privacy officers may have done.  But if there was a

3    statement in the privacy policy that there we would inform

4    you, there were various methods to let people now.  If it says

5    that we would email you, we would email.

6    Q.    So did you review the former privacy officer's work?

7    A.    It depended upon the topic and what was happening at the

8    time.  I did not go back through binders of everything that

9    every privacy officer has done in the history of the company.

10   Q.    Did you review -- but I understand your testimony that

11   you didn't look and see if 23andMe sent notices out to

12   consumers.

13   A.    I have not gone back through each change to the privacy

14   policy since 2007 to determine whether or not notices were

15   sent.

16   Q.    All right.  So you have a looked at any of those notices?

17   A.    No, that's not what I said.

18   Q.    All right.

19   A.    I have not looked to determine whether or not, in each

20   case of a change to the privacy policy, a notice was sent.

21   Q.    Did you review any notices that were sent to any

22   consumer?

23   A.    I have not looked at any notices that have been sent to

24   consumers.

25   Q.    Would you -- based upon what you know about how 23andMe



Peter Lefkowitz – Cross

1    operates and what the privacy statements say, would any of

2    these notices to consumers or customers have that two-step

3    process that we talked about?

4    A.    I'm sorry; what is the two-step process?

5    Q.    Check a box, agree and acknowledge.

6    A.    That's not called for in the privacy statement.

7    Q.    Did any of the notices to consumers have that two-step

8    process?

9    A.    Not to my knowledge.

10   Q.    Did 23andMe track how many consumers read emails that

11   were sent to them?

12   A.    Not to my knowledge.

13   Q.    Were you here on Wednesday when Ms. Wojcicki -- excuse me

14   for the pronunciation -- commented about the read rate on

15   emails?

16   A.    Yes.

17   Q.    Do you recall what she said it was?

18   A.    I don't recall.

19   Q.    All right.  If Ms. Wojcicki has an understanding as to

20   the read rate of consumers to 23andMe emails, does 23andMe

21   somehow track if consumers read the emails?

22   A.    Again, I can only speak to my personal knowledge.  I'm

23   not aware of -- I have not been informed of the company having

24   tracking on the exact percentage of customers that have read

25   emails that have gone in.



Peter Lefkowitz - Cross

1    Q.    All right.  And as someone who works in the privacy

2    sphere, you know that companies have ways to track if

3    consumers open emails?

4    A.    Yes.  Depending upon circumstances, yes.

5    Q.    All right.  Did 23andMe --

6    A.    There are technologies available.

7    Q.    Yes.  And you don't know if 23andMe did that?

8    A.    I don't.

9    Q.    Did 23andMe keep track of which privacy policy applied to

10   which consumer?

11   A.    I -- I think I've answered that.  The privacy policy that

12   is posted at any moment is the privacy policy that applies.

13   Q.    All right.  Are you aware of GPDR requirements?

14   A.    Yes.

15   Q.    That 23andMe tracking was subject to GPDR?

16   A.    The residents of the -- of the twenty-seven member

17   states.

18   Q.    So 23andMe tracked who was subject to the GDPR and the

19   specific GDPR privacy policy?

20   A.    Well, let -- let me just clarify with respect to

21   "tracked".  23andMe has a European privacy notice.  It's GDPR,

22   UK, Switzerland -- I forget if there are any other countries

23   covered in there, because their laws are substantially

24   similar.  That is just like the U.S. resident notice that

25   provides particular terms and particular language that are --



Peter Lefkowitz - Cross

1    that are -- are appropriate to those jurisdictions.

2         Do we track, in the sense that every time a customer

3    comes in, we're doing a reverse IP lookup?  No.  Do we know

4    that we have customers throughout the European Union?  Yes.

5    Q.   Does 23andMe know which customers are subject to GDPR?

6    A.   We know the addresses that customers have given to us

7    when they've signed up.  I don't want to give the impression,

8    though, that every time somebody comes to 23andMe.com, that

9    they're coming in from France or Germany.

10   Q.   Understood.  And if I told you that the UK was also in

11   the privacy statement, would you agree with me?

12   A.   No, UK is in that privacy statement.  I was just making a

13   clarification, following Brexit, UK is not in the EU.

14   Q.   Understood.  So did 23andMe keep track of when registered

15   customers logged into the website?

16   A.   I believe that the company has a log of every access to

17   the website.  That's important, from a security perspective.

18   Q.   Does it go back beyond just the most recent access?

19   A.   I don't recall the exact logging history of the company.

20   The company follows NIST guidelines on logging, which I

21   believe is thirteen months.

22   Q.   Understood.

23   A.   But that is -- that is my knowledge of the policy base of

24   the company.  I have not inquired of the security team exactly

25   as to exactly how long logging is used and for which purposes.



Peter Lefkowitz - Cross

1    Q.    Do you know how many consumers have not logged in, in the

2    past three years?

3    A.    I don't.

4    Q.    All right.  Does 23andMe just have some one-time users?

5    A.    I presume they do.

6    Q.    Does 23andMe have customers who are incapacitated

7    currently?

8    A.    I presume they do.

9    Q.    Does 23andMe have customers who are deceased currently?

10   A.    I presume they do.

11   Q.    All right.  Now I want to jump forward for a minute to

12   paragraph 27.

13   A.    Okay.

14   Q.    You mentioned 23andMe's website, and you say that

15   23andMe's privacy website contains information related to

16   privacy and various links.

17   A.    Yes.

18   Q.    And footnote 27 contains the link to "Your privacy comes

19   first".

20   A.    Footnote 27, yes.

21   Q.    Now, you didn't include that website as an exhibit, did

22   you?

23   A.    No, but I believe you did.

24   Q.    Yes, and we'll --

25   A.    We received it last night.



Peter Lefkowitz - Cross

1          MR. NADAL:  Your Honor, may I approach the witness?

2          THE COURT:  Yes.

3          THE WITNESS:  Thank you.

4    Q.   I just handed you what is docketed as ECF 825.  Do you

5    see that?

6    A.   Yes.

7    Q.   All right.  I would like you to turn to Exhibit CA-2.

8    A.   Okay.

9    Q.   Do you see the title of the page on there?

10   A.   I do.

11   Q.   Does it look familiar?

12   A.   Yes, it does.

13   Q.   All right.  Is that the "Your privacy comes first" page?

14   A.   I believe it is.

15         MR. NADAL:  All right.  Your Honor, I would move to

16   move that CA-2 be admitted into evidence.

17         THE COURT:  Any objection?

18         UNIDENTIFIED SPEAKER:  No objection.

19         THE COURT:  No objection.  CA-2 is admitted.

20   ("Your privacy comes first" page was hereby received into

21   evidence as State of California's Exhibit CA-2, as of this

22   date.)

23   Q    All right.  Now, when you look at ECF, page 7 of 10, or

24   the website display page 6 of 9, the company says it would

25   love if consumers dove deeper into their privacy, correct?



Peter Lefkowitz - Cross

1    A.    I'm sorry.  Repeat that, please.

2    Q.    Sure.  ECF page 7 of 10, or if you're looking at the

3    bottom, the website displays page 6 of 9.

4    A.    I don't -- I don't see either of those.  I'm sorry.  I

5    see 3 of 10, 4 of 10, 5 of 10 at the very top of the page.  If

6    you could point me to one of those, that would be very

7    helpful.

8    Q.    Yes.  One second.

9              THE COURT:  So are we looking at 825-2?

10             MR. NADAL:  Yes, Your Honor.

11   Q    Does it read doc 825-2 at the top?

12   A.    825-2, yes.

13   Q.    All right.

14   A.    Or if you could just tell me what's at the top of the

15   page, then I can --

16   Q.    Yes, and I'm --

17   A.    -- follow you.

18   Q.    -- working on that.  If we can go to ECF 825-2, page 7 of

19   10.

20   A.    Okay.

21   Q.    And I'm looking at it right here.  Do you see that bold

22   text in the middle?

23   A.    "Want to know even more"?

24   Q.    Yes.  And then you see the sentence starting with, "But

25   we also understand that you may want to dive even deeper into



Peter Lefkowitz - Cross

1    the details, and we love that".

2    A.    Yes.

3    Q.    Do you see that?

4    A.    Yes.

5    Q.    And then there's a number of arrow bullet points.  And

6    near the bottom there's a blog series on privacy; do you see

7    that?

8    A.    Yeah.  Yeah.

9    Q.    Did 23andMe maintain a blog series on piracy?

10   A.    Prior to my being at the company, they had some blogs on

11   privacy.

12   Q.    All right.  I understand.  Now I'd like you to turn to

13   Exhibit CA-1.

14   A.    Okay.  I'm with you.

15   Q.    All right.  This is a 23andMe blog post about the passage

16   of California genetic testing, correct?

17   A.    Yes.

18   Q.    All right.  Have you read this before?

19   A.    Yes, last night.

20   Q.    Oh, you did.  Excellent.

21            MR. NADAL:  Your Honor, I would move to introduce CA-

22   1.

23            THE COURT:  Any objection?

24            UNIDENTIFIED SPEAKER:  No objection.

25            THE COURT:  CA-1 will be admitted.



Peter Lefkowitz - Cross

1   (23andMe blog post about the passage of California genetic

2   testing was hereby received into evidence as State of

3   California's Exhibit CA-1, as of this date.)

4   Q   All right.  Would this be one of the things that the

5   company would love if consumers who dove deeper into privacy

6   read?

7   A.   Well, I don't even know how to answer that.  It's a blog

8   that the -- the materials in CA-2 say we'd love for you to

9   learn more, and it points to blogs.  So if what you're saying

10  is the company would love consumers to know about their blogs,

11  sure, they'd love them to know about their blogs.

12  Q.   Do you dispute that, if you click the blog link, it will

13  get you to this page eventually?

14  A.   I -- I'll take your word for it.

15  Q.   Because I have CA-3 if you wanted to do that.

16  A.   No, that's fine.  I'm not --

17  Q.   Okay.  Okay.

18  A.   I'm not contesting it.

19  Q.   All right.  Now, in this blog post 23andMe discusses how

20  it worked hard to have GIPA happen.  Second full paragraph --

21  A.   Yes, I understand.

22  Q.   Yes?

23  A.   Yes.

24  Q.   And 23andMe hopes that California's Genetic Information

25  Privacy Act would be a model for genetic privacy legislation



Peter Lefkowitz - Cross

1    nationally.

2    A.    Yes.

3    Q.    All right.  And 23andMe characterized the law as

4    including many of the same protections that 23andMe has long

5    offered its consumers, including -- bullet point -- "requiring

6    separate express consent for genetic data to be" -- second

7    bullet point -- "shared with a third party".  Do you see that?

8    A.    Yes.

9    Q.    And is this statement of a company something that the

10   company would love if consumers who dove in deeper read?

11   A.    Again, the -- the materials at CA-2 say we'd love you

12   to -- to see our blogs.  This is stated within a blog.

13   Q.    Understood.

14   A.    And that's about as far as I'll go on that.

15   Q.    Understood.  Let's turn the paragraph 13 of your

16   declaration.

17   A.    Yes.

18   Q.    You represent that the current privacy statement, and all

19   prior versions --

20   A.    Yes.

21   Q.    -- -- contained language advising customers that there

22   can be a change in ownership, correct?

23   A.    Yes.

24   Q.    Now, does the U.S. States Privacy Notice say that?

25   A.    The privacy statement, which includes the U.S. Privacy



Peter Lefkowitz - Cross

1    Notice, states that.

2    Q.   What is your understanding -- all right.  Let's go to

3    your Exhibit N, page 144.  Or if you'd like, I will represent

4    that this is the same -- no, let's just do your Exhibit N.

5    A.   Okay.

6    Q.   Does this say "Privacy notice for U.S. state residents"?

7    A.   Yes.

8    Q.   I want to make sure we're looking at the same thing.  It

9    says, "Last updated as March 15th, 2024".

10   A.   Yes.

11   Q   All right.  And --

12        THE COURT:   What's the ECF page number, please?

13        MR. NADAL:   It's docket number 774, ECF page 144.

14        THE COURT:   144, thank you.

15   A.   Thank you.

16   Q   Looking at the second paragraph, can you confirm for me

17   that it says that it applies to residents of California?

18   A.   Yes.

19   Q.   And the fourth full paragraph, last sentence, says, "This

20   notice makes sure we cover state specific requirements.  In

21   the event of any conflict between the terms of this notice and

22   the privacy statement, the terms of this notice prevail."

23   A.   Yes.

24   Q.   Now, do you see the bullet point list lead-in with,

25   "Here's a summary before we dive into the details"?



Peter Lefkowitz - Cross

1    A.    Yes.

2    Q.    And the first bullet point says, "You have the right to

3    opt out of the sale or sharing of your personal information

4    with a third party"?

5    A    Yes.

6    Q    All right.  Let's look past this summary.  Can you move

7    down to the "Your rights" section at the bottom of the page?

8    A    Yes.

9    Q    And if you're going to look at the list of privacy

10   rights, and then it says, "You have the right to", and then

11   down at the sixth bullet point, it says "opt out of the sale

12   or sharing of your personal information with third parties".

13   A    Yes.

14   Q    This wasn't the only state specific privacy policy, was

15   it?

16   A    This is the U.S. state resident privacy policy that is in

17   effect.  So I don't know --

18   Q.    That's the one that --

19   A.    I don't know -- I mean, I -- I'm sorry, I'm a little bit

20   confused by your question.  This is the U.S. state resident

21   policy that is in effect.

22   Q    Correct.  And there are historical versions of this

23   privacy policy.

24   A    Yes.

25   Q    All right.  I don't want to rush you on this next part;



Peter Lefkowitz - Cross

1    I just want to be a little efficient.  I'd like for you to

2    turn to -- it was previously the Jami Vibbert declaration

3    binder, but I believe it's Quinn Emanuel, tab 2.

4    A    Quinn Emanuel, tab 2.  Okay.  Let me get the tab 2.

5    Okay.

6            UNIDENTIFIED SPEAKER:  Sorry, Your Honor.  I just

7    want to make sure I have what Mr. Nadal --

8    Q    Again, much thanks to our colleagues at Quinn Emanuel.

9    Can you open to Exhibit 23 at ECF page 286?

10   A    Okay.

11   Q    This is the U.S. States' Privacy Notice, last updated

12   March 15, 2024.

13   A    Which appears to be the same exact document we were just

14   looking at.

15   Q    How did you guess my next question?  All right.  So we

16   already discussed this one.  Let's look back to Exhibit 24,

17   which is -- or move forward to Exhibit 24, which is page 296.

18   A    Okay.

19   Q    Turn to the next page which actually displays the privacy

20   notice.  This is the U.S. States Privacy Notice, last updated

21   June 2nd, 2023.

22   A    Okay.

23   Q    It applies to residents from California.

24   A    Is that a question?

25   Q    Yes.



Peter Lefkowitz - Cross

1    A.    Yes.

2    Q    And the summary, again, states that you have the right to

3    opt out of a sale or share any of your personal information

4    with a third party.

5    A    Yes.

6    Q    And turn to page 298.  Then nonsummary privacy rights --

7    sorry.  It was, I think, the next page.

8    A    The next page.  Got it.

9    Q    Page 298, which is the nonsummary version of the privacy

10   rights, it again says you can opt out of sale or sharing of

11   your personal information with third parties.

12   A    Yes.

13   Q    All right.  Let's turn to Exhibit 25, which is at page

14   305.  Again, that's the exhibit page.

15   A    Yes.

16   Q    This is the U.S. States' Privacy Notice, effective March

17   30th, 2022, correct?

18   A    No, it's March 30th, 2023, unless I'm looking at the

19   wrong page.  Page 306?

20   Q    Yes.  All right.  So it's March 30th, 2023?

21   A    That's what it says here.

22   Q    I apologize.  All right.  But this applies to California

23   residents?

24   A    Yes.

25   Q    And it also says, in the event of a conflict, that these



Peter Lefkowitz - Cross

1  terms control.

2  A    Yes.

3  Q    And the summary says that California residents have a

4  right to opt out of sale?

5  A    Yes.

6  Q    And then on the next page, the actual statement of

7  privacy rights includes the right to opt out of a sale.

8  A    And you're looking -- yes.

9  Q    All right.  Turn to, I believe, now Exhibit 26, page 313.

10 A    Okay.

11       MR. CLAREMAN:  If I may, in the interest of

12 efficiency, we can stipulate that the documents say what they

13 say, I think similar to before.  I don't want to step on Mr.

14 Nadal's cross, but the documents are in evidence.  And if

15 we're just reading the documents, then we can stipulate that

16 the words are the words.

17       THE COURT:  I think that should take care of this,

18 unless there's a twist coming, Mr. Nadal.

19       MR. NADAL:  There is, Your Honor.

20       THE COURT:  Can we go to the twist?

21       MR. NADAL:  Potentially.  I'm not sure.

22 Q.   But I think we can all agree that Exhibit 26 says the

23 exact same thing.

24 A    It either says the exact same thing or something

25 substantially similar.



Peter Lefkowitz - Cross

1    Q    All right.  Let's turn to Exhibit 27 at page 319.  And

2    this one, it's a little different.  This is the privacy notice

3    for California residents.

4    A    Right.

5    Q    Last updated August 2nd, 2022.

6    A    Correct.

7    Q    The summary section says, "Here is a summary before we

8    dive into the details".  And the first bullet point has

9    language that says, "But rest assured we do not sell your

10   personal information".

11   A    It says that.

12   Q    Same page, at the very bottom, which is, I believe, in

13   the actual statement of privacy, says, "23andMe does not sell

14   personal information to third parties".

15   A    Yes.

16   Q    All right.  Let's turn to Exhibit 28.  This is page 324.

17   This is the privacy notice for California residents?

18   A    Yes.

19   Q    Effective date is January 1st, 2020?

20   A    Yes.

21   Q    At the bottom of the page it says "Consumer rights"?

22   A    Yes.

23   Q    And then next page, the third bullet point says "opt out

24   of sales"?

25   A    I'm sorry, I don't see that on this --



Peter Lefkowitz - Cross

1   Q.   Sorry.  This is page 326.

2   A    Oh, number three.

3   Q.   Yes, number three.

4   A.   Opt out of sales, yes.

5   Q.   Do you see that?

6   A    Yes.

7   Q    Does it say, "23andMe does not sell personal information

8   to third parties"?

9   A    It says the CCPA provides you the right to opt out of

10  having your personal information sold by a business.

11  Q    And what is the next sentence?

12  A    "23andMe does not sell personal information to third

13  parties".

14  Q    All right.  So from January 1st, 2020, to December 13th,

15  2022, 23andMe's privacy statement for California residents

16  said that 23andMe does not sell California consumers' personal

17  information.

18  A    To third parties, yes.

19  Q    And when California residents went through the two-step

20  process to sign up, they were agreeing to this.

21  A    Yes.

22  Q    All right.  And then from December 14th, 2022, to

23  present, 23andMe's privacy statement for California residents

24  said that 23andMe would provide notice and an opt-out right.

25  Q    What document are you referring to?



Peter Lefkowitz - Cross

1    A    Sorry.  The December 14th one starts at Exhibit 26.

2    That's the one that we actually skipped over.  I'll represent

3    to you that December 14th, 2022, Exhibit 26, is the first time

4    that it changes to "right to opt out".

5    A.   Okay.

6    Q.   If that's correct, from December 14th, 2022, to present,

7    the privacy statement for California residents, that they

8    checked a box and acknowledged and confirmed, said that

9    23andMe would provide notice and an opt out right, correct?

10   A    Where are you looking in the document?

11   Q.   Sure.  Exhibit 26, page 313.  If you look at the -- so

12   there's the summary which says you have a right to opt out of

13   sale.

14   A    Notice of right to opt out of sale?

15   Q    Yes.  And then on the next page, the actual statement of

16   privacy rights, it includes the right to opt out.

17   A    Okay.

18   Q    And then the ones going to the present all said the same

19   thing.

20   A    Okay.

21   Q    So from December 14th '22, to present, California

22   residents who checked the box, and acknowledged and agreed to

23   the privacy statement, were told that 23andMe would provide

24   them notice and an opt-out right.

25   A    Yes.



Peter Lefkowitz - Cross

1   Q    How many customers does 23andMe have now?

2   A    I believe currently approximately thirteen million.

3   Q    All right.  How many customers did 23andMe have before

4   the filing of this bankruptcy petition?

5   A    Approximately fifteen million.

6   Q    And what was the highest number of customers that 23andMe

7   has had?

8   A    I don't know.

9   Q    All right.  Do you know how many customers 23andMe had as

10  of March 31st, 2022?

11  A    I do not.

12  Q    All right.  23andMe was publicly traded?

13  A    Yes.

14  Q    And as part of that, 23andMe filed various forms and

15  reports with the United States Securities and Exchange

16  Commission?

17  A    That is what public companies do.

18  Q    Yes.  Can you turn to California-4?

19  A    Yes.

20  Q    And can you look at the top and tell me what this appears

21  to be?

22  A    It's a 10-K, Form 10-K --

23  Q.   What --

24  A.   For the -- for the year March 31st, 2022.

25       MR. NADAL:  All right.  Your Honor, I'd move to have



Peter Lefkowitz - Cross

1    CA-4 admitted into evidence.

2         THE COURT:  Any objection?

3         MR. CLAREMAN:  No objection.

4         THE COURT:  CA-4 is admitted.

5    (March 31, 2022 Form 10-K was hereby received into evidence as

6    State of California's Exhibit CA-4, as of this date.)

7    Q    All right.  We'll keep this short, and I think we'll be

8    done in maybe two more questions.  I want you to go down to

9    page 5 of the report, but it's designated ECF, page 11 of 185.

10   A    Okay.

11   Q    Do you see "Market opportunity consumer"?

12   A    I do.

13   Q    And the last paragraph says, "As of March 31st, 2022, we

14   had approximately 12.8 million customers"?

15   A    Yes.

16   Q    Any reason to dispute that?

17   A    No.

18   Q    All right.  And then if you could flip forward to page

19   9 -- sorry -- back to page 98 of 185, which is report page 92.

20   A    Report page?

21   Q    Report page 92.

22   A    Okay.  I'm with you.

23   Q    All right.  The very last line on the page.  It repeats

24   the 12.8 million number for March 31st, 2022?

25   A    Yes.



Peter Lefkowitz - Cross

1   Q     And then it adds that there were 11.3 million as of March

2   31st, 2021.

3   A     Yes.

4         MR. NADAL:  No further questions, Your Honor.

5         THE COURT:  Further cross?

6         MS. EICHELE:  Yes, Your Honor.  Elizabeth Eichele

7   here.

8         THE COURT:  Hold on, hold on.  Cross in the

9   courtroom, please.  Ms. Milligan has the lectern.

10        MS. MILLIGAN:  Thank you.

11        MS. EICHELE:  Oh, sorry.  Sorry.

12        MS. MILLIGAN:  Thank you, Your Honor.

13  CROSS-EXAMINATION

14  BY MS. MILLIGAN:

15  Q.    Good afternoon.  I think I'm the first to be able to say

16  good afternoon.  My name is Layla Milligan.  I'm appearing on

17  behalf of the State of Texas.  I just have a few follow up

18  questions for you --

19  A.    You bet.

20  Q.    -- if I may.

21  Q.    A few technical data privacy questions.  Do you know how

22  many Texas customers 23andMe has currently?

23  A     My understanding is there's something on the order of

24  835,000.

25  Q.    Do you know --


www.escribers.net | 800-257-0885

Peter Lefkowitz - Cross

1    A.    Is that correct?  Did I give the right answer there?

2    Q    I don't know, but I'll defer to your knowledge.  Do you

3    know how many of those Texas consumers have consented to

4    having their data be included in third-party research?

5    A    I don't know exactly, but I do know that across the

6    company, and generally by region, it's over eighty percent.

7    Q    Okay.  So there's a good chance that the 835,000 Texans

8    of that eighty percent --

9    A    And it's somewhere -- somewhere in the range of 650- if

10   my -- you know, if my brain is operating fast enough, yeah.

11   Q    Fantastic.  You mentioned that 23andMe does not track

12   when an email is opened by a consumer or a customer?

13   A    No, I -- I didn't say that.  I'm saying --

14   Q.    I'm sorry.

15   A.    -- I'm not a member of the security department, and I

16   don't know exactly what -- I was a security officer in a prior

17   life.  I know the level of tracking and security controls that

18   can be used.  I don't know exactly what's used in the case of

19   23andMe's security group.

20   Q    Okay.  Do you have any affiliation with that security

21   group, or they're totally separate from what you do?

22   A    As the privacy officer, I have a pretty close affiliation

23   with the security group, yes.

24   Q    Okay.  But you don't have personal knowledge as to --

25   A    I don't have personal knowledge of the question you just



Peter Lefkowitz - Cross

1    asked.

2    Q    Okay.  Do you have knowledge of whether 23andMe retains

3    information related to emails sent for marketing purposes?

4    A    I'm sure some information is kept.  I can't tell you the

5    exact parameters.

6    Q    I'm going to go to your statement.  In your statement, at

7    paragraph 17 -- and I'm sorry, do you have it open?  It

8    starts, "Every iteration of the privacy statement".

9    A    Yes.

10   Q    You have "sale" in quotation marks.  What does that mean?

11   A    Well, if you don't mind, I'm just going to go to the most

12   recent privacy statement.  Give me just a moment, if you don't

13   mind.  So there are -- there are essentially two types of

14   provisions throughout the privacy statements, one concerning

15   potential sale.  This is a concept that, beginning with the

16   CCPA, the notion that one needed to speak about "sale".  And

17   this was largely in the context of commerce, third-party

18   marketing, retargeting ads, sharing with social media, that

19   sort of thing.  And the policies required, the CCPA required a

20   California state notice, as your -- as your colleague was

21   pointing out.  We also separately have a statement, and have

22   had a statement going back to 2007, about the sale of the

23   business.

24   Q    Is that why the "sale" is in parentheses?  I don't

25   understand.



Peter Lefkowitz - Cross

1    A.    In quotes?

2    Q.    In quotes, yes.  Sorry.  Parentheses, quotes, yes.

3    A     Look, as -- as I think about this, as I formulate this,

4    there are -- there are two issues here.  One is, if you look

5    at the privacy statement at M, or at N, there's a discussion

6    about sale for commercial purposes.  There are separate

7    statements.  And we've covered -- you covered with Prof. Cate,

8    going back through the history of the company, statements

9    about sale of the business.

10   Q     And that's why it's in quotation marks?

11   A     Yes.

12   Q     In paragraph 23, which is just page 9, I think --

13   A     Yes.

14   Q     Paragraph 23.  Are you with me?  Okay.  23, I'm just

15   going to -- well, actually, can you read that sentence?

16   A     "23andMe customers also may request deletion of their

17   data at any time.  And 23andMe carries out these deletion

18   requests in conformance with its privacy statement and subject

19   to its legal, contractual, and compliance obligations."  Would

20   you like me to continue?

21   Q     No, that's fine.  Thank you.  Sitting here today, are you

22   aware of any outstanding complaints from customers that their

23   account or data has not been deleted after requesting

24   deletion?

25   A     Well, yes.  And if you'd allow me to just take a moment



Peter Lefkowitz - Cross

1    to explain.  We have deletion requests that come in through

2    the service.  We have had, as you know, 1.9 million of those

3    since Attorney General Bonta's suggestion that customers

4    delete their accounts following the bankruptcy.

5         Within that set, there is a smaller number of customers,

6    a much smaller number of customers -- there have been 40,000

7    since the beginning of the bankruptcy -- who needed some form

8    of revalidation, because in order to protect people's privacy

9    rights, we are not going to allow access to somebody's data,

10   or deletion of somebody's data, in violation of their privacy

11   rights, if we don't have validation of who they are.

12        The main forms -- the main areas where there may not be

13   an appropriate understanding of who people are, is where they

14   either have not been able to access their account, because

15   they've lost their password, or something like that, or where

16   they give us an incorrect date of birth.  Some people have

17   signed up as a customer over time, and they've given fake

18   dates of birth in order to -- presumably; I'm guessing here --

19   to protect their own privacy.

20        In either of those cases, they need to contact our

21   customer care group.  It's an escalation process.  And then we

22   go through validation of who they are.  There have been

23   approximately 40,000 of those.  We have now resolved over

24   39,000 of them.

25   Q    Are you aware that certain Attorneys General, as part of



Peter Lefkowitz - Cross

1    their duties, receive consumer complaints and have received

2    consumer complaints regarding the inability to delete their

3    customer data?

4    A    Yes.  And the Attorneys General have been very good about

5    forwarding to us -- those to us so that we could deal with

6    them.

7    Q    Okay.  Can you pick up the big ones, the State of Texas

8    exhibit book?

9    A    My college roommate was from Texas.  I spent four years

10   learning about how big everything is in Texas.

11   Q    If you can please turn with me to Tex-C?  Texas-C?

12   A    Okay.

13   Q    The first two pages are an affidavit, I'll represent.  So

14   you can turn to the third page.

15   A    Um-hum.  Okay.

16   Q    And can you tell me what you believe this represents, in

17   your best knowledge?

18   A    So before I answer, can I just ask you, are these -- are

19   these the documents that were produced last night?

20   A    Yes.

21   Q    Okay.

22        MR. CLAREMAN:  Excuse me, Your Honor, if I may

23   interpose an objection.

24        THE COURT:  Yes.

25        THE CLERK:  We need to have you up at the mic.



Peter Lefkowitz - Cross

1        THE COURT:  Up to the mic, please.

2        MR. CLAREMAN:  Yes.  So the document at Exhibit C is

3   not in evidence, so I don't believe it's appropriate to read

4   from the document.  It's also a document that was provided to

5   us last night, for the first time, in redacted form.

6        We have, I will also add, notwithstanding the late

7   hour in which this was provided to us, particularly with

8   respect to complaints that go back to March and April, we were

9   able to spend some time looking into the documents that are

10  reflected here, and in fact, have seen that many of these

11  complaints relate to customers whose data has been deleted.

12       So I do object to the admissibility of these

13  documents, or the use of these documents in the redacted form

14  in which they were provided.  I don't think they're

15  appropriate to use with the witness.

16       THE COURT:  Okay.  Well, let's first talk about

17  whether they're coming into evidence.

18       MR. CLAREMAN:  I'm sorry.  I should also add they're

19  hearsay as well.

20       MS. MILLIGAN:  We were intending to submit these

21  documents into evidence.  Regarding the redaction, one, these

22  are complaints received, and the purpose of them is to

23  acknowledge that there are post-petition complaints being

24  received, by the Texas Attorney Generals, regarding the

25  inability of customers to delete data.



Peter Lefkowitz - Cross

1    The redaction is personally identifiable information.

2  So we, in an abundance of caution, redacted things like the

3  email address, the address, and phone number.  The consumer's

4  first name and last name and the text of their complaint to

5  the Texas AG are included.  These have already been submitted

6  by our office to the company, in an attempt to get them

7  resolved, but never received a response as to whether they

8  were resolved.  So I'm glad to hear some of them have been,

9  here today.

10    THE COURT:  Are you offering C into evidence?

11    MS. MILLIGAN:  Yes, sir.

12    THE COURT:  Okay.  We have a hearsay objection.  What

13  else do we have?

14    MR. CLAREMAN:  It's a hearsay objection.  That's the

15  principle objection, that this is not a business record.

16  There's a business record certification of someone named

17  Michael O'Leary (ph.).  These are not business records of the

18  Texas Attorney General.  They were submitted to the Texas

19  Attorney General.  So I don't believe that there's an

20  applicable hearsay exception that applies.  And I haven't

21  heard an argument that there is.

22    THE COURT:  Ms. Milligan?

23    MS. MILLIGAN:  There is an affidavit of Michael

24  O'Leary, who is available and on the line to testify if there

25  are questions.  These are records that are retained by the



Peter Lefkowitz - Cross

1    Texas attorney General related to consumer complaints

2    specifically submitted to the Attorney General's office, and

3    again, were only redacted for the personally identifiable

4    information.

5        The purpose of this is not to prove the matter

6    asserted.  It's to prove that we have received complaints.

7    We're not trying to get the specific complaint information in.

8    It is just evidence that complaints have been submitted post-

9    petition.  So it's not for the truth of the matter.

10       THE COURT:  Did the debtor stipulate that complaints

11   have been submitted to the Texas Attorney General?

12       MR. CLAREMAN:  You read my mind, Your Honor, yes.

13       THE COURT:  Okay.  I think that will take care of us.

14   I don't think there's any need to use Exhibit C, Ms. Milligan.

15   That avoids any hearsay problem.

16       MS. MILLIGAN:  Okay.  Thank you, Your Honor.

17   BY MS. MILLIGAN:

18   Q.   In the 1.9 million requests for deletion, as the data

19   privacy officer, were you able to confirm that those deletion

20   requests were bona fide unique requests and not duplicate

21   requests?  Like, 1.9 million separate customers requested

22   deletion of their data?

23   A    I have not asked that question.  I have not -- at the

24   same time, as the privacy officer, I would expect to hear if

25   there was a substantial problem with that, and I have not.



Peter Lefkowitz - Cross

1    Q    Okay.  Let's talk a little bit about the transactions.

2    You talked a little bit about the asset purchase agreement.

3    This transaction that's being proposed is the establishment of

4    a NewCo, a subsidiary, correct?

5    A    That is --

6    Q.   And then --

7    A.   That is part of the transaction.

8    Q    Right.  Part of the transaction.  I'm not saying that's a

9    complete transaction.  Sorry for the confusing question.  And

10   then a separate transaction between NewCo and TTAM.  Is that

11   your understanding?

12   A    That is my understanding.

13   Q    Does NewCo have any assets, to your knowledge?

14   A    Prior to all of the data going into it?  You know,

15   I'll -- I'll admit to you, I am not an expert on tax law.  I'm

16   not an expert on corporate restructuring.  I think any entity

17   that's ever set up starts out as just an entity.

18   Q    And I apologize; I should back up.  Has NewCo been

19   created yet, to your knowledge.

20   A    I don't know the answer to that.

21   Q    Okay.  You state in your paragraph -- well, I think there

22   has been testimony that the sale, the asset purchase

23   agreements, have terms that are consistent with the

24   obligations in the privacy statement and would remain subject

25   to those pre-existing privacy statements.  But that is subject



Peter Lefkowitz - Cross

1   to the ability to change those privacy statements, correct?

2   A    That is correct.

3   Q    The day after the closing of the sale, the privacy

4   statements can be changed.  Is that your understanding?

5   A    That's correct.

6   Q    Okay.  The day before bankruptcy is filed, the privacy

7   policies can be changed by the company.

8   A    They could have been, but they were not.

9   Q    Okay.  And you, I think, previously testified you had no

10  knowledge of whether the change in 2022, to include bankruptcy

11  in the disclosure part of the privacy policies, prompted an

12  email to customers of the change.  You don't know that?

13  A    Well, two answers to that.  I don't know the answer to --

14  to that specific question.

15  Q.   Okay.

16  A.   But I'll just quibble a bit with the notion of including

17  bankruptcy.  It included the word "bankruptcy".  I believe

18  that bankruptcy has always been part of the notion of a

19  business transition.

20       MS. MILLIGAN:  I think, first of all, move to strike

21  the second part of his comment, just because it's his opinion

22  as to what the previous policies that he's testified he has no

23  knowledge of say.

24       THE COURT:  Overruled.  I'll allow it.

25       MS. MILLIGAN:  Okay.



Peter Lefkowitz - Cross

1    Q.    There are certain data privacy enhancements that have

2    been proposed as part of this transaction.  Are you aware of

3    those?

4    A     Yes, I am.

5    Q     Have you, in your knowledge, reviewed whether those data

6    assurances are something that 23andMe already does, such as

7    having a privacy board or --

8    A     If you -- if you have the -- if you -- if you have the

9    list, I can go through them with you.

10    Q.    Okay.  I --

11           MR. CLAREMAN:  Your Honor, I'm actually going to

12    object to this line of questioning on the grounds that there

13    was a prior version of the declaration, that we filed on the

14    docket and offered into evidence, that related to the

15    questions that Ms. Milligan is now asking.  And we struck the

16    paragraph at their request.  So I think the questioning now

17    exceeds the scope of cross and is, in any event, improper

18    because it was stricken from the direct at their request.

19           THE COURT:  Ms. Milligan?

20           MS. MILLIGAN:  Respectfully, I thought that was

21    California's request, but I do agree it's stricken, so I'm

22    happy to withdraw the question if it's --

23           THE COURT:  It's withdrawn.  Go ahead.

24    Q     Are you aware of any specific state's data privacy laws

25    related to genetic matter?



Peter Lefkowitz - Cross

1    A    Of course.

2    Q    Are you aware of the Texas Direct-to-Consumer Genetic

3    Testing Act?

4    A    Yes.

5    Q    Are you aware that Texas customers have a perpetual right

6    to delete their data under Texas law?

7    A    I'm not sitting with the law in front of me.  If you, as

8    a member of the Attorneys General's office, represent that to

9    me, I'll accept it.

10   Q    Okay. And the transaction that is being proposed, as part

11   of this asset purchase agreement, does not contemplate

12   obtaining separate express consent from Texas consumers, in

13   your understanding; is that right?

14   A    That is exactly right.

15   Q    Okay.

16   A    Excuse me.

17   Q.   Yes, sir.

18   A.   It does not contemplate obtaining a new second express

19   consent.  I believe that that consent has already been

20   obtained.

21   Q    You believe that consumers who signed up with 23andMe as

22   an entity consented ahead of time that their data can be

23   transferred or disclosed to a third party?

24   A    I believe that, when they clicked "agree" to the terms of

25   service and privacy statement, they were agreeing that their

Peter Lefkowitz - Cross

1   data could be part of a transaction.

2   Q    I think we'll respectfully disagree about that, but I

3   appreciate your testimony.

4   A    I expected you would.

5        MS. MILLIGAN:  I think that's all the questions we

6   have.  That's all the questions we have.  Thank you.

7        Thank you, sir.

8        THE COURT:  Okay.  Additional cross, Mr. Nadal?

9        MR. NADAL:  Just very briefly.

10       You talked a couple moments ago about --

11       THE COURT:  Oh, well, that wasn't really -- I was

12   really asking about the other parties.

13       MR. CLAREMAN:  Your Honor, I'd object.  I don't think

14   it's proper.

15       THE COURT:  We'll see if we need recross, but let's

16   hold it.

17       Any other parties wish to cross-examine the witness?

18       MS. EICHELE:  Your Honor.  Elizabeth Eichele.  If the

19   Court would permit me, I do have a few questions for this

20   witness.

21       THE COURT:  Briefly.  Go ahead.

22       MS. EICHELE:  Yes, Your Honor.  Thank you.

23   CROSS-EXAMINATION

24   BY MS. EICHELE:

25   Q.   Good afternoon, Mr. Lefkowitz.  My name is Elizabeth



Peter Lefkowitz - Cross

1    Eichele, and I'm a 23andMe customer.  I filed an objection

2    docketed as ECF 764.  Throughout the Wednesday hearing, I

3    heard repeatedly that customers are free to delete their

4    accounts at any time.  And you stated the current situation,

5    which saved me several questions, of some of the problems that

6    people have been having.  I will assume your numbers are

7    correct for the purposes of how many people are left having

8    problems.  But you acknowledge -- are you acknowledging that

9    there are still people that are having problems with deleting

10   their account?

11   A    I -- I acknowledge that there are still open customer

12   care cases for people who need to validate their identity and

13   close their accounts.  And we're working actively to close

14   those.  We're happy to work with any consumer or, if the AGs

15   provide us notice, with the AGs to -- to help address those.

16   Q    Okay.  Do you know when the birth date screen requirement

17   was added?

18   A    It was added in early -- I believe, early 2024, in order

19   to better protect customers against the possibility that

20   somebody else doing a credential stuffing, or other attack,

21   could access or delete somebody's data.

22   Q    Do you know if it was added before or after 23andMe knew

23   they were going to file for bankruptcy?

24   A.   Before.

25   Q.   Okay.  The birth date screen has also been added in order



Peter Lefkowitz - Cross

1    for a customer to change even their email address; is that

2    correct?

3    A    I don't know the answer to that.

4    Q    Okay.  And are you aware that, after a certain number of

5    tries of inputs of a birth date, that the customer sees a

6    screen that says they've exceeded their number of attempts and

7    must call customer service or contact customer service?

8    A    Yes.  And we do that, and technology companies generally

9    do that, in order to avoid credential stuffing attempts

10    that -- that generally involve multiple efforts with multiple

11    sets of data to try to access an account.

12    Q    And you have previously stated that customer service

13    requires additional identifying information from a customer in

14    order to effectuate the deletion of their account; is that

15    correct?

16    A    Correct.

17    Q    Okay.  And that would be a government issued ID; is that

18    correct?

19    A    Yes, we work with a service called Vouched.

20    Q    Would you agree that one's driver's license number

21    information, et cetera, passport information, or other

22    government ID information is additional personal identifying

23    information that 23andMe is collecting?

24    A    Vouched is collecting.

25    Q    So this is an outside entity other than 23andMe; is that



Peter Lefkowitz - Cross

1    correct?

2    A    Correct.

3    Q    Okay.  Would you agree that, if there's an issue with the

4    birth date screen, in other words, if the customer is

5    inputting the correct birth date, and they get denied however

6    many times before they get told to contact customer service,

7    that they're basically being asked by 23andMe to initiate --

8    well, they're being asked -- 23andMe is initiating the account

9    deletion rather than permitting the customer to do so; is that

10   correct?

11   A    I'm sorry; I don't understand the question.

12   Q    Well, a customer normally can go into 23andMe and click

13   on delete their account.  And now, with the relatively new

14   screen of the birth date requirement, if they put in a birth

15   date, and 23andMe system acknowledges that birth date, then

16   the customer can delete the account right there without having

17   to contact customer service, correct?

18   A    That is the way the service works, yes.

19   Q    All right.  My personal experience was I was entrusted

20   with a couple of family members' accounts who asked to delete

21   them, and my own.  And having gone through all of them with

22   correct birth dates, it still told me I had to contact

23   customer service.  And at that point, I was asked to produce

24   government IDs and to email them in those emails, to 23andMe

25   directly, or that was what customer service was showing, I



Peter Lefkowitz - Cross

1    would be sending it directly to them.  And being that I'm

2    trying to delete information so it isn't part of the sale,

3    adding additional identifying information, particularly

4    government IDs, when the information was input correctly, was

5    a little bit disturbing to me.  Can you understand that?

6    A    I appreciate your concern.  Our customer care team is

7    happy to work with you.  I don't know the specifics of your

8    circumstance.

9    Q    Well, I said the specifics of the particular situation

10   was that correct birth dates -- the relatively new birth date

11   screen, which I hadn't seen for most of the time I've been a

12   23andMe customer; it's relatively late in the game, is the

13   correct birth dates were put in, and it was still denied and

14   sent to customer service.

15   A.   You --

16   Q.   So now --

17          MR. HOPKINS:  Your Honor, if I may?

18          MS. EICHELE:  I'm sorry?

19          MR. HOPKINS:  This is Chris Hopkins from Paul, Weiss,

20   counsel to the debtors.  I apologize for interrupting your

21   cross.  I just wanted to offer --

22          MS. EICHELE:  That's okay.

23          MR. HOPKINS:  I believe you sent me an email today.

24   I believe I responded to that email.  And we are happy to work

25   directly with you, and the folks at the company, to resolve



1    the deletion issues you're having with respect to yourself and

2    your family members, if that would resolve the cross.  And we

3    will do that as quickly as possible.

4         MS. EICHELE:  Would that be without forcing me to

5    provide additional identifying information such as driver's

6    license, passport, et cetera?

7         MR. HOPKINS:  We will do our best.  But as Mr.

8    Lefkowitz said, there are certain privacy procedures that the

9    company has to follow, but we will find any conceivable

10   solution to address your issues as quickly as we can.

11        MS. EICHELE:  Well, I would appreciate that.  The

12   problem is that that's never been a requirement to delete the

13   accounts prior to this situation.  And now all of a sudden it

14   is.

15        THE COURT:  Okay.  All right.  Hold on.  All right.

16   Thank you, Mr. Hopkins, for that creative solution.

17        Ms. Eichele, I understand your concern.  I understand

18   the company's position that there are issues with privacy --

19   let me put it this way.  There are issues with identity

20   verification in both creating and deleting accounts.  And the

21   company seems to be trying to work through that as best they

22   can.

23        So I'm going to conclude this cross-examination.

24   Respectfully, your personal situation is something that ought

25   to get resolved, but it is not something that ought to hold up



1    this sale.  And so thank you for appearing, Ms. Eichele.  And

2    please work with Mr. Hopkins, or somebody from his team, that

3    he will get in touch with you.  And I think, if there's a

4    solution to be found, the parties will find it.

5        MS. EICHELE:  Thank you, Your Honor.  I appreciate

6    it.  And I will be in contact with him.  And I appreciate his

7    jumping in.

8        THE COURT:  Very good.

9        MS. EICHELE:  Thank you, Judge.

10        THE COURT:  All right.  Additional cross-examination?

11    Okay.  Redirect?

12        MR. CLAREMAN:  No redirect, Your Honor.

13        THE COURT:  No redirect.

14    Recross?  Do I want to ask about recross?

15        MR. NADAL:  Your Honor, I don't have any recross.  I

16    just wanted to thank the witness for the work that he's done

17    in working with the Attorney General's office.

18        THE COURT:  Oh, well, there we go.

19    All right.  Thank you.  You may step down, Mr.

20    Lefkowitz.

21    We should probably be thinking about taking a lunch

22    break, but tell me what's up next.

23        MR. HOPKINS:  Your Honor, I think that concludes the

24    debtors' evidence.  I believe we have some evidentiary issues

25    with certain of what we understand the states will be putting



```
 1    forward as their evidence.  I think, if it's all right with
 2    Your Honor, and not to impose on the Court or anyone that's
 3    here today, I think, in the interest of advancing this
 4    hearing, we would ask for a short lunch break and then to come
 5    back and quickly work through the states' evidence.
 6              THE COURT:  Sure.  But before, are all of your
 7    exhibits in, or are you holding that till the end?
 8              Go ahead.  Go ahead and -- yeah, take your time.
 9              MR. HOPKINS:  Yes, Your Honor, I confirm all of the
10    debtors' exhibits are in.
11              THE COURT:  Okay.  All right.  So timing for lunch.
12    We can't go too short because folks have been sitting here and
13    have got to get up and eat.
14              MR. HOPKINS:  Understood, Your Honor.
15              THE COURT:  What do you suggest?
16              MR. HOPKINS:  And the cafeteria is --
17              THE COURT:  The cafeteria is closed.
18              MR. HOPKINS:  -- unfortunately closed.
19              THE COURT:  The cafeteria is closed, yes.  I brought
20    a brown bag, but I live here, so it's a little easier for me
21    to do that.  So --
22              MR. KIRPALANI:  What did you bring, Your Honor?
23              THE COURT:  I don't remember.  I'm laser focused on
24    the testimony, Mr. Kirpalani.  I've totally forgotten about
25    what I brought for lunch.  All right.
```



1           So how long do you suggest, Mr. Hopkins?

2           MR. HOPKINS:  If it would be all right with the

3    Court, could we resume at 1:30?

4           THE COURT:  Any objection to 1:30?  Do folks have a

5    lunch option that's going to work?

6           Ms. Milligan?

7           MS. MILLIGAN:  I think 1:30 is fine.  And I'm also

8    happy to discuss with counsel, during that break, the

9    remaining exhibit issues --

10          THE COURT:  Okay.

11          MS. MILLIGAN:  -- and see if we can get those

12   resolved.

13          THE COURT:  Perfect.  Okay.  So --

14          MR. HOPKINS:  Yeah, we'll make as much progress as we

15   can.

16          THE COURT:  Let's do 1:30.  If you need more time to

17   talk, as always, talk to Mr. Spidle, and we'll get that for

18   you.  But otherwise, we'll be in recess till 1:30.

19          MR. HOPKINS:  Thank you, Your Honor.

20       (Recess from 12:54 p.m. until 1:32 p.m.)

21          THE CLERK:  We're on the record.

22          THE COURT:  Thank you.  Please be seated.  Okay.

23   Where are we?

24          MS. MILLIGAN:  Layla Milligan for the State of Texas.

25   I understand that debtors are -- I'm not sure if debtor has



```
1    additional documents to submit into evidence or --

2            MR. RECHER:  No --

3            MS. MILLIGAN:  Okay.

4            MR. RECHER:  -- we do not.  So I think -- and we can

5    do this on a consensual basis.  I understand there are a

6    couple documents the State of Texas would like to seek

7    admission.

8            MS. MILLIGAN:  Yes.  Thank you.  In the Texas, State

9    of Texas exhibit list and booklet, there is Texas D, which is

10   a written statement.  It goes to Selsavage --

11           THE COURT:  It's a B, bravo?

12           MS. MILLIGAN:  D as in --

13           THE COURT:  D, Delta.

14           MS. MILLIGAN:  -- in dog.

15           THE COURT:  Okay.

16           MS. MILLIGAN:  Delta, yeah.

17           THE COURT:  Yeah.

18           MS. MILLIGAN:  A written statement of Joseph

19   Selsavage to the House Committee on June 10th, 2025, and I

20   would ask the Court to submit that into evidence?

21   (J. Selsavage statement was hereby marked for identification

22   as State of Texas' Exhibit D, as of this date.)

23           THE COURT:  Any objection?

24           MR. RECHER:  No objection.

25           THE COURT:  All right.
```



```
1              MS. MILLIGAN:  Texas --

2              THE COURT:  Texas, D, Delta is admitted.

3    (J. Selsavage statement was hereby received into evidence as

4    State of Texas' Exhibit D, as of this date.)

5              MS. MILLIGAN:  Thank you.

6              And Texas E is another written statement of Joseph

7    Selsavage to the Senate Committee, dated June 11th, 2025.

8    (Statement of Selsavage  was hereby marked for identification

9    as State of Texas' Exhibit E, as of this date.)

10             THE COURT:  Any objection?

11             MR. RECHER:  No objection.

12             THE COURT:  Texas, echo is admitted.

13   (Statement of Selsavage  was hereby received into evidence as

14   State of Texas' Exhibit E, as of this date.)

15             MS. MILLIGAN:  I believe Texas F was admitted

16   Wednesday so --

17             THE COURT:  Yes.  That's consistent with our records.

18   Okay.

19             MS. MILLIGAN:  I will say there are two other

20   documents that I think the Court can take notice of, but out

21   of an abundance of caution, I'm asking for submission into

22   evidence, one is the joint stipulation and agreed order

23   directing U.S. Trustee to appoint a CPO, which is at docket

24   number 346.

25   (Joint stipulation was hereby marked for identification as
```



```
 1      State of Texas' Exhibit 346, as of this date.)

 2                 THE COURT:  346?

 3                 MR. RECHER:  No objection.

 4                 THE COURT:  No objection.  346 is admitted.

 5      (Joint stipulation was hereby received into evidence as State

 6      of Texas' Exhibit 346, as of this date.)

 7                 MS. MILLIGAN:  Thank you, Your Honor.  And then

 8      finally is the actual consumer privacy ombudsman report, and

 9      that is at docket 718.

10                 THE COURT:  718.

11                 MS. MILLIGAN:  And all of the attached documents that

12      are associated with that report.

13      (Consumer privacy ombudsman report was hereby marked for

14      identification as State of Texas' Exhibit 718, as of this

15      date.)

16                 THE COURT:  Any objection to the admission of the CPO

17      report 718?

18                 MR. RECHER:  No objection on the understanding that

19      we have that the State of Texas -- the document is not being

20      offered for any evidentiary value with respect to the meaning

21      instruction of the law, which I think is the same basis on

22      which we offer Professor Cate's declaration.

23                 THE COURT:  Is that agreeable?

24                 MS. MILLIGAN:  I believe that Professor -- I'm not

25      going to try characterize his testimony.  I think he prepared
```



```
 1    this report pursuant to the joint stipulation for the

 2    assistance of the Court to review, and of course, it's not

 3    binding on the Court.  So the Court would not have -- it's not

 4    evidence of what the Court should do.  That's correct.  I

 5    think that's the same agreement.

 6              THE COURT:  It stans on the same plane as Professor

 7    Cate?

 8              MS. MILLIGAN:  Yeah.

 9              MR. RECHER:  I'm fine with that --

10              THE COURT:  Okay.

11              MR. RECHER:  -- that understanding that it's on the

12    same plane as Professor Cate.

13              THE COURT:  Okay.  With that understanding, I'll

14    admit the CPO report 718.

15    (Consumer privacy ombudsman report was hereby received into

16    evidence as State of Texas' Exhibit 718, as of this date.)

17              MR. RECHER:  Thank you, Your Honor.

18              MS. MILLIGAN:  And that's all the exhibits that Texas

19    at this time for submission.  So I think that's all.

20              THE COURT:  Any witnesses?  Witnesses from Texas?

21              MS. MILLIGAN:  Yes, Your Honor.  Texas calls -- and

22    I'm sorry.  One housekeeping matter --

23              THE COURT:  Sure.

24              MS. MILLIGAN:  Because Texas and California and

25    Tennessee and Kentucky, I think have pending objections, it
```



1    may make sense to sort of consider them concurrently so we

2    only have to call witnesses once and not, like, have the

3    witness come in and answer my questions and then answer them

4    again and answer --

5         THE COURT:  That sounds fine.

6         MS. MILLIGAN:  -- someone else's question.

7         THE COURT:  That sounds fine.

8         MS. MILLIGAN:  Very good.

9         And the State of Texas calls Professor Neil Richards

10    to the stand.

11        THE CLERK:  Please raise your right hand, and state

12    your name for the record.

13        MR. RICHARDS:  Neil Richards.

14    (Witness sworn)

15        THE CLERK:  Please take a seat.  Speak directly into

16    the microphone.

17    DIRECT EXAMINATION

18    BY MS. MILLIGAN:

19    Q.   Good afternoon, Professor Richards.

20    A.   Good morning, Ms. Milligan.

21    Q.   Laylan Miiligan again appearing on behalf of the State of

22    Texas, but we know that.  So can you please just state your

23    name and your current position?

24    A.   My name is Neil Michael Richards.  I am a Koch

25    distinguished professor in law and the codirector of the



Neil Richards - Direct

1    Cordell Institute for Policy in Medicine and Law at Washington

2    University here in St. Louis.

3    Q.    Fantastic.  And also --

4    A.    And I'm also the CPO.

5    Q.    Okay.  My next question was you were appointed in this

6    case to serve as the consumer privacy ombudsman, correct?

7    A.    That's correct.

8    Q.    All right.

9    A.    It's been more of a life than being a professor for the

10    past five weeks.

11    Q.    You filed a report with the Court on June 11th, 2025; is

12    that correct?

13    A.    I believe that's true.  It was last Wednesday.

14    Q.    Okay.  Time has flown.  So did you prepare this report?

15    A.    Yes.

16    Q.    Were the documents attached to the report used by you in

17    the preparation of the report?

18    A.    Yes.

19    Q.    Can you describe who you interviewed or sought

20    documentation from to prepare the report?

21    A.    Sure.  So I understood my charge to conduct an

22    examination pursuant to paragraph 3 of the joint order of the

23    stipulation entered by this Court to assist the Court in its

24    determination of certain issues relevant to the bankruptcy

25    proceeding before us.  I, initially, upon being appointed, I



Neil Richards - Direct

1    talked to the U.S. Trustee's Office to get my charge.  They

2    encouraged me to retain counsel as rapidly as possible.  I

3    endeavored to do that.  I reached out to counsel for the

4    debtor, Mr. Hopkins.  We spoke I think the day that I was

5    appointed.  I conducted my examination by seeking interviews

6    where possible through counsel for the debtor with the various

7    stakeholders, this included, in addition to privacy and

8    security presentations by counsel for the debtor relating to

9    the debtor's privacy and security practices.

10        Separate interviews with in sort of rough order of

11   chronology:  the committee with subsets of the committee

12   related to the data breach, plaintiffs, and the data breach --

13   so the data breach cause action plaintiffs and the data breach

14   arbitration claimants.  I also met with counsel and leadership

15   of both of the two bidders at that time, Regeneron and then

16   TTAM.  I also met with, upon their request, counsel for the

17   State of California, and then I think my final formal

18   interview right before attending the hearing two weeks ago on

19   Wednesday was with the State AG's multistate and NAAG.  I may

20   have missed someone, but as I sit here today, that list is are

21   the ones that are salient to me.

22   Q.   Very good.  Did you meet with -- you said you met with

23   the leadership of TTAM.  Who did you meet specifically with?

24   A.   It was -- it was -- all of these meetings that I've

25   described were Zoom or Teams calls.  Ms. Wojcicki was on the

Neil Richards - Direct

1    TTAM call.  There were others, but that interview was largely

2    a conversation between myself and her as I recall it.  There

3    were lawyers on the call, both I think counsel for the debtor,

4    privacy counsel was there.  There were lawyers for TTAM, who

5    were also there, but the majority of the conversation was the

6    two of us.

7    Q.   To your knowledge, did the debtors and the parties

8    provide you with all of the information you requested to

9    prepare your report?

10   A.   So I think I say in my report, on the whole, all

11   stakeholders were cooperative, and I stand by that statement.

12   I think, you know, in any examination you're going to have

13   questions that maybe cannot be answered or questions that

14   people don't want you to answer, but on the whole, I was

15   satisfied with the volume of factual and other material that

16   was made available to me.  As I also note in my report, some

17   of the materials were coming in within a week of even the

18   revised CPO deadline of last Wednesday.

19   Q.   Were you able to reach a conclusion that the proposed

20   sale -- TTAM, I guess now, would comply with nonbankruptcy

21   law?

22   A.   So that's a really important question.  This is, as we're

23   all aware, and I think as we've all heard a lot over the past

24   two days in court has been very fast moving -- at least by my

25   understanding, it's a fast-moving bankruptcy proceeding, and



Neil Richards - Direct

1   of course, my report was filed before I knew that TTAM was

2   going to be the successful bidder.

3   Q.    Okay.  So in your review were you able to -- you were

4   looking at the original purchase agreement with TTAM; is that

5   correct?

6   A.    That's correct.

7   Q.    Okay.  Did you review the amended or the revised asset

8   purchase agreement when that was changed?

9   A.    Which one are you referring to?  I want to be sure

10   that -- I've been through a lot of tabbing already today, and

11   I want to be sure that I'm answering the -- that we have a

12   meeting of minds on which document we're talking about.

13   Q.    I would say the latest amended asset purchase agreement

14   submitted by the debtor between debtors and --

15   A.    So I have not read the entire thing.  It was not made

16   available to me by counsel for the debtors, but I have some

17   familiarity with the privacy, the purported voluntary privacy

18   safeguards.

19   Q.    In your opinion, since I know you've only reviewed part

20   of the amended asset purchase agreement, would the changes to

21   your knowledge change the opinion that you have expressed in

22   this report as to any of your findings?

23   A.    No.

24   Q.    Okay.  Is it your opinion that the transaction as

25   proposed complies with applicable nonbankruptcy law?



Neil Richards - Direct

1    A.    So I think, Counsel, it's important at this point to look

2    at my report and the method that I applied in my report.    I

3    tried as best I could to answer the questions that were

4    framed -- that were posed to me by the Court in paragraph 3 of

5    that report.    I believe paragraph -- there were eight of them,

6    but they were labeled A through F, and there were two sort of

7    unlabeled additional questions that were in there, but I

8    believe that paragraph 3-B of the joint order and stipulation

9    addressed that.    And my conclusion was that -- and again, I'm

10   giving you an oral summary of my report.    My report is

11   controlling here.    My opinion has not changed, but I could not

12   conclude that there was not a violation --

13   Q.    And --

14   A.    -- of applicable nonbankruptcy law.

15   Q.    Thank you.    I didn't mean to interrupt you.    Thank you.

16   Were you present in the courtroom for the testimony of

17   Professor Cate?

18   A.    Yes, I was.

19   Q.    Do you agree with his assessment?

20   A.    No.    Some of it, I might agree with it, but on the whole,

21   no.    I do not agree with the general thrust of his opinions.

22   Q.    What specifically do you disagree with, if it can be

23   reducible to an easy answer?

24   A.    Right.    So let me say, I think there are perhaps --

25   without prejudice to other -- we're law professors, right?    We



Neil Richards - Direct

1    like to disagree.  Without prejudice to other areas of

2    potential disagreement, I think with respect there may be two

3    or three of them that I want to highlight in response to your

4    question.  The first is I think the -- my view and my report

5    answered the question addressed to me in paragraph 3 and not

6    to opine about the construction of 363.  I can't speak to

7    Professor Cate's expertise, but I am not a bankruptcy expert.

8    I am a privacy expert, and I understood that my testimony

9    today and my written report to be offered in that vein of

10   expertise.

11       Second, with respect to the discussion of notice and opt

12   in, opt out.  I was very surprised by Professor Cate's

13   statements that the consumers had made a choice when both on

14   the stand today and in his own scholarship, he's been very

15   critical of notice and choice, agreements of the sort that

16   were put forth by the '22 version of the 23 new privacy policy

17   between 2007 and the present.  In particular, I recall -- I

18   looked up a 2011 article in the California Law Review in which

19   he said that consumers don't read privacy policies and often

20   misinformed and poor choices on the basis of policies they

21   haven't really particularly the fine print.

22       And then the third point -- sorry.  I think I said there

23   were three.  The third point is the discussion of the scope of

24   what constitutes the relevant privacy policies of the debtor

25   in this case, and I was puzzled by Professor Cate's suggestion

Neil Richards – Direct

1    that regulators and privacy lawyers and scholars don't look at

2    the totality of representations made my a company towards

3    consumers, and this sort of fixation on one word in the fine

4    print out of 10,000 -- close to 10,000 words that consumers

5    are -- or suggested to read, the word, bankruptcy.  Was it all

6    with the way -- for example, the FTC addresses it.  I notice

7    that Professor Cate cited the FTC letter from Chair Ferguson

8    to the debtor in March of this year.  If you look at that

9    letter, which is reproduced in the appendix to my report and

10   which is cited by Professor Cate and his report, you'll see

11   that the FTC talks about representations broadly as made to

12   consumers of the first step in analysis of whether the

13   policies regarding privacy are misrepresentations or

14   inconsistent with actual practice or not.

15   Q.   So in your opinion, if a privacy statement in the first

16   page, first line says, we will not sell your data, or we will

17   not sell your data without your expressed consent, and then

18   later, in the body or at the end of privacy statement says, we

19   may transfer or sell the company, do those two comments -- are

20   they inconsistent?

21   A.   So as I said -- I think before we get into that, Counsel,

22   I think it's important to talk about method.

23   Q.   Okay.

24   A.   Because I think method -- particularly for academic work

25   and expert reports, method is very, very important.  And as I



Neil Richards - Direct

1  talk about in my report, the method that I followed was the

2  ways in which actual consumers would encounter and would

3  understand representations about the privacy policies of a

4  company, and those begin at the general level.  For example, I

5  recall this morning, there was a discussion of the

6  23andMe.com/privacy page where we put privacy first.  I detail

7  a lot -- I don't mean to cover ground that is laid out with

8  greater precision in the words of my expert report.  I would

9  refer you to that.  But I do think that you when you look at

10 the total -- as I say in my report, when you look at the

11 totality of the representations made by the debtor in this

12 case and you look at it the way that consumers -- and not, as

13 I say in my report, lawyers at large law firms, or for that

14 matter, law professors with privacy training would zero in on

15 the one word bankruptcy or the other word -- you know, the

16 fine print in the 10,000 words of -- 9,306 words, I think it

17 is actually in the consumer facing representation.  So that

18 doesn't count the slash privacy page which has even more words

19 that consumers have to wade through, a daunting task, as I

20 say.  When you do that, I could not say that it was

21 consistent, and that's I believe the way it's phrased in my

22 report.  And again, I would stand by the precise words in my

23 report because it was a very meticulous and careful and

24 methodologically-focused task that I engaged in in my report,

25 but I was surprised that Professor Cate did not engage with

Neil Richards - Direct

1    that in his shorter report.

2    Q.   Are you familiar with the Texas Direct to Consumer

3    Genetic Testing Privacy Law?

4    A.   I am.

5    Q.   And is it your understanding that that law actually

6    grants Texas citizens a property interest in their genetic

7    data?

8              MR. CLAREMAN:  Objection, Your Honor.  The nature of

9    the objection is I don't believe that the questions that are

10   being asked now are covered in the text of the report.  So I

11   do think it's an undisclosed opinion.  We had reached out to

12   counsel for the CPO prior to the hearing to inquire whether or

13   not Professor Richards intended to offer any opinions that

14   were not encompassed within his report or had any opinions

15   that were encompassed within his report, and if we did, we

16   would have pressed a deposition, and we agreed to forego a

17   deposition on the basis that no undisclosed opinions would be

18   offered.  So I believe that we are now probing an area that's

19   not discussed in the text of the report, in which event, I

20   would object to the question.

21             THE COURT:  Ms. Milligan?

22             MS. MILLIGAN:  I was not aware of that agreement, and

23   so I ask -- and I understood that that law was one of the

24   issues that he may have referenced in his report, and so I

25   thought it was ripe for asking.  If it's not, I will have to



Neil Richards - Direct

1    defer to the report, but I don't know really how to respond.

2    I'm not aware of the agreement.  I wasn't aware that they

3    sought a deposition.  I'm not trying to exceed the terms of

4    his report.  I literally thought that that was referenced in

5    his report.

6             THE COURT:  Yes, sir?

7             MR. FIRSENBAUM:  Good afternoon, Your Honor.  Ross

8    Firsenbaum from Wilmer, Hale, counsel for the CPO.  I think

9    Mr. Clareman's description of the agreement is accurate.

10   Obviously, at the time that we were discussing whether the

11   debtors were going to take a deposition, CPO had no intention

12   of offering any opinions beyond the scope of his report.  I'm

13   not here asking him questions.  I have no idea what questions

14   anybody is asking, and the CPO is on the stand under oath, and

15   people are asking him questions that are within the scope of

16   his expertise.  So if Your Honor doesn't think questions are

17   appropriate, we defer to Your Honor on that, but there's

18   certainly no intention to go beyond the scope of any agreement

19   that we've made or what the Court would like to do in this

20   proceeding, and we defer to Your Honor.

21            THE COURT:  Okay.  Well, I'm not sure exactly sure

22   where this is going to go.

23            But this particular question, Ms. Milligan, I don't

24   think the CPO's understanding of that particular Texas law is

25   especially relevant to his conclusion, and it says what it

Neil Richards - Direct

1    says, of course.  So why don't we move on and see where else

2    we go with this.

3    BY MS. MILLIGAN:

4    Q.   I think I have one final question for you, can you

5    describe how much time that you spent on the report drafting,

6    reviewing documents, and interviews?

7    A.   Many, many, many hours over about four or five weeks.  I

8    don't have my time sheet in front of me, and I know that I

9    have devoted -- I think counsel for the debtor mentioned there

10   was the promise, let's say, of a deposition that was

11   enticingly teased earlier in the week, and I certainly spent

12   time preparing for that eventuality, and of course, my

13   testimony today.  I would say, again off the top of my head,

14   I'll be submitting a time sheet hopefully to someone for

15   compensation of my time at some point -- well over a hundred

16   hours.  Probably for preparation of the report about 150, and

17   of course, I -- in order to meet the exigencies of the

18   accelerated deadline insisted by counsel for the debtor in

19   this case for the submission of the CPO report, there was

20   additional considerable time that members of my team that I

21   was supervising and overseeing their work also engaged in, but

22   certainly, in excess of 150 hours.

23   Q.   Thank you.  That's all the questions I have.  Thank you.

24        THE COURT:  Mr. Nadal?

25   CROSS-EXAMINATION



Neil Richards - Cross

1    BY MR. NADAL:

2    Q.    Good afternoon, Professor Richards.

3    A.    Good afternoon.

4    Q.    My name is Daniel Nadal.  I'm with the California Office

5    of the Attorney General here for the People of the State.

6    Thank you for your -- you submitted a report, correct?

7    A.    I did.

8    Q.    Can you turned to page 39 to 40?

9    A.    I'm not sure I've been given a copy of my report.  There

10   may well be one up here, but --

11            MR. NADAL:  May I approach, Your Honor?

12            THE COURT:  Yes.

13            THE WITNESS:  I think my counsel has a copy, if

14   that's helpful.

15            THE COURT:  If you need to move any of those other

16   binders, any of these various rails around you, we'll do it

17   for now, I think.

18            THE WITNESS:  Thank you, Judge.  As they say in the

19   Navy, in the age of sail, I've cleared the decks for battle.

20            MR. NADAL:  I hope you don't think about that

21   engagement.

22            THE WITNESS:  It was a metaphor, Counsel.

23   BY MR. NADAL:

24   Q.    It's page 39 to 40.

25   A.    Sorry.  I didn't need to use reading glasses, and I've



Neil Richards - Cross

```
1    needed them more in the last two months.  Okay.  39 to 40.

2    Q.   All right.  Do you see where it says in their response,

3    dated June 9th, 2025, two questions posed by the CPO, counsel

4    for the company explain that while there are eighteen million

5    customers currently registered with the company, nearly one-

6    third of those customers have not logged in during the last

7    three years?

8    A.   Yes.  I do see that.

9    Q.   Yes.  And then you go on to say, "Indeed, more than half

10   of 23andMe's customers have averaged one or fewer logins for

11   the past three years since the addition of the word

12   "bankruptcy" to the relevant provision of the privacy

13   statement."

14   A.   Yes.  That's correct.  It does -- I don't know whether

15   you're asking whether I saw it or whether it says it, but both

16   of those are true.

17   Q.   Yes.  You inquired of debtor about this information?

18   A.   Counsel for debtor.

19   Q.   Yes.  And counsel for debtor provided you with that

20   information?

21   A.   Yes.  On June the 9th.

22   Q.   Thank you.  No further questions.

23        THE COURT:  Redirect examination?  Cross?

24        MR. CLAREMAN:  Yes, Your Honor.  Very briefly.  If I

25   (indiscernible), I promise not to use (indiscernible), but if
```



Neil Richards - Cross

1    I may approach again?

2           THE COURT:  Yes.  Professor Richards has made room

3    for it so we're in good shape.

4    CROSS-EXAMINATION

5    BY MR. CLAREMAN:

6    Q.   Good afternoon, Professor Richards.  My name is Billy

7    Clareman.  I'm from the law firm of Paul, Weiss, one of the

8    law firms that is here on behalf of the debtors.  We met very

9    briefly a couple of days ago, but other than that, we haven't

10   spoken; is that right?

11   A.   That's correct.

12   Q.   Okay.  This is the first case in which you've served as a

13   CPO, correct?

14   A.   Yes.

15   Q.   And all of the conclusions that you've reached in

16   connection with your assignment are set forth in your report,

17   correct?

18   A.   Yes.

19   Q.   All right.  You have your report in front of you?

20   A.   Yes.

21   Q.   If I could ask you to turn to page 7, please?

22   A.   Sorry.  7 or 70?

23   Q.   Page 7.

24   A.   It's a good thing there's no 700.

25   Q.   Okay.  Are you there?



Neil Richards - Cross

1   A.    Yes.

2   Q.    And page 7 has a header at the top, summary of legal

3   conclusion.  Do you see that?

4   A.    Yes.

5   Q.    And there are two paragraphs with bolded headers that set

6   forth a summary of your legal conclusions, correct?

7   A.    That's correct.  To clarify, a summary of the conclusions

8   that -- yes.  Let me just stop there.

9   Q.    Okay.  And --

10  A.    Yes.  That's correct.

11  Q.    So I'd like to ask you about the first paragraph

12  following the bold header, compliance with the debtor's

13  privacy policies.  Do you see where I am?

14  A.    I do.

15  Q.    Okay.  In that paragraph, you write, "The CPO interprets

16  the interprets the debtor's privacy policies broadly to

17  include not just the many versions and revisions of the

18  23andMe privacy statement and 23andMe's terms of service, but

19  also the frequent representations and promises 23andMe about

20  privacy, most of which were far more visible and less likely

21  to be understood by consumers in technical language about

22  change and control in the privacy statement."  Did I read that

23  correctly?

24  A.    That's correct.

25  Q.    I'd like to ask you about the technical language that



Neil Richards - Cross

1    you're referring to in that paragraph.  Now, you're familiar

2    with the debtor's privacy statement, the current version and

3    past versions, correct?

4    A.    Yes.

5    Q.    You analyzed those in connection with your report?

6    A.    Yes.  All twenty-two of them.

7    Q.    Okay.  And if you go to Appendix B of your report, which

8    is ECF docket 718, page 131 -- I'm sorry.  It starts at page

9    129.  Are you there?

10   A.    Yes.

11   Q.    And this is the policy that was the most recent policy as

12   of the petition date, correct?

13   A.    Off the top of my head, I don't know when the petition

14   date was because that was not part of my analysis, but I

15   believe this is the most recent.  As it says on page 128, this

16   is the current privacy statement.

17   Q.    Okay.  Current privacy statement, last updated, March 14,

18   2025.  Do you see that?

19   A.    That's correct.

20   Q.    All right.  And if you go to page 131 of 211, there's a

21   paragraph, commonly owned entities, affiliates, and change of

22   ownership.  It's about halfway down the page.  Do you see

23   where I am?

24   A.    I see it.

25   Q.    And you're familiar with this language, correct?



Neil Richards - Cross

1    A.    I am.

2    Q.    And that says, "If we are involved in a bankruptcy,

3    merger, acquisition, reorganization, or sale of assets, your

4    personal information may be accessed, sold, or transferred as

5    part of that transaction, and this privacy statement will

6    apply to your personal information is transferred to a new

7    entity."  Do you see that?

8    A.    Yes.

9    Q.    Okay.  And that language that I just read, you refer to

10   that as change in control language in your report; is that

11   right?

12   A.    I believe that was -- when you asked me about my

13   summary -- and of course, there was a much more fulsome

14   description of this analysis later on in the report.  But when

15   you asked me about the technical language about change in

16   control on page 7, those refer to -- actually to the entirety

17   of the paragraph, including the following sentence:  "We may

18   also disclose personal information about you to our corporate

19   affiliates to help offer services in our affiliate service."

20   So it refers to that paragraph.  That -- I don't know what you

21   would call it, but that sort of subparagraph on the third page

22   of the privacy policy under the one, two, three, four, fifth

23   main heading, and then the one, two, the third subpoint under

24   the fifth main heading, yes.

25   Q.    Can we shorthand that provision to change in control



Neil Richards - Cross

1   provision?

2   A.    I am delighted to call it that, Counsel, instead of what

3   I just said.

4   Q.    And in fact, if you go to page 134 of your report,

5   Appendix C, there's a chart of the change in control language

6   over time that actually walks through all of the twenty-two

7   versions of the report of the privacy statements you referred

8   to.  Is that what's happening in Appendix C?

9   A.    Yes.

10  Q.    And if we look on page 135 of 211, we see that the

11  language in the change in control provision has been the same

12  since June 8th of 2022, correct?

13  A.    That is correct.

14  Q.    And prior to that change on June 8th, 2022, and we see

15  this in the last update, February 3rd, 2022, "In the event

16  that 23andMe goes through a business transition such as a

17  merger, acquisition by another company, or sale of all or a

18  portion of its assets, your personal information will likely

19  be among the assets transferred.  In such a case your

20  information would remain subject to the promises made in any

21  pre-existing privacy statement," and that's from a section on

22  business transaction.  Did I read that correctly?

23  A.    You did.

24  Q.    And if you turn the page, that same language existed in

25  the privacy statement in the change in control provision going



Neil Richards - Cross

1    back to June 24 of 2010.  That's the second to last row in

2    this table; is that right?

3    A.    Actually, I think it goes back to December the 1st, 2011,

4    when the language -- no.  No.  I'm sorry.  That's correct,

5    yes.

6    Q.    And prior to that, the language said, "In the event that

7    23andMe goes through a business transition such as a merger,

8    acquisition by another company, or sale of all or a portion of

9    its assets, your personal information and nonpersonal

10   information will likely be among the assets transferred,

11   you'll be notified in advance by email and prominent notice on

12   our website of any change in ownership or control of your

13   personal information.  We will require an acquiring company or

14   merger agreement to uphold the material terms of its privacy

15   statement, including honoring requests for account deletion."

16   Did I read that correctly?

17   A.    Yes.

18   Q.    Okay.  Now, if I can direct you -- well, you agree that

19   the language we just read, this is the change in control

20   language that you were making reference to in the paragraph we

21   read on page 7 of your report; is that correct?

22   A.    Yes.

23   Q.    And you agree that it is true that there's always been

24   language in the actual privacy statement that personal data

25   could be transferred under a change of ownership?



Neil Richards - Cross

1   A.   Not in those exact words.

2   Q.   Okay.  Well, she would look at your exact words?  If I

3   can direct you to page 38.  I don't want to put words in your

4   mouth.  Go to page 38, please.  And that's page 41 of 211 in

5   the ECF number.  You're in the middle page, you write, "While

6   it is true that there has always been technical legal language

7   in the fine print of the actual privacy statement, the data

8   could be transferred under a change of control.  This document

9   has been changed twenty-two times since 2007, and it was only

10   after June 8, 2022, that the word bankruptcy was added."  Did

11   I read that correctly?

12   A.   Yes, you did.

13   Q.   And you'd agree with the statement as you wrote it in the

14   first part of that sentence, while it is true that there's

15   always been what you called technical legal language in the

16   fine print of the actual privacy statement, the data could be

17   transferred under a change of ownership?

18   A.   That's correct.

19   Q.   Now, in the summary opinion, if go back to page 7, your

20   statement of opinion, summary of opinion in the paragraph that

21   we were looking at before about the debtor's privacy policies

22   states that the CPO cannot conclude with certainty that the

23   sale of the company's data in bankruptcy is otherwise

24   consistent with its privacy policies, particularly for those

25   customers who created their accounts before 23andMe privacy



Neil Richards - Cross

1   statement was amended in June of 2022 to expressly note a

2   potential for a sale of customer data in bankruptcy.  Did I

3   read that correctly?

4   A.    Yes.

5   Q.    And that's, you describe, a very carefully worded

6   opinion?

7   A.    Yes.

8   Q.    In reaching that opinion, your opinion is based on the

9   privacy policy as you conceived it and described it in the

10  first part of that paragraph, correct, to not just include the

11  privacy statement; is that fair?

12  A.    To not include just the privacy?  That's correct.  My

13  review -- my understanding is it says in the paragraph is to

14  interpret the debtor's privacy policies broadly to include

15  more than just the twenty-two versions of the 23andMe privacy

16  statement.

17  Q.    And you differentiate in some fashion in the sentence

18  between the language as it existed after June 8, 2022, and the

19  language that existed before, correct?

20  A.    Yes.

21  Q.    And the change in control language as it existed

22  before -- I'm sorry, as it existed on June 8, 2022, is the

23  same as the current language in the change in control

24  paragraph, correct.

25  A.    I'm sorry.  That was a lot of -- a lot of words



Neil Richards - Cross

1    altogether.  I'm not trying to fight you, Counsel.  I just

2    want to be precise so that my evidence is accurate for the

3    Court.

4    Q.   In the change in control chart that we looked at in

5    Appendix C, the language as it existed on June 8, 2022, is the

6    same as it has been subsequently, including the debtor,

7    correct?

8    A.   I think it's slightly different.  Before June 8th, 2022,

9    it says, "In the event that 23andMe go through a business

10   transition such as a merger, acquisition by another company,

11   or sale of all or a portion of its assets, your personal

12   information will likely be among the assets transferred."  And

13   then in the subsequent one it says, "If we're involved in a

14   bankruptcy, merger, acquisition, reorganization, or sale of

15   assets, your personal information may be accessed, sold, or

16   transferred as part of that transaction, and this privacy

17   statement will apply to your personal information as

18   transferred to the new entity."  So the language is different.

19   Q.   But my question is, the language as it existed starting

20   on June 8th has been the same language subsequently?  That's

21   my question.

22   A.   Oh, yes.  I'm sorry.  I misunderstood your question.

23   Q.   That's okay.  So the -- you attach some significance in

24   your report to the inclusion of the word, bankruptcy, after

25   June 8th, 2022, right --



Neil Richards – Cross

1    A.    Yes.

2    Q.    -- for analysis?  If you were looking only at the

3    language of the privacy statement as it existed on that date

4    and includes the word, bankruptcy -- you would agree we are in

5    a bankruptcy case, correct?

6    A.    That's my understanding, Counsel.

7    Q.    Okay.  And if that was the only policy, if that was the

8    only paragraph you were looking at, that is consistent with a

9    transaction as proposed here, correct, just that language?

10   A.    I -- so I want to be very careful here, Counsel.  I -- my

11   opinions offered in my report were offered as of June the 11th

12   of this year, before I knew that TTAMX was going to be the

13   presumptive -- the successful bidder in the second auction and

14   before I had ever heard the term equity total.

15   Q.    Okay.

16   A.    And so I want to -- you know, I think it's important to

17   time locate the report versus where we are right now in the

18   transaction.

19   Q.    All right.  Fair enough.  But you do attach significance

20   in your report to the inclusion of the bankruptcy word that

21   began June 8th, 2022; is that fair?

22   A.    Yes.

23   Q.    You are not -- going back to your opinion about what the

24   privacy policy is, you're not excluding from the debtor's

25   privacy policy, as you conceptualize it, the language that is



Neil Richards - Cross

1    in the privacy statement, are you?

2    A.    No.

3    Q.    It's one of the things that you consider among others?

4    A.    It is.  As I note in my report and as Professor Cate

5    noted this morning, few, if any, consumers would have read

6    this.  And moreover, for the bankruptcy word, we know for a

7    fact that one-third of 23andMe customers did not login -- have

8    not -- at least as of June the 9th have not logged in in the

9    three years since the word bankruptcy was added.

10   Q.    But your conceptualization of the privacy policy includes

11   statement in terms of service, but also all the other

12   information that a consumer may see; is that fair?  When you

13   say you considered not just, in your opinion, the privacy

14   statement?

15   A.    So this is of course, as we both know, laid out in my

16   report, but I considered the privacy -- the version of the

17   privacy statement, the versions of the terms of use, the

18   supplemental privacy statement for California and other state

19   citizens, supplemental privacy statement for EU citizens, the

20   23andMe.com/privacy page through which most consumers would

21   perhaps access the privacy policy -- this privacy statement,

22   rather, and 23andMe representations that were consumer facing

23   more broadly consistent with the practice of regulators and

24   academic research on how consumers actually understand privacy

25   policies as a general term.



Neil Richards - Cross

1    Q.   Okay.  You didn't cite in your report any case law

2    interpreting Section 363 of the Bankruptcy Code specifically

3    in your assessment of what the police was; is that correct?

4    A.   No, I did not.

5    Q.   And you didn't independently take on the project of

6    analyzing what Section 363(b) of the Bankruptcy Code requires,

7    did you?

8    A.   No.  I thought it would be presumptuous to lecture this

9    Court as a privacy scholar on what the Bankruptcy Code means.

10   Q.   You did include some opinions in your report concerning

11   the role of CPOs in other prior cases; is that fair?

12   A.   Yes.

13   Q.   And you, in fact, described a -- in your report, and this

14   is on page 3, you say that the CPO mechanism has been sharply

15   criticized in the academic literature as frequency producing

16   only privacy theater in which there was an illusion of

17   protection.  So you include that critique in your report,

18   correct?

19   A.   Yes.

20   Q.   And that includes a citation to some law review articles,

21   correct?

22   A.   It -- it does.  Including by -- the leading ones are by

23   now Bankruptcy Judge and formerly Professor Chirstopher

24   Bradley.

25   Q.   Right.  And the privacy theater terms comes from the



Neil Richards - Cross

1  article that was written by now Judge Bradley, then Professor

2  Bradley, correct?

3  A.    Not originally, no.

4  Q.    Well, that was -- it's the title of the article that you

5  were quoting input --

6  A.    Yes.  But you asked me about the term.  The concept of

7  privacy theater is broader than Judge Bradley's critique of

8  the CPO process in the past.

9  Q.    Right.

10  A.    And is sort of more general in the academic literature on

11  privacy.

12  Q.    And did you read that article with care?

13  A.    Yes.

14  Q.    You're familiar with what it says?

15  A.    Yes.

16  Q.    And are you --

17  A.    I'm sorry.  Counsel, there's two by Judge Bradley, but

18  the theater one or privacy for sale?

19  Q.    The theater one.

20  A.    Yes.

21  Q.    Are you familiar with the fact that there is some

22  analysis in that article of what Section 363 does and doesn't

23  allow?

24  A.    Yes.

25  Q.    Okay.  And isn't it true that one of the conclusions



Neil Richards - Cross

1    expressed in that article is that the law, meaning Section

2    363(b), only applies if the debtor has disclosed to an

3    individual a policy prohibiting the transfer of personally

4    identifiable information, if the policy is in effect on the

5    date of a commencement of a case, and if the sale would

6    violate it --

7         MS. MILLIGAN:  I'm going to object, Your Honor.  This

8    question involves an article written by another person who is

9    not here to testify about this article that it's not in

10   evidence, and it's providing an analysis of what the

11   interpretation of the law is, which is a constant concern in

12   this case.  And so my concern is hearsay, first, and then

13   also, it's not relevant as far as what Judge Bradley, who I

14   would note sits in Austin, his opinion as to 363, I'm not sure

15   that Professor can attest to Judge Bradley's opinion that's

16   expressed in a law review article.

17        THE COURT:  Go ahead.

18        MR. CLAREMAN:  Your Honor, I'm simply asking

19   questions about the article that's cited in the report.  It's

20   regarding the report.  That terminology used in the report.

21   There's criticism of the CPO role in other cases in the report

22   that's linked to this article.  I'm simply asking -- testing

23   the basis for the criticisms and the statements about the CPO

24   role that is set forth in the report.

25        MR. FIRSENBAUM:  Your Honor, two objections, first if



Neil Richards - Cross

1    the Court is going to allow any questions about this article,

2    I'd ask the article be provided to the witness so the witness

3    can understand the full context of what he's being asked

4    about.  He doesn't have it in front of him.

5    Second of all, I don't think these questions are proper.  Yes.

6    The article is cited, but not for the proposition of what 363

7    means or how the Court should interpret 363.  It's for a

8    different purpose.  Just because you cite an article for one

9    purpose doesn't mean you should be allowed to ask questions

10   about legal conclusions that are outside the scope of the

11   CPO's report simply because they're found elsewhere in the

12   article.  And so I think debtor's counsel and State's counsel

13   are free to argue to the Court in their closings about what

14   the law 363 is.  There's no reason that this witness has to be

15   peppered with questions about 363, which wasn't in the scope

16   of the stipulated in an order assigning him his role and not

17   in the scope of his report?

18          MR. CLAREMAN:  The article is at Tab 5 in the binder.

19   I only have a handful of questions on this topic.  It is

20   related to criticisms of the way the CPO role has been

21   performed in past cases, and there was certainly decisions

22   made about what to quote and not quote from the article that

23   were made.  And so I simply would like the opportunity to ask

24   the witness a handful more questions about some of the

25   analysis in that article.

Neil Richards - Cross

1        THE COURT:  All right.  I'll overrule the objection.

2    We haven't gotten to the question yet.  What is the law,

3    Professor Richards, tell us what the law is.  That's a

4    different animal.  We're still in preliminary matters about

5    this article, so I'll allow Mr. Clements some leeway here.

6        MR. CLEMENTS:  Thank you, Your Honor.

7    BY MR. CLEMENTS:

8    Q.    Do you have the article in front of you?  It's in that

9    binder that I handed you.  It's Tab 5.  And if you go to page

10   625.  Are you there?

11   A.    Yes, I was -- I was looking at the article to refresh my

12   recollection and to make sure that I understood where in the

13   professor/Judge Bradley situated the sentence.

14   Q.    Okay.  Well, the sentence as I read it, I'll repeat it,

15   says, forth the law -- and this is referring to 363(b)(1) as

16   you can see from the footnote, the law only applies if the

17   debtor has disclosed to an individual a policy prohibiting the

18   transfer of personally identifiable information.  If the

19   policy is in effect on the date of the commencement of the

20   case, and if the sale would violate it.  Did I read that

21   correctly?

22   A     Yes.

23   Q     Okay.  And you didn't quote that in report in your report

24   or cite to that language in your report, correct?

25   A     No.



Neil Richards - Cross

1    Q    And you didn't do your own analysis of Section 363(b),

2    correct?

3    A    Of course not.

4    Q.    And you're not --

5    A.    I took paragraph 3 of the -- of the joint order and

6    stipulation as my assignment.  And I tried to discharge that

7    assignment to the best of my ability.  And I did not see a 363

8    analysis or indeed any substantive analysis of bankruptcy law

9    in that paragraph.

10    Q.    Okay.  And you're not offering any disagreement with that

11    characterization as set forth in the article?

12    A.    I'm -- I'm here to talk about my report, and my report

13    does not engage with 363.

14    Q.    Okay.  Well, isn't it true that this article is, in fact,

15    leveling criticisms at the way that Section 363 is drafted in

16    part?  There are other criticisms too, but this is actually a

17    criticism of the law and the way that the statute is written;

18    is that fair?

19    A.    It's my understanding that Judge Bradley is -- is

20    concerned about the -- the overarching structure of -- of the

21    extent to which 363 structures the CPO process.  But that was

22    not part of my review --

23    Q.    Okay.

24    A.    -- for my report.

25    Q.    You would agree that whatever disagreements we might have



Neil Richards – Cross

1   with the law or the policy of the law, we should follow the

2   law, correct?

3            MR. FIRSENBAUM:  Objection, Your Honor.

4            MR. CLEMENTS:  Is that a controversial question?

5            MR. FIRSENBAUM:  Well, this is just asking the

6   witness about 363, whether the Court should follow 363.  It's

7   outside the scope of his report.

8            THE COURT:  I'll sustain that objection.

9            MR. CLEMENTS:  Okay.  All right.  Nothing further.

10           THE COURT:  Let's keep going.

11           MR. CLEMENTS:  Thank you.

12           THE COURT:  Thank you.

13           Additional cross?

14           MR. LARKIN:  Good afternoon, Your Honor.  Joe Larkin

15   from Skadden, Arps on behalf of the TTAM parties and Ms.

16   Wojcicki.

17   CROSS-EXAMINATION

18   BY MR. LARKIN:

19   Q.   Good afternoon, Professor Richards.

20   A.   Good afternoon.

21   Q    Just have a few questions for you.  Give me one moment.

22   I just want to take a step back for a moment.  Spent a lot of

23   time with your report, sir.  And you discussed the issue of

24   consent quite a bit in your report.  Sir, do you believe that

25   individuals have the capacity to make their own choices?



Neil Richards - Cross

1    A.    We just avoided one open-ended question to a law

2    professor, and you've given me another one.  I would say that

3    that is a complicated question that does not admit to a yes/no

4    answer, particularly given some of the literature on

5    behavioral economics.  But I want to keep things on track

6    here.  So I will say that's a complicated question.

7    Q.    Okay.

8    A.    And it depends to --

9    Q.    Fair enough.

10    A.    -- to repair to something Mr. Cate said this morning.

11    Q.    Okay.  With respect to 23andMe, okay?  Is it fair to say

12    that all of 23 customers were given the opportunity to review

13    the company's privacy policy before they consented to it?

14          MR. FIRSENBAUM:  I'm going to object to that

15    question, if you could formulate it as to his understanding.

16    He's not a fact witness.

17          MR. LARKIN:  That's a fair request.

18          THE COURT:  Sure.

19          MR. LARKIN:  I'll rephrase, Your Honor.

20          THE COURT:  Okay.

21    BY MR. LARKIN:

22    Q.    Professor Richards, is it your understanding based on

23    done your detailed analysis that you undertook over the last

24    five weeks that a customer of 23andMe is given the opportunity

25    to review the company's privacy policies and has to consent,



Neil Richards - Cross

1    has to opt in to those policies to become a 23 customer?

2    A.    I think, Counsel, that certainly, so -- so there might be

3    some -- some factual uncertainty about the extent to which the

4    initial interface by which customers sign up to 23andMe might

5    have changed over time.  I did not review that back to 2006.

6    But it is my understanding that assuming that that is the

7    case, and I do not have a reason to believe that it is not the

8    case, that the interface, like many interfaces on the

9    internet, does provide links to the privacy statement and the

10   terms of use, but not the other privacy policies, including

11   some of the ones that I talk about in my report.  And that

12   consumers have an opportunity to view them -- those two, those

13   two pieces of the policy --

14   Q.    Uh-huh.

15   A.    -- before they sign up for an account.  But it is also my

16   view to put this in -- in context based upon twenty-five years

17   of studying this kind of behavior, that consumers don't and

18   everyone knows that consumers don't.  In fact, Professor Cate

19   said the same thing this morning.  So while there is an

20   opportunity for consumers to review, I think the -- the

21   consensus of the academic literature, the consensus of my --

22   the results of my study of these questions for approximately a

23   quarter of a century, and the consensus of my findings in my

24   examination of 23andMe's policies in particular, is that

25   consumers, on the whole, do not.  And that 23andMe does not

Neil Richards - Cross

1    track that information, much less make them click through the

2    terms of the privacy statement in terms of use, as is done

3    for, for example, the research consensus.

4    Q.   Consumers don't as a factual matter, but they certainly

5    have the opportunity to.  And you're not questioning the fact

6    that 23andMe customer has to give its consent by clicking the

7    box before they can become a 23andMe customer, correct?

8    A.   Well, consent being a legal conclusion, I think we can --

9    we can contest what is consent.  But in the interest of

10   finding common ground, it is my opinion that the -- the

11   interface requires customers to click those boxes --

12   Q.   Thank you.

13   A.   -- before they click the bigger box.

14   Q.   And it's also your understanding that -- is it your

15   understanding, sir, that a 23andMe customer retains the right

16   to opt out of being a 23andMe customer at all times?

17   A    No.

18   Q.   No?  Were you in court on Wednesday?

19   A.   Yes.

20   Q.   Okay.  And you recall the Court asked counsel for the

21   State of Texas if the proposed sale altered the right of each

22   of the 850,000 citizens of the State of Texas to delete their

23   23andMe accounts at any time.  Do you recall that line of

24   questioning?

25   A    Yes.



Neil Richards - Cross

1    Q    Okay.  If the sale is approved, is it your understanding,

2    sir, that the existing customers of 23andMe will not retain

3    the right to delete their accounts?

4    A    It's -- it's my understanding under the -- under -- it's

5    my understanding.  Under my understanding of the revised APA

6    that the right is there, but for -- for example, dead

7    customers -- it's difficult for -- I mean, what is the old

8    line?  The dead men tell no tales.  Dead men also can't really

9    opt out from internet services.  And that was the reason for

10   my no answer to your first question.

11   Q.   Let me ask you about some of the protections and

12   enhancements that TTAM has agreed to as part of its proposed

13   acquisition of 23andMe, okay?

14       MS. MILLIGAN: Your Honor, we received a written objection

15   to ask anything out of the scope of his report.  And I think

16   these are most certainly out of the scope of his report.  And

17   so I don't know that he has an opportunity to testify as to

18   something that he did not study and provide as part of his

19   report.

20       MR. LARKIN:  Okay.

21       THE COURT:  Mr. Larkin?

22       MR. LARKIN:  Your Honor, on direct, Professor

23   Richards testified that he was aware of the enhancements that

24   had been agreed to by TTAM in the proposed asset purchase

25   agreement; that he hadn't read the asset purchase agreement



Neil Richards - Cross

 1   that was filed with the Court on June 13th.  I was simply

 2   going to ask the professor a couple of questions about those

 3   enhancements since he did, in his report, provide an opinion

 4   on -- I can just go to it.  Professor Richards says in

 5   addition, the winning bidder should publicly commit to adhere

 6   to certain privacy and security standards with regard to the

 7   personal information they obtained from the acquisition of the

 8   company's assets.  That's at Richards report at 10.  I'm

 9   simply going to ask the professor whether he was aware of the

10   additional enhancements that TTAM had agreed to that seemed

11   consistent with that recommendation in his report.

12          THE COURT:  Well, the first part of your question is

13   certainly fine if he's aware of them.  Let's start there and

14   let's see where it goes, Mr. Larkin.

15          MR. LARKIN:  Fair enough.

16   BY MR. LARKIN:

17   Q.   Let's start there, Professor Richards, page 10 of your

18   report, you say, publicly available privacy and security

19   commitments.  Let me know when you're there, sir.

20   A    Yes.

21   Q    Great.  So you say, in addition, the winning bidder

22   should publicly commit to adhere to certain privacy and

23   security standards with regard to the personal information

24   they obtained from their acquisition of the company's assets.

25   Do you see that?



Neil Richards - Cross

1    A.    I do.

2    Q.    Okay.  Professor Richards, are you aware that TTAM has

3    agreed to adhere to certain privacy and security standards

4    with regard to the personal information it may obtain from its

5    acquisition of the company's assets?

6    A    Depending upon what you mean by aware, yes.

7    Q    Okay.  And you haven't reviewed the asset purchase

8    agreement that was agreed to by TTAM, correct?

9    A    I -- I believe I said that I've not read it in its

10   entirety, but that I had seen the voluntary commitments.

11   Q    Okay.  And sir, did those voluntary commitments address

12   your concerns?

13   A    No.

14   Q    Okay.

15   A.    But I'm happy to explain why.

16   Q.    Well, one of the concerns that you also raised in your

17   report, your report includes a discussion of the objections

18   filed by the twenty-eight states to the proposed sale of

19   23andMe, correct?

20   A.    Can you point me to the --

21   Q.    Do you recall that?  Sure.

22   A.    I believe it's in there, but as -- as I'm sure you're

23   aware, counsel, it's a very long report.

24   Q.    Yeah.  It's page 75, and I have another question related

25   to that, sir.



Neil Richards - Cross

1    A.    Okay.

2    Q.    Okay.  And you raised the concern -- I'm sorry, you

3    raised the objections filed by the twenty-eight states in your

4    report.  And one of the other issues that you raised with

5    respect to TTAM is that TTAM is organized as a nonprofit

6    medical research organization.  And you had concerns that TTAM

7    may not have to comply or may not be subject to certain state

8    privacy laws that are only applicable to for-profit

9    corporations, correct, sir?

10   A     State and federal.

11   Q     Okay.  Are you aware as you sit here today, Professor,

12   that TTAM, pursuant to the APA, has agreed to comply with all

13   obligations under applicable state privacy laws, including

14   those governing genetic privacy and consumer health privacy,

15   as if it were a for-profit entity?

16   A.    Yes, I believe that was discussed in this morning's

17   testimony, Professor Cate.

18   Q.    Right, it was discussed by Professor Cate.  I'm asking

19   you if you were aware of that, sir?

20   A.    I am aware of that representation, yes.

21   Q     Okay.  With respect to the settlement now that has been

22   reached with the states, you raised the issue in your report

23   of the objections filed by the twenty-eight states to the

24   proposed sale of 23andMe, correct?

25   A.    It's I think -- this is on page 75?



Neil Richards - Cross

1    Q.    Correct.

2    A.    The report says twenty-four, but I know that number

3    has --

4    Q.    Fair enough.

5    A.    -- had some fluctuation.

6    Q.    It has.  I would agree to that.  Are you aware,

7    Professor, that at least as of this morning, I believe, we

8    have twenty-three states have agreed not to oppose the sale of

9    23andMe to TTAM pursuant to the APA that was filed with the

10   Court on June 13th?

11        MS. MILLIGAN:  I'm going to object to that question

12   first.  Again, beyond the scope of his report.  He reviewed

13   the transaction that was pending at the time of his report.

14   And also, I think the agreement with the states -- and I see

15   Ms. Ryan behind me -- may be mischaracterized.

16        MR. LARKIN:  May I respond, Your Honor?

17        THE COURT:  Let's let Ms. Ryan.

18        MS. RYAN:  You can go right ahead.

19        MR. LARKIN:  Okay, go ahead.

20        MS. RYAN:  Oh.  Good afternoon.  Abigail Ryan for the

21   National Association of Attorneys General, United Client

22   States.

23        While we've reached a meeting of the minds of some of

24   the protections in Exhibit D, there is not a formal settlement

25   per se.  As you've noticed, I have not pursued cross-examining



Neil Richards - Cross

1    or calling witnesses.  And we are standing on our pleadings,

2    but our objection is not withdrawn.  And so I think

3    characterizing it as a settlement is probably a bridge too far

4    right now.  It's an agreement, I would think.  Fair enough?

5          MR. LARKIN:  I agree with Ms. Ryan.  I was simply

6    asking Professor Richards whether he was aware, and I'm happy

7    to quote directly from the pleadings.

8          THE COURT:  Well, let's start over.  Okay?  The --

9    page 75 is talking about the State's motion for appointment of

10   CPO.

11         MR. LARKIN:  Correct.

12         THE COURT:  It's not talking about their objection to

13   the sale.

14         MR. LARKIN:  Yeah.

15         THE COURT:  So I think the foundation here is a

16   little off.

17         MR. LARKIN:  Fair enough.

18   BY MR. LARKIN:

19   Q.   Professor, I'll start over.  Professor, are you aware

20   that a number of the states who originally filed objections to

21   the proposed sale have filed papers with the Court agreeing

22   not to oppose the sale of 23andMe to TTAM as it's currently

23   structured?

24   A.   Yes, I believe Ms. Ryan just informed us of that, but --

25   but -- but I was aware.  I was generally aware before you



Neil Richards - Cross

1   asked this question.

2   Q.   Have you reviewed that filing, sir?

3   A    I have -- which filing in particular?

4   Q.   Have you reviewed the filing?  I'm happy to provide you

5   with a copy?

6   A.   It's my understanding there have been several that have

7   come through over the past couple of days.  And --

8   Q.   This is at docket 823.

9          MR. LARKIN:  May I approach, Your Honor?

10         THE COURT:  Sure.  Sure.  Thank you.

11  BY MR. LARKIN:

12  Q.   Professor, this is the pleading I just referenced, which

13  is the State's first supplemented docket Number 803 (sic).

14  A.   Can I ask when this was filed?

15  Q.   This was filed yesterday, sir.

16  A.   Okay.  Thank you.

17  Q.   Could you turn to paragraph 3 for me?

18  A    Okay.

19  Q    Okay.  Could you read that paragraph for me, sir?

20  A    Under Roman numeral II?

21  Q    Yes.

22  A    The State's position as to this particular transaction

23  with TTAM is not incongruent with their pending objection and

24  complaint, including because this particular buyer is arguably

25  an affiliate footnote of the debtors and not a third party.



Neil Richards - Cross

1   Q.   Goes on to say, sir, furthermore, there's no actual

2   physical or electronic transfer or disclosure of any DNA or

3   other customer material or data.  The states recognized that

4   all the customers previously entrusted their data with

5   23andMe.  That initial consent appears applicable to this

6   proposed transaction of 23andMe into a nonprofit form.  Do you

7   see that, sir?

8   A.   I do.

9   Q    Okay.  Were you aware that that had been filed before you

10  took the stand today?

11  A.   I had a general awareness of it, but I had not subjected

12  it to -- to study of the sort that the documents I cited and

13  relied on in my CPO report had that level of study.

14  Q.   And you're not second guessing the judgments of the

15  states that have filed this pleading with the Court, correct?

16          MR. FIRSENBAUM:  Objection, Your Honor.  This is well

17  beyond the scope of this report.  It's about events that have

18  taken place after his report.  I reached agreement with the

19  debtors that he wasn't offering opinions beyond the scope of

20  his report, and now we're being asked for opinions based on

21  events from yesterday.  I object.

22          THE COURT:  Response?

23          MR. LARKIN:  I'll withdraw the question, Your Honor.

24          THE COURT:  The question is withdrawn.

25          MR. LARKIN:  I have no further questions for this



Neil Richards - Cross

1   witness.  Thank you.

2        MS. RYAN:  Again, Abigail Ryan, for the National

3   Association of Attorneys General Client States.

4        A couple of clarifications on what was just read into

5   the record, paragraph number 3 of docket Number 823.  The

6   State of North Carolina dropped a footnote that they actually

7   would not sign on to that one paragraph.  The other states

8   signed on to the entire pleading.  However, the history behind

9   where that pleading came from, I think is pertinent to

10  testimony that's been put on the record, and it was only

11  agreed to after the states and TTAM had further negotiations

12  about the Exhibit D and the protections.  And through further

13  concessions that are now put into Exhibit D and will be filed

14  with the Court, the states that signed on would benefit by

15  those further concessions.  If we did not sign on, we would

16  not benefit from those concessions.  And so I think protecting

17  our citizens and being able to work cooperatively is

18  important.  And so that didn't come out of -- it wasn't made

19  up out of whole cloth.  We didn't all of a sudden switch our

20  position.  We made a decision to make that agreement, stand

21  down on cross-examining or calling witnesses.  And if Your

22  Honor chooses to approve the sale, overrule our objection, as

23  it applies to TTAM.

24        THE COURT:  Sure, I understand.  Thank you.

25        MS. RYAN:  Thank you.



Neil Richards - Redirect

1      THE COURT:  Additional cross before we go to

2  redirect?  Any additional cross?  Okay.  Sorry.

3      You were right, Ms. Milligan.

4      MS. MILLIGAN:  Thank you, Your Honor.

5      THE COURT:  Redirect.

6  REDIRECT EXAMINATION

7  BY MS. MILLIGAN:

8  Q.  Professor, you testified that the additional privacy and

9  agreements that TTAM have posted in the most recent APA do not

10  address your privacy concerns; is that correct?

11  A.  I think the question was slightly different --

12  Q.  Okay.

13  A.  -- when it was posed to me, but in general sense, yes, I

14  would agree with that statement.

15  Q  Why not?

16  A  Well, I -- I think it's difficult for me to opine upon

17  them without them in front of me, but as I -- as I recall

18  them -- and I recall some of Professor Cate's testimony this

19  morning, many of them would appear to be -- to -- to offer

20  rights or opportunities that are already guaranteed by

21  existing federal and state law.  Particularly, state so-called

22  comprehensive privacy statutes, state genetic privacy

23  statutes, federal and state unfair and deceptive trade

24  practice jurisdiction, among other things that I talk about in

25  the -- the legal overview section of my CPO report.



Neil Richards - Redirect

 1    Particularly though, with respect to the Privacy Advisory
 2    Board, that is something that I -- that -- that since you have
 3    asked me about it, I would -- I would offer an opinion rooted
 4    in my study of these practices and my understanding of the
 5    literature on privacy, compliance.  And it's that privacy
 6    advisory boards are not always the benefit that they seem to
 7    be.  In my colloquy with -- with our colleague from Skadden
 8    representing TTAM, I was asked about privacy theater.  And as
 9    I -- as I testified then, that is a general term that we see
10    in the academic literature discussing corporate privacy
11    practices.  And I think advisory boards are one -- another of
12    those areas which can result in privacy theater.  Privacy
13    theater being as -- as Judge Bradley points out in his
14    invocation of the term from the broader literature in his
15    article, something that produces the illusion of a benefit but
16    actually can be -- can be under protective of privacy.
17    So for example, I believe in that paragraph, I think it's
18    Roman II of that paragraph of the APA which discusses a
19    privacy advisory board, no details are given on the
20    composition.  I believe Ms. Wojcicki testified on Wednesday
21    that there would be three members of the advisory board.  But
22    many privacy advisory boards are staffed by compliant
23    individuals who will perhaps rubber stamp corporate practices.
24    And even if they offer sort of good faith consumer advocacy as
25    a sounding board, there's no guarantee that those concerns



Neil Richards - Redirect

1   will be -- will be adopted.  And there's -- there's a history

2   of advisory boards being -- being ineffective as cited in the

3   literature by -- by Waldman (ph.), the literature cited by

4   Bradley in his article on theater and others.

5   Q.   Okay.  Thank you.

6            MS. MILLIGAN:  No further questions.

7            THE COURT:  Redirect from California?

8            MR. NADAL:  None, Your Honor.

9            THE COURT:  All right.  Thank you, Professor

10  Richards, you may step down.  Were you here yesterday when I

11  thanked you for your hard work?  I didn't know who --

12           THE WITNESS:  Yes, it was very kind, Your Honor.

13           THE COURT:  Okay.  All right.  Thank you, again.

14           Other witnesses from the objecting states?

15           MS. MILLIGAN:  No further witnesses for the State of

16  Texas.

17           MR. NADAL:  No further witnesses for the State of

18  California.

19           THE COURT:  Any other objecting states?  All right.

20           So we have a few other objections besides those from

21  the states.  We have some housekeeping to do.  We have some

22  arguments to make.

23           Hopkins, how do you suggest we tackle these best?

24           MR. HOPKINS:  Your Honor, Chris Hopkins of Paul

25  Weiss, co-counsel to the debtor, for the record.



Colloquy

1        I'm happy to proceed however Your Honor would prefer.

2    I'm prepared to go into argument.  I'm prepared to address the

3    kind of what I'll call not in terms of importance, but the

4    ancillary objections that we have that don't involve the

5    objecting states.  Whatever Your Honor would like.

6        THE COURT:  Why don't we wrap up the objections and

7    then talk about the scope of what's left and do some

8    arguments?

9        MR. HOPKINS:  That sounds good, Your Honor.

10       THE COURT:  All right.

11       So is Mr. Neal in the courtroom or on the Webex?

12   David Neal?  All right.  I'll resolve Mr. Neal's objections on

13   the papers.

14       Pamela Norton, are you with us?  I'll resolve her

15   objections on the papers.

16       Jerry Makin, are you with us?  I'll resolve his

17   objections on the papers.

18       Intellectual Property Scholars?  Counsel appeared

19   yesterday.

20       MR. LINDSAY:  Yes, Your Honor, this is Michael

21   Lindsay representing the Scholars.

22       THE COURT:  Yes.  Please proceed.

23       MR. LINDSAY:  Thank you, Your Honor.  First of all, I

24   wanted to describe what we are not here objecting to.  We did

25   not address any agreements with existing licensees who are in



Colloquy

1    a position to make whatever objections they wish to make.

2           We are not addressing privacy issues or the

3    determination of the highest and best offer.

4           And we are not addressing the more recently filed

5    amicus brief by a different group of scholars.

6           The interest that the scholars have is, first of all,

7    that a number of them are themselves customers of 23andMe who

8    have contributed their genetic data and have consented to

9    research.  They have an interest in making sure that that data

10    set continues to exist and continues to be used to advance

11    medical research.  Their interests specifically are to ensure

12    that biomedical research as to genomic information advances

13    science for the benefit of public health and to preserve the

14    wishes of those who, like themselves, have consented to use

15    for research.

16           This is an overwhelming interest, I believe.  There

17    was testimony this morning from Professor Cate that something

18    on the order of eighty-one percent of 23andMe customers have

19    consented to research use.  That is consistent with the

20    scholar's discussion in their objection of people's motivation

21    for public research.

22           We recognize, of course, that individuals should have

23    the ability to delete their own data.  This does remain a

24    matter of choice for each individual, but that is not in and

25    of itself a mechanism that would help the scholars achieve the



Colloquy

1   interests that they are seeking to protect, namely, the

2   ability for that data set to exist for the benefit of public

3   research.

4        We recognize that TTAM has stated that it will

5   continue its policy as to academics.  We do not yet see that

6   in a sales order and would like to see it there.  We also note

7   that in Ms. Wojcicki's declaration she states an intention to

8   continue the prior policies of advancing public health

9   benefits through partnerships with third-party researchers,

10  which is at least a step toward avoiding what we would call

11  the monopolization or enclosure of the data.  That's in

12  paragraph 17 and 19 of her declaration, which is at docket

13  778.  The scholars applaud that intention.  But again, we

14  would like to see that memorialized within the sale order.

15       We proposed specific language both to debtor's

16  counsel and to TTAM.  The response that we received from

17  debtors was that they would defer to TTAM.  The response that

18  we received from TTAM was that the language was not

19  acceptable.  We followed up with a request for the reasoning

20  so we could try to reach a mutually acceptable resolution.  We

21  received no further response.

22            THE COURT:  All right, Mr. Lindsay --

23            MR. LINDSAY:  So accordingly --

24            THE COURT:  Mr. Lindsay, let me come to the point

25  here.



Colloquy

1          MR. LINDSAY:  Yes.

2          THE COURT:  What is it --

3          MR. LINDSAY:  Yes.

4          THE COURT:  -- that you want that TTAM is not willing

5    to provide and what authority do I have to make that happen?

6          MR. LINDSAY:  You have, first of all, specifically,

7    what we want is language in the order.  And I can read it to

8    you in a moment or submit it now through the docket.  But the

9    basic idea is that it would impose a legal obligation on TTAM

10   to make licenses available to academics on a royalty free

11   basis and to any bona fide applicants for research licenses

12   other than academics on a reasonable and nondiscriminatory

13   basis.  That's what we are asking for.

14         Your authority is that the data was provided to

15   23andMe in the first place with that intention in mind.  As

16   Professor Cate testified, the vast majority of data providers

17   have consented to research.  We want to ensure that that

18   continues.

19         THE COURT:  All right.

20         Mr. Hopkins?

21         MR. HOPKINS:  Your Honor, we applaud the goals of Mr.

22   Lindsay's clients.  I think he said some have contributed data

23   to the debtors in connection with receiving services from

24   23andMe.  Presume that means not all.  So to the extent he

25   represents clients who are not customers of 23, are not



Colloquy

1    23andMe -- not creditors of 23andMe, not equity holders of

2    23andMe, I don't think they have standing to object to the

3    sale.

4           THE COURT:  Well, he's here for the rest of them.   So

5    let's take up the merits.

6           MR. HOPKINS:  With respect to the request that TTAM

7    provide an asset that it is acquiring for value to them on

8    commercial terms that they dictate, I'm not aware of any

9    authority under the code to make a buyer do that.  TTAM has

10   made some concessions in this regard with respect to the

11   privacy enhancements that they've agreed to put in the APA.

12   And I think that Mr. Lindsay's clients are free to reach out

13   to TTAM post-closing to negotiate whatever kind of information

14   sharing arrangement they wish and that TTAM is willing to

15   agree to in its commercial judgment.

16          THE COURT:  Okay.

17          Mr. Lindsay, rebuttal?

18          MR. LINDSAY:  Yes, Your Honor.  The Court is making

19   some decisions based upon representations that TTAM has made,

20   both in its reply brief and in Ms. Wojcicki's declaration.  We

21   are asking that the Court hold TTAM to that by placing those

22   conditions within the sale order.

23          THE COURT:  Okay.  I'll take that under advisement

24   and rule on that along with the ones -- the pro se objections

25   we just discussed.



Colloquy

1          MR. HOPKINS:  I would note for the record and for

2    Your Honor, for Mr. Lindsay, the term sheet is part of the APA

3    that's being approved under the sale order.  So that is a term

4    of the sale that the Court is approving and that will be

5    binding on TTAM.

6          THE COURT:  Right.  And if there are other

7    commitments that have been made through side discussions

8    between the scholars and TTAM, those are private agreements as

9    far as I'm concerned.  Okay.

10          MR. HOPKINS:  That's our understanding as well, Your

11    Honor.

12          THE COURT:  Okay.

13          Sonia Herb?  Ms. Herb, are you with us?  All right.

14    I'll rule on that objection on the papers.

15          Ms. Eichele?  Heard from Ms. Eichele this morning and

16    perhaps that has resolved her objection.  In any event, I'll

17    rule on that on the papers.

18          Others, Mr. Sant, are you and your clients are new to

19    this matter?  Mr. Sant, your papers are filed as an amicus

20    brief, but read like an objection.  So --

21          MR. SANT:  Yes, Your Honor.

22          THE COURT:  -- are your client's parties-in-interest?

23          MR. SANT:  They are parties-in-interest, Your Honor.

24    My clients consist of a number of scholars, some of whom are

25    actually customers.  They're involved in formation of the



Colloquy

1    Global BioData Trust.  And there have been various customers

2    of 23andMe that have asked that trust to get involved on their

3    behalf.  And my clients are ultimately quite concerned about

4    treatment of bio data as a commodity and the super importance

5    of treating that data properly over simply commoditizing and

6    monetizing the information that all of these customers have

7    provided to the debtors.

8         What they're seeking, Your Honor, they would like

9    some more time, of course, because we've only filed a brief at

10   this point.  But they're quite concerned that any sale takes

11   into account the proper treatment of this data.  And there's

12   continuing concerns -- not -- it's impossible, really, in

13   order to put a fence around all of the rights and protect all

14   of these rights of all these people.  It's impossible also for

15   them to have meaningfully consented.  So what they're seeking

16   is to have basically the Global Trust appointed as a

17   continuing body to protect the very important genetic

18   information that's been provided.

19        THE COURT:  All right.  And what authority do I have

20   to do that, Mr. Sant?

21        MR. SANT:  Well, Your Honor, first of all, I think

22   under 363, you can condition a sale on whatever's required to

23   protect the interests of the party in interest.

24        THE COURT:  And have you talked to TTAM about whether

25   they'd agree to that or whether they would terminate the --



Colloquy

1    MR. SANT:  I have not, Your Honor.

2    THE COURT:  -- $305 million --

3    MR. SANT:  I've been involved in this, and we'd of

4    course like the opportunity to talk with them further.  The

5    concerns that we have are that this is essentially the same

6    group under which huge data breaches have already occurred.

7    And we'd like the opportunity to talk further, but we're quite

8    concerned about the identity of the purchaser being virtually

9    the same as the seller, under which there were severe data

10    breaches, et cetera.

11    THE COURT:  All right.

12    Mr. Hopkins?

13    MR. HOPKINS:  Your Honor, I would make a couple

14    points.  Global Data Trust was actually a bidder in this

15    process.  So the notion that there was not sufficient time to

16    appear and raise whatever substantive objections they would

17    like, I think I take issue with that.  A losing bidder does

18    not have standing by virtue of being a losing bidder.  The

19    objection deadline was June 10th.  The amicus brief was filed

20    after June 10th, and I'm not hearing a substantive objection

21    to the sale, other than that Global Data Trust would desire

22    that the debtors were seeking approval of some other form of

23    transaction than what we in our business judgment are seeking

24    approval of today.

25    THE COURT:  Mr. Sant, briefly?



www.escribers.net | 800-257-0885

Colloquy

1        MR. SANT:  Well, Your Honor, we are saying that the

2   sale should not go through unless and until there can be

3   satisfactory protections for this very important data.  And

4   we're saying that the sale as proposed doesn't provide those

5   protections.

6        THE COURT:  Okay.  Thank you.  I'll take that

7   objection/amicus brief under advisement, and I'll rule on that

8   in due course.

9        Are there other parties who have objected that I have

10  overlooked in the courtroom first?

11       All right.  On the Webex?

12       Okay.  We've heard from everyone, so we need a little

13  bit of argument.  But a couple of housekeeping matters, and we

14  don't -- maybe I'll rattle these off and then parties can

15  respond to them.  Everybody got out their pens, I saw.

16       So first of all, want to clarify which states remain

17  in what I'll call active opposition, Ms. Ryan, as opposed to

18  the states who have inactive opposition.

19       And then what do you anticipate, Ms. Ryan, that I

20  should do as to the inactively opposing states?  For example,

21  you're retaining your objection.  Are you nevertheless asking

22  me to rule state by state on the various statutes of those

23  twenty-however many states even though they're not here

24  actively opposing the sale?

25       MS. RYAN:  No, Your Honor, I'm not asking for that.



Colloquy

 1    Just a general to the extent that this objection applies to

 2    TTAM, it's summarily overruled would be fine.

 3            THE COURT:  Understood.  Okay.  Thank you.

 4            MS. RYAN:  Thank you.

 5            THE COURT:  That clarifies that.

 6            So for -- yes, ma'am?

 7            MS. JORDAN:  Excuse me, Your Honor.  Dalila Jordan,

 8    with the State of Minnesota representing the People of

 9    Minnesota.

10            THE COURT:  Yes.

11            MS. JORDAN:  We just also wanted to go on record and

12    say that our state is continuing to hold its objection and its

13    subsequent adversary.  But we do -- we did file a first

14    supplemental, as the Court has recognized, agreeing to the

15    sale of TTAM.  But we -- and in the event if you overrule, if

16    you confirm the sale, we want to preserve our objection to the

17    backup bidder.

18            THE COURT:  Understood.

19            And so you're with Ms. Ryan on that in other words?

20            MS. JORDAN:  We have signed the NAAG state objection.

21            THE COURT:  Got it.  Okay.

22            MS. JORDAN:  But Ms. Ryan doesn't represent the State

23    of Minnesota.

24            THE COURT:  Yes.  That's right.  Okay.

25            MS. JORDAN:  Thank you.



Colloquy

1          THE COURT:  Very good.  Thank you.

2          MS. ESBECK:  Alison Esbeck, representing the State of

3   Missouri for the Missouri Attorney General's Office.

4   Basically, ditto.  I just wanted to be on the record.

5          THE COURT:  Sure.

6          MS. ESBECK:  As Ms. Ryan also does not represent the

7   State of Missouri, but we are in agreement with the TTAM

8   proposal and the protections that have been put in place with

9   regards to privacy and cybersecurity, but are not withdrawing

10  that objection.  And again, would obtain it to the extent that

11  the backup bidder becomes in play in this matter.

12         THE COURT:  Understood.  Understood.

13         MS. ESBECK:  Thank you.

14         THE COURT:  Thank you, Ms. Esbeck.

15         All right.  So then for those states that remain in

16  active opposition, can I have some clarification about which

17  legal theories and statutes remain at issue?  For example, I

18  haven't heard word one about the common law right of ownership

19  or control.  If that's still in play, I need to know it.  If

20  that's not part of the act of opposition, please clarify that

21  for me.

22         The Federal Trade Commission Act, the State Uniform

23  Deceptive Trade Practices Acts.  Are those still in play?

24         959(b), is that still part of anyone's active

25  opposition?



Colloquy

1          Is anyone making arguments specific to Lemonaid?  I

2     don't believe Lemonaid's name has come up during the entire

3     hearing, so some clarification on that would be good.

4          We got clarification this morning about Regeneron as

5     the backup bidder.

6          So those are the main questions about the scope of

7     what's left.  And perhaps if the states can clarify where they

8     are on those issues, then maybe if you'd like to take a short

9     recess before we get into argument, we can do that.

10         It's probably around that time anyway, Mr. Hopkins.

11         But perhaps the states can clarify for me what are

12    the bases on which they're actively opposing the sale at this

13    point?

14         MR. HOPKINS:  Defer to Your Honor.  I'm ready to go

15    if you want me to -- if you'd like to hear argument, if you

16    want to take a short recess to allow the states to confer and

17    come back to Your Honor and answer that question.

18         THE COURT:  Well, the states may be ready to clarify

19    that now and then we could take a recess and then you could

20    respond to that.  And --

21         MR. HOPKINS:  Of course.

22         THE COURT:  But are you all ready to define the

23    contours of your objection at this point, or do you need a

24    little bit of time?

25         MS. MILLIGAN:  I can give the Court a general



Colloquy

1    overview.  I do want to take a moment and a break and just

2    review to make sure that everything I'm saying is still

3    accurate, but I believe our papers included objections

4    generally under 363, 28 U.S.C. 959(b), the Texas Direct to

5    Consumer Genetic Testing Act.  And I can give you the specific

6    state site if you need that.

7          THE COURT:  No, I yeah, I know the statute, you mean.

8    Okay.

9          MS. MILLIGAN:  I don't think that we're moving on the

10   other two statutes that we listed in our objection, which is

11   the Texas -- I'm sorry, the TDSPA and ITEPA (ph.), I think,

12   but just the DTC genetic act is --

13         THE COURT:  Okay.

14         MS. MILLIGAN:  -- what we're focusing our attention

15   to, along with the just general 363(b) and -- or I'm sorry --

16   363 in general and again, I will get kicked under the table if

17   I've forgotten something, but --

18         THE COURT:  No, just we'll take --

19         MS. MILLIGAN:  I did want to take those off of the --

20         THE COURT:  -- we'll take a short recess.

21         Alert Mr. Hopkins, as soon as you think of what it

22   was that you just -- I understand we're in the middle of --

23   this is real time.  Nobody's trying to play games.  So -- but

24   this is helpful to me to just get my head around what we're

25   dealing with.



Colloquy

1          Mr. Nadal?

2          MR. NADAL:  Yes.  The People of the State of

3    California's objection is currently still standing as to the

4    Genetic Information Practices Act.

5          THE COURT:  GIPA, right.  Okay.

6          MR. NADAL:  Yes.  Various arguments under 363 to

7    address the legal positions they're making.  And as well as 28

8    U.S.C. 959.

9          THE COURT:  959.  Okay.

10         MR. NADAL:  We did not assert a common law argument.

11   I believe we -- and we did have some CCPA arguments, but we're

12   not continuing to press them.

13         THE COURT:  Okay.  Thank you.  Appreciate the

14   clarification.

15         Sir?

16         MR. CLEMENTS:  Good afternoon, Your Honor.  Marvin

17   Clements for the State of Tennessee.  We filed our limited

18   objection -- excuse me, and our supplemental objection.  And

19   the main tenants that we're arguing under are whether this, in

20   fact, equity transaction is a sale, such that it would be

21   subject to 363.  And then we have arguments as to how 363

22   should be applied to the state's laws.  And we have arguments

23   about that there's not really an affiliate exception for

24   consideration of whether it's a sale or not.

25         THE COURT:  Under your state statute?



Colloquy

 1          MR. CLEMENTS:  Yes.

 2          THE COURT:  Okay.  Okay.  Thank you.  I didn't mean

 3    to cut you short.  That was --

 4          MR. CLEMENTS:  The only -- and just the issue of

 5    preemption in general with recent agreements.

 6          THE COURT:  Response to the debtor's preemption

 7    argument?

 8          MR. CLEMENTS:  Yes.

 9          THE COURT:  Okay.  All right.  Kentucky?

10          MR. HUNT:  Yes, Your Honor.  Thank you.  Just to

11    clarify, I'm here opening with this, but I guess I'll do it

12    here and maybe save some time.  Kentucky had joined in the

13    United States' objection.  That's Docket Entry 687.  So we

14    would just incorporate that.  I don't mean to plow that ground

15    again.  And then we, like Tennessee, had filed a supplement.

16    That's Docket Entry 792.  And that references a specific

17    Kentucky law.  So my intention was to was to briefly cover

18    that, and making some general arguments that incorporated the

19    testimony and documents that had been placed in the record.  I

20    don't anticipate that taking terribly long.

21          THE COURT:  Okay.  Mr. Hunt, just to be clear, the

22    NAAG objection filed earlier in this process has a number of

23    other arguments, including the common law, if I recall

24    correctly.  So that's why I'm trying to figure out, of the --

25    is there anything that you're relying on that's not in your



Colloquy

1    supplemental filings, Mr. Hunt?

2          MR. HUNT:  No, we've joined that.  And we would stand

3    on that as just on the pleading.  I don't intend to argue it.

4    I hope that answers your question.

5          THE COURT:  Okay.

6          MR. HUNT:  I was going to address Kentucky statute in

7    particular.  But the other issues I was going to leave alone

8    today and let you rule on the papers.

9          THE COURT:  Okay.  Very good.  Thank you.

10          MR. HUNT:  Does that answer your question?

11          MR. HOPKINS:  Only because Mr. Hunt is remote, so I

12   won't be able to speak to him in the hallway.  If Mr. Hunt is

13   not pressing his objection under Kentucky's genetic data

14   privacy law, I can probably save Your Honor a minute or two of

15   time to get to the argument.

16          THE COURT:  I think he is pressing it, under the --

17          MR. HOPKINS:  Okay.

18          THE COURT:  --under the Kentucky statute.

19          Did I hear that correctly, Mr. Hunt?

20          MR. HOPKINS:  I see him nodding his head, Your Honor.

21          THE COURT:  Okay.  Okay.  Got it.  All right.

22          And then do we have Utah?  Is that our other --

23          MR. HUNT:  Yes.

24          MR. NEDICK:  Brett for Utah Attorney General's

25   Office, for the State of Utah.  And we will be pursuing the



Colloquy

1    same avenue as Kentucky, so --

2              THE COURT:  States --

3              MR. NEDICK:  We were originally part of the NAAG

4    objection.  We'll be resting on the papers for that and then

5    arguing our state genetic information, perhaps.  Yes.

6              THE COURT:  Okay.  Very good.  And so I think those

7    were the five states that were mentioned at the beginning of

8    this morning's hearing, Texas, California, Tennessee,

9    Kentucky, Utah.  Is that right?  Active opponents?

10             MR. HOPKINS:  That's certainly --

11             THE COURT:  Okay.

12             MR. HOPKINS:  -- the debtor's understanding.

13             THE COURT:  Okay.  That's very helpful.  Thank you

14   all.  Why don't we -- it's 5 after 3.  Why don't we take a

15   fifteen-minute recess, come back at 20 after for argument.

16             MR. HOPKINS:  See you then, Your Honor.  Thank you.

17        (Recess from 3:04 p.m. until 3:21 p.m.)

18             THE COURT OFFICER:  Your Honor, we're back on the

19   record.

20             THE COURT:  Thank you.  Please be seated, everyone.

21   A couple folks still coming in?  Okay.

22             Mr. Hopkins?

23             MR. HOPKINS:  Good afternoon, Your Honor.  Chris

24   Hopkins of Paul, Weiss, counsel to the debtors.  I think two

25   potential housekeeping --



                                    Colloquy

 1          THE COURT:  Yes.

 2          MR. HOPKINS:  -- items before we go into argument.

 3          THE COURT:  Housekeeping sounds great.

 4          MR. HOPKINS:  Counsel to the CPO would like to

 5   address the Court.

 6          THE COURT:  Sure.

 7          MR. HOPKINS:  And then I just wanted to give the

 8   states the opportunity to make any additional comments on the

 9   scope of argument, because I believe they were conferring

10   during the recess.

11          THE COURT:  Yes, of course.  That's fine.  Yes, sir.

12          MR. FIRSENBAUM:  Thank you, Your Honor.  On behalf of

13   the CPO, with the evidence closed, and mindful of the debtor's

14   resources, we were inclined to conserve resources and leave

15   the proceedings for the day, with testimony over and evidence

16   closed.  However, since CPO is a pseudo officer of the Court,

17   we did not want to be presumptuous and leave without asking

18   Your Honor for the Court's preferences.

19          THE COURT:  Sure.  Thank you.  That'd be fine.  Yeah,

20   that'd be fine.

21          MR. FIRSENBAUM:  Okay.

22          THE COURT:  Yes, I appreciate that.  And have a good

23   weekend.

24          MR. FIRSENBAUM:  Thank you, Your Honor.

25          THE COURT:  Ms. Ryan, please.



Colloquy

 1          MS. RYAN:  I just have one housekeeping matter.  Yes.

 2     I did not forget about my exhibits.  However, after listening

 3     to my friends here, I think the things that we would want in

 4     the record are in the record.  And as far as -- we have

 5     consumer complaints as well.  But it sounds like the debtors

 6     have conceded that, yes, states have been getting complaints.

 7     And so as opposed to arguing that, let's just go with states

 8     have been getting complaints.  So --

 9          THE COURT:  That sounds fine.

10          MS. RYAN:  I didn't want you to think I forgot about

11     my evidence.

12          THE COURT:  Okay.  Thank you, Ms. Ryan.

13          MS. RYAN:  Thank you.

14          THE COURT:  All right.  So then the states need to

15     clarify the scope of what's at issue since the recess.

16          MS. MILLIGAN:  Thank you, Your Honor.  Layla Milligan

17     for the State of Texas.  We did file an objection and a

18     supplemental objection.  Just' to clarify, we're not seeking

19     argument under the TDSPA (sic) and the ITAP, as mentioned

20     earlier.  There are some additional arguments as to

21     jurisdiction and due process and things like that.  But it's

22     not beyond what's in our pleadings already, so we'll touch on

23     that in our argument.

24          THE COURT:  Okay.

25          MS. MILLIGAN:  Thank you.



                              Colloquy

 1          THE COURT:  As long as it comes up today, I know I

 2   need to rule on it.

 3          MS. MILLIGAN:  Okay.  Thank you.

 4          UNIDENTIFIED SPEAKER:  Just a minor clarification for

 5   Tennessee, I did not include a reference to the 959 that's in

 6   our brief, that we're still going to be --

 7          THE COURT:  Okay.  You're running with 959 as well.

 8   Okay.

 9          UNIDENTIFIED SPEAKER:  -- we're going to rely on

10   that, too.

11          THE COURT:  Okay.  Any other clarifications, counsel

12   on Webex.

13          Okay.  You know what you need to argue, Mr. Hopkins?

14          MR. HOPKINS:  I'm sorry, Your Honor?

15          THE COURT:  You know what you need to argue now?

16          MR. HOPKINS:  If I don't know need to argue now, I'm

17   in trouble.

18          THE COURT:  All right.  Please proceed.

19          MR. HOPKINS:  All right.  Thank you, Your Honor.  So

20   to be blunt, the Court can and should approve the sale.  The

21   objective states as -- the objecting states ask the Court to

22   rewrite the Bankruptcy Code and require that any sale of PII,

23   full stop, must comply with applicable nonbankruptcy law.

24   Congress, not the states, get to make that call under the

25   Code.  They have done so, and they have rejected the states'



Colloquy

 1    position.  Congress specifically amended 363(b) to permit the

 2    sale of PII, unless the debtor's privacy policy, in effect on

 3    the petition date, prohibits the transfer of PII.  Our policy

 4    as of the petition date, and all of our policies since the

 5    founding of the company, expressly permit the sale of PII in

 6    connection with the sale of the business.  That's it.

 7         If the Court finds that the debtors did not disclose

 8    the policy prohibiting the transfer of PII in connection with

 9    the sale on the petition date, which it clearly does not, then

10    the Bankruptcy Code instructs that the objecting states'

11    objections should be overruled, and the Court may approve the

12    sale.

13         THE COURT:  All right.  A couple of questions on

14    that, Mr. Hopkins.  First of all, what do you contend makes up

15    the debtor's privacy policy for purposes of 363(b)(1)?  Is it

16    the privacy notice?  Is it the privacy notice plus the

17    California specific page that counsel reviewed with several

18    witnesses?  Is it more than that?  Is it less than that?  What

19    do you contend that I should be looking at for purposes of

20    this question?

21         MR. HOPKINS:  Our contention is that it is the terms

22    of service, the privacy statement, and the supplemental

23    privacy statements expressly incorporated into those documents

24    which would include the state supplement, the GPDR that you

25    heard from Mr. Lefkowitz.  It is the four corners of the



Colloquy

1    documents that the debtors disclose to consumers that they

2    must accept in order to receive the services from 23andMe.

3           We do not agree with Professor Richards.  We do not

4    agree with the states that you look outside and beyond those

5    policies for terms of privacy policies.  I don't think the

6    debtors could, for example, disclose a privacy policy and then

7    have a press release and then unilaterally change those terms

8    of service, just by statements they make outside the four

9    corners of the policies that the customers agreed to when they

10   sign up for 23andMe services.

11          THE COURT:  Okay.  So your -- tell me if you agree

12   with this characterization.  The debtor's view of the privacy

13   policy is more like how a lawyer would view it, as opposed to

14   Professor Richards, who's more like how a student of

15   behavioral economics might view it.  Maybe I got the wrong

16   discipline there, but you get the idea.

17          MR. HOPKINS:  I understand your question, Your Honor.

18   I think we would say we interpret the policies consistent with

19   the law as to how privacy policies are interpreted in courts

20   around the country, which is not, what did they say in a

21   marketing campaign?  What did they say in a blog post?  It's

22   what did they disclose to the customers as being the binding

23   terms of service and privacy policy that the customers consent

24   to when they sign up for the services of 23andMe.

25          THE COURT:  Okay.  And then in the preemption



Colloquy

1   argument, just I want to make sure I understand the scope of

2   preemption argument.  First of all, this is limited to PII,

3   right?  For example, the debtors can't sell a kilo of cocaine,

4   because that's illegal under federal law, right?

5        MR. HOPKINS:  That's right, Your Honor.  I -- a

6   couple points on this.  We think this is clear conflict

7   preemption.  We think Congress looked at -- I mean, I think

8   the -- to parrot Mr. Richards -- or Professor Richards,

9   rather -- I think the academic literature has broad consensus

10  that BAPCPA amendments to 363(b) came out of the Toysmart

11  case, and the concerns that the FTC raised about what happens

12  to sales of PII in bankruptcy.

13       We think Congress looked at two things.  They looked

14  at bankruptcy policy.  And I think Your Honor knows as well as

15  anyone what the key tenets of bankruptcy policy are,

16  maximizing value for the benefit of stakeholders and

17  preserving business as a going concern.  Congress put that on

18  one side of the scale.  On the other side of the scale, they

19  thought about, well, what about consumer privacy with respect

20  to sales involving the transfer of PII?  And they made a

21  decision, and they expressly contemplated applicable

22  nonbankruptcy law in making that decision.  And that's clear

23  from the text and structure of the statute, which the Supreme

24  Court instructs us is what we look to to determine issues of

25  conflict preemption.



Colloquy

 1          And Congress made a choice.  They balanced the
 2   competing policies to the extent they're competing, which I
 3   would argue on the terms of this sale, they're really not.
 4   And Congress said a debtor can sell PII in furtherance of
 5   those bankruptcy policies in one of three ways.  One, they
 6   have not disclosed a policy to consumers, in effect as of the
 7   petition date, that prohibits the sale of PII.
 8          THE COURT:  So that if the debtor doesn't have a
 9   policy at all, does the preemption apply or not?
10          MR. HOPKINS:  I think it does, Your Honor.
11          THE COURT:  Okay.
12          MR. HOPKINS:  Then.  363(b)(1)(A) says we -- our
13   position is that even if the policy may restrict or prohibit
14   the transfer of PII, the Court can approve the sale, as long
15   as it's consistent with the policy.  And I think that would
16   involve a situation like Toysmart, where maybe the debtor does
17   have policy that, on its face, says we will not transfer your
18   PII.   But you structure a sale like we've done with TTAM,
19   where it's a sale of the entire business, not just the PII.
20   Maybe the buyer is willing to provide privacy enhancements, as
21   TTAM is doing here.
22          The Court can either conclude that there's no policy
23   prohibiting the transfer.  They can conclude that to the
24   extent there is a policy, it's still consistent with the
25   policy, and the Court can approve the transfer.  And Congress

Colloquy

1    has preempted state law under conflict preemption in the

2    narrow circumstance of a 363 sale involving PII.  Or neither

3    of those two statutory predicates are met, and then, and only

4    then does Congress think applicable nonbankruptcy law comes

5    into the picture.

6         And I think you heard testimony from Professor Cate

7    today.  He's not aware of a case where a court has ruled that

8    there's a policy that -- where a court has gotten to, does

9    state law prohibit a transfer that the Code otherwise permits?

10   And we would submit that's because those cases are going to be

11   few and far between because of the structure of the statute.

12        Congress has decided that, in furtherance of

13   bankruptcy policy, even if there was a state statute that

14   placed a restriction on the ability to sell PII, that as long

15   as the debtors have not disclosed the policy prohibiting the

16   sale, or the sale is not otherwise consistent with that

17   policy, then the Court looks to state law to fill the gap.

18        THE COURT:  So I asked Professor Cate.  I'm going to

19   ask you, too.  You can't cite to me a case where a judge has

20   done what you're asking me to do here.

21        MR. HOPKINS:  Not with respect to the sale of PII in

22   bankruptcy.  We have not found a case.  But I do think there

23   are -- there is Eighth Circuit precedent that we could point

24   to that we think is instructive, in terms of how the Eighth

25   Circuit has interpreted preemption and how it should be



Colloquy

1    applied here under 363(b) of the Code.

2           THE COURT:  Okay.  Let me make sure I understand the

3    implications of your argument.  If a debtor has a privacy

4    policy that allows all-asset sales, are there any

5    nonbankruptcy restrictions on that sale that the Court must

6    enforce?

7           MR. HOPKINS:  On any assets, Your Honor?

8           THE COURT:  On PII.  Sorry, PII.

9           MR. HOPKINS:  Just on PII.

10          THE COURT:  On, PII.  Yeah.

11          MR. HOPKINS:  So the -- your hypothetical, the

12   debtors have a policy that just says we can we can freely

13   transfer your PII to --

14          THE COURT:  Well, the policy says we freely transfer

15   any asset.  But in the context of PII, are there any state law

16   or nonbankruptcy law restrictions that would then apply?

17          MR. HOPKINS:  I don't think there are any transfer

18   restrictions on the debtor on the debtor's transfer of PII

19   under 363(b)(1).  I think that to the extent that that policy,

20   in and of itself, violates applicable nonbankruptcy law, once

21   the data is in the hands of the buyer, if the policy has

22   traveled with the data, the regulators are free to pursue

23   whatever claim or cause of action they wish against the buyer,

24   once it's in the hands of the buyer.  But I think Congress has

25   said that if your policy doesn't prohibit it in furtherance of

Colloquy

1    the bankruptcy goals of value maximization and preserving

2    going concerns, that we will allow the sale of PII.

3              THE COURT:   Okay.   So what if the debtors here said,

4    we want to sell our collection of PII, including genetic data,

5    to Vladimir Putin's brother?   Applicable nonbankruptcy law, I

6    assume he's on a sanctions list somewhere.   Maybe it's Putin.

7    Somebody's on a sanctions list.

8              MR. HOPKINS:   I think that's right, Your Honor.

9              THE COURT:   Right.   Under your theory, wouldn't the

10   Bankruptcy Code preempt the trade sanctions and OFAC review

11   and all that sort of thing?

12             MR. HOPKINS:   I think 363(b), by the structure, gives

13   protections around issues that apply in all 363(b) sales.

14   Sound business purpose, good faith purchaser, fair purchase,

15   like all of the things that we would have to come in and show

16   to your court.   So if we came in and told you, Your Honor --

17   to stick with your example -- we want to take all of our

18   customers' data.   We want to -- and because our policies

19   permit it, we're going to sell it to Vladimir Putin.   He's

20   going to tear it up and do whatever he wants with the data.   I

21   don't think that that -- I mean, I would argue to Your Honor,

22   that you could tell me that's not a sound exercise of your

23   business judgment.

24             THE COURT:   I probably would, but the question is

25   whether -- well, let me give you another one.   Let's say the



Colloquy

1    debtors want to sell to a company that's majority controlled

2    by a foreign person, and it would otherwise trigger review by

3    the Committee on Foreign Investment in the United States.  The

4    U.S. filed a brief or filed a warning in this case about this

5    very issue.

6         MR. HOPKINS:  Well, I think with respect to federal

7    statutes, like HRS, CFIUS, like, we don't dispute CFIUS and

8    HSR apply.  But I think there's express language in the sale

9    order that says that it does.  I think the preemption is

10   derived from the Supremacy Clause.  So it's -- it is to the

11   extent that a state is putting a transfer restriction on the

12   sale of PII, where Congress has said the relevant standard is

13   just, what is the policy on the effective date?  I think

14   that's the limited scope of preemption that that we're arguing

15   is clear from the text of the statute and congressional

16   intent.

17        Because they clearly thought about nonbankruptcy law.

18   It's in the text of the statute, and it's very prescriptive

19   about the waterfall of provisions you get to before a sale of

20   PII requires a finding that no showing was made that the sale

21   violates applicable nonbankruptcy law.

22        THE COURT:  Sure, but it doesn't say state law.  How

23   do we cabin this to only state laws that pose an obstacle to

24   completion of a sale, as opposed to CFIUS or something like

25   that?



Colloquy

1    MR. HOPKINS:  Well, I don't believe that the concept

2    of preemption under the Supremacy Clause would apply to a

3    competing federal statute where Congress, who has exclusive

4    jurisdiction over the bankruptcy process, may also have

5    exclusive jurisdiction or another federal statutory regime

6    that may apply to limit the sale, like HSR or CFIUS.

7        THE COURT:  Okay.  Okay.  Go ahead.  Sorry.

8        MR. HOPKINS:  No, no problem, Your Honor.  Questions

9    are more than welcome.  So I think we've kind of -- we've

10   walked through, obviously, our view of how the Court should

11   apply 363(b)(1) in the context of the sale.  And our position,

12   as we just discussed, is that under clear principles of

13   conflict preemption, Your Honor can approve the sale, because

14   it's consistent with our policy.

15       But even if the Court wants to wade into the waters

16   of state law, our position is no showing has been made that

17   the proposed equity sale violates state law.  And I think the

18   text of the Code that no showing was made places the onus not

19   on the debtors to prove that it does comply with applicable

20   nonbankruptcy law.  I think the onus is on the objecting

21   parties as a matter of who bears the burden of proof.

22       And our position is the objecting states can never

23   make that showing, given the structure of the equity sale and

24   the terms that TTAM has agreed to for the transaction we're

25   seeking approval of today.  And I know Your Honor is probably



Colloquy

1    well aware, because we went through it in some detail on

2    Wednesday, but just to kind of reset the table for the

3    purposes of the argument.

4            The equity sale structure involves two pieces.  There

5    is a traditional 363 sale from the debtors to HoldCo or to

6    NewCo.  NewCo will be a wholly-owned subsidiary controlled by

7    the debtors, walled off from any third-party that doesn't have

8    access to the company or the company's information as of

9    today.  That's step one.  Step two is the debtor HoldCo that

10   owns the equity of NewCo will be selling the equity of NewCo

11   and only the equity of NewCo to TTAM.

12           I want to take those -- and just in brief summary,

13   and then I'm happy to jump around in the argument to wherever

14   Your Honor wants to focus, but just at a high level as to why

15   we think this complies with all the state laws you're going to

16   hear about from the objecting states.  And I want to start

17   with the sale of the -- actually the second step, the sale of

18   the NewCo stock, because I think that's the easiest.  The

19   debtor's sale of stock of a wholly-owned subsidiary to TTAM is

20   not a transfer or disclosure to a third-party or person of --

21   and this is the key term -- genetic data by a direct-to-

22   consumer genetics testing company.

23           In that sale, no genetic data is moving anywhere.

24   And we've talked to Your Honor about that before.  Same

25   officers, directors, and employees, same management team, same

Colloquy

1    servers, same laboratories, same policies as enhanced by the

2    TTAM proposal.  Nothing is changing.  It is strictly a sale of

3    equity.  No objecting state statute prohibits changes in

4    ownership of a direct-to-consumer genetic testing company.

5             And just to save us some time, Your Honor, if it's

6    all right with you, "direct-to-consumer genetics testing

7    company" is a term of art under these statutes.  I -- to be

8    brief, I'll just refer to it as a "DTC company," if that's

9    okay with you.  None of those statutes regulates a change of

10   ownership in DTC company effectuated through a stock sale.

11   And the NAAG states seem to acknowledge that in their papers.

12            I don't want to put words in their mouth.  But they

13   said, what we're doing on the asset sale, that violates all of

14   our laws.  There is a legal way to do it.  You could sell the

15   debtor's stock.  We don't think that's necessary.  We think

16   that's a bit form over substance.  But we can structure this

17   as an equity sale.  That's what we're doing.  And if, based on

18   the text of their statutes, they think that type of transfer

19   works, we're happy to accommodate, and TTAM agreed to

20   accommodate.

21            The debtor's sale of the acquired -- now we're -- now

22   on to step one in the structure, the sale to NewCo.  The

23   acquired assets, which are the same acquired assets that have

24   been in the in the TTAM APA since May 19th, when it was filed

25   on the docket, obviously includes the PII.  So that's where



Colloquy

1    the states are going to argue, and they have to argue, and

2    it's the only component of the sale in which we submit they

3    can argue that genetic data is being moved anywhere.

4          That is also not a transfer or disclosure to a third-

5    party or other person.  That would require affirmative opt-in

6    consent from the objecting states to effectuate that sale.

7    The sale of the debtor's assets, including PII to NewCo, which

8    again is an entity that will be wholly-owned and controlled

9    affiliate of the debtors, is merely an intercompany ownership

10   change.  We already talked about how everything will

11   effectively stay the same, in terms of who has access to the

12   data, how it's processed, managed and used, everything.

13         It is a sale to affiliate -- to an affiliate of a DTC

14   genetic testing company that is part of the DTC company,

15   something most states' comprehensive privacy laws -- which

16   there's a distinction between -- I believe all of the

17   objecting states have comprehensive privacy laws, in addition

18   to their CHIPA laws, although I believe Kentucky's may have

19   been approved, but it's not technically in effect until

20   January.  So I just want to be clear with Your Honor.

21         All of those more comprehensive regulatory regimes

22   expressly exclude, from the scope of those laws, transfers to

23   affiliates.  Every state except California does it expressly

24   in the statutory language.  It says a sale to an affiliate is

25   carved out of whatever transfer restrictions the law may

Colloquy

1    apply.  California doesn't include that express prohibition.

2    But we would submit that's easy, Your Honor, because all --

3    the other four objecting states besides California, their

4    statute speaks to restrictions on a transfer or disclosure to

5    a person, and depending on the statute, which we'll get to

6    later on, that has various meaning.  Some states don't define

7    it.  Some states do define it.

8         "Third party" under California law is not defined.

9    And in the context of what does it mean for a party to make a

10   showing that a proposed sale of PII does not comply with

11   applicable bankruptcy law?, we believe it's California's

12   burden to establish that "third party" means "affiliate."  And

13   we think it is very clear under the law.  And we cite a case

14   in our papers.  And I can cite a case to Your Honor today that

15   uniformly -- and this is from a decision from Judge Marvin

16   Isgur recently in the Southern District of Texas.  He says, in

17   the context of a dispute arising in a liability-management

18   transaction, that, of course, in the legal context, "third

19   party" does not mean an "affiliate."

20        And so it's logical that because California uses

21   "third party," whereas all the other statutes just say

22   "person," that you don't need a carve-out for sales to an

23   affiliate in California's comprehensive data privacy law,

24   because "third-party" does not include "affiliates."

25        And so on these facts, the sale to NewCo is not a



Colloquy

1    transfer or disclosure to a third party or person under any

2    conceivable reading of the objecting states' laws.  And we

3    would submit that even if Your Honor feels compelled to look

4    to 363(b)(1)(B) that you can still approve the sale.  There's

5    two prongs under that piece of the statute, one based on the

6    facts, circumstances, et cetera and after a CPO report has

7    been submitted.

8          I think the facts and circumstances of this case

9    weigh heavily in favor of the sale.  My colleague from the

10   from the creditors committee made a -- I believe, a tongue-in-

11   cheek comment yesterday that this is a perfect sale.  But you

12   heard in testimony from Professor Cate -- who he is an expert

13   on privacy, in our view -- that this -- in many ways, this is

14   the perfect sale, and we agree.

15         And then as I -- and I'm happy to -- we have a

16   demonstrative, Your Honor, if you -- we're prepared to go kind

17   of statute by statute and unpack the arguments for the Court

18   as to why we do not believe that even if state law applied --

19   which it doesn't and -- both just on the plain reading of

20   363(b)(1)(A), (b)(1) and (b)(1)(A), and the principles of

21   conflict preemption, if Your Honor wants to get in -- rule on

22   whether the sale complies with applicable nonbankruptcy law,

23   we're prepared to do that and go through those statutes.

24         THE COURT:  Okay.  Well, I'm not sure if I'm going to

25   go in that direction or not.  So probably want to take that

Colloquy

1   opportunity to walk me through it.  Okay.

2         MR. HOPKINS:  Your Honor, I can either go straight

3   there, or, I mean, as the debtors, there are other elements of

4   363(b).  They're not really in dispute, so I'm happy to spend

5   as much or as little time.  But these are things like sound

6   business purpose, highest and best.  To the extent the Court

7   concludes that heightened scrutiny applies to the sale, we can

8   walk through the arguments on that, or we can we can jump to

9   what I think is really the heart of today.

10         THE COURT:  I think those are all in your brief and

11   covered pretty well, right?

12         MR. HOPKINS:  We believe so, Your Honor.

13         THE COURT:  Okay.  If there's any --

14         MR. HOPKINS:  If you'd like -- if you have any

15   questions -- I do think, actually -- if it's all right with

16   Your Honor, because I believe Ms. Milligan mentioned due

17   process, so it may be worth spending a minute --

18         THE COURT:  Sure.

19         MR. HOPKINS:  -- on notice --

20         THE COURT:  Sure.

21         MR. HOPKINS:  -- if that's all right with Your Honor.

22         THE COURT:  Sure.

23         MR. HOPKINS:  The notion raised by the objecting

24   states that we are proceeding without adequate and reasonable

25   notice here, I think, just really and respectfully just



Colloquy

1   ignores the facts of the case.  The objecting states have

2   known, since before the petition date, that the business was

3   up for sale.  They, in the special committee, as early as

4   January 28th, had issued a press release that said the company

5   is exploring strategic options, including a sale.  There was

6   obviously an extraordinary amount of media attention around

7   the company.  There continues to be an extraordinary amount of

8   media attention around the company today.

9         And even after the cases were commenced, I think

10  we've heard argument from the objecting states that they

11  didn't know that PII was going to be sold.  I think that

12  there's a couple reasons why I think that doesn't hold water.

13  One, many state AGs felt compelled to issue press releases

14  encouraging our customers, both before and after the petition

15  date, to delete their data, to the detriment of the debtor's

16  estates.  So if they didn't think the data was going to be

17  sold, what's the purpose of those press releases?

18        They also -- we filed on the first day of the case,

19  and Your Honor approved, at the first-day hearing, bidding

20  procedures that explicitly said, we're going to be selling

21  all -- all or substantially all of our assets are going to be

22  marketed.  So to the extent that the states take issue with

23  the debtor's ability to sell PII under the Code,

24  notwithstanding what their state laws say, they've really been

25  on notice of that since the end of March.



Colloquy

1            On May 14th, we completed service of the bar date

2    notice and a notice of commencement to all customers at

3    significant expense to the estate.  I won't keep reiterating

4    that point, because obviously due process and notice are

5    important to the debtors.  But every time you hear me say

6    "notice to all customers," that's millions of dollars in

7    expense, to ensure that the debtors did the right thing, and

8    that the customers had every opportunity to make an informed

9    decision about what to do with their data.

10           On May 14th -- I'm sorry -- on May 19th, we filed and

11    served the notice of successful bidder and backup bidder.

12    That was TTAM and Regeneron.  Those APAs lay out defined

13    terms.  What's the -- what are the acquired assets?  What are

14    the assumed liabilities?  What's staying behind in the estate?

15    And I would note for the record, Your Honor, because certain

16    of the states have made comments that the equity sale is a

17    gotcha, or it's a material sea change in how this transaction

18    is being structured and effectuated.

19           One, I would make the point that the perimeter of

20    what are the acquired assets and assumed liabilities has not

21    changed.  So in terms of what we are seeking to sell to the

22    buyer in the 363 process has been on the record for over a

23    month.  And with respect to the TTAM APA, section 2.8 of the

24    TTAM APA that was filed on May 19th, expressly contemplate the

25    possibility that the transaction could be effectuated as an



Colloquy

1   equity sale or through a plan toggle.

2          Now, admittedly, Your Honor, it was not as in the

3   fully flushed out form that was in the APA's that were later

4   filed after the final proposal procedures.  But anyone who

5   read the APA would have known that, based on our negotiations

6   with TTAM, that type of flexibility was based in that

7   transaction.

8          THE COURT:  Give me that section number again,

9   please.

10         MR. HOPKINS:  2.8.

11         THE COURT:  2.8.  Thank you.

12         MR. HOPKINS:  Between June 11th and June 16th, we

13  sent a subsequent notice of all of the sale to all of our

14  customers, advising them of the potential sale of their data

15  to either TTAM or Regeneron.  We didn't know at that time when

16  we had to start that process, because the final proposal

17  procedures hadn't happened.  Nothing in the bidding procedures

18  required us to do that.  We don't believe that anything under

19  the rules required us to do that.  We did that because we felt

20  it was the right thing to do, to provide people notice,

21  because of the company's historical commitments to customer

22  privacy.

23         On June 13th, we filed and served the notice of

24  winning bidder, disclosing TTAM as the winning bidder.  And

25  that APA has the full-fledged equity toggle and plan toggle

Colloquy

1    provisions that are in the APA we're seeking approval of

2    today.  Again, those were not new concepts.  And those APA

3    provisions were filed on June 13th.  The states' objections

4    came in on June 9th and June 10th.  We didn't know NAAG's

5    position on how equity sales were viewed under their laws,

6    really, until we saw it in writing on a pleading filed three

7    days before.

8           So the debtors and TTAM reacted to what we saw to

9    maximize the likelihood of, one, we get the sale approved

10   today, and two, we could resolve as many objections as

11   possible with the states.  On June 14th, because it was an

12   equity-sale toggle, we filed a notice informing all parties in

13   interest that we were exercising our rights to implement the

14   transaction through that toggle.

15          And so I think I went longer than a minute.  But the

16   notion that the debtors have sandbagged this process or

17   provided insufficient notice I think on this record, false

18   flag.  So turning to some of the other provisions of -- I

19   think with that, Your Honor, unless you have questions

20   about -- I think the only other point I would like to address

21   briefly, before we turn to the state law arguments, is 363(f).

22   And this is, in large part, due to Texas' arguments that there

23   is some due process issue here, or that we are somehow

24   violating Texans' property rights with respect to their data,

25   or using the Bankruptcy Code to improperly strip a property



Colloquy

1    interest from a customer.

2        Under the equity sale, it's true, like in -- the

3    NewCo sale is -- and the equity sale are both free and clear

4    relief under 363(f).  Regular-way monetary claims, Your Honor,

5    I mean, those are those are -- like unsecured claims, those

6    are going to remain behind in the states.  I think we talked

7    about it with Your Honor at the prior hearing.  There is

8    language in the sale order that says whatever the debtor's

9    rights, as among each other, or their respective creditors and

10   stakeholders to the sale proceeds, those are preserved, as

11   of -- if we had done it the way of an asset sale, and there

12   were -- there was no NewCo sale, and there was no sale to TTAM

13   of NewCo's equity, those are preserved.  So no, I don't -- as

14   a substantive matter of who has a legal entitlement to the

15   proceeds of the sale, that's all being kept exactly as it

16   exists today.

17       For customers specifically, I think there's two

18   lenses to look at this.  If you are a creditor of the company,

19   prior to the closing date, that monetary claim -- so if you're

20   a cyber-breach claimant, for example, the monetary claim stays

21   behind in the estate.  We think that's appropriate under

22   363(f)(5).  They have a right to money.  They're going to be

23   able to assert that right to money against the sale proceeds.

24   All their legal entitlements are preserved.

25       With respect to customers' rights as to their data,



Colloquy

```
1    whether that's under our privacy policies or under Texas law,

2    that is not subject to 363(f).  And I think there's language

3    in the sale order, or the updated version of the sale order,

4    that's very clear about that.  Monetary claims stay behind.

5    All other rights ride through.  So their rights -- customers'

6    rights under Texas law, customers' rights under the privacy

7    policies, that's not being affected or taken away.  In fact,

8    it's being enhanced by what TTAM is agreeing to under their

9    APA.

10        So I wanted to address that, to try to give Ms.

11   Milligan and the State of Texas some comfort, that nothing

12   that's happening here is abrogating those rights.  Whatever

13   interest in the data we have, that's all we're selling to

14   TTAM, no more, no less.  We're not taking anything away from

15   the customers in effectuating the sale to TTAM.

16        With that, Your Honor, I mean, I think we've already

17   covered the statutory arguments, and we've discussed

18   preemption with Your Honor.  Unless you have any questions on

19   any of the other topics for me, I think we can dive into state

20   law.

21        THE COURT:  I think, yeah, I'm comfortable with the

22   briefing on the -- what I'll call the basic 363 issues that we

23   would see in any case.  So I think focusing on the State

24   statutes is probably a good next step.

25        MR. HOPKINS:  Sure.  We do have some slides --
```



Colloquy

1          THE COURT:  Sure.

2          MR. HOPKINS:  -- to help walk through this.

3     Because -- and I would ask for Your Honor's indulgence in

4     advance, because these are somewhat dense statutes.  And so I

5     think --

6          THE COURT:  Yeah.  I've got --

7          MR. HOPKINS:  -- we need to be thorough in how we

8     kind of parse them.

9          THE COURT:  I think I've got copies of them here,

10    too.  We'll see if we're looking at the same statutes.

11         MR. HOPKINS:  Can we go to slide 15, please?

12         So I think we heard from the states that other than

13    our -- in terms of what state-law arguments are we going to

14    hear today, it sounds like all five of the objecting states

15    are going to rely on their GIPA statutes.  And this is

16    somewhat of a summary, although it's pretty close, because

17    there's slight variations, as we said, across the statutes.

18         So what needs to exist for GIPA to apply?  One, needs

19    to involve a direct-to-consumer genetic testing company.

20    That's a defined term under the statutes.  It needs to involve

21    a transfer or disclosure of genetic information to any person,

22    for all the four states, except California, and for

23    California, it's to a third party.  And if those conditions

24    are satisfied, the state laws require separate express

25    consent.  And I'm a restructuring lawyer, not a privacy

Colloquy

1    lawyer.  I read that as effectively affirmative opt-in

2    consent.  That's how I think about that under these privacy

3    laws.

4           Next slide, please.

5           So I think we already covered this, Your Honor, in

6    the intro, so I'll be brief, unless Your Honor has questions.

7    With respect to step two of the equity sale, which is the sale

8    by debtor HoldCo to TTAM of the NewCo equity, there is no

9    genetic data that is actually being sold.  The genetic data

10   stays in NewCo, all the things we talked about remaining the

11   same.  It is simply a sale of an equity interest in a wholly-

12   owned sub.  And that equity interest is indisputably an asset

13   of the estate that can be transferred pursuant to 363(b), and

14   we don't think GIPA even applies.

15          Next slide, please.  And I wanted to cover this off,

16   because I think it's a similar point.  All of these laws refer

17   to transfer or disclosure.  And so how does Your Honor get

18   comfortable that there's no disclosure under any of these

19   statutes?  And we can just focus on the issue of whether there

20   is a transfer.  As supported by the testimony Your Honor has

21   heard Wednesday and today, there really isn't a disclosure of

22   new genetic -- of genetic information happening to anyone.

23   Same management team, same employees.  Data stays on existing

24   servers and in the existing labs.  Same privacy policies

25   enhanced by the TTAM privacy protections.  And there will be



Colloquy

1    no new use, maintenance, collection, or processing of customer

2    data that's not contemplated and permitted by the privacy

3    policies today.

4         So we think, as we go through these statutes, we're

5    just going to focus on transfer, because we think the record

6    is clear that there's no conceivable disclosure on which the

7    states can rely.

8         Next slide, please.

9         MR. HOPKINS:  So we've dealt with the step two, the

10   equity-sale component.  So from here on out, we're really --

11   we're focused on the NewCo sale.  We think the NewCo sale is a

12   transfer within, not from, the genetic-testing company.  And

13   as I said, direct-to-consumer genetic-testing companies has a

14   specific meaning under the statutes.  And that is an "entity."

15   And that's an important word, although it's undefined under

16   the statutes.  But I'll explain why in a moment.  That offers

17   genetic testing services directly to a consumer, or the second

18   prong, collects, uses, or analyzes genetic data from a DTC

19   genetic testing product or service.

20        And while the GIPA laws do not define the term

21   "entity," we submit that in order for that term to be

22   interpreted consistently throughout the structure of the GIPA

23   statutes, that term has to be read to encompass the entire

24   corporate family that operates the business.  I think the

25   states would have Your Honor take a myopic view and say,

Colloquy

 1    whatever the legal boxes in an organizational structure that
 2    does one particular type of thing, whether it's genetic
 3    testing -- or we'll get to it in a second -- insurance-related
 4    businesses, that it just means the legal entity that actually
 5    does the thing.  It doesn't mean any ancillary entities that
 6    may be wholly-owned and controlled affiliates that are related
 7    to and contribute to the main entity's ability to provide the
 8    service.  And so let me tell you why I think the statute has
 9    to operate that way.

10          Next slide, please.

11          All of these GIPA statutes, in addition to
12    restricting what kind of disclosures and transfers a DTC
13    genetic testing company can make, they also place significant
14    restrictions, understandably so, on the ability to transfer
15    genetic data to any entity that is responsible for
16    administering or making decisions regarding various forms of
17    insurance-related businesses.  And the position the states
18    want you to take on what an entity means with respect to
19    23andMe breaks the statute, with respect to the protections
20    that the legislatures were trying to give customers, in the
21    context of a transfer to an entity involved in health
22    insurance, life insurance, long-term -- this list of things on
23    the screen.

24          And why do I say that?  If I was a large national
25    health insurance company, and the Court agrees with any of the



Colloquy

1   objecting states' interpretation of what does an entity mean

2   under GIPA, I would say, aha, all I have to do is form a new

3   wholly-owned subsidiary, wall it off from my insurance

4   business, and I can I can get genetic data free and clear of

5   the protections that GIPA would otherwise -- the protections

6   and the restrictions that GIPA would otherwise require if --

7   for me to receive genetic data.  That cannot be what

8   California or any of the other objecting states legislatures

9   intended.  We think you have to read terms across the statute

10  consistently.  We think "entity" means "the business", which

11  is multiple legal entities that do the same thing or are under

12  common ownership and control.  And therefore, the NewCo sale

13  is not a transfer from a DTC genetic testing company.  It is a

14  transfer within a DTC genetic testing company.  And Your Honor

15  need not even consider whether it's a transfer to a third-

16  party or a person.

17          The next slide, please.

18          And this is a point I made -- this is also a point I

19  made earlier, but I wanted to show Your Honor the actual text

20  of the statutes in the objecting states.  What's referenced

21  here on this slide is each objecting states' comprehensive

22  privacy law.  So GIPA is more specific.  GIPA applies to

23  genetic information.  These laws are similar in purpose,

24  protecting consumers' privacy.  Each of them, with the

25  exception of California, which I'll clarify in a second,



Colloquy

1    carves out a sale of personal information to an affiliate.

2           Step one of our transaction is a sale of personal

3    information to an affiliate.  I think I mentioned it to Your

4    Honor.  Why is California different?  Well, California doesn't

5    have a carve-out for transfer to affiliate, but that's because

6    California doesn't restrict transfers to a person.  It

7    restricts transfers to a third party.

8           And under the law, third party is consistently read,

9    and we cite case law in our brief, for the proposition that,

10   well, of course an affiliate is not a third party.  They're

11   under common control.  And that also reinforces the argument

12   we just made to Your Honor about how the NewCo sale is a

13   transfer within a DTC genetic testing company that doesn't

14   even get you to the transfer restrictions under state law.

15          Next slide, please.

16          NewCo is not a person or a third-party.  And here's

17   the case law I promised Your Honor.  In re: Wesco Aircraft.

18   The cite, for the record, it's 2025 WL 354858 at 21.  And as I

19   said, that's a decision from Judge Marvin Isgur.  Bankruptcy

20   Court of the Southern District of Texas.  And that's a very

21   recent decision, Your Honor.  That's from January of 2025.

22   And quoting, "In common legal writings, the term third party

23   is uniformly used in a manner that excludes affiliates."

24          And again, I would reiterate to Your Honor that what

25   363(b)(1)(B) says is no showing was made that the transaction



Colloquy

1    violates applicable nonbankruptcy law.  And here, it's

2    California's burden to convince you that in light of actual

3    authority and case law that third party doesn't mean

4    affiliate.

5           The remaining statutes of the objecting states refer

6    to person.  And just to walk through it, those objecting

7    states either do not define the term.  I think that's only

8    Utah.  Or others define it by reference to specific enumerated

9    entities.  And so I think it's worth going through that

10   analysis with the Court.

11          Next slide, please.

12          I want to start with Texas.  And I want to preface

13   this argument, Your Honor, by making a point.  The AGs asked

14   this Court to engage in a hyper-technical analysis of state

15   law that is really, in many ways, divorced from the actual

16   policy, these statutes, or what they can be reasonably assumed

17   to have been the legislative intent, in terms of the type of

18   transfers and disclosures the legislature is intended to

19   prevent.  We think the approach is myopic.  And I think a good

20   example is what I walked Your Honor through in terms of how

21   they want to read "entity" in different ways based on where it

22   appears in the statute, which is not something that typically

23   is recommended by courts when interpreting statutes.  They

24   require that terms be applied consistently.

25          And so I think it's worth applying Texas' statutory



Colloquy

1    interpretation to their definition of person.  And it's laid

2    out on the slide.  It's a very specific definition.  It

3    includes certain types of legal entities.  And those types of

4    legal entities are also clearly defined elsewhere under Texas

5    law.

6         So what is a person under GIPA?  An individual,

7    partnership, corporation, association, business, business

8    trust, or the legal representative of an organization.  One

9    thing that's not in that list, Your Honor, is a limited

10   liability company.

11        How does Texas law define a limited liability

12   company?  Under the Corporations Act, an LLC is not a

13   corporation or a partnership.  It's not an individual.  It's

14   not an association.  TTAM -- or I'm sorry, not TTAM.  NewCo

15   will not own or operate anything at the time of the transfer.

16        And so if Texas tells us, don't look to what a

17   reasonable purpose in enacting the statute is.  Let's just

18   apply the text in a myopic and robotic way.  Well, then, with

19   respect to the NewCo sale, NewCo is not a person.  It's not

20   subject to GIPA.  And that's the type of absurd result that we

21   think our interpretation of these statutes intends to avoid.

22   But under Texas law, on a strict construction of the statute,

23   we don't even think NewCo is a person to whom a transfer would

24   be prohibited under GIPA.

25        On the next slide, on the remainder of the statutes,



Colloquy

1    Utah's is undefined.  We will stipulate that the Kentucky and

2    Tennessee statutes do include LLC.  But again, Your Honor, I

3    think this gets to kind of the fundamental canon of statutory

4    interpretation that a statute should not be construed to

5    create an absurd result.

6         And so if the objecting states are right, I think

7    it's worth talking about what some of the results of their

8    interpretation would be.  And let's use 23andMe as an example.

9    Let's assume we never filed for bankruptcy.  We're a regular,

10   healthy operating company.  We have thirteen million

11   customers.

12        Under their reading of the statute, if it was

13   beneficial for our shareholders to do an internal

14   reorganization for tax purposes, we need millions of customers

15   in the objecting states to consent.  If Mr. Lefkowitz decides

16   to go and enjoy early retirement and we need to replace the

17   chief privacy officer, who in his role assists the customer

18   care team who has access to PII of our customers, we can't do

19   that.  We can't go hire a new chief privacy officer because

20   he's an individual -- he or she is an individual without going

21   and getting thirteen million customers' affirmative consent.

22   We can't hire or replace our customer care employees.  We

23   couldn't elect a member of the board in accordance with good

24   corporate governance.

25        And so we think even statutes that define person to



Colloquy

1    include LLCs, it has to be rooted in what is the statute

2    intended to do and what is it intended to protect.  We think

3    that, with respect to these state statutes, this type of

4    transaction, where so much is staying the same.  There's no

5    new disclosure.  There's no change in how the data is used.

6    Maintained.  Collected.  Processed.  Anything that matters

7    from a perspective of consumer data privacy.  That this cannot

8    be the type of transfer that any of these state laws are

9    intended to prohibit.

10        And so we would submit in some, and I'm obviously

11   happy to answer Your Honor's questions, that even if Your

12   Honor gets to 363(b)(1)(B), that we comply with applicable

13   nonbankruptcy law.  We check the boxes under GIPA.  We're not

14   in the world of a transfer or disclosure to a third party or

15   person on the facts of this sale that we're asking Your Honor

16   to approve.

17        Any questions on the --

18        THE COURT:  I don't think so.  That's very thorough.

19   Thank you.

20        MR. HOPKINS:  Just a couple -- just to circle back,

21   Your Honor, on the preemption point because there are two

22   Eighth Circuit decisions that I think are pretty instructive.

23   One, and we did not --

24        Do we have -- can we have copies of the Heart of

25   America decision?



Colloquy

1           So there's a decision.  It is Heart of America Grain

2    by Judge Bowman.  The site is 123 F.3d 1098.  And that's an

3    Eighth Circuit decision from 1997.  And I have a bunch of

4    copies, if folks would like.

5           Would Your Honor like a copy?

6           THE COURT:  Sure.  That'd be great.  Thank you.

7           MR. HOPKINS:  Your Honor, this case dealt with

8    competing grain weighing laws.  There was a federal statute.

9    The other, a Missouri law.  And I would note, Your Honor,

10   because I think you'll hear this from the states when they

11   make their arguments.  This was a case where the Court held

12   that the state law was preempted, even though it was dealing

13   with a state law that was in an area of traditional state

14   concern, where courts should be or may be reluctant to find

15   preemption.  And I won't go into the intricacies of the ruling

16   that involves interesting things about various types of

17   certificates for the weight of grain.

18          THE COURT:  Please don't.

19          MR. HOPKINS:  But the Eighth Circuit stated that a

20   state's attempt, not only to regulate grain weights in

21   federally licensed warehouses, but to assert that function

22   entirely is an unconstitutional exercise of state power.

23   Notwithstanding that, the -- notwithstanding that the

24   applicable federal statute did not expressly address the exact

25   subject matter of the state's regulation.



Colloquy

1        And I think the analysis of how you apply that lens

2    to this case, the objecting states' attempt to use state laws

3    to prohibit a sale of PII that Congress specifically

4    permitted, in other words, to assert the function of Congress

5    in determining what standard to apply to an approval of sales

6    of PII in 363 sales.  And I think Your Honor before mentioned

7    the sale of cocaine, which to my knowledge, 23andMe is not

8    engaged in the business of.  The preemption here is really

9    quite narrow.

10       Congress did not look at 363 and say, notwithstanding

11   anything contrary to state law, a debtor can use, sell, or

12   lease property of the estate.  It is a very narrow focus.

13   What about the sale of PII?  And Congress made that policy

14   decision on the back of a case that received widespread

15   notoriety and focus from the FTC and others.  It got a lot of

16   press.  It involved the sale of PII of children.  But Congress

17   made an informed decision.

18       And I would note, for Your Honor's benefit, this

19   Eighth Circuit case, admittedly, it dealt with field

20   preemption, not conflict preemption.  But the principle is

21   similar, and that is states seeking to usurp the objectives

22   and purposes of Congress in permitting sales of PII that are

23   not prohibited by the debtors' privacy policies is preempted

24   under conflict preemption.  And courts note, and this is In

25   re: Old Carco, which is cited in our brief, 442 B.R. 196, that



Colloquy

1    field preemption and conflict preemption may be overlapping or

2    complementary, and field preemption and conflict preemption

3    are usually both found based on implied manifestations of

4    congressional intent.

5         And we would submit that under 363(b), you have a

6    clear manifestation of congressional intent that they wanted

7    to permit specific categories of PII laws -- or I'm sorry, PII

8    sales, notwithstanding what nonapplicable nonbankruptcy law

9    may be able to -- have to say about that.  And I actually

10   think, I believe every states' objection to a state cites to

11   Your Honor the Eighth Circuit decision in Schauer.  I hope I'm

12   pronouncing that correctly.  And that's 835 F.2d 1255 (sic).

13   For the support that 363(b)(1) does not preempt state privacy

14   laws.

15        That's a case, I believe, from 1987, which predates

16   BAPCPA by decades.  And what Schauer said, again, I will not

17   bore Your Honor the details about patronage margin

18   certificates.  I had to look up what that was.  What that

19   said, in Schauer, the Chapter 7 trustee was trying to sell an

20   instrument, despite state and contract laws that prohibited

21   the sale of the instrument without the consent of I believe it

22   was a farming co-op.

23        And the Court in Schauer said, I can't do that.

24   363(b)(1) just says a trustee can use, sell, or lease property

25   of the estate.  Doesn't give me any authority anywhere in the

Colloquy

1    statute to say that I can just run roughshod over state law,

2    which I can see Your Honor is considering in his mind as he's

3    evaluating the arguments we're making.  I think the exact

4    quote is 363 did not expressly authorize the trustee to sell

5    property contrary to the restrictions imposed by state law.

6          Well, in BAPCPA, Congress did something.  It amended

7    363(b)(1)l.  And it did provide express authorization to sell

8    PII, as long as it's consistent with the debtor -- as long as

9    it's permitted under the debtor's privacy policy or it's

10   consistent with the policy.  Now, but what Congress did say is

11   if a debtor is trying to violate the policy and it's trying

12   to -- and the Court can't otherwise find that the sale is

13   consistent with the policy, then the Court has to look to

14   applicable nonbankruptcy law.  But it's then and only then --

15         THE COURT:  All right.

16         MR. HOPKINS:  -- under our view of the statute.

17         THE COURT:  Mr. Hopkins, since you mentioned clear

18   statement and the word "notwithstanding", what do you make of

19   363(l)?

20         MR. HOPKINS:  May I grab my Code?

21         THE COURT:  Sure.  Yes, of course.  Which authorizes

22   the trustee to use, sell, or lease property, notwithstanding

23   any provision in a contract, a lease, or applicable law that's

24   conditioned on insolvency or financial condition or

25   commencement of a case under this title, appointment of a

Colloquy

 1    receiver, and effects of forfeiture of the debtor's interest

 2    in such property.  That's express preemption, right?

 3            MR. HOPKINS:  I think that's right, Your Honor.

 4    Now --

 5            THE COURT:  But with a pretty narrow focus.

 6            MR. HOPKINS:  Very narrow focus.

 7            THE COURT:  And proceeded BAPCPA.  That's been around

 8    for a while.  I don't remember exactly when.  But if Congress

 9    wanted to preempt restrictions on the sale of PII, why didn't

10    it either amend (l) or parallel (l)?

11            MR. HOPKINS:  I think, Your Honor, because it is a

12    narrow form of conflict preemption, and I think there is

13    Supreme Court authority.  I believe we have copies of that

14    case as well.  It's a relatively recent decision from Justice

15    Gorsuch, I believe, who wrote the majority opinion, that says

16    it's not just the text of the statute.  You look to its

17    structure.

18            THE COURT:  Sure.

19            MR. HOPKINS:  And I think there's a canon of

20    statutory construction that says if Congress puts words in

21    certain places of a statute and not in others, that that's

22    intentional.  And I think that Congress, in saying, Bankruptcy

23    Court, you can permit a sale of PII as long as the debtors

24    didn't do this thing as an initial step.  And that thing is

25    disclosing a policy that prohibits the sale of PII.  I think

Colloquy

1  Congress also says the Court can permit the sale of PII if

2  such sale or lease is consistent with such policy.

3       I think what Congress was not willing to do was to

4  just say, Bankruptcy Court, on any set of facts, you can

5  approve a sale of PII, notwithstanding applicable

6  nonbankruptcy law.  And the protection and the balance that

7  Congress struck between the bankruptcy policy you heard me

8  talk about earlier and considerations of consumer policy lives

9  in 363(b)(1)(B).

10       THE COURT:  All right.  All right.  I look forward to

11  reading Heart of America.  That's not one I've run across in

12  my prep.

13       MR. HOPKINS:  We have a great team who does

14  exhaustive research, Your Honor.

15       THE COURT:  I have no doubt.

16       MR. HOPKINS:  I can't take credit for that find.

17       THE COURT:  No doubt.

18       MR. HOPKINS:  Although the main character is a man

19  named Hopkins.  No relation.

20       THE COURT:  Oh.  Oh.

21       MR. HOPKINS:  I think, with that, Your Honor, I'd

22  like to -- unless Your Honor has any further questions for me,

23  I think I would cede the podium to TTAM, if that's okay with

24  Your Honor, and then --

25       THE COURT:  Yeah.  Let's have the parties in favor



Colloquy

1    speak first, and then we'll hear from the states.

2            MR. HOPKINS:  Thank you, Your Honor.

3            THE COURT:  Okay.  Thank you.

4            MR. HOPKINS:  And I would just like to -- oh, my

5    colleague reminded me.  The states are -- the states are also

6    pursuing their objection under 28 U.S.C. 959(b).  I don't

7    think I addressed that for Your Honor.

8            I think this is pretty straightforward.  28 U.S.C.

9    959, paraphrasing, says a debtor has to manage and operate its

10   business in accordance with state law.  We agree.  You heard

11   testimony from Mr. Lefkowitz today.  23andMe goes to great

12   efforts to operate its business in accordance -- to manage and

13   operate its business in accordance with state law.  They

14   updated their privacy policy, I think you heard Prf. Richards

15   testify, twenty-two times in an effort to comply with

16   applicable state and other privacy laws.  But it speaks to the

17   management and operation of the business.

18           So yesterday, could we go violate law with respect to

19   PII and the AGs have nothing to say about it?  Absolutely not.

20   But 363(b) is a sale outside of the ordinary course of

21   business.  Congress has articulated a statutory scheme for how

22   those sales should be evaluated.  It doesn't run afoul of 28

23   U.S.C. 959 because a sale outside of the ordinary course of

24   business, I think, by definition, is not management and

25   operation of the business.  I think, if it was management and



Colloquy

1    operation of the business, we'd be either not in 363(b) land

2    at all, or we would be living under 363(c), which is ordinary

3    course of business, which is obviously not the position we're

4    taking here.

5            THE COURT:  Makes sense.

6            MR. HOPKINS:  Thank you, Your Honor.

7            THE COURT:  All right.  Thank you, Mr. Hopkins.

8            Mr. Kirpalani.

9            MR. KIRPALANI:  Thank you, Your Honor.  Susheel

10   Kirpalani of Quinn Emanuel Urquhart & Sullivan on behalf of

11   the TTAM parties, including Ms. Anne Wojcicki.  My colleague's

12   just going to plug in some slides, if you just give us one

13   moment.

14           THE COURT:  Sure.

15           MR. KIRPALANI:  And I'm going to try to be brief

16   because I think Mr. Hopkins covered two thirds of what I was

17   otherwise going to address.  And it's late in the day.  And

18   folks have to catch planes.  So I want to give the objecting

19   parties their due amount of time.

20           Okay.  I'm actually going to skip over the concept of

21   preemption and talk to Your Honor instead about the second

22   prong, which is that the trustee may not sell or lease

23   personal identifiable information to any person unless, under

24   (B), 363(b)(1)(B), after the appointment of a consumer privacy

25   ombudsman, that has happened, and after notice and a hearing.



Colloquy

1   That has happened, one, giving due consideration to the facts,

2   circumstances, and conditions of such sale and the court is

3   finding that no showing was made that such sale or such lease

4   would violate applicable nonbankruptcy law.  I did a word

5   search on the Cornell website that has the whole Bankruptcy

6   Code for "no showing was made".  I've been doing this for

7   thirty years.

8        THE COURT:  Bet you didn't find anything.

9        MR. KIRPALANI:  Never seen that phrase --

10        THE COURT:  Yeah.

11        MR. KIRPALANI:  -- in the Bankruptcy Code before.  It

12   actually referred me to a bunch of criminal statutes and then

13   about beyond a reasonable doubt being the standard.  I'm not

14   urging that.  It may well be a very high burden, but I'm not

15   urging that.

16        What I am urging, though, Your Honor, is that looking

17   at the structure of the statute, not delving into preemption,

18   Your Honor is just interpreting this federal statute as it's

19   written.  The structure of this statute says in (A), this is

20   the "or".  It's either the first one, (A), which I'm going to

21   come back to, or (B), after three things happen.  The

22   appointment of an ombudsman.  Check.  Giving due consideration

23   to the facts, circumstances, and conditions of such sale.

24   We're going to come to those in a moment.  Finding.  Sounds

25   like a factual finding, but I think it's probably a mixed



Colloquy

 1   question of fact in law.  But we do want the Court to find

 2   that no showing was made.  It clearly refers to the objecting

 3   party.  That such sale or such lease would violate applicable

 4   nonbankruptcy law.

 5        So we think it's by a preponderance of the evidence.

 6   And the states have adduced some evidence from a couple of

 7   witnesses and have pointed to some statutes.  But it is their

 8   burden that they've got to show, looking at the specific facts

 9   of this transaction, not generally, not a general statement of

10   preemption, not a general statement of law about state law

11   from this court, but that they've proven to you that their

12   state statute is violated by the structure of this sale, by

13   the identity of the buyer, by whatever circumstances of

14   privacy law that have been violated, that they have proved to

15   you that that's happened.

16        But what they're doing is they're actually flipping

17   the burden, and they're saying you have to affirmatively

18   declare that the transaction complies with state law.  I don't

19   think that's what the statute says.  It actually says in (A),

20   if there's a policy in place, all you have to do is find that

21   the sale is consistent with such policy.  So you can't read

22   into (A) a higher burden than what is actually their burden in

23   (B).  And I think that's where, from a structure of the

24   statute perspective, they've kind of jumped over what the

25   Court is supposed to be doing and whose burden it is to show



Colloquy

1    it.

2            But I do want to talk about the facts, circumstances,

3    and conditions of the TTAM transaction.

4            So if we can flip the slide to the next one.

5            UNIDENTIFIED SPEAKER:  That's controlled by someone

6    else.  I don't know if they can hear.

7            MR. KIRPALANI:  Oh, okay.  Great.  So we're on slide

8    9.

9            So here, we have the uncontroverted testimony of Ms.

10   Wojcicki in paragraphs 14 and 15 that TTAM's privacy policy

11   will be the same as 23andMe's privacy statements in effect as

12   of the bankruptcy filing, plus "additional privacy forward

13   enhancements contained in TTAM's voluntary consumer protection

14   and privacy safeguards term sheet."  Beyond that, TTAM has

15   committed to maintain in perpetuity 23andMe's current policies

16   that allow customers -- consumers, I'm sorry, to delete their

17   accounts and genetic material and to opt out.  Those are the

18   facts.  The record facts in the case.

19           In paragraph 15, she also testified that ,"TTAM will

20   comply with all obligations under applicable state privacy

21   laws, including those governing genetic privacy and consumer

22   health privacy, as if it were a for-profit entity".  So beyond

23   actually what the law requires, and those are the unique

24   special facts of this transaction, which I can't get my head

25   into the minds of the NAAG states, who agreed to rest on their



Colloquy

1    papers as long as it's TTAM that's acquiring but reserving

2    their rights to object if it were another bidder.  But you

3    could see the logic of perhaps based on the specifics of this

4    transaction and this buyer, the unique facts and circumstances

5    support that there is no showing that their laws would have

6    been violated.

7         The next slide.  Oh, whoever is in control of it.

8    Thank you.

9         You heard Ms. Wojcicki testify about the TTAM

10   voluntary privacy commitments.  This demonstrative was

11   discussed during her testimony.  I don't need to go through

12   it.  Those are the facts and circumstances.

13        If we can go to the next slide 11.

14        We also heard the testimony of Mr. Swift from Moelis

15   that the acquired assets and assumed liabilities will be

16   transferred to a newly formed and wholly owned nondebtor

17   subsidiary called NewCo.  That's the drop down feature that

18   Mr. Hopkins talked about, again, the specifics of this

19   transaction.  And I think where it's important to focus on

20   this is because we're going to hear from our friends at the

21   objecting states that this transaction either was -- they may

22   say no due process.  I believe they've said in other circles

23   it's a sham, or it wasn't in good faith.  We're specifically

24   asking the Court to determine that this buyer, that this

25   transaction was in good faith.



Colloquy

1              There is no evidence.  They had people on the witness

2    stand.  They had Moelis.  They had Ms. Wojcicki.  They had

3    debtors' other representatives.  Nobody asked a single

4    question about why was this transaction structured this way.

5    Nobody adduced any evidence that it was done in bad faith.

6    And so the Court has no basis to determine it's anything that

7    remotely resembles bad faith.  This is not a sham.  This is an

8    effort by the debtors constructively to try to meet the

9    objecting states where they stood on their papers and in order

10   to anticipate and resolve objections.  And in point of fact,

11   it worked for most of the states.  And we think that that's an

12   important factor for the Court to consider, too, under Section

13   363(b)(1)(B).

14             Next slide.

15             And this is just a diagram of -- Your Honor knows

16   this transaction well, now, but it's important when you're

17   looking at the statutes to ask yourself is there a transfer of

18   data to a third party.  Your Honor asked that question on the

19   first morning of the hearing, and so I ad libbed it with Ms.

20   Wojcicki about whether even she herself will be given access

21   to the data as one of the three members of the governing body

22   of TTAM.  And she said no.  And she hasn't even had access to

23   that genetic data as the CEO and founder of 23andMe.

24             So there is no evidence in the record that any

25   genetic data regulated by these specific GIPA statutes will be



Colloquy

1    transferred to any third party.

2        The next statute.  I'm sorry.  The next slide is the

3    statute.  I think Your Honor can look generally at these

4    consumer privacy acts to determine what are they regulating.

5    It's very important not to take statutes out of their context.

6    What are they trying to regulate?  I think that's an important

7    inquiry when determining whether or not state law has been

8    violated.  Our position is they don't regulate M&A activity at

9    all.

10        In the California Consumer Privacy Act, which is the

11   more umbrella act, not the specific genetic one, California

12   statute specifically says a business does not sell personal

13   information when it's part of a merger, acquisition,

14   bankruptcy, or other transaction in which the third party

15   assumes control of all or part of the business.  That's not a

16   sale, even though, in your mind, of course, you think of it as

17   a sale.  But that's not the work that these statutes are

18   trying to do.

19        In the NAAG state's pleadings, and they did rest on

20   their pleadings and that's fine, they stated a change in

21   ownership without a sale and transfer of the customer data is

22   legally possible.  The debtors are corporations, and their

23   shareholders are owners.  Through the purchase of the debtors'

24   stock, the proposed buyers could effectuate a change in

25   ownership, arguably without causing a sale, transfer, or



Colloquy

1    disclosure of the assets.  It's exactly what the debtors are

2    doing to my client.

3         Let's go to slide 14.

4         Apologies that we didn't cite this case in our brief,

5    but we found it subsequently.  In the Seventh Circuit, there

6    was a transaction where Ancestry, the stock of Ancestry was

7    sold to Blackstone.  Big private equity company.  There was a

8    class of consumer plaintiffs who came forward and brought a

9    lawsuit under their version of GIPA, in Illinois, saying that

10   by virtue of a private equity owner now owning ancestry.com,

11   the private equity owner has violated GIPA because it is

12   compelling the transfer of genetic data to someone else

13   because the equity owner could now cause the subsidiary to

14   just give us all your genetic data because those Blackstone

15   private equity executives love to do that on a Sunday evening.

16   But that's what the lawsuit was about.

17        Here's what the Seventh Circuit said.  "The fact that

18   the acquisition took the form of an all stock purchase further

19   cuts against the plaintiffs' theory of liability.  All we can

20   say with certainty about Blackstone's all stock acquisition of

21   ancestry is that a change in ownership occurred.  Nothing

22   more."  We think that's directly relevant and analogous to

23   TTAM, which of course is no private equity firm, it's a

24   charitable foundation, acquiring the stock of NewCo under the

25   debtors' structure for this sale.  And for the record, that



Colloquy

1    cite is 66 F.4th 687 at 689 (7th Cir. 2023).

2         I think the other sections that I would have covered

3    of our presentation were adequately covered by Mr. Hopkins.

4    Let me just double check.  Yeah, I think that's all I have

5    that can --

6         THE COURT:  Okay.

7         MR. KIRPALANI:  -- I think useful.  Thank you, Your

8    Honor.

9         THE COURT:  Thank you, Mr. Kirpalani.

10        We have committee or others in support?

11        Yes, Ms. Ryan.

12        MS. RYAN:  I just want to make a clarification about

13   something that this gentleman said.  And I'm so sorry.  I

14   don't remember your name.

15        MR. KIRPALANI:  Oh, it's Susheel Kirpalani.

16        MS. RYAN:  It's Susheel?  Thank you.

17        That Mr. Susheel said.  I don't believe that the

18   Court should take into consideration the NAAG states, whether

19   we say the law is violated or not violated.  Fact is, we're

20   not arguing it.  I stayed seated back there, as hard as it is

21   for me sometimes to keep my mouth closed.  And based upon the

22   concessions that we got, the extra concessions for exhibit D,

23   we agreed not to argue that.

24        And so we're not conceding either way that the NAAG

25   states' laws are violated.  And in fact, we negotiated a



Colloquy

1    special term for the sale order.  It's paragraph 37, and it

2    says, "The findings and provisions of this order regarding the

3    transfer of customer data are based upon the specific facts

4    and circumstances of this case are of no precedential value

5    and do not waive any state's laws."

6              So I think we're neutral on that point.  And I just

7    wanted to make sure Your Honor was aware of it.

8              THE COURT:  Okay.  Well, while you mentioned that, I

9    don't get to decide what's of precedential value.  If what you

10   mean is that your clients can disagree in the next case and

11   they're not collaterally estopped or something like that,

12   that's fine.

13             MS. RYAN:  Yes.

14             THE COURT:  Okay.  I'm good with that.

15             MS. RYAN:  That's exactly what we mean.

16             THE COURT:  I'm good with that.  Okay.

17             MS. RYAN:  Thank you.  Any other questions, Your

18   Honor?

19             THE COURT:  No, I don't think so.

20             MS. RYAN:  Thank you.

21             MR. VISCITO:  Your Honor.

22             THE COURT:  Mr. Viscito, let's wait for the folks in

23   the courtroom, please.

24             MR. VISCITO:  Okay.  Thank you.

25             MR. ADAMS:  Good afternoon, Your Honor.  Jason Adams,



Colloquy

1    Kelley Drye & Warren, on behalf of the committee.

2            THE COURT:  Adams.

3            MR. ADAMS:  Couple things.  I'm not going to touch on

4    the NAAG states at all because I certainly don't want Ms. Ryan

5    coming up here and saying that I said something wrong.  So I'm

6    not going to do that.  Your Honor, I also have no

7    demonstratives, for better or for worse.

8            So two days ago, I used a silly term.  I said

9    perfect, and that has been repeated time and time again today.

10   And I appreciate Prof. Cate validating that statement.  But

11   quite frankly, it was hyperbole.  Right.  And I think

12   counsel's indicated that.  Right.  There is no such thing as a

13   perfect sale in bankruptcy.  Certainly not outside of

14   bankruptcy, and a hundred percent not in bankruptcy.  There's

15   no such thing as a perfect sale because in bankruptcy, rights

16   are always affected, and they're always impacted.  That's kind

17   of the very nature of the Chapter 11 process.

18           In Chapter 11, creditors' rights are always impacted.

19   Often, hopefully not this case, but often, creditors receive

20   little to no value.  Shareholder equity rights are completely

21   wiped out in bankruptcy all the time.  Damages claims are

22   capped by Section 365 of the Bankruptcy Code.  Contracts and

23   leases are assigned, notwithstanding anti-assignment

24   provisions in contracts.  Warranties are eliminated.

25   Creditors can affirmatively -- or can vote on a plan and say,



Colloquy

1    no, I don't support this plan, and they're bound by it.  So

2    the Bankruptcy Code, it's inherent in the nature of it that

3    rights are impacted.

4          So with that in mind, I'm not going to say perfect

5    again, but I'm going to say if it's not this sale, if this

6    sale is not good enough, then what sale ever possibly could

7    be, given the facts and circumstances of this case, because

8    and this has been said by counsel repeatedly, what this sale

9    does is it preserves the business.  It maximizes value.  And

10   it ensures that customer rights, whatever they are under the

11   policies, are unaffected.  They're unaltered and likely

12   enhanced, given the additional protections that TTAM has put

13   into its APA.

14         The continue will operate as it has been.  It will be

15   the same people.  It'll be the same structure.  It'll be the

16   same mechanisms.  We heard Ms. Wojcicki say that yesterday.

17   Nobody new is going to have access to PII.  And as Ms.

18   Wojcicki said herself, I think Mr. Kirpalani referred to this

19   as well in his discussion, Ms. Wojcicki as the cofounder has

20   no access to anybody's PII, other than her own.

21         So if this sale can't be approved, then I think what

22   the states are truly arguing here is that there is absolutely

23   no asset sale in bankruptcy that can ever happen.  And we're

24   not necessarily talking about an asset sale here.  We are

25   talking about two-level transaction.  But there's no asset



Colloquy

1   sale that can ever be approved in bankruptcy, regardless of

2   what 363(b)(1) says, other than with express consent from

3   customers.  And maybe one day, Your Honor, that is what

4   Congress will provide.  But that's not what the section -- not

5   what the statute says today.

6        And we unfortunately, or maybe fortunately, we don't

7   play in the world of what the law should be.  That's a wholly

8   different branch of the government, which I am not qualified

9   to be a part of.  We have to live with what the Bankruptcy

10  Code says now.  And we believe, consistent with the debtor's

11  position, with TTAM's position, that 363(b)(1) is clear.  And

12  I'm not going to repeat those arguments today because there

13  are a lot of people who want to catch flights tonight.

14        But I will close with what I think the ultimate goal

15  of Chapter 11 is, which is to allow companies to restructure,

16  with the corresponding concept of do as little harm as humanly

17  possible.  I think that's one of the core features of the

18  Chapter 11 process.  And so I ask, what is the greater harm

19  here?

20        Is it to approve a sale where the customer's rights

21  are maintained and enhanced?  They'll continue to have access

22  to the services that they signed up for.  The business is

23  going to be maintained the same way, same structure, same

24  limitations, same privacy policies, and maybe some

25  enhancements.



Colloquy

1    Or is the greater harm potentially wiping out those

2    rights entirely because people did not affirmatively say, yes,

3    I want this transaction at this point in time and again,

4    eliminating their rights to the services, eliminating the

5    potential of research opportunities, all because again, these

6    consumers did nothing?  I don't think that's necessarily

7    consistent with what the states' logic is here and ultimately,

8    what, again, the purpose of these statutes were, which is to

9    protect consumers.

10    And then, of course, there's the harm to everybody

11    else, Your Honor, that needs to be factored in as we consider

12    this because it's not just the company.  It's not just the

13    customers.  There's a whole bunch of other stakeholders

14    involved here.  And again, customers certainly will maintain

15    their services.  That's important.  They'll have the same

16    privacy rights they had before and more.  Employees, if this

17    transaction doesn't go through, they will not have jobs.

18    Creditor recoveries will clearly be little to nothing.  Equity

19    holders will be completely wiped out if the sale transaction

20    is not approved.

21    And again, we can't do the crystal ball here today,

22    but if we can't approve a transaction of this type, I'm not

23    sure there's any transaction that we can necessarily approve.

24    And that potentially leads us down a Chapter 7 route.  And if

25    it's a Chapter 7 route, they still don't know what the



Colloquy

1    protections are for the customers at that point.  And it could

2    be potentially worse.

3            So we believe, based upon the law, the legal

4    arguments, the balance of harms, the purpose of Chapter 11,

5    that this is a sale transaction, as currently structured, that

6    works under the law, whether you look under Section

7    363(b)(1)(A) or (B).  We don't think you have to get to (B)

8    for all the reasons that have been said today.  But if you do,

9    we still believe it complies with applicable state law.  We

10   still believe, considering all the facts and circumstances,

11   that it is appropriate.  And for those reasons, the committee

12   is supportive of the sale transaction.

13           THE COURT:  Thank you, Mr. Adams.

14           MR. ADAMS:  Thank you, Your Honor.

15           THE COURT:  Others in the courtroom in favor.

16           MS. DWOSKIN:  Very briefly, Your Honor.  Good

17   afternoon.  Shari Dwoskin of Brown Rudnick on behalf of the ad

18   hoc group of equity holders.  We filed a statement in support

19   of the sale at docket number 804.

20           The ad hoc group was very pleased that the sale

21   process resulted in a sale price of over five times the

22   initial bid at auction, and we believe that this is more than

23   sufficient to pay all creditors in full and provide meaningful

24   recovery to shareholders.  And for that reason, Your Honor, I

25   really wanted to raise to rise to speak.  We haven't heard a



Colloquy

1    lot about the economics of this deal.  We haven't heard from

2    equity, who I believe is the fulcrum security here.

3            And I think that it's important to consider what the

4    economics would mean if this sale was approved and if it's not

5    approved, as the committee laid out, particularly given that

6    this is a sale to an affiliate of an insider.  The process was

7    competitive, as the evidence showed.  As the Court is aware,

8    with TTAM and Regeneron appearing here after the initial stage

9    of the auction seeking a process to submit additional bids,

10   that process was overseen by the special committee.  It was

11   fair.  It resulted in a sale price that was more than anybody

12   expected that the sale would provide.

13           And I won't go into the 363(b)(1) factors.  I think

14   the debtors and TTAM have laid those out in detail.

15           But I do want to say, Your Honor, if the sale is not

16   approved, then the estate and the equity holders, who are the

17   residual interest holders in the estate, would be

18   significantly worse off.  It's not at all clear that the

19   Regeneron bid or any other bid would be acceptable to the

20   states for the reasons that the committee laid out.  And the

21   likely outcome would be either that the PII would end up in

22   foreclosure or in a Chapter 7, which would result in

23   significant destruction of value.  And it's unlikely that the

24   result would be any better for customer privacy than the sale

25   to TTAM.



www.escribers.net | 800-257-0885

Colloquy

1          And I want to stress, Your Honor, that because

2     customers always have the right to delete their data, it's in

3     the economic interests of the company to make privacy as

4     strong as possible, right, to retain as many customers as

5     possible.  That's where the value of the company lies.

6          So for those reasons, Your Honor, the ad hoc group is

7     in favor of the sale, and we request that the sale be

8     approved.

9          THE COURT:  Thank you, Ms. Dwoskin.

10          MS. DWOSKIN:  Thanks.

11          THE COURT:  Yes, sir.

12          MR. GLUCK:  Good afternoon, Your Honor.  I'll be very

13     brief.  For the record, Kristian Gluck, Norton Rose Fulbright,

14     on behalf of JMB Capital Partners Lending, the DIP lender

15     here.  Your Honor, we did file a joinder in support of the

16     sale at docket 790.  I won't repeat it.  I won't belabor it.

17     I also have a flight later I'd like to catch.

18          But we do support the sale, Your Honor.  It's been a

19     fantastic result.  Kudos to the debtors and all their

20     professionals for the result here.  It justifies JMB's

21     decision to make this DIP loan in the beginning.  And we do

22     ask that the Court approve the sale.  Thank you.

23          THE COURT:  Thank you.

24          Others in the courtroom in favor.

25          All right.  On the Webex.



Colloquy

1          Mr. Viscito, briefly.  I believe your counsel just

2     spoke.  So let's keep it tight, please.

3          MR. VISCITO:  Yes, Your Honor.  I'll be brief.  To

4     the extent the -- to the extent the Court looks beyond the

5     Bankruptcy Code in making determinations in this individual

6     case, I would ask the Court to consider common sense in its

7     deliberation.  TTAM is an acronym for 23andMe, as identified

8     in the CPO report.  And the reason seems to be very clear.

9     The business under 23andMe is the exact business that would be

10    operated under TTAM.

11         The Court has heard no state consumer witness

12    describing how they would be harmed by the equity purchase of

13    TTAM of the business of 23andMe or the entity.  That's because

14    they will not be harmed.  Creditors and equity shareholders

15    will be considerably harmed if this sale is not approved or if

16    it's approved with an opt in condition.

17         I would ask the Court to approve the sale with no

18    conditions or provisions for an opt in or express consent.

19    Thank you, Your Honor.

20         THE COURT:  Thank you, sir.

21         Others on the Webex in favor of the sale.

22         All right.  To the objecting states.  Who's first?

23         MR. NADAL:  Good afternoon, Your Honor.  The People

24    of the State of California object to the proposed sale because

25    debtors refused to comply with California state law



Colloquy

1    restrictions on the transfer of human genetic data and

2    biological samples.  I want to start here by pointing out that

3    we have maybe a few states continuing to object, but we're not

4    small.  The objecting states have approximately eighty-six

5    million residents.  That's twenty-five percent of the country.

6    And with no offense to my other colleagues, but California and

7    Texas alone are seventy million.  That's twenty percent of the

8    country.  It's just me here.  I didn't have time to put

9    together a fancy PowerPoint or come up with a really great

10   thing.

11        But my thing that I'm going to have here is that this

12   is just wrong.  It's wrong from a bankruptcy procedural

13   standpoint.  It's wrong from a California law standpoint.  And

14   it's wrong from a bankruptcy substantive standpoint.

15        THE COURT:  All right.  Mr. Nadal, let me ask you.

16        MR. NADAL:  Yes.

17        THE COURT:  Do you agree that if the debtors

18   confirmed a Chapter 11 plan that restructured their balance

19   sheet and resulted in TTAM becoming the new equity owner of

20   the reorganized debtor, your state's law would not be an

21   obstacle to confirmation of that plan?

22        MR. NADAL:  Your Honor, I agree that debtors would

23   have a fighting chance.  So yes.

24        THE COURT:  Okay.  And that would take two months,

25   result in a massive cash burn, and unbelievable professional



Colloquy

1   fees; is that fair?

2          MR. NADAL:  Yes, Your Honor.

3          THE COURT:  Okay.  How would consumers in your state

4   be better off if the debtors took that route?

5          MR. NADAL:  Consumers would be better off if the

6   debtors took that route because in that circumstance, we have

7   express Congressional articulated preemption law.  We don't

8   have that in the 363 context.

9          THE COURT:  No, it's not a preemption issue.  It's

10  that your state's law wouldn't apply to that transaction.

11         MR. NADAL:  Yes, Your Honor, because Congress

12  specifically articulates in 1123(a)(5) that notwithstanding

13  applicable state law, a plan may do X, Y, and Z.

14         THE COURT:  But we never get to that.  How would

15  California's statute apply to the reorganization of this

16  debtor under new equity owners?

17         MR. NADAL:  Through a bankruptcy plan?

18         THE COURT:  Right.

19         MR. NADAL:  I do not believe it would, Your Honor.

20         THE COURT:  Okay.  So we don't need to get to

21  preemption.  Right.  There's nothing to preempt.  State law

22  doesn't bar that transaction, so Congress doesn't need to

23  preempt it.  Right.

24         MR. NADAL:  The reason that California law would not

25  apply to a transaction that they structured through a Chapter



Colloquy

1    11 plan is because Chapter 11 specifically has notwithstanding

2    applicable state law within it.

3         THE COURT:  All right.  If we went down that road and

4    confirmed a plan two, three months from now, shareholders in

5    California would be demonstrably worse off than if this

6    transaction goes forward as structured; is that is that fair?

7         MR. NADAL:  Essentially, Your Honor, yes.

8         THE COURT:  Okay.  Let's take it a step further.

9    Let's take TTAM out of the picture.  The debtors could confirm

10   a plan that gives ownership to someone totally unaffiliated.

11   Ancestry.  Or want to pick on Procter & Gamble, a consumer

12   products company.  A life insurance company could be the new

13   owner of the reorganized debtors.  Your state's law wouldn't

14   apply to that transaction, would it?

15        MR. NADAL:  The California state law, GIPA, would not

16   apply to prevent the reorganization from happening, but it

17   would apply and follow the data because the new purchaser

18   would be defined under California statute as a direct-to-

19   consumer genetic testing company.  And so all of the --

20        THE COURT:  Right.  There might be -- there might be

21   restrictions on the ability of New 23andMe to give the data to

22   its new life insurance overlord, but there's nothing in the

23   statute that would prohibit that life insurance company from

24   owning reorganized 23andMe, as long as nothing further

25   happened, right?


www.escribers.net | 800-257-0885

Colloquy

1          MR. NADAL:  I believe that's correct, Your Honor.

2          THE COURT:  Okay.  And no consumers would have to opt

3     into that transaction.  It's just a change of ownership,

4     right?

5          MR. NADAL:  Correct.

6          THE COURT:  Okay.  If they didn't like it, they could

7     delete their accounts?

8          MR. NADAL:  And if they did not like it, I believe

9     they could.  Yes, Your Honor.  And they could also vote

10    against the plan.

11         THE COURT:  If they're creditors.

12         MR. NADAL:  Correct.

13         THE COURT:  Which, if they were subject to the data

14    breach, they could vote.  Let's put it that way.

15         All right.  So as I understand it, and I think this

16    applies to all five states, the state regulates transfers of

17    genetic information but not ownership of the companies that

18    hold that information; is that fair?

19         MR. NADAL:  I believe that's fair, Your Honor.

20         THE COURT:  Okay.  So why should I interpret your

21    GIPA statute to prohibit something that's technically a

22    transfer, maybe it's technically a transfer, but it has no

23    effect except to facilitate the change of ownership that on

24    its own would be unobjectionable?

25         MR. NADAL:  Because the mechanics and operation of



Colloquy

1    the bankruptcy law matter.

2            THE COURT:  So it sounds like you're saying the

3    mechanics and operation of state law matter but --

4            MR. NADAL:  Your Honor, what I'm saying is that the

5    mechanics of Section 363 matter.

6            THE COURT:  So we're talking about form versus

7    substance.  Right.  Okay.  Is there some reason to believe --

8            MR. NADAL:  Not entirely, Your Honor.

9            THE COURT:  Okay.  How are we talking about

10   substance?

11           MR. NADAL:  We're talking about substance because

12   363, under the arguments that we are making based on In re:

13   Schauer and other cases, a transfer under Section 363 must

14   comply with state law restrictions on property of the estate.

15   That doesn't apply in a Chapter 11 plan context.  And in a

16   sense, that's also our sub rosa plan argument that we have

17   made.  That moving a Section 363 sale where the equity toggle

18   is invoked a couple days beforehand, it doesn't really matter

19   when it's invoked, but invoking this equity toggle to do what

20   you can do under a Chapter 11 plan is denying the procedural

21   safeguards that are in the Chapter 11 plan process.  Congress

22   has a Chapter 11 process, and that should be followed here.

23           THE COURT:  And what would be different if it were

24   followed here, other than the loss of eight figures' worth of

25   dollars?



Colloquy

1          MR. NADAL:  We would be proceeding under a plan with

2     the procedural safeguards that exist under it.

3          THE COURT:  What procedural safeguards are present

4     there that aren't here?

5          MR. NADAL:  There is a disclosure statement.

6          THE COURT:  What would be disclosed in the disclosure

7     statement that would cause any rational creditor or

8     shareholder of this company to vote against the plan?

9          MR. NADAL:  Your Honor, I don't know at this point.

10          THE COURT:  Okay.  Tell me about sub rosa plan

11     because when I think sub rosa plan, I think that the sale

12     dictates which creditors are going to get what.  I think that

13     it defines the contents of the plan.  How is any of that

14     happening here?

15          MR. NADAL:  Sure.  The way that is happening here is

16     because under Section 363 allows for the use, sale, or lease

17     of estate property.  It doesn't provide for the creation of a

18     debtor NewCo.  You can do and create a debtor NewCo through a

19     Chapter 11 process.

20          THE COURT:  How is creating a subsidiary not a use of

21     property?

22          MR. NADAL:  It's not a use of property because in the

23     Chapter 11 plan statutes, there is different language that's

24     used to describe that.

25          THE COURT:  Okay.  Anything more to the sub rosa plan



Colloquy

1    argument, other than the fact that a subsidiary is being

2    created?

3              MR. NADAL:  No, Your Honor.

4              THE COURT:  All right.  Please continue.

5              MR. NADAL:  Sure.  I'd like to briefly make some

6    express bankruptcy requests here.

7              The first here is in bankruptcy procedure, two quick

8    comments.  The first is that the People request that if you

9    grant the motion, the fourteen day stay and Rule 6004(h)

10   remain in place.

11             Second, again, the bankruptcy problems that exist

12   with NewCo, as I just attempted to articulate, are

13   substantive.  Debtors have not pointed to any authority that

14   you can create a new business through 363, which we just

15   discussed.  But then debtors are stuck with the 363(m)

16   problem.  In order to evade application of California law,

17   debtors are arguing that NewCo is an affiliate of debtors.  If

18   that's the case, then NewCo is not the customary third-party

19   purchaser that is entitled to 363(m) protection.

20             In addition, NewCo is not providing any true

21   consideration.  It has no assets.  It has nothing real to

22   offer debtor in exchange for the genetic data.  All it does is

23   receive this genetic data and give an IOU that it never

24   actually pays out because TTAM is the one that is paying the

25   debtors.



Colloquy

 1          THE COURT:  Okay.  So let me ask you.  If a company

 2     creates a subsidiary, at that moment, the subsidiary has no

 3     value.

 4          MR. NADAL:  Yes, Your Honor.

 5          THE COURT:  If the company puts 305-million dollars'

 6     worth of assets into the subsidiary, what is the stock of the

 7     subsidiary worth?

 8          MR. NADAL:  305-million dollars.

 9          THE COURT:  Okay.  And why is that not consideration

10     for purposes of fraudulent transfer statute?  Why is that not

11     reasonably equivalent value for purposes of fraudulent

12     transfer statute?

13          MR. NADAL:  It's not reasonably equivalent value

14     because all that NewCo has is received 305-million dollars,

15     and it wrote a note for 305-million dollars.

16          THE COURT:  What makes that fraudulent transfer?  Is

17     it an attempt to hinder, delay, or defraud creditors of the

18     debtors?

19          MR. NADAL:  Your Honor, it's not attempt to hinder,

20     delay, or defraud creditors of the debtor.  It's an attempt to

21     evade application of California law.

22          THE COURT:  Okay.  And so I understood your argument

23     to be a fraudulent transfer argument.  Does the fraudulent

24     transfer statute in California contemplate attempts to evade

25     state law?



Colloquy

1           MR. NADAL:  No, Your Honor.  What I was saying is

2    that NewCo wasn't providing consideration for 363(m) purposes.

3           THE COURT:  For 363(m) purposes?

4           MR. NADAL:  Yes, Your Honor, because the money that

5    flows in this transaction goes from TTAM to debtor.  Doesn't

6    go from TTAM to NewCo to debtor.

7           Additional 363(m) problems is that debtors have not

8    established that NewCo qualified as a bidder.  Did not

9    participate in the auction.  And I believe, I'll discuss this

10   later, the testimony shows that the equity toggle, which Mr.

11   Walper viewed as adding value and if debtors are correct,

12   permits elimination of opt in consent, which Mr. Haight (ph.)

13   used as a prohibition and extremely costly, was never

14   marketed.

15          So now, I'd like to move on to --

16          THE COURT:  Who was required to market what?  I'm

17   sorry.

18          MR. NADAL:  Your Honor, what I'm saying is that the

19   equity toggle was never marketed in the auction process.

20          THE COURT:  All right.  Was the State of California

21   going to buy these assets?

22          MR. NADAL:  No, Your Honor.

23          THE COURT:  Why do you care?

24          MR. NADAL:  I care because if there's a 363(m)

25   finding as to the transfer to NewCo, our appellate rights will

Colloquy

1    be -- there will be a statutory mootness issue.

2            THE COURT:  But what does the failure to market the

3    toggle have to do with 363(m)?

4            MR. NADAL:  363(m) requires that it's a third-party

5    purchaser for value.  And the argument I'm making here is that

6    by failing to market the equity toggle, if debtors are correct

7    that that adds value, they did not put it to the market.  So

8    there was no test of whether or not that's a proper purchase

9    price under an equity toggle.

10           THE COURT:  So step two of the transaction.  23andMe

11   sells the stock of NewCo to TTAM, a third party, for value.

12   Why doesn't 363(m) apply to that?

13           MR. NADAL:  I'm not arguing that 363(m) does not

14   apply to that.  I don't think I have established testimony as

15   to that.  What I believe that I've established testimony as to

16   is that the transfer from -- the genetic data from 23andMe to

17   NewCo is not entitled to 363(m) protection, such that if we

18   prevail on appeal, those assets can return to the estate.

19           I'd like to --

20           THE COURT:  Okay.  Please proceed.

21           MR. NADAL:  Yes, Your Honor.  I'd like to proceed to

22   GIPA.  We've had a lot of discussion about this in the

23   courtroom, and so I'd like to just focus on that GIPA applies

24   to NewCo.

25           To start, section 2.8(a) of this asset purchase



Colloquy

1    agreement still envisions a transfer or disclosure.  It says

2    sellers may elect to sell, transfer, convey, assign,

3    deliverance that over to NewCo all of the industry data, which

4    includes biological samples and genetic data.  That data is

5    leaving the bankruptcy estate, and that is unquestionably a

6    transfer, as defined under the Code.

7         Next, there was a lot of discussion about the

8    affiliate exemptions.  There is no affiliate exemption in

9    California's GIPA.  And similar to the argument raised by my

10   colleague in Tennessee in his supplemental brief, California's

11   legislature knows how to create an affiliate-ish exemption.

12        Mr. Hopkins is correct that California CCPA does not

13   have an affiliate exemption.  But it does define business to

14   include any entity that controls or is controlled by the

15   original company, meaning fifty percent or more of the voting

16   share, and has common branding.  That's California Civil Code

17   section 1798.140(d)(2).  This responds to debtors' slide 18,

18   where they're talking about how this is within, not from, a

19   direct-to-consumer genetic testing company.  California's

20   legislature knows how to create this affiliate subsidiary

21   exception.  They did it for the CCPA.  They did not do it for

22   GIPA.

23        Now, I'd like to talk about the third party issue.

24   Debtors talk about the Wesco case.  Wesco is a Southern

25   Bankruptcy Texas decision, interpreting the interplay of two



Colloquy

1    sections of an indenture agreement about an open market

2    purchase.  There, the Southern Bankruptcy of Texas had a

3    recent Fifth Circuit decision interpreting the meaning of an

4    open market purchase laws.  Southern Bankruptcy of Texas Judge

5    Isgur found that the third party at issued there, a hundred-

6    percent equity owner with control of the board, was not a

7    third party under the terms of that 2027 indenture.  The word

8    "affiliate" was a defined term in that document.  The court

9    considered the context and the intent of the parties.

10       So what debtors would have this Court do is take an

11   interpretation of "affiliate" derived from a definition in a

12   bond issuance that was interpreting an open market purchase

13   clause, where there was apparently on-point circuit level

14   decision.  That doesn't exist here.  GIPA does not use

15   affiliate.

16       Further, on GIPA, I came out in testimony that

17   debtors supported GIPA, both in their blog post and in the

18   legislative history that debtors cite in footnote 36.

19   Finally, there's another exception in GIPA.  But neither NewCo

20   or TTAM are service providers, nor do they propose to be.

21       Now, finally, on this new transaction, that why it

22   should be subject to California's Genetic Privacy Act.  And we

23   asked the Court in our brief to look through the two step.

24   This is a sale of genetic data to TTAM.  TTAM's principal

25   thinks that she's getting the genetic data.  On the most

Colloquy

1    friendly of redirects, she testified that her assumption is

2    that she is getting the assets, the data, substantially the

3    same way as before.  Now, to his credit, counsel tried to

4    salvage that testimony by asking her to confirm that she has a

5    lot of lawyers and that she relies on them to help.  But the

6    lawyers aren't even acting as if TTAM isn't getting the

7    genetic data.

8         All of the negotiated benefits in the voluntary

9    consumer protection and privacy safeguards term sheet.  What

10   debtors witness' claim add value.  All of those apply to TTAM.

11   If you look at the preamble, it says that TTAM is buying

12   substantially all the assets.  TTAM is implementing the

13   procedures.  TTAM is notifying all customers that TTAM is the

14   expected purchaser of debtors' assets.  TTAM is saying it will

15   adhere to 23andMe's privacy policy.  And then it goes on in

16   the future transfers and foreign entities section.  The entire

17   equity toggle was designed so that TTAM doesn't get the

18   genetic data because TTAM is a third-party.

19        But when asked, TTAM's principal testified that these

20   enhancements are going to apply to old and new customers.

21   That is, TTAM is getting the data.  It's getting the data of

22   the old customers.  And that's because we know what's going to

23   happen once TTAM gets NewCo.  When asked by my colleague from

24   Kentucky, TTAM's principal testified that TTAM would absorb

25   NewCo.  So they're trying to have it both ways.



Colloquy

 1             TTAM has got the limited and conditional acceptance

 2    of the different states who agreed to the newly proposed

 3    equity sale to TTAM.  That's at ECF 823.  So either NewCo is

 4    getting everything, and TTAM just has ownership and not access

 5    to any of the data, in which case all of these voluntary

 6    exhibit D enhanced protections don't apply to the old

 7    customer's data, or it's a transfer to TTAM.

 8             THE COURT:  Why can't TTAM, as parent company,

 9    implement policies applicable to its entire new corporate

10    family?

11             MR. NADAL:  It can.  That's not what they proposed to

12    do here.  They are saying that TTAM is purchasing

13    substantially all the assets.  They're providing what they

14    call enhanced privacy safeguards for TTAM's handling of the

15    genetic data.

16             THE COURT:  Under the California statute, if the

17    direct-to-consumer company is owned by a parent company, does

18    anything prevent those two companies from merging?

19             MR. NADAL:  I'm not sure, Your Honor.

20             THE COURT:  Okay.  Go ahead.

21             MR. NADAL:  In addition, I was prepared to take a

22    moment to address why, at least in California, these privacy

23    enhancements are basically illusory because California

24    requires many of these privacy enhancements.  It's more

25    protective for some of them.  But I'm not going to walk

Colloquy

1    through each one to explain where California's GIPA actually

2    is more protective, unless Your Honor would like me to.

3              THE COURT:  No, that's okay.  Thank you.

4              MR. NADAL:  All right.  So California law already

5    requires most of these things are stronger, and all that TTAM

6    is doing is exporting watered down versions of California law,

7    which, I will say, I understand why the other states that

8    don't have California's law view that as a win and as a reason

9    to either support the sale or conditionally withdraw.  But I'm

10   here representing the People of the State of California, and

11   California law gives those people more.

12             Now, I'd like to turn to Section 363(b)(1) conflict

13   preemption argument.  This is wrong for a couple different

14   reasons.  First, this isn't a preemption statute.  Debtors'

15   implied conflict preemption argument is based on out-of-

16   circuit authority.  They cite a Southern District of New York

17   case about how implied conflict preemption is appropriate

18   where state law frustrates and undermines actions taken under

19   the Code.  But debtors aren't in the Southern District of New

20   York.  We're in the Eighth Circuit.  And in the In re: Schauer

21   case, the Chapter 7 trustee made that exact same argument.  He

22   contended that state law may not frustrate the purposes and

23   objectives of federal bankruptcy law.  The Eighth Circuit

24   rejected that argument as without merit.

25             THE COURT:  I think the debtors are conceding that

Colloquy

 1    outside PII, Schauer remains good law.  But their argument is

 2    that something happened in 2005 that brought preemption into

 3    363(b)(1).

 4         MR. NADAL:  Yes.  Do you want me to discuss that now

 5    or a little bit later?

 6         THE COURT:  Go ahead.  Do it.  I don't mean to

 7    give --

 8         MR. NADAL:  No, that's all right.

 9         THE COURT:  -- you a new order of argument.  I'm

10    sorry.

11         MR. NADAL:  Yes, no, I'm aware of that argument.

12         I'd like to additionally move on and talk about how

13    debtors cite the Supreme Court Freightliner Corp. v. Myrick

14    for their implied conflict preemption argument.  That's not a

15    bankruptcy case.  And as I'll discuss in a second, the Supreme

16    Court treats bankruptcy case -- excuse me, Supreme Court

17    treats preemption differently in bankruptcy.  Even if it were

18    a bankruptcy case, Freightliner wouldn't help them because the

19    Supreme Court goes on to say that they find conflict

20    preemption where it is impossible for a private party to

21    comply with both state and federal requirements or where state

22    law stands as an obstacle to the accomplishment and execution

23    of the full purposes and objectives of Congress.

24         We already know that that second one doesn't apply in

25    the Eighth Circuit, but neither of them are present here.



Colloquy

1    Debtors have never said it is impossible to get California

2    consumers' consent.  They just don't want to.  They don't want

3    to for the reasons that Mr. Cate articulates and testify to.

4    It costs more to get opt in consent.  You get less people.

5           Now, I want to turn to that in bankruptcy courts --

6    excuse me, in bankruptcy cases, courts, including the Supreme

7    Court, regularly adopt a more restrained approach to

8    preemption.  The Third Circuit Integrated Solutions case we

9    cited in our initial objection explains that the Supreme Court

10   law has attempted -- its strangely written.  Supreme Court law

11   attempting to balance federal and state law in the bankruptcy

12   context has generally taken a similarly restrained approach to

13   federal preemption.

14          This is still a good law, and I admit it's from the

15   Third Circuit.  And that's why I'm going to talk about how it

16   is based on the recognition that when it comes to bankruptcy,

17   things are a little different.  That's something that we all

18   agree on.  Congress has the authority under Article I to pass

19   uniform laws of bankruptcy, and Congress has historically and

20   consistently chosen to allow applicable nonbankruptcy law to

21   define the nature, scope, and extent of property rights once

22   they come into the bankruptcy estate.  That's Butner v. United

23   States.  It's also the more recent Mission Products Holdings

24   v. Tempnology case, which we cited in our objections.

25          Debtors fail to grapple with the Supreme Court's



Colloquy

1    recitation of the general Bankruptcy Rule that the estate does

2    not possess more than what the debtor did outside bankruptcy.

3    Laws that apply outside bankruptcy apply inside it as well.

4            And it's getting late, but I'd like to take a brief

5    history detour here.  In Mission Products, the Supreme Court

6    traced this general Bankruptcy Rule to a 1924 Bankruptcy Act

7    case, Board of Trade of Chicago v. Johnson.  That's 264 U.S. 1

8    (1924).  I'm not going to talk about the facts of that case --

9            THE COURT:  I'm familiar with it.

10           MR. NADAL:  -- not because they're bad for me, but

11   because Chief Justice Taft in that case traces the rule back

12   even farther to the 1876 case, Hyde v. Woods.  Chief Justice

13   Taft's description of Hyde v. Woods is at pincite 8 through

14   10, and he describes about how the bankrupt in that case was a

15   member of the San Francisco Stock and Exchange Board,

16   voluntary association, and there's a right in each member to

17   sell their seat, subject to an election of the directors of

18   the vendee as a member.

19           Chief Justice Taft describes, "This court held that

20   the membership to be an incorporeal right and property which

21   passes to the trustee of the bankrupt, subject to the rules of

22   the Board", which required first the payment of all debts due

23   to the members.  It might be a little different nowadays, but

24   nearly 150 years ago, the Supreme Court held that a bankruptcy

25   estate's ability to sell property was limited by contractual

Colloquy

1    restrictions enforceable under California law.

2          Today, 23andMe wants to ignore California, and that's

3    wrong.

4          THE COURT:  And Nadal, let me ask you about

5    363(d)(1).  Trustee may use sell or lease property under

6    subsection (b) or (c) in the case of a debtor that is a

7    corporation or trust that is not a moneyed business,

8    commercial corporation, or trust only in accordance with

9    nonbankruptcy law applicable to the transfer of property by a

10   debtor that is such a corporation or trust.  That is a clear,

11   unequivocal statement that nonbankruptcy law applies --

12         MR. NADAL:  Yes, Your Honor.

13         THE COURT:  -- but not to this debtor.  To

14   nonprofits.

15         MR. NADAL:  Your Honor, can --

16         THE COURT:  Yes, please do.

17         MR. NADAL:  -- I borrow the --

18         THE COURT:  363(d)(1).

19         MR. NADAL:  Your Honor, this is a provision of the

20   law that does say that -- yes, Your Honor.  You're right.  It

21   says that.

22         THE COURT:  So I mean, it's long been puzzling to me

23   why Congress needed to say that if all nonbankruptcy law is

24   enforceable in the context of 363?  Why did they need to say

25   that with respect to nonprofits?



Colloquy

1      MR. NADAL: I'm not sure. I haven't considered

2  363(d)(1). But what I can say is that the text and structure

3  of the Code supports this argument that I'm making. And I'd

4  like to walk through, I know this is basic, but how property

5  enters and leaves a bankruptcy estate because it's important.

6      When you file a Chapter 11 bankruptcy, it creates an

7  estate under 541. We know from United States v. Whiting Pools

8  that it sweeps broadly. And 541(c) expressly states that a

9  debtor's interest in property becomes property of the estate,

10  notwithstanding any provision in an agreement or applicable

11  nonbankruptcy law that, (A), restriction or conditions

12  transfer, or (B), is an ipso facto clause. That's 11 U.S.C.

13  541(c).

14      But once property enters the estate, the ability the

15  debtor to use or sell it is more limited. And that's because

16  we know that debtors-in-possession can use 363(c) to use or

17  sell estate property in the ordinary course or outside the

18  ordinary course, as here in 363(b). And as Your Honor pointed

19  out earlier, Section 363(l) further allows the debtor to use

20  or sell estate property under 363(c) or (b), notwithstanding

21  any ipso facto clause in the contract or applicable bankruptcy

22  law. The notwithstanding clause in 363(l) is narrower than

23  the notwithstanding clauses in Section 541(c). So

24  restrictions that may have been ineffective to prevent the

25  property from entering the estate still remain applicable with



Colloquy

1    respect to the trustee's use, sale, or lease of the property
2    under 363.

3            Now, again, as I mentioned earlier and as we
4    discussed, another way for property in a bankruptcy to deal
5    with it is through a plan, and Congress includes preemption
6    language there.   Notwithstanding applicable law.   Section
7    1123(a) says, notwithstanding any otherwise applicable
8    nonbankruptcy law, a plan shall do a variety of things.   We
9    cite in our objection that that includes plan may allow for
10   transfer of property to an entity created either pre or post-
11   petition.   And then 1123(b) says, subject to 1123(a), looping
12   in the notwithstanding language, a plan can propose to sell a
13   state property free and clear of liens.

14           None of this language exists in Section 363(b)(1).
15   And as we just discussed, you don't even have to look far to
16   find true preemption language in 363.   It's in 363(l).   I'll
17   even concede that it's in 363(g), where Congress expressly
18   says that a debtor can sell free and clear of dower or curtesy
19   interests.

20           And I'd even accept a more direct preemption
21   argument, which they're making, which is that the Bankruptcy
22   Code preempts state insolvency laws that directly conflict
23   with the Code.   And that's State of Missouri v. U.S.
24   Bankruptcy Court for the Eastern District of Arkansas, 647
25   F.2d 768.   It's an Eighth Circuit case from 1981.



Colloquy

1    Respectfully, I believe that's a better case than the debtors'

2    Heart of America Grain case for direct conflict preemption

3    because it deals with bankruptcy.

4         What debtors are doing is treating 363(b)(1) as a

5    preemption statute.  What they're trying to do is transform

6    363(b)(1)(A) into either Section 1123 or 1123(b)(4) without,

7    again, as we discussed earlier, complying with the

8    requirements of a plan.

9         I want to -- that was a lot of bankruptcy stuff, and

10   I want to talk about California law and how it interplays

11   here.  California law is an applicable state law that

12   restricts transfer of property.  When 23andMe filed

13   bankruptcy, I'll concede that 541(c) says that that

14   restriction on transfer doesn't stop it from entering the

15   estate.  But now that the debtor-in-possession has these

16   things, they have to do something with them.

17        We know, based on Supreme Court and Eighth Circuit,

18   that debtors can't use 363(b) to sell in a way that

19   contravenes applicable state law.  Of course, if California's

20   Genetic Information Privacy -- sorry, GIPA imposed a monetary

21   restriction that would likely be preempted because of 363(l)

22   if it was an ipso facto law.

23        Now, I'd be remiss if I didn't address debtors' and

24   others' argument that if you don't approve this, we're going

25   to convert to Chapter 7, the DIP lender will foreclose, and so



Colloquy

1    on.  First, California law is clear.  GIPA follows the data.

2    Follows the biological samples.  If it goes to Chapter 7,

3    still subject to GIPA.  If it goes to the DIP lender, still

4    subject to GIPA.

5            Second, this would be a problem of debtors' and TAM's

6    own making.  You heard consistent testimonies that debtors did

7    not market this without the California data.  That debtors did

8    not market this with the condition that California consumers

9    provide separate and express consent.  Debtors did not market

10   deidentified California consumer data.  Debtors didn't try to

11   substantively comply with California law.

12           And I want to turn this argument around and pick up

13   on a statement that Your Honor made.  Debtors were marketing

14   an illegal transaction.  The debtor-in-possession comes into

15   possession of illegal drugs with a street value of one-billion

16   dollars, you can't sell that in bankruptcy.  We have the same

17   issue when it comes to cannabis-related businesses that can't

18   get bankruptcy relief as well.

19           But this leads to a finer point, which is that

20   debtors' business judgment in this case is wrong.  A sale of

21   assets that violates applicable California law is more than

22   just illegal.  It also opens the estate to liability through

23   an administrative claim that would be superior to the

24   professionals.  This is a point that Mr. Lefkowitz -- not the

25   priority claim, but Mr. Lefkowitz admitted that there are

Colloquy

1    serious penalties that apply.  For the 1.8-million California

2    residents, penalties for each violation would only need to be

3    170 dollars each to absorb the entire 305-million dollar

4    amount.

5         In addition, despite TTAM's principal's testimony

6    that she didn't negotiate a deal that provided separate

7    express consent, you saw just this morning that TTAM agreed

8    with the State of Alaska to get the opt in consent for

9    residents of the State of Alaska.

10        In addition, you heard Mr. Cate testify that you can

11   get opt ins.  It just costs money.  GIPA has a deidentified

12   data exception.  Debtor doesn't want that.  TTAM doesn't want

13   that.  TTAM's principal's testimony was that she didn't want

14   deidentified data only, even though the research arm of TTAM

15   can proceed with deidentified data.  They could also let

16   California consumers opt in.

17        Now, TTAM's principal testified on direct that there

18   are people who are really concerned about the data being

19   deleted.  Those people can opt in.  To the extent those people

20   are really concerned about the data of 1.8 million California

21   consumers being deleted, those people don't get to decide for

22   Californians.

23        Finally, or third, I'd like to turn to the Title 28

24   U.S.C. Section 959 argument.  Federal nonbankruptcy law

25   requires, and here I'm going to go a little farther, a



Colloquy

1    trustee, receiver, or manager appointed in any cause pending

2    in any court of the United States, including a debtor-in-

3    possession, to, as they state, comply with applicable state

4    law.  The actual language of that statute is old fashioned,

5    but that's because it's an old statute.

6         I want to jump back to 1931, when the District Court

7    for the Southern District of California, likely based out of

8    my hometown of San Diego, appointed a receiver over a gasoline

9    company.  California state law made it unlawful to distribute

10   motor fuel without license, bond, or paying taxes.  For two

11   years, everything proceeded fine, but then the receiver lost

12   his bond.  He asked the district court for permission to

13   operate without a bond or license, or there would be final

14   liquidation and material loss to all concerned.

15        Perhaps surprising no one in this room, the

16   California Attorney General objected.  The district court

17   granted the request.  My office appealed to the Ninth Circuit.

18   It reversed, based on the text of what is now 28 U.S.C. 959.

19   The case went to the Supreme Court, which agreed with the

20   Ninth Circuit.  That's Gillis v. California, 293 U.S. 62, from

21   1934.

22        The Supreme Court framed the ultimate issue as

23   whether Congress could withhold from district courts the power

24   to let receivers transact business contrary to state law.

25   Congress could do that, but it chose not to because of 28



Colloquy

1    U.S.C. 959.  Again, a hundred years ago, the Supreme Court

2    vindicated California law.  That same statute applies to

3    debtors.

4           And I'm going to bring this back to the structure of

5    the Bankruptcy Code because there's one more Supreme Court

6    case, which is Midlantic National Bank v. New Jersey

7    Department of Environmental Protection, 474 U.S. 494, from

8    1986.  There, the Supreme Court held that a trustee can't use

9    Section 544(a) to abandon property the estate in a way that

10   violates state and federal environmental law.  In that case,

11   the Supreme Court says that Title 28 U.S.C. 959(b) provides

12   additional evidence that Congress did not intend for the

13   Bankruptcy Code to preempt all state laws.  That's another way

14   you can get property out of the estate.  Abandonment.  You

15   can't abandon property in contravention of state law.

16          In sum, 363(b) isn't a preemption statute.  If

17   debtors want to use 363 to move property out of the bankruptcy

18   estate, they have to comply with applicable state law

19   restrictions on transfer.  California does not have the burden

20   here.  Debtors' burden shifting argument is premised on

21   363(b)(1)(B), which I'll turn to next, but it looks like you

22   have a question.

23          THE COURT:  I do not have a question.  Sorry.

24          MR. NADAL:  Oh, that's all right.  So even if

25   363(b)(1)(A) applies as debtors want, the sale still fails.



Colloquy

1    Debtors' proposed sale is not consistent with the debtors'

2    privacy policies for California consumers.  Today, we walk

3    through 23andMe's California privacy statements.  From January

4    1st, 2020 through December 13th, 2022, 23andMe said that they

5    do not sell California's consumers' personal information.

6    Full stop.  Rest assured.

7         We know that in March 2022, debtor had 11.8 million

8    customers.  Some of those were California residents.  They got

9    this rest assured policy twice, as Mr. Lefkowitz explained.

10   They twice confirmed their agreement to it.  We also have

11   numbers from the CPO report, which says that -- I'll

12   summarize, but eighteen-million customers.  On June 9th, 2025,

13   nearly one third of those customers have not logged in in the

14   last three years.  That takes us back to the December 13th,

15   2022 policy.  That's the rest assured policy.  We also know

16   that debtors track this information.  They could have put on

17   evidence about this.  They didn't.

18        And then from December 14th, 2022 to the present,

19   23andMe promised that it would provide notice and an opt out

20   right.  After all this time and reworking of the transaction

21   structure, the sale order and TTAM's exhibit D, whatever

22   its -- the last version I saw does not do this.  Debtors and

23   TTAM haven't even put in that California residents get notice

24   of the opt out rights that debtors required consumers to twice

25   acknowledge.  That's not quite wrong, but it shows something.

Colloquy

1    Maybe an -- well, I'll pause there.

2            I'm sure that between the time I just said this and

3    when I sit down in a couple minutes, debtors and TTAM can push

4    out a new version of their agreement that says you have a

5    right to opt out.  If that was all it took, we wouldn't be

6    here because in a sense, the State of California, it doesn't

7    matter what debtors' privacy policy says.  And that's because

8    of the company's privacy policy violates applicable state law.

9    It is illegal and void as against public policy.

10           Debtors' 363(b)(1) argument creates perverse and

11   improper incentives, and this Court should not endorse it.  If

12   debtors' argument is correct, two minutes before filing a

13   bankruptcy petition, any company can reissue a privacy policy

14   to say that the company can do whatever it wants with the

15   person's most sensitive and private data.  Now, that didn't

16   happen here, but their interpretation allows it to.  And

17   that's an absurd result.

18           I appreciate Mr. Cate's commitment to this point, but

19   I think I can also salvage the potential inconsistency there.

20   In normal circumstances, Mr. Cate views privacy policies as

21   contracts.  But then once the legislature acts, it's the law.

22   It becomes something more than just a contract.  Companies

23   have to comply.

24           Mr. Cate's position that if a company violates state

25   law, the state Attorneys General can take action, but then



325

Colloquy

 1    once they file bankruptcy, it's too late, that's an untenable

 2    position.  I don't practice in the privacy arm at the

 3    California Attorney General's office, but I know that both

 4    TTAM and 23andMe have very good privacy lawyers.  I'm pretty

 5    sure they don't want the state AGs to immediately jump to

 6    filing declaratory judgment lawsuits or lawsuits for violation

 7    of state policy the moment there's an issue spotted.  Debtors'

 8    interpretation leads to that result.

 9         In addition, it wouldn't even matter because even if

10    the state AGs filed a lawsuit, two minutes before a company

11    files bankruptcy, they can change the policy again, even if

12    there's a consensual resolution of the privacy policy issues.

13    Now, this is also more than just a legal argument.  It's also

14    a factual one.  23andMe did not intend for their privacy

15    policies to violate state law.  Mr. Lefkowitz said at

16    paragraph 11 that the U.S. state privacy statements are

17    designed to comply with laws specific to those jurisdictions.

18         TTAM's principal said they wanted privacy policies to

19    comply with state law and their blog post that has trumpeted

20    the passing of California's GIPA as if their policies complied

21    with it because again, if your policies don't comply with the

22    law, it can't enforce them, and you're subject to potential

23    liability.

24         This brings me full circle back to the beginning.

25    You've heard a lot about privacy from a lot of different



Colloquy

1    people.  Mr. Cate has a view.  Mr. Richards has a view.

2    TTAM's principal has a view.  But in this circumstance, GIPA

3    applies.  GIPA was passed by the elected California Senate.

4    I'm sorry.  Was introduced by the elected California Senate.

5    Passed by the elected California Assembly.  Signed by the

6    elected governor.  And now being enforced by the elected

7    Attorney General's Office.  Despite all that, GIPA doesn't put

8    the issue to any of those individuals.  GIPA puts the relevant

9    question to the California consumer.  The company wants to

10   sell your sensitive and private information.  They have to get

11   your consent.

12           So really, it doesn't matter what TTAM's principal

13   thinks.  It doesn't matter what debtors think.  It doesn't

14   really matter what I think because California law puts that to

15   the 40-million California consumers, or here, 1.8 million

16   California consumers.  Debtors propose to usurp that for the

17   1.8 million California consumers.  Why?  Because it costs

18   money to get their consent.  They don't want to do that.

19           This is a 363 sale.  GIPA applies.  For the 1.8

20   million consumers, debtor has to get their separate and

21   express consent.  Debtor could do this, but they refuse to do

22   it.  The People request that you deny the motion.  I also

23   available to answer any further questions.

24           THE COURT:  Don't think I have any more.  Thank you.

25           MR. NADAL:  Thank you.



Colloquy

1          THE COURT:  Texas.

2          MS. MILLIGAN:  Thank you, Your Honor.  Layla Milligan

3    with the Texas Attorney General's office, appearing on behalf

4    of the State of Texas.

5          I want to reset the conversation a little bit as far

6    as Texas goes because as probably is not a surprise to anyone

7    in this room, Texas, in my view, has quite a different special

8    circumstance that is different from the other states and in my

9    view, puts Texas in a different position because under Texas

10   law, under the direct-to-genetic -- I'm sorry, Direct-to-

11   Consumer Genetic Testing Act, which I'll call the DTC law,

12   that law grants a specific -- I'm going to read it.  I'm

13   sorry.

14         503A.003 of the Business and Commerce Code -- of

15   Texas Business and Commerce Code creates an exclusive property

16   right in DNA and confidentiality of that information.  And I'm

17   reading the Code.  "An individual has a property right in and

18   retains the right to exercise exclusive control over the

19   individual's biological sample that is provided to you were

20   used by a direct-to-consumer genetic testing company, and the

21   results, genetic testing or analysis, conducted on the

22   individual's DNA by a direct-to-consumer genetic testing

23   company, including to the collection, use, retention,

24   maintenance, disclosure, or destruction of the sample or

25   results.  The results of the genetic testing of an

Colloquy

1    individual's DNA are confidential and may not be disclosed to

2    another person without the individual's express consent."

3        The reason I think this part -- and I want to pause

4    there because I want -- a direct-to-consumer genetic testing

5    company is defined as an entity that offers genetic testing

6    products or services directly to individuals as consumers of

7    those products or services or collects, uses, and analyzes

8    genetic data that results from a direct consumer genetic

9    testing product or service.  And that, in this case, is we

10   would posit as 23andMe, Inc.  That is the company that has

11   been doing the direct genetic testing.  It is not an umbrella

12   of companies.  It is the company, the entity, that is doing

13   the direct-to-consumer genetic testing.

14       This is important because under 541, the property of

15   the estate consists of the debtor's interest in property, and

16   that interest in property retains any restrictions that may be

17   applicable to that property under 541(c)(1)(A).

18       The debtor is saying we agree.  We only own what we

19   own.  But that ownership that they're trying to transfer --

20   that ability to transfer is limited to the data for

21   individuals who give express consent.  So that express consent

22   is an additional requirement on that property aspect that the

23   debtor is claiming.  So under Texas law, that property is not

24   property that can be sold by the debtor because it is property

25   of Texas consumers as expressly indicated in the statute and

Colloquy

 1    also comes with a restriction.  I want to say --

 2            THE COURT:  And that's 003 you're talking about?

 3            MS. MILLIGAN:  503A.003.

 4            THE COURT:  Okay.  So if 003 on its own prevents

 5    transfer of the genetic material, why do we have 006 which

 6    talks about the transfer of disclosure of genetic data?

 7            MS. MILLIGAN:  Well --

 8            THE COURT:  Why do we need that?

 9            MS. MILLIGAN:  Thank you for asking that question.

10    It is not banning the sale or transfer or disclosure of the

11    asset.  It is only upon the individual's express consent.

12            THE COURT:  But why does the statute say that twice,

13    effectively?  Your interpretation of 003 is the same as 006 as

14    I understand it.

15            MS. MILLIGAN:  It's very similar.  I think 003 gives

16    the individuals a property interest in their genetic data very

17    specifically.

18            THE COURT:  But your argument is that property

19    interest, the bundle of sticks that the consumer has, includes

20    the right to prevent transfer.  So what do we need 006 for?

21            MS. MILLIGAN:  It requires -- I'm sorry.  503(A).006

22    provides that this company must -- the DTC company engaging in

23    the following activities must obtain separate express consent

24    for the transfer or disclosure of the individual's genetic

25    data to a person other than the company's vendors or service



Colloquy

1    providers. So it's not saying you can't sell it, it's saying

2    you can sell it after you get the individual's express

3    consent.

4             THE COURT: But you're arguing that 003 does the same

5    thing all on its own, aren't you?

6             MS. MILLIGAN: I think they work in --

7             THE COURT: And I'm not being critical, but you

8    brought up the property interest almost every time you're at

9    the lectern. And it seems to me that your argument is that

10   that's the showstopper, the property interest. The right to

11   prevent transfer is inherent in the property interest.

12   Nothing else matters. So what is 006 doing in the statute?

13            MS. MILLIGAN: 006, I think, provides the -- like, as

14   I said, the last sentence of 003 says "without the

15   individual's express consent". And then 503A.006 discusses

16   the required consent. And so in that, it works together.

17   503A.003 gives the exclusive property right and limits that

18   property -- the transferability of that property right. It

19   conditions it upon express consent. 503A.006, it discusses

20   the required consent is what I would say. And it all works

21   together.

22            THE COURT: But 006 seems to permit transfer to a

23   vendor. Isn't that inconsistent with the property right in

24   003 as you construe it?

25            MS. MILLIGAN: No, sir. And I will say that while a



Colloquy

 1    vendor or service provider is defined in the Texas -- I'm

 2    going to say it wrong.  The TDPSA, which is -- I will

 3    apologize, I have not looked at the Texas Data Protection.

 4    I'm sorry, my consumer privacy at --

 5                THE COURT:  The general privacy statute you're

 6    talking about?

 7                MS. MILLIGAN:  Yes.  The general privacy statute.

 8                THE COURT:  Yes.  Okay.  I know the one you're

 9    talking about.

10                MS. MILLIGAN:  Yes.  That further defines -- I'm

11    sorry, Your Honor, I completely lost track when I couldn't

12    figure out what the TDPSA is.

13                THE COURT:  Well, let me ask a related question.  Why

14    does 006 allow a transfer to a vendor without express consent?

15                MS. MILLIGAN:  Yes.  I'm sorry.  Thank you for the

16    reminder.  A vendor or service provider is specifically

17    defined in the Texas Data Privacy Security Act, TDPSA.  And it

18    is meant to allow the company to use the services of, like,

19    Labcorp in this case, or another entity with which they have a

20    specific contractual relationship with restrictions that are

21    complied with under Texas law.

22                THE COURT:  Okay.  But the consumer doesn't have a

23    relationship with Labcorp, for example.

24                MS. MILLIGAN:  Yeah.  The vendor has the contract

25    with the direct-to-consumer genetic testing company.



Colloquy

1       THE COURT:  So the Legislature has made a

2   determination that that's the sort of thing that a consumer

3   can't reasonably object to because it doesn't harm them.

4   Disclosure to a vendor doesn't harm the consumer, right?

5       MS. MILLIGAN:  The purpose of the vendor and the

6   service provider is to facilitate the analysis of the genetic

7   data.  So in this case, I think 23andMe uses various research

8   labs, things like that, that can do the service.  It's not

9   just sort of any vendor that has access to this.  There are

10  specific codified contract agreements that would be reached

11  between the vendor or service provider and the direct-to-

12  genetic testing.

13      THE COURT:  Right.  But the Legislature has said,

14  consumer, you can't object to that.  And the reason is that it

15  doesn't harm them, right?

16      MS. MILLIGAN:  I agree with that because the vendor

17  and service provider is facilitating what the direct-to-

18  consumer genetic company is doing.

19      THE COURT:  Right.  So if a direct-to-consumer

20  company creates a subsidiary to house its data, how is that

21  objectionable?

22      MS. MILLIGAN:  Because the entity that is housing the

23  data is changing.  It is even -- if it is a subsidiary, we

24  would argue that the actual company that does the direct-to-

25  genetic testing in this case, again, 23andMe, Inc., would be

Colloquy

 1    in violation of this statute if they transferred it to

 2    Lemonaid Health or another corporate entity of the debtor.  So

 3    a subsidiary does not solve that issue because its control

 4    disclosure to an entity that is not the company.

 5            THE COURT:  But you would agree with me, wouldn't

 6    you, that there is less risk to the consumer from a transfer

 7    from parent company to subsidiary than a disclosure from

 8    parent company to third-party service provider, isn't there?

 9            MS. MILLIGAN:  I --

10            THE COURT:  There's only one way to hack a

11    corporate -- I'm going to oversimplify.  There's one way to

12    hack a corporate family.  If you have data at Labcorp, Labcorp

13    could get hacked.  I hope nobody from Labcorp is listening.

14    I'm not picking on Labcorp.

15            Labcorp can get hacked and 23andMe could get hacked.

16    But the Legislature said under the circumstances, that's a

17    risk that the consumer's got to take, right?

18            MS. MILLIGAN:  I think because of my understanding,

19    and albeit I'm a bankruptcy lawyer, not a privacy lawyer, but

20    the restrictions and arguments between the vendor and the

21    service provider -- I'm sorry, the DTC company and the service

22    provider or vendor would control that relationship in any

23    breach -- or any sort of security protocols would be a part of

24    that underlying contract between there -- between those two.

25            But when you create a subsidiary and -- I plead -- I



Colloquy

 1   want to be clear, I cannot substitute my opinion for the Texas

 2   Legislatures.  They have passed this law and said a DTC

 3   genetic testing company can conduct its business with its

 4   vendors and service providers pursuant to the restrictions in

 5   the TDPSA or other Business and Commerce Code sections.

 6        But the control of the DNA, the biological samples,

 7   the results, the information, the raw sequence of DNA has to

 8   stay with that company.  And it can only be changed once the

 9   consumers have given their permission and express consent,

10   which is a defined term.

11        THE COURT:  So Ms. Milligan?

12        MS. MILLIGAN:  Yes, sir.

13        THE COURT:  Do you know whether in the last eighteen

14   years, 23andMe has moved the data somewhere within its

15   corporate structure?

16        MS. MILLIGAN:  Unfortunately, I don't.  And I think

17   that the State of Texas -- I don't want to speak out of turn

18   because it's a consumer protection issue -- but I think one of

19   the issues leading up to where we are today was a lack of

20   clarity as to which entity is the one doing the actual

21   service, which is a problem -- a concern for Texas.  It's my

22   understanding that the majority of the information that we've

23   received pre-bankruptcy was from 23andMe, Inc.

24        But in this case, in the debtor's schedules, it has

25   been unclear really which entity has control of the genetic



Colloquy

1    data, who's doing the actual processing and work.  And so

2    that's why I say I believe it's 23andMe, Inc. is because

3    that's the information and that's the entity that has been

4    communicating with Texas prior to this bankruptcy case.

5           THE COURT:  Okay.  Let me ask you some of the

6    questions I asked Mr. Nadal.

7           MS. MILLIGAN:  Yes, sir.

8           THE COURT:  The gist of your argument is that the

9    debtors need to confirm a plan, liquidate or spend I don't

10   know how much money trying to get consents and probably not

11   get very many of them, at which point there is a real question

12   whether TTAM has gotten the benefit of its bargain, whether

13   it's getting what it's paid for.  It's getting something, but

14   would it have paid 305 million dollars for that?  I doubt it.

15   I can't say.  So is confirming a plan better for Texas

16   consumers?

17          MS. MILLIGAN:  If I may, I don't know that that's all

18   of our position.  But I will say confirming a plan allows for

19   the process under Chapter 11, 1129, and the plan to be

20   proposed, disclosed consumers would have consent or they'd be

21   able to vote if they have claims.  They would have knowledge

22   of what's going on.  They would be able to participate in that

23   plan process should they so choose.  That's not what's

24   happening here.

25          But I understand the cost that would be incurred.



Colloquy

1     But what I'm balancing here is we have a law that specifically

2     lays out a Texas consumers property right.  And if the

3     debtor -- we have -- yeah, I think it's been suggested, like,

4     Texas could be carved out.  Texas could get express consent

5     for their consumers.

6              The de-identified data, which as I understand is

7     eighty percent of the data that TTAM is interested in, could

8     be transferred because de-identified data is treated

9     differently under our statute.  It's the identified data -- or

10    identifiable data that is restricted to express consent.

11             We saw the filing by Alaska indicating that they had

12    a process with transferring research, consented transactions

13    that is probably -- would be perfectly compliant with Texas

14    law should the debtors and TTAM choose to proceed that way.

15             And I would note that what we've understood is Texas

16    consumers compromise about 840 to 860,000 of the 13 million

17    consumers of 23andMe.  And so I'm not arguing necessarily that

18    the sale is -- I mean, I have, as a bankruptcy attorney, have

19    some issues with the sale that's being proposed.  Setting that

20    aside, if the Court is inclined to approve the sale, would --

21    I think there are alternatives for the treatment of the Texas

22    consumers that would be in compliance with the law.  And --

23             THE COURT:  But what power do I have to tell TTAM I'm

24    going to change the deal and you've still got to pay 305?

25             MS. MILLIGAN:  I think in their APA, they have a plan



1    toggle which is contemplated.  They already have a plan toggle

2    for Lemonaid Health.  I don't think it's beyond --

3            THE COURT:  But if we plan -- if we plan toggle,

4    they're not going to seek consent from a soul in Texas.

5    They're not going to do it because it's not required.

6            MS. MILLIGAN:  I --

7            THE COURT:  So what have we accomplished?

8            MS. MILLIGAN:  In this process, the one that is

9    before us today, the debtors are proposing under 363 to sell

10   the data of Texas consumers that they own their data.  And I'm

11   not talking about the other assets.  I'm not talking their --

12   but their genetic identifiable data without their consent as

13   provided under Texas law.

14           This is a law that was enacted after -- I believe,

15   after the Ancestry.com situation.  Because I think the

16   Legislature considered the private genetic testing company

17   sort of a gray area because it wasn't a healthcare provider

18   necessarily, which has some exemption under our law.

19           And they wanted to reaffirm that Texans have a right

20   in their genetic data and have control over their genetic

21   data.  This is a very as -- and I know that you know, this is

22   a very specific case involving genetic data of individuals

23   that they have voluntarily given for analysis, maybe ten --

24   maybe twenty years ago.

25           But having that information, their genetic samples,



Colloquy

1    their bio samples, their saliva, their blood transferred,

2    disclosed to a different entity than the one they contracted

3    with under Texas law requires their consent.

4         So I am not saying that this is a situation where

5    we're trying to completely undo the sale.  I understand.  We

6    have consistently, from the beginning of this case, shared

7    that this is Texas law and we believe it has to be enforced.

8    The express consent is -- has been there since the beginning

9    of this case.  We've put it in our motion to appoint a CPO.

10   We've had these discussions informally with the parties.  We

11   have said Texas is special in this way in that these folks

12   have this property interest in this that is conditioned, and

13   you cannot sell it in the way that you're proposing to sell

14   it.

15        That sale transaction, I would say, has morphed over

16   time.  And it is -- I will add, it is a gray area because

17   there was a bidding process.  Regeneron was the winning

18   bidder.  There was a subsequent motion filed to reopen the

19   bidding.  And I think that motion was filed -- I'm sorry --

20   June 6th was the order entered.  June 10th was the objection

21   to plan deadline for the parties who wanted to object.  The

22   revised APA was filed on a Friday the 13th.  A plan toggle --

23   or I'm sorry, the equity toggle was elected on Saturday the

24   14th, and on June the 18th, four days later, we're here before

25   Your Honor trying to approve this process.



Colloquy

1         And so the benefit of Texas consumers to having at

2    least their data involved in a plan is that they would at

3    least have notice of what's going on.  And I would note that

4    debtors do refer to their notice that they sent, that they

5    filed on the docket that was sent on, I think, on June 11th.

6    Started to be sent on June -- which was before the equity plan

7    toggle also.  It also says nothing about genetic data.  The

8    notice does not reflect genetic data in the terms anywhere

9    therein.  It's personal information.

10        So I would argue that while a plan would be costly,

11   they have considered that there is going to be a plan for the

12   Lemonaid Health aspect of this business.  They have a plan

13   toggle should Your Honor believe that the sale should not be

14   approved.  This is something they're contemplating.  We

15   certainly don't want to risk a transaction that is beneficial.

16   But also we can't risk the Texas consumers who own this data

17   and may not agree to have it transferred and opt out.

18        Deletion options, it is required under Texas law.

19   That is not a concession.  It's required.  It's not a

20   concession by TTAM.  It's required under Texas law that

21   individuals have opt out or data deletion rights.

22        But that's not what express consent is defined as

23   under the Code.  It is affirmative express consent.  That

24   could be by email.  That could be done over time if TTAM were

25   to isolate the material and not access it until that consent



Colloquy

1    is reached.  There are ways to work around this process.

2          But on a basic level -- very high level, the value of

3    the Texas consumers' property interest in their saliva, in

4    their blood, in their test results, in their deceased father's

5    information, in their future -- I have learned for the first

6    time in being involved in this case, that people would use

7    23andMe to identify parental -- like parents.  So there is a

8    lot at stake.  Their children who have data out there.

9          This consent is innate in this legislative -- this

10   law that was created and signed by elected officials.  I don't

11   know to what extent Your Honor would like for me to talk about

12   363(b)(1)(A) or (b)(1).  I do think that in this case, I --

13   this is going to sound like a complaint, but this case, one,

14   has moved very quickly, and I know bankruptcy does move

15   quickly.  And that's not to be unexpected.  What is different

16   in this case is that the transaction has changed pretty

17   significantly from a straight up --

18         THE COURT:  I disagree that that's different.  That

19   happens all the time.

20         MS. MILLIGAN:  I think the nature --

21         THE COURT:  It happens all the time.

22         MS. MILLIGAN:  The nature of the equity structure is

23   what is different, because I think initially Regeneron had won

24   the bid and had a specific sale under 363.  And then we

25   switched to this equity structure, which does resolve the

Colloquy

1    TDPSA.  But it doesn't resolve this element of the DTC Act.

2         But throughout this process, there has been a

3    significant amount of gray as far as we have -- we have sought

4    more information to confirm that the genetic data was even

5    part of the sale.  We saw it and asked to even just listen in

6    to the auction to understand what was being bid on.  It was

7    not clear that the genetic data was part of the transaction

8    because it was differently defined.  And the information we

9    got was very generic and very open.

10        But along with the gray area, in our view, is the

11   privacy policies involved in this case, and the assurances

12   that the debtors and their principals have made to consumers

13   is wholly inconsistent.

14        I would even refer the Court to the statement that we

15   admitted in earlier of Joe Selsavage to the House and the

16   Senate, where he in -- this is his statement -- prepared

17   statement submitted to the House and the Senate, not

18   testimony.  But even he says we follow strict security

19   protocols and privacy principles, including explicit consent.

20   We never share individual level data without the user's

21   consent.

22        So I think that that -- and that was June 10th and

23   June 11th.  So I think there's inconsistency.  I don't want to

24   argue the DTPSA because that's not in our pleadings.  But if a

25   company is able to make representations that are wholly



Colloquy

1    inconsistent in their privacy policies and then ask this Court

2    to only enforce the one paragraph at the end of the document,

3    that works for them.  I think that is very risky in a

4    precedential way.

5           And specifically in the same way that my colleague

6    from California indicated that a company could change their

7    policy that they've represented to their consumer, their

8    customers, very shortly before filing bankruptcy and then

9    propose a sale that is violative of state law, or federal law

10   for that matter, it's not something that I think is -- I think

11   for public policy argument it's very concerning that a company

12   would be allowed to modify its privacy policies to facilitate

13   something that it couldn't do under state law.

14          And I don't believe the parties can contract around

15   state law, can't bypass state law.  There are different

16   provisions in the Code that contemplate the consideration of

17   non-bankruptcy law, and 363(b)(1)(B) does just that.

18          We have an appointed consumer privacy ombudsman.  His

19   report is in evidence.  His concern was with the disclosure of

20   data, disclosure of policies to consumers, what they really

21   would understand.  And coupling with the property interests

22   that Texas consumers have, this is not something -- the

23   concern is that this has become an exercise to adapt a sale

24   that ultimately is -- I hear to an affiliate, not an

25   affiliate, separate company, not a separate company.  I think

Colloquy

1    this would just be --

2              THE COURT:  All right.

3              MS. MILLIGAN:  -- testified --

4              THE COURT:  Each side can accuse the other of

5    elevating form over substance, and parties are acting and

6    reacting.  But --

7              MS. MILLIGAN:  Sure.

8              THE COURT:  -- we're pushing our luck timing wise,

9    Ms. Milligan.

10             MS. MILLIGAN:  Okay.

11             THE COURT:  Anything further you want to cover?

12             MS. MILLIGAN:  Yes.  I did want to add that we do

13   believe -- we do object to the sale under 363(f).  We don't

14   believe it meets with the requirements of 363(f), and the free

15   and clear -- Texas law doesn't permit the transaction as

16   proposed as far as Texas consumers.  And I'm not speaking to

17   the rest of the state law, the Texas consumers have not

18   affirmatively consented to the transaction.  This is genetic

19   data.  It's not reducible to a lien.  It's not a lien on this.

20   They're not in dispute.  And these folks cannot reduce their

21   genetic data to a claim to be paid.  And so we are concerned

22   with the request.

23             And at a high level, the two-step process is

24   ultimately a party -- an insider taking back control of her

25   company, and it's been described as an affiliate, a change of

Colloquy

1   ownership.  That's a restructuring process in a plan.  It's a

2   363 sale is a sale of assets.  So I just want to be clear that

3   we believe that there are troubling concerns with the sale,

4   but if this Court is willing to approve the sale we would ask

5   that the Court consider carving out the Texas assets, allowing

6   the debtors to toggle that to a plan that's just the Texas

7   identifiable genetic data.  Potentially have similar treatment

8   to what Alaska was afforded.  And because there is a plan

9   toggle, it's not an unreasonable ask.  And it allows the

10  debtor's transaction to complete, but also allows for a

11  process for them to follow Texas law and respect the property

12  interests and rights of Texas citizens.

13          So I think with that -- also, I'm sorry.  I do think

14  that my colleague from California referenced Henry Shower

15  (ph.).  I think that was the case that I mentioned earlier and

16  another case involving a dairy farm, but I'm not sure that

17  that dealt with genetic data, so I won't bother the Court with

18  it.

19          THE COURT:  Very good.

20          MS. MILLIGAN:  That's all for now.  Thank you, Your

21  Honor.

22          THE COURT:  All right.  Thank you, Ms. Milligan.

23          Other states in opposition?

24          MR. HUNT:  Hi, Your Honor, I think I'm up next.  If

25  you'll allow me.



                                    Colloquy

 1              THE COURT:  Yeah.  Go ahead, Mr. Hunt.  Yeah.

 2              MR. HUNT:  Unless Utah was like --

 3              THE COURT:  Go ahead, Mr. Hunt.

 4              MR. HUNT:  Oh, I'm sorry, I apologize.  You're

 5      referring to folks in the courtroom.  I --

 6              THE COURT:  Okay.  We'll go to Tennessee next, all

 7      right?

 8              MR. HUNT:  A bad case of senioritis.  So I would

 9      defer to my colleague from Tennessee.

10              THE COURT:  All right.  He's deferring to you.

11              MR. CLEMENTS:  I appreciate that.  Marvin Clements on

12      behalf of the State of Tennessee.  I think I've heard some of

13      the Court's concerns here about why is the states -- why are

14      the states coming in trying to undo this deal that has

15      benefits for their residents and their citizens.  And I want

16      to assure the Court we're not coming in just as a wrecking

17      ball, just for the sake of destroying the sale, and seeing

18      what happens as a result of that.

19              There's important principles of state sovereignty at

20      issue for the states to be able to pass their own laws and

21      have them be enforceable with the understanding that there is

22      the principle of federalism with the Supremacy Clause.  And if

23      the federal law does override state law, then it has to give

24      way to that.  But where it doesn't, the states have the

25      ability to expect their laws to be complied with.  And that's



Colloquy

1    what we're seeking here.

2           We're not seeking even to destroy the sale or stop

3    the sale wholesale.  We're just seeking to have it done in a

4    way that's compliant with Tennessee's TIPA law.  And

5    particularly with the part that requires the separate express

6    consent or an opt-in for the -- when a direct genetic testing

7    company transfers, or uses, or discloses information to an

8    entity other than -- or a person rather other than service

9    providers or vendors.  And that's not what we have here.

10          So we're clearly of the position that this is a sale

11   to which the GIPA does apply.  There is no third-party

12   requirement.  I mean, some of the statutes have said that if

13   you -- it's to a third-party, you have to get the separate

14   express consent.  That's not Tennessee statute.  It's just to

15   any person, which is also defined as individual corporation,

16   business partnership, limited liability company, or other

17   business entity.

18          And if it is going to be a transfer or disclosure to

19   one of those types of persons separate express consent of the

20   of the consumers whose data is being disclosed or transferred

21   have the under the GIPA to receive prominent, clear,

22   meaningful notice of the sale transaction.

23          And I think it's -- this case, kind of, to me -- or

24   to the State shows why that's so important.  Because here

25   there is this complicated transaction that's being done with

Colloquy

1   creating a NewCo, transferring all the assets to that, then

2   using an equity sale to have those -- that control of that

3   wholly owned subsidiary go to a new purchaser, TTAM in this

4   case.

5        And here if they said -- I think there's been a lot

6   of testimony about people signed up for property being able to

7   be sold during their -- during the case of a bankruptcy.  But

8   it's inconceivable that consumers would think my data is going

9   to be sold from the company I signed up with, through this

10  complicated process, to the same person that caused the data

11  breaches in this -- or was running the company when the data

12  breaches in this case happened.  That had the company that

13  ended up going into bankruptcy.

14       And while the consumers could say, we did contract

15  with her before, we trusted the judgment of 23andMe and the

16  principles that stood for and the policies that it had, and we

17  do -- we want to continue on through this new transaction.

18  But that's why it's so important to let the consumers be the

19  ones that have that separate express consent.

20       THE COURT:  So Mr. Clements, I certainly understand

21  your point about state sovereignty and that sort of thing.  As

22  you probably have guessed, what I'm struggling with is the

23  idea that your legislature has not regulated ownership of a

24  direct-to-consumer company.

25       MR. CLEMENTS:  That's correct.



Colloquy

1    THE COURT:  And the debtors can change ownership to

2    not only Ms. Wojcicki, but pretty much anybody else they want

3    to without violating state law if they do it in a certain

4    form.  And so what principle are we really establishing here?

5    MR. CLEMENTS:  I think we're giving way to the

6    Supremacy Clause of the Bankruptcy Code.  And if there's a

7    plan mechanism set out in the Code that's going to allow that

8    kind of a transfer to happen through an equity resolution --

9    through a plan, then the states recognize supremacy.  I mean,

10   we don't --

11   THE COURT:  But this is the same issue -- same

12   discussion I had with Mr. Nadal.  It doesn't even need to go

13   there because your state statute doesn't have anything to say

14   about a recapitalization of this company with new

15   stockholders.

16   MR. CLEMENTS:  Right.  But it does about this

17   transfer to this this NewCo.

18   THE COURT:  Right.  So I mean, I -- and don't take

19   this the wrong way.  This is a spirited discussion.

20   MR. CLEMENTS:  Yes, sir.

21   THE COURT:  It seems to me that what you're saying is

22   that the debtors can do what they want to do, as long as

23   they're willing to spend 15 million dollars to get from here

24   to there.  I mean, isn't that what it comes down to?  I'm not

25   sure that number is right, but it's --



Colloquy

1      MR. CLEMENTS:  Yeah.  I mean, I think that what it

2   comes down to is there is a mechanism in place that was put in

3   place by Congress to go through the plan process where the

4   states recognize that there is that process.  Outside of that

5   process, to come in and say, well, we're going to do this with

6   a different process and your laws don't apply.

7      We submit that they do, that they're not preempted,

8   and that once we've gotten to the consumer privacy ombudsman,

9   we're asking that all the circumstances of the case be looked

10  at and then find that there's not going to be a violation of

11  our rightly passed laws.

12     THE COURT:  Well, let me take it out of the

13  bankruptcy plan context.  I mean, as I understand it, the

14  debtor's securities are traded on the pink sheets now.

15     MR. CLEMENTS:  I'm sorry.  Say that again, please?

16     THE COURT:  As I understand, the debtor's equity

17  securities are trading on pink sheets now.  So Ms. Wojcicki,

18  at 9:30 Eastern time tomorrow, can sell her twenty percent

19  interest -- or forty-nine percent interest in this company to

20  anybody she wants.  And Mr. Viscito, I don't know how much he

21  owns, but let's say he owns at least two percent, and he

22  could -- the two of them could sell majority control of this

23  company to anybody they want.  And Tennessee law, and the laws

24  of these other states, don't have anything to say about that,

25  right?

Colloquy

 1              MR. CLEMENTS:  I think that's the case.  And that's
 2     a -- that's something that the Legislature is going to have to
 3     exercise its sovereign responsibility and come up with a way
 4     to address that, or if they choose to have that as the way
 5     that these transactions get done, then they can leave it as it
 6     is.
 7              THE COURT:  Okay.
 8              MR. CLEMENTS:  So I mean, I don't think it's
 9     necessary for me to go through and talk about all the --
10     sorry, I just lost my train of thought.
11              THE COURT:  That's okay.  That's all right.
12              MR. CLEMENTS:  I'll keep going on that.  So I think
13     that what we're saying is if they're going to do the
14     preemption of the state law, you have to go consider several
15     issues and questions that -- it's in my case, I cited in my
16     brief, Sears.
17              And these questions are we going to look and see is
18     the state law explicitly preempted by federal law?  And I
19     don't think the genetic data is explicitly preempted by the
20     federal law here.  Is the state law implicitly presented
21     because Congress has regulated the entire field and it has
22     not.
23              Is the state law implicitly preempted because
24     compliance by a private party with federal and state law is
25     impossible?  Again, it may be more expensive.  It may be more

1    time consuming.  It may require that they look to do it in a
2    different way that has been around for such a long time that
3    it's a known way of doing this.  But facts of expedience or
4    saving money, that's not a basis for preempting rightfully
5    enacted state law.

6           And then the fourth is, is it implicitly preempted
7    because it creates an obstacle to accomplishment of the
8    execution of the full purpose of the federal law.  And we
9    would argue that it's not because the federal law recognizes
10   there's going to be swings and sways, pluses and minuses, and
11   we're still going to have people coming into bankruptcy,
12   seeking to reorganize and get the value for the estate, still
13   recognizing the comedies of sovereign states and other
14   lawfully acted -- enacted rights.

15          I just wanted to take a just a brief minute.  I think
16   I already talked about it a little bit, about that why the
17   state law applies.  Tennessee has also enacted a TIPA, a
18   Tennessee Information Protection Act.  And in that act, the
19   Legislature specifically made provisions for opt outs.  They
20   also specifically made provisions for treatment of affiliates.
21   And so we -- they knew how to create these exceptions for
22   affiliates.

23          They didn't in the GIPA.  They talked about
24   affiliates in dealing with hospitals and affiliated entities
25   or academic medical research organizations and their



Colloquy

1    affiliated entities.  But again, it did not go so far as to

2    make a carve-out for compliance with separate consent for

3    affiliates.  It's strictly just vendors and service providers.

4            And I think Your Honor was asking some questions

5    about that earlier.  And that's one of those prerogatives

6    where it makes sense for a company to be able to contract and

7    hire people to do the services that people came to the debtor

8    to have done with their -- test their data, process it.  And

9    there's all -- there's that -- that's an acceptable carve-out

10   for the legislature to do as opposed to create -- allowing

11   this transfer to some different entity that then can sell its

12   equity.

13           I think that was all that I really needed to say.  I

14   would also rely on my brief.

15           THE COURT:  Sure.

16           MR. CLEMENTS:  And if the Court has any other

17   questions, I'd be happy to try to answer them to the extent I

18   have.

19           THE COURT:  I don't think I have any more.  Thank

20   you.

21           MR. CLEMENTS:  All right.  Thank you.

22           THE COURT:  All right.  Mr. Hunt.

23           MR. HUNT:  Thank you, Your Honor.  At the risk of

24   being -- I mean, looking at this the wrong -- or taking this

25   the wrong way, I just wanted to say I appreciate your



Colloquy

1    bandwidth, your ability to absorb all of the information that

2    we've had today, so.  And I know the hour's late, so I will be

3    brief.

4            I think I already mentioned this earlier, and it's in

5    my brief, so I'll just say that Kentucky statute -- and I will

6    bypass the other detailed bankruptcy specific arguments

7    here -- I will commend those to your judgment and the

8    arguments you've already heard.

9            But Kentucky Revised Statute 311.705 clearly requires

10   separate express consent before there is a transfer.  We had a

11   lot of discussion about the nature of the transaction and so

12   forth.  Our position is quite simply that those constitute

13   whatever form that happens to take.  It's been discussed that

14   constitutes a transfer.

15           And I'll address that with my second part that I

16   thought I would take a different tack with this a little bit,

17   which is I wanted to mention -- or highlight for the Court a

18   number of things that have been presented Wednesday and today

19   that I think should inform your decision that you would find

20   helpful.

21           The first set can be found in Ms. Wojcicki's

22   declaration.  If we're considering whether this is a transfer,

23   whether we're talking about an affiliate or not, all of those

24   issues -- in paragraph 8 of her declaration, she notes that

25   TTAM did not exist before the petition was filed.  And also in



Colloquy

1    that paragraph she states, "TTAM is not and was never

2    affiliated with the debtors."  She goes on to say that TTAM

3    has never been associated with the debtors, and she reiterates

4    those claims in paragraphs 10 and 11.

5         So part of the reason that I questioned her in the

6    manner I did is an attempt to sort of ascertain what the

7    length and breadth and depth of that actually involved.  In

8    that conversation with her -- so now I'm referring to her

9    testimony on Wednesday -- I would submit to the Court that Ms.

10   Wojcicki either could not or struggled mightily in answering

11   some pretty basic questions about how TTAM would operate.

12        I'll stop here and say in our reading of this, we're

13   not so much interested in the NewCo aspect of this step.

14   Because as we understand the transaction, it will ultimately

15   be TTAM that is in control of these -- of the equity of these

16   assets.

17        So that led me to exploring with her what that would

18   look like and what that governance structure would be.  And

19   she could not, as I saw it, accurately describe how TTAM

20   operates.  She couldn't tell me whether the decision for TPM

21   to bid on these assets came solely as her decision, or if it

22   came as a vote of the board of directors and -- or what that

23   vote was.  And it seemed there was just no -- there was no

24   detail that I would have expected to be a pretty easy question

25   to answer quite frankly.



Colloquy

1          She indicated, which I found curious, that she has no

2     control over authority of this data and would not if the sale

3     went through, which left me perplexed, because if TTAM is the

4     one that's in control and they have -- they own NewCo, NewCo

5     is made up, essentially, as I understand it, of somebody that

6     was a -- somebody or somebodies who were appointed by 23andMe

7     or the debtors collectively.

8          So there were a series of those questions where I was

9     trying to ascertain what that would look like and how

10    decisions would be made and who would be ultimately

11    responsible for ensuring compliance with privacy policies and

12    a number -- all the other things that come with running a

13    business.  And she did indicate while TTAM is a nonprofit, she

14    did indicate that they would -- as I understood it, that they

15    would run the business as it had been run before, so as a

16    going commercial enterprise in addition to whatever its

17    research mission ended up being.

18         So from our perspective, I would suggest that it's a

19    business.  And it's a separate business.  It's not the same

20    people that had control over 23andMe or the debtors

21    collectively.  She was part of that.  But she was, as I

22    understand it, a minority owner.  There were other folks that

23    could, if you will, act as a check on decisions that she may

24    want to take or not take.  And that doesn't seem to be the

25    case -- that would not seem to be the case if the plan -- if

Colloquy

 1   the sale goes through as proposed.  And everything would seem

 2   to fall to her in that regard.

 3        That's coupled with the fact that there was some

 4   testimony we heard today that I would submit is kind of

 5   troubling if they felt like there was really no restriction.

 6   They could enter into an agreement with a consumer, change

 7   that agreement unilaterally in any fashion they want.  And

 8   that would be binding on not only the consumer, but as I -- if

 9   I understood Mr. Hopkins correctly, on anybody else, including

10   states and conceivably this Court.

11        That doesn't strike me as the way -- certainly not

12   the way it ought to be.  And I don't think that's exactly the

13   way it would operate in the end.  Again, the question I would

14   commend to your good judgment under the circumstances.

15        The next thing that I would like to point out is --

16   if I can wax philosophical for just a moment -- is it occurs

17   to me in thinking about this, that our society is engaged in a

18   point in time that is not unusual.  But it's one of those

19   moments where technology is advancing in a way that our system

20   of jurisprudence, our laws, a whole host of things, frankly,

21   are just -- are not -- have not anticipated.  And so we're all

22   sort of feeling our way as to what is the what are

23   best practices, trying to identify pitfalls and dangers and so

24   forth.  I would submit that the study, use, and manipulation

25   of this genetic data, which is, again, profoundly sensitive



Colloquy

1    and important, is a serious challenge.  And it crops up in a

2    lot of different places because of its uniqueness to each one

3    of us.

4         I would also suggest that, compared to other personal

5    identifying information, PII, I think this is different, and I

6    think it ought to be treated differently.  It's more

7    sensitive.  It's more important.  It's wholly deserving of an

8    enhanced level of protection.  And I think that's what a

9    number of states have tried to recognize and address.  And we

10   can argue whether they've done it appropriately or fully or

11   what have you.  But I think that's why Kentucky has the

12   statute that it has, along with a number of other states.

13        What's concerning to me beyond that is, when I

14   questioned Ms. Wojcicki, she didn't seem to agree with that.

15   She asserted that, for example, her bank account information,

16   she considered more important and sensitive than her genetic

17   information.  Now, she, of course, is free to hold that

18   position if she so chooses.  But I would submit that she's

19   wrong, because if her bank information is somehow compromised,

20   it is possible for her to get a new bank account, to move her

21   money if it hasn't all been taken.  Or those accounts are

22   insured in some way, so there are a number of protections.

23   There's a way to come out on the other end hopefully not too

24   damaged.

25        If this information, genetic data, is compromised,



Colloquy

 1   the results could be far more lasting and severe and

 2   irreversible, and some of those in ways that we cannot fully

 3   anticipate because of what I had mentioned before.  I think

 4   we're in an area scientifically that we're feeling our way.

 5   We just don't know what those are, and I think that can --

 6   that gives us an opportunity for great and terrible things.

 7   And so we need to tread lightly, which is part of the reason

 8   that I think that some of our states are pressing the way they

 9   are.

10        I'll also point out very quickly that -- the consumer

11   privacy ombudsman's report has been discussed at length.  I

12   will not belabor this point.  But if you review his findings

13   on pages 7 -- roughly 7 through 10, he essentially indicates

14   that separate affirmative consent would be the optimal path

15   for dealing with this -- i.e., the path that provides the most

16   protection and the most advisable way to proceed.  He also

17   states on page 10 that the path -- I would say the path that's

18   proposed by the debtors -- is significantly -- provides

19   significantly less protection in that regard.  So I would ask

20   the Court to take that into consideration when you consider

21   this.

22        Winding down, I have one more point, which is I do

23   not believe that obtaining this consent is the burden that has

24   been asserted and almost sort of assumed.  So I wanted to push

25   back on that, and I want to refer to Ms. Wojcicki's testimony.

Colloquy

1        I asked her a number of questions about how 23andMe

2    communicated.  The answer -- and forgive me for a quick

3    summary here, but it was essentially by email.  I think it's

4    already been discussed that email is pretty inexpensive and

5    pretty easy.  I think the debtors and TTAM have already

6    proposed that they will send a communication to all of their

7    customers.  So they're already going to send that

8    communication.  So I don't think that they're doing anything

9    extra that they couldn't include in that communication, which

10   is obviously notifying these folks and asking and explaining

11   why they would need to provide an affirmative response.  And

12   to be perfectly honest, I think, technologically, that is not

13   a difficult hill to climb.

14       Added to that, when asked some additional questions,

15   Ms. Wojcicki indicated that the response rates in the past to

16   a number of these similar communications with 23andMe

17   customers had yielded response rates somewhere in the eighty-

18   to-eighty-five-percent range, which is a far cry from what the

19   fear of, I think, Professor Cate and some others had indicated

20   that it may be in the single digits or ten to twenty percent.

21   I think, if you weigh what may be at best some measure of

22   inconvenience to the debtors and to TTAM, weighed against the

23   severity of these issues that we are grappling with and that

24   this court will have to deal with, I think that's a small

25   price to pay.  I don't think it's unreasonable.  I don't think

Colloquy

1    the debtors or TTAM have provided Your Honor with anything

2    resembling evidence or persuasive evidence that this would be

3    crippling to them, that somehow this would vastly undermine

4    the value of the assets that we're talking about here.

5         So I think, absent that, I would ask the Court to not

6    place -- not let that guide them too much in terms of whether

7    they think that this will end the deal.  I think they can do

8    this notice, and I don't think that will blow up this deal,

9    for lack of a better way of describing it.  And that is not

10   our -- that is not Kentucky's intent in objecting.  We simply

11   want to exonerate our statute and have it followed for all

12   those reasons.

13        I also wanted to point out -- this had been mentioned

14   a couple of places throughout today -- the additional privacy

15   enhancements, so those that had been agreed to by some of the

16   NAAG states and so forth.  Some of us are here, and we're not

17   in that group at this stage.  So I just wanted to point out

18   the fact that, for our part, Kentucky was engaged in

19   discussions with TTAM.  Now, I'm not Mr. Hopkins, so I don't

20   know -- I can't profess to say whether TTAM and the debtors

21   are sort of simpatico on this particular point or not.  It

22   seemed like they were, but I don't want to speak for them.

23   But we were in the middle of those discussions on Wednesday,

24   and that was abruptly shut down by TTAM's representatives.

25        But I bring that up not so much for the reason that



Colloquy

1    some folks might think, but to point out that now what has

2    been filed in the record are these privacy enhancements that

3    are explicitly for a select group of states, but not others.

4    And that suggests to me, Your Honor -- and I suggest that you

5    should view it that way -- that it is possible for them to --

6    if this is the right use of the word, to bifurcate different

7    groups based on states.  So apparently, they are going to

8    provide a certain level of privacy protection to -- I forget

9    the number.  I think it's twenty-two some-odd states.  The

10   rest, they are not going to provide those protections for, as

11   we sit here now.  So I bring it up solely to point out that if

12   they -- it would seem disingenuous for them to somehow suggest

13   that it is technologically impossible for them to make a

14   distinction between those groups, and say, the citizens of

15   Texas or California or the Commonwealth of Kentucky.

16          So with that, I've pretty much reached the end.  I

17   will just the debtors and TTAM chose to develop and

18   purchase -- develop a company.  And they entered a particular

19   playing field, which is fifty states in our republic.  They

20   knew what they were getting involved in, and they knew what

21   the rules of the game were when they started, which is they

22   have to comply with these laws.  They've indicated a

23   willingness or desire to comply with them, except in this

24   particular regard.  So as I've indicated, I think it's a

25   dubious proposition that it somehow would end the deal if they



Colloquy

1   had to comply with these particular statutes.

2           So again, commended to your good judgment whether

3   there is a path forward with saving this sale.  I'd like to

4   think that there is, but regardless, like I said, I think they

5   chose this.  And they got into the business of dealing with

6   this kind of data, and so there are some responsibilities and

7   consequences that come with that.  And they shouldn't be able

8   to avoid those.  I appreciate it; thank you, Your Honor.

9           THE COURT:  All right.  Thank you, Mr. Hunt.

10          Mr. Hopkins, yes.

11          MR. HOPKINS:  Your Honor, if I may, and I don't want

12  to interrupt Counsel from Utah.

13          THE COURT:  Yes.

14          MR. HOPKINS:  I just wanted -- we've gotten some

15  inbounds from certain attorneys at various of the -- various

16  stakeholders here that need to depart the courtroom for travel

17  reasons.

18          THE COURT:  Sure.  Right, right.

19          MR. HOPKINS:  We want to stay as long as Your Honor

20  will have us and finish the hearing, but no one wanted to walk

21  out without --

22          THE COURT:  No, folks are free --

23          MR. HOPKINS:  -- addressing the Court.

24          THE COURT:  Folks are free to leave, of course.

25  Yeah, I mean, I think we're in a position to wrap this up this



Colloquy

1    evening, aren't we?  Yes?  Yes, later than some might have

2    hoped, but.

3                    MR. HOPKINS:  That is a hundred percent the debtor's

4    position, Your Honor.

5                    THE COURT:  Okay.

6                    MR. HOPKINS:  If the Court will accommodate us, we

7    absolutely want to finish and need to finish today.

8                    THE COURT:  Yeah.

9                    Are you all okay?

10                   THE CLERK:  Yeah.

11                   THE COURT:  You guys good?  Okay.  Okay.

12                   Yeah, I think we should power forward, but anyone who

13   needs to go, of course, that's fine.

14                   MR. HOPKINS:  Thank you, Your Honor.

15                   MR. KIRPALANI:  Not to make a big thing of it, Your

16   Honor, but my eldest daughter is getting married this weekend.

17   Otherwise, I would promise I would stay.

18                   THE COURT:  Oh, wow.

19                   MR. KIRPALANI:  But I have to make that flight.

20                   THE COURT:  Yes.

21                   MR. KIRPALANI:  I just have to make that flight.

22                   THE COURT:  Yes, absolutely.

23                   MR. KIRPALANI:  So thank you.

24                   THE COURT:  Do.  Do that.

25                   MR. KIRPALANI:  Okay.



Colloquy

1          THE COURT:  Do that.  Thank you, Mr. Kirpalani.

2          MR. CLEMENTS:  Your Honor, if I may.

3          THE COURT:  Yes.  Yes.

4          MR. CLEMENTS:  May I make one more sentence on my

5    argument?

6          THE COURT:  I'm sorry, what?

7          MR. CLEMENTS:  May I make one more sentence?

8          THE COURT:  One more sentence?  Okay.

9          MR. CLEMENTS:  Yes.

10          THE COURT:  I'll allow that.  Okay.

11          MR. CLEMENTS:  Thank you.

12          THE COURT:  That's reasonable.

13          MR. CLEMENTS:  In the event that Your Honor grants

14    the sale motion, we ask that you do not waive Bankruptcy Rule

15    6004(h) and 6006(d).

16          THE COURT:  Got it.  Okay.  Thank you.

17          Utah.

18          MR. NEDICK:  Thank you, Your Honor.  I'll be only a

19    couple of minutes, hopefully, so not too bad.  I'm Brett

20    Nedick with the Utah Attorney General's Office, representing

21    the State of Utah.

22          And so like other genetic privacy laws, Utah's, like

23    other states, requires separate express consent for the

24    transfer or disclosure of genetic data and additionally

25    requires separate express consent prior to using the genetic



Colloquy

1    data beyond the primary purpose of the company's genetic

2    testing product or service.

3          So on the transfer prong of our statute, I'm not sure

4    how much more I have to add that has not yet been discussed or

5    stated before this court.  But our transfer provision creates

6    no exception for the structure of the sale.  This is a new

7    organization with a new purpose.  Our statute states that

8    separate express consent is required for the transfer and

9    disclosure of consumers' genetic data to any person other than

10   the company's vendors or service providers.

11         And this has been discussed earlier on why that type

12   of transfer should be allowed versus this potential transfer

13   in this instant transaction, the difference being that the

14   company's vendors and service providers are processors and not

15   controllers.  They're not making the decisions about the data.

16   They're acting pursuant to the -- to 23andMe, or in a

17   subsequent case, TTAM's directions.  But TTAM is not a vendor

18   nor a service provider, and thus, this meets the transfer

19   prong of our statute and requires consumers' express consent.

20         THE COURT:  Well, wait, Mr. Nedick.  Step 2 of the

21   transaction triggers your statute, or step 1?

22         MR. NEDICK:  Either/or.  Any transfer that --

23   transfer or disclosure of the consumer's genetic data to any

24   person other than the company's vendors or service providers.

25   TTAM is not a vendor, nor is it a service provider.  NewCo is



Colloquy

 1    not a vendor, nor is it a service provider.  So any way you

 2    slice it, this will require a consumer's express consent.

 3         With regard to the primary-purpose prong, I just want

 4    to add that we think this is a clear case of the primary

 5    purpose being changed.  23andMe offered consumers a genetic

 6    testing product and service.  Any research a consumer may have

 7    opted into was secondary.  TTAM offers a substantively

 8    different service.  As the primary purpose has changed, all

 9    Utah consumers should have the opportunity to opt in to that

10    change.  This is no longer about finding out where your

11    ancestors are from or any genealogical work, but an

12    organization dealing with genetic research.

13         THE COURT:  Wait, wait.  What in the record supports

14    that assertion?  You're the only one who's made that argument.

15    And as I see the testimony, the business will be exactly the

16    same, but under new ownership.  What am I --

17         MR. NEDICK:  TTAM has been advertised --

18         THE COURT:  What am I -- what am I missing?  Sorry.

19         MR. NEDICK:  TTAM is advertised as a medical -- as a

20    nonprofit medical research organization.

21         THE COURT:  And if this transaction goes through, it

22    will have a subsidiary that will probably buy the name 23andMe

23    and will be named 23andMe and will do exactly what 23andMe

24    does today, except as it may decide to do other things in the

25    future, in which case Utah could weigh in at that point.  Is

Colloquy

1    that not what the evidence shows?

2            MR. NEDICK:  It is, but we do not have confirmation

3    at this point in time with that.

4            THE COURT:  You don't have -- we had Ms. Wojcicki, on

5    the stand, say that under oath.

6            MR. NEDICK:  Okay.  Understood.  Moving on is that

7    there are a certain tranche of consumers that have opted in to

8    medical research.  I believe the split was eighty-twenty, that

9    eighty percent specifically -- or that eighty percent did opt

10   into medical research when signing up for 23andMe and twenty

11   percent did not opt into this use.  And again, I think that

12   this is an argument that the primary purpose has lapsed and

13   that these consumers require consent prior to their data being

14   used.

15           THE COURT:  I'm sorry.  I don't follow that --

16           MR. NEDICK:  The data in question --

17           THE COURT:  I don't follow that argument at all.  I

18   do not understand what you're saying.  The testimony is that

19   this business will be run exactly the same way post-closing as

20   it is today.  What triggers the change-in-scope provision of

21   your statute, again, please?

22           MR. NEDICK:  That TTAM is advertised as a medical

23   research organization, and as a nonprofit one.  I think the

24   business scope has changed.

25           THE COURT:  So if -- take the bankruptcy out of the



Colloquy

1    picture -- 23andMe is out there in the world doing its own

2    thing, and it is acquired, its stock is acquired in a go-

3    private transaction by -- I'm going to use Procter & Gamble

4    again.  Does that mean that 23andMe has exceeded the scope of

5    its business?  It's a subsidiary now.

6            MR. NEDICK:  Now, I would argue yes.

7            THE COURT:  It's doing exactly the same thing.

8            MR. NEDICK:  I would argue yes.

9            THE COURT:  Okay.  Well, I think you're alone among

10    the attorneys general in making that argument, but I will note

11    it.  Thank you.

12            MR. NEDICK:  Okay.  (Indiscernible) is immutable and

13    should be given the highest level of privacy protections for

14    the consumers in question.  A lot of this discussion has been

15    centered around the value of this data and how it would impact

16    the transaction or shareholders.  We believe that this

17    discussion should be centered around ensuring the proper

18    protections for all consumers that initially engaged with

19    23andMe.  And this is to ensure express consent prior to

20    transferring their data to TTAM or changing the purpose or use

21    of this data.  Thank you.

22            THE COURT:  All right.  Thank you, sir.

23            Rebuttal from the debtor, yes.

24            MR. NADAL:  Thank you, Your Honor.  My colleague, Mr.

25    Eskandari is on the line for anything.  I wish I could stay



Colloquy

1    here.  Thank you for your courtesy this week.

2           THE COURT:  Thank you for your spirited argument,

3    sir.

4           MR. SANT:  Your Honor?

5           THE COURT:  Yes.

6           MR. SANT:  Tal Sant again.  Would it be possible to

7    hear from one of my clients online on their arguments with

8    respect to this transaction?  I think it would be a lot

9    briefer than if I address the Court, if we could have that --

10          THE COURT:  I think you've -- I think we've already

11   heard from you, Mr. Sant, and I've taken that under

12   advisement.

13          MR. SANT:  Okay.  You've heard briefly.  I think they

14   had a -- they wanted to clarify a point or two, if that would

15   be acceptable.

16          THE COURT:  No, we're not going to do that.

17          MR. SANT:  Okay.

18          THE COURT:  Sorry, but your objection is under

19   advisement.

20          Let's go to rebuttal from the debtor.

21          MR. HOPKINS:  Thank you, Your Honor.  Chris Hopkins

22   of Paul Weiss, cocounsel to the debtors.

23          I'm going to be -- I'm going to try to do this as

24   quickly as possible, but I think it's important to be

25   thorough.



Colloquy

1           THE COURT:  Yeah, don't rush.  Don't rush through.

2           MR. HOPKINS:  And our colleagues at the states made a

3     lot of arguments.

4           THE COURT:  Yeah.

5           MR. HOPKINS:  As a threshold matter, there is a theme

6     here that the debtors' pursuit of maximizing value for the

7     benefit of our stakeholders makes us a villain.  That is the

8     debtors doing the job.  That is the special committee doing

9     the job.  Debtors use tools that Congress provides them under

10    the Bankruptcy Code for the benefit of their stakeholders,

11    which includes 6.4 million customers who were subject to the

12    2023 cyber-incident, among other folks.

13          I didn't hear any state say a plan doesn't work, to

14    Your Honor's point, and I think that kind of hits home.  It is

15    not the outcome, it is not the outcome, that they're really

16    focused on preventing.  I candidly don't know what it is, on

17    the facts of this case.  But they say there are other

18    mechanisms available under the -- other than what we're doing

19    here.  But 363(b)(1) is a mechanism provided under the Code.

20    They allude to alternative transactions that -- because Texas

21    or any of the other states wish, that TTAM will continue to

22    stand behind an APA where we rep that we can transfer customer

23    data to you without this opt-in consent construct, because

24    that is our read of 363(b)(1) and the law.  That is what we

25    repped to.  That is what TTAM agreed to.  That is the -- that

Colloquy

1    is the business deal that underlines -- underlies the 305-

2    million-dollar purchase price.

3           THE COURT:  So let me ask a question carefully about

4    that, and --

5           MR. HOPKINS:  Sure.

6           THE COURT:  -- answer carefully, as I'm sure you

7    will.  If I, as several of the AGs have suggested, were to

8    require as a condition of the APA transaction, the equity

9    drop-down transaction, that the debtors get express consent

10   from the citizens of East Carolina, a moderately large state,

11   can the debtors require TTAM to close the transaction with

12   that condition imposed by me?

13          MR. HOPKINS:  I'm going to give you a careful answer,

14   and I'm going to refrain from wanting to ask you the question

15   about how many people live in East Carolina.

16          THE COURT:  Well, it's not as large as Texas, but

17   it's maybe larger than Alaska.

18          MR. HOPKINS:  Understood, Your Honor.  I think, as

19   the debtor, I would tell you that that's a litigation.  I

20   think TTAM could argue that it's a material breach of a rep.

21   I think the debtors would exercise their fiduciary obligations

22   to likely contest that obligation, or sorry, that assertion by

23   TTAM.  I'm not going to tell you on the record, under oath,

24   that I would just roll over and say, that's an automatic

25   termination, right, Your Honor, we're out of luck.



Colloquy

1          THE COURT:  Right.  You're not under oath.

2          MR. HOPKINS:  Okay.  Well, on the record, on the

3     record.  But it's a litigation, and let's --

4          THE COURT:  Yeah.

5          MR. HOPKINS:  I think it's -- I think it's worth

6     saying what the consequences of that litigation are if TTAM

7     makes that argument and it's right.  The backup bidder

8     certainly has no obligation -- if TTAM has a termination

9     right, so does the backup bidder.  At that point, we have a

10    final proposal.  Technically, we have a final proposal

11    procedure order from Your Honor that says it's just TTAM and

12    Regeneron.

13         Any risk to this transaction, that 305 million, it's

14    not even as if TTAM, in theory, would say, I'll give you

15    151,000,001 dollar so I'm just barely better than the backup

16    bid.  There is nothing.  We're at square 1.  We have a DIP

17    outstanding.  You've heard -- well, you've heard me say, and I

18    think it is in the record because DIP budgets are on file,

19    that full freight for this case, it's about twelve, fifteen

20    million a month.  So that's money out of cyber-breach claimant

21    victims' pockets.  It's money out of shareholders' pockets.

22         And so the short answer is, Your Honor, I don't know.

23    I think it's a litigation.  I think they could say, I get to

24    renegotiate my whole deal because now I have a termination

25    right.  I think we would have a fiduciary obligation to



Colloquy

1    dispute that.

2            THE COURT:   That's what I thought.

3            MR. HOPKINS:   Thank you, Your Honor.

4            And so just to -- I'm, again, not going to rush, but

5    I want to be efficient with everybody's time.   So I want to

6    start with preemption because I think it's important.   We are

7    not advocating a position that 363(b)(1) opens a floodgate of

8    preemption that wholesale overrides state law.   Only laws that

9    restrict the transfer of PII, and only if the requirements of

10   363(b)(1)(A) are met, do we submit that Congress, in BAPCPA

11   through conflict preemption, preempts state transfer

12   restrictions on PII.   All other assets, all other types of

13   assets, which are no -- there is no other enumerated type of

14   asset in 363(b).   I think you're in Shower.

15           But Congress has spoken about PII specifically.   They

16   put it in the statute.   Now, it is narrow -- we think it is

17   narrow conflict preemption.   And we will acknowledge, as Your

18   Honor deftly pointed out, there are other portions in the

19   Code, or of the Bankruptcy Code, where Congress puts it right

20   in the text, notwithstanding anything to the contrary under

21   applicable nonbankruptcy law.

22           But -- and I mentioned the Supreme Court precedent

23   before -- preemption is not just a textual analysis.   It's

24   text and structure.   So the structure of 363(b)(1) is

25   disjunctive.   You have to give meaning to "or".   It is either



Colloquy

1    the policy is -- the sale is consistent with the policy or

2    based on -- after a CPO is appointed, based on the facts and

3    circumstances, and no finding of -- there is no finding --

4            THE COURT:  There's no showing.

5            MR. HOPKINS:  -- no showing that -- been a long

6    day -- that applicable nonbankruptcy law has not been

7    violated.  In our view, you cannot read that statute and read

8    compliance with applicable nonbankruptcy law into 363(b)(1)(A)

9    because it would obviate and essentially delete from the

10   statute -- and we actually didn't get to it.  But we had a

11   nice little slide in our demonstrative about what 363 would

12   look like if you accepted the state's view of the law.  And

13   it's effectively a whole bunch of deletions that says, doesn't

14   matter what the policy says, doesn't matter if it's consistent

15   with the policy, it has to satisfy 363(b) and applicable

16   nonbankruptcy law.  And Congress did not do that.  And again,

17   we think that, yes, Your Honor is obviously correct.  There

18   are examples in the Code where it's clear from the text, but

19   Congress can use text or structure to indicate conflict

20   preemption, and we believe that's what they did here.

21           I'm going to try to take in order arguments raised by

22   various of the objecting states.  And where I believe they

23   apply to more than one state, I'm not going to repeat them

24   each time.

25           Sub rosa plan, I agree with Your Honor.  Sub rosa



Colloquy

1    plan is about, are you crystallizing distributions under the

2    plan, are you doing things through a 363 sale that are

3    typically the providence of a plan.  The answer to both of

4    those questions is no.  We are -- no one raised a sub rosa

5    plan objection when it was structured as an asset sale.

6    Somehow getting to the same outcome transmutes the whole thing

7    into a sub rosa plan when the revised form of the sale

8    order -- which the states have seen, I believe, for a number

9    of days now -- expressly has language in it that says, this

10   does not affect anyone's rights with respect to the sale

11   proceeds.  All of that is preserved.  It is the exact opposite

12   of what a sub rosa plan does.  All we're doing is bringing

13   distributable proceeds that we need to confirm a plan into the

14   estate.  Otherwise, nothing is happening.

15           I believe it was the gentleman from California who

16   said this cannot be a sound exercise of business judgment.

17   Reject the premise.  The special committee has done all the

18   right things in getting the debtors to today.  Obviously,

19   you've have seen from our briefing, you've seen from our

20   argument, we stand behind the conviction of our arguments and

21   what we're permitted to do under 363(b)(1).  And this is the

22   way to maximize value.  We marketed all of our assets.  We ran

23   a competitive auction process.  It was very competitive.

24   There was no unfairness.

25           You've heard a lot of aspersions cast towards TTAM



Colloquy

1    and Ms. Wojcicki [Wo-ji'-kee] -- Ms. [Wo-ji'-skee].  I

2    committed my own sin.  I was just talking to her earlier today

3    about that.  This is a case where the sale -- I'm not even

4    sure, Your Honor, and I don't want to admit that it is a sale

5    to an insider.  Because I think you have to be very careful

6    how you trace through the Code, and Ms. Wojcicki's equity

7    ownership of the debtors has actually morphed over time in

8    this case, because -- it's gone down, is the punchline.

9          But even if heightened scrutiny applied, let's look

10   at the facts.  It's a sale -- even if it is a sale to an

11   insider, there's no release of estate claims.  There's no

12   purchase of estate claims against any insider of the debtors'.

13   Personally, I've never seen that in a 363 sale involving an

14   insider purchaser.  Ms. Wojcicki voluntarily stepped away from

15   the debtors with -- based on -- in discussions with the

16   special committee.  Coming into the filing, a broad delegation

17   was approved by the board, granting all restructuring related

18   governance authority to the special committee.  Ms. Wojcicki

19   kept her seat as a director of the board, as is her right as a

20   significant shareholder.  She had no involvement in the

21   special committee, no involvement in any governance decisions

22   post-petition, let alone anything related to the sale.

23          Your Honor is well aware that we ran a competitive

24   bidding process, and TTAM did have a view about how that was

25   run, to the extent she -- they can be deemed an insider, is

Colloquy

1    that it was run unfairly against them, against the insider.  I

2    think any accusation that this is a sweetheart deal, trying to

3    flip the keys back to an insider for a low valuation, is just

4    not supported by the record whatsoever.

5          And I think that's a good segue to 363(m), because I

6    think that's very important to the structure of the sale here.

7    And it's very important to TTAM, as it should be.  And I think

8    363(m) is important.  We have two 363 sale -- two 363 sales

9    here.  We have:  step 1, sale to NewCo; step 2, sale of NewCo

10   equity to TTAM.

11         I believe the gentleman from California was

12   questioning whether -- I believe I was following him

13   correctly -- that because NewCo is not providing cash to the

14   debtors, it is somehow knocked out of 363(m).  I read 363(m).

15   I believe it speaks to value.  It does not say cash.  So let's

16   talk about value.  What is NewCo giving?  It's giving a note

17   equal to the -- it's giving a note and an amount sufficient to

18   ensure that, as of the closing, the debtors receive the

19   benefit of the purchase price.  I'm happy to go into as much

20   technical detail as you'd like, Your Honor, but -- and this is

21   in the sale order -- that note will provide that it's due and

22   payable upon a change of control, the debtors or the borrower.

23         Mr. Nadal seemed to spin some sort of fraudulent

24   conveyance theory.  I don't really want to spend any time on

25   that, because I don't think there's really any substance to



Colloquy

1    it.  But the reason why the purchase price is going directly
2    to the debtors is it's a closing mechanic.  Otherwise, TTAM
3    would be acquiring an entity that immediately has an up to
4    305-million-dollar loan due and payable back to the debtor.
5    So you could pay a dollar for the stock and then repay the
6    debt.  It's just a function of closing.

7          And what other value is NewCo providing?  It's
8    facilitating a value-maximizing transaction that, if done on
9    the timeline of a 363 sale, will, on a conservative estimate,
10   save the debtors' estates approximately 20 million dollars in
11   pro fees and OPEX, maybe higher.  I think, to the -- NewCo is
12   providing value to the estates.  NewCo is owned and controlled
13   by the debtors.  The notion that an entity owned and
14   controlled by the debtors could somehow be acting in bad faith
15   with respect to the parent of itself, who controls it, is a
16   new legal theory.  But there's certainly value, and I think
17   363(m) is satisfied.

18         On Mr. Nadal's arguments about GIPA, I think he
19   characterized Wesco as interpreting the definition of
20   affiliate in the context of a contract.  I don't disagree with
21   that, but the citation we provided was Judge Isgur, who has
22   certainly been around the block and is a very well-reasoned
23   and thorough judge, quoted that third party is uniformly used
24   in legal texts to not mean affiliate.  Third party is not an
25   affiliate based on a regular read of the statute.  California



Colloquy

1    statute does not define third party based on 363(b)(1)(B).

2    Our position is it's California's burden to demonstrate that

3    third party does not mean affiliate.  I don't know how they

4    read "third" out of third party in the interpretation of their

5    statute.  And we think they haven't met that burden, and so

6    California GIPA does not apply.

7         Mr. Nadal spoke about we didn't market the equity

8    toggle.  Candidly, I'm not sure how you market an

9    implementation structure.  But just so the record is clear,

10   the bidding procedures allowed people to bid how they so

11   choose.  And we got multiple forms of bids in connection with

12   the bidding procedures.  TTAM did that.  Their May 19th APA

13   had the concept of an equity toggle.  It had the concept of a

14   plan toggle, and that was before we saw any of the state's

15   objections.  It's an implementation methodology.  I'm not

16   entirely sure where he reads nefarious intent into this

17   structure.

18        But I mean, the APAs, as I think I told Your Honor

19   when we had the discussion about what would happen if opt-in

20   consent were required for a particular state, I mean, the APAs

21   required transfer of PII with opt-in consent.  We repped to

22   that under those agreements.  So to find a way to ensure that

23   we're satisfying the rep at closing, I don't understand how

24   that could possibly be anything the debtors are doing in bad

25   faith.



Colloquy

1          THE COURT:  You said you said the APA says with opt-

2    in consent.  Do you mean without opt-in consent?

3          MR. HOPKINS:  Without.

4          THE COURT:  Okay.  That's what I thought.

5          MR. HOPKINS:  Sorry.  Thank you for clarifying that.

6    That's an important clarification, Your Honor.

7          I believe a few of the states have argued for a

8    waiver of the fourteen-day stay, and I want to be upfront with

9    Your Honor.  Is this a transaction where, if your order is

10   entered today, can we close on Monday?  It's not.  We're going

11   to work with TTAM to close as fast as we can, because -- I

12   think you've heard me say this a number of times -- it's a

13   500,000-dollar-roughly-per-day toll on the estates.  The

14   longer we're in Chapter 11, the longer we're operating the

15   business.

16         And we're going to move heaven and earth to get this

17   transaction closed as quickly as possible, we hope within

18   fourteen days.  We actually have some optimism that, because

19   this is now -- and I'm not even talking specifically about

20   PII.  I mean, the global acquired assets -- this is just a

21   matter of corporate law.  I think, because we're dropping

22   things into an affiliate and then selling the equity, it may

23   actually facilitate standing up a actual operating entity

24   where we can close faster.

25         And so looking at the other factors that courts



Colloquy

1    consider on the cause analysis for waiver of a fourteen stay,

2    for the fourteen-day stay, I think it's certainly at arm's

3    length.  I haven't seen many non-arm's-length negotiations

4    result in litigation.  This was very much arm's length.  The

5    special committee is very -- has been as independent as it

6    gets throughout this entire process.

7            Courts think about notice.  I think Ms. Milligan

8    again questioned the robustness of the notice here.  I think

9    she made a comment, it's nice that the debtors didn't have to,

10   but they provided notice to all their customers of the sale,

11   anyway, and it's nice that TTAM's going to do it again, but it

12   didn't really talk about genetic data.  We're a genetic data

13   testing company.  If you receive a notice from 23andMe that

14   says, we're selling our business to either Regeneron and TTAM,

15   it's very difficult for me to understand how the consumer

16   could not think that whatever 23andMe -- whatever interest we

17   have in their data is not being sold as part of that sale.

18           And I would note that the TTAM notice, which is going

19   out before closing, they've committed to actually provide

20   customers instructions on how to delete their data in that

21   notice, and to provide instructions on how, should they so

22   choose, opt out of things like the research consent.

23           And then the other standard is no prejudice to

24   creditors.  This is not a transaction, thankfully, where we

25   have jilted, bitter litigation, where someone has come in

Colloquy

1    after the final procedures order and said, I'm going to pay

2    more, you should overrule the -- override the Court's order

3    and take my higher and better deal.

4             THE COURT:  Well, we don't have that anymore.

5             MR. HOPKINS:  Yeah, once is enough.  Although, it was

6    good for the estates.  No prejudice to creditors will result

7    from a waiver of the fourteen-day stay; it's the opposite.  If

8    we can close as fast as possible, that's how we maximize value

9    for our creditors, and that's what's good for creditors.  And

10   I think you've heard from every major creditor in the case

11   that they support the sale.  So we would submit that a waiver

12   of the fourteen-day stay is appropriate.

13            And just so Your Honor is aware of coming

14   attractions, I mean, I think, if the states do seek a stay

15   pending appeal, we will certainly argue that it should be

16   bonded for the full amount of the purchase price.

17            I think Mr. Nadal cited a lot of case law about, you

18   know, narrowing preemption in various cases, and I mean, he

19   obviously was well prepared for today.  But I don't think --

20   and this circles back to the first point I made about

21   preemption.  We are arguing a very narrow, specific form of

22   conflict preemption.  We are not saying that any sale that

23   involves PII, full stop, you get to ignore all bankruptcy law,

24   or I'm sorry, all applicable nonbankruptcy law.  It's only

25   nonbankruptcy law that purports to restrict the transfer of

Colloquy

1    PII.

2            So to give you a hypothetical, if I stood up here and

3    said, I want to violate CFIUS, but because I'm selling a

4    couple customers' emails and my policy says I can sell those

5    emails, I get to violate CFIUS because of 363(b)(1)(B).  We've

6    been very careful that that is exactly not what we're doing

7    here.  If it's not -- the sale order is very clear that it's

8    very much the opposite.  The only thing that we're asking this

9    court to potentially preempt -- we think we win if we get to

10   363(b)(1)(B), but we don't think we should, or we don't think

11   Congress requires it.  It's very, very narrow.  So cases that

12   go broader and say -- like Shower, you can't alienate an

13   interest in a farm co-op in contravention of state law.  I

14   don't think anything we're saying here changes the analysis on

15   that.

16           Mr. Nadal spoke to the privacy policy in California

17   GIPA.  Unless Your Honor wants me to reiterate our arguments

18   about why we think it works under those laws, I will just rest

19   on our papers and our argument on that.

20           THE COURT:  I think I'm okay there.

21           MR. HOPKINS:  Okay.  Thank you, Your Honor.  Let's

22   see here.

23           Texas, the property right issue, I think we've been

24   clear, and I'm happy to try to further clarify.  Whatever

25   interest in their genetic data that Texas law provides a

Colloquy

1   consumer, I don't think Texas law makes 23andMe's business

2   illegal as a matter of law.  So a customer can make a decision

3   to sign up for 23andMe.  We think that if they do that, they

4   are required to consent, as a predicate step, to our terms of

5   Service and privacy policies.  Whatever rights we have in the

6   data arise, among other things, under those documents that

7   customers freely consented to.

8          We are not seeking to -- again, I think, at the risk

9   of repeating myself, Your Honor, because it seems to be a very

10  important objection to the State of Texas, I want to be clear.

11  We are not changing -- if there's a collective bundle of

12  sticks here, and the customer has some -- owns the bundle, and

13  they've given 23andMe a stick, we're not taking two sticks.

14  We're just keeping the stick we have, and that's all we're

15  selling.  We're selling our interest in the property that the

16  customer voluntarily, consensually granted to us under the

17  privacy policies.  We're transferring it to TTAM.  We're

18  respecting the customer's rights under those policies through

19  that process.  Arguably, we're giving half the stick back

20  because TTAM is giving privacy enhancements to the customers

21  that they may not have had before.

22         I understand Ms. Milligan's point that at least some

23  of the things TTAM is agreeing to is already required under

24  state law.  But we're being clear in the sale order that the

25  only 363(f) relief we're seeking with respect to customers is

Colloquy

1    monetary claims that arise prior to the closing.

2         THE COURT:  So as I understood Ms. Milligan's

3    argument on this point, it's that the bundle of sticks in

4    Texas, maybe a loan in Texas, is divided such that 23andMe

5    gets some of the sticks.  But one of the sticks retained by

6    the customer is alienation of the entire property, whatever

7    else it is.  And so I mean, I had some questions of, why do we

8    have the transfer restrictions, then, in 006 if that's what

9    003 means, that the property interest is defined in an

10   unconventional way.

11        MR. HOPKINS:  I think that's right, Your Honor.  I

12   think, if you wanted to read Texas GIPA consistently with all

13   the provisions of the statute, I think what that enshrines is

14   a customer's right to delete.  I think there's certain -- to

15   say, I gave you something, I want it back, and you can never

16   take my right to take it back away from me, I think there

17   is -- I mean, obviously we confronted it in our main argument.

18   There are restrictions on transfers or disclosures to a

19   person.  I think we talked about why we think that doesn't

20   apply here.  I'm not arguing that state law doesn't give them

21   that right.  We're just arguing that even if Your Honor gets

22   to state law, it's not applicable to our sale, for all the

23   statutory construction reasons we mentioned.

24        I don't think Ms. Milligan -- I mean, we are not

25   advocating, Your Honor take a hyper-technical read of the

Colloquy

1    statutes.  I think that's clear from our argument.  That does

2    appear to be the position of the State of Texas.  And I don't

3    think they ever actually grappled with our argument that, on a

4    strict construction of their statute, NewCo is not even a

5    person.  That wholly pulls it out of the transfer disclosure

6    restrictions under the statute.

7            Texas also agreed that the plan works.  They talked

8    about de-identified versus identified data.  I mean, I can

9    explain to Your Honor, if helpful, why that's commercially

10   important.  But I don't think it goes to the merits of the

11   law, so I don't --

12           THE COURT:  Yeah, I think we can move on.

13           MR. HOPKINS:  Okay.  I'm just going through my notes

14   here to make sure I don't -- I think I already addressed her

15   points about notice.  Moving quickly, I'd like to touch on

16   that briefly, because I think due process and notice is

17   important here.

18           Your Honor has obviously been a bankruptcy

19   practitioner for many years, and now a bankruptcy judge.  I'm

20   sure you've seen many, many 363 sales.  I would submit that

21   the fact that there was a month between everyone getting

22   notice of who the two potential bidders are, the terms of

23   their APAs -- which, with TTAM, did include an equity toggle

24   and a plan toggle; it included the definition of acquired

25   assets, included, the definition of assumed liabilities -- is



Colloquy

1   actually a pretty significant period of time in large Chapter
2   11 cases.

3           And I think Mr. Swift's declaration that was entered
4   into evidence yesterday has a footnote to that effect where
5   it's usually maybe a week, ten days, where you have the
6   auction and you're at the sale hearing.  That obviously didn't
7   happen here.  And so I think the notice is -- I just don't
8   believe it's an issue on this record.

9           And the suggestion that we somehow tried to hide the
10  ball, we've worked constructively with the states all along
11  the way.  I think settling twenty-five objections between the
12  10th and today kind of demonstrates, at least in some
13  respects, our commitment to working collaboratively with them.
14  We agreed to the appointment of the CPO.  We didn't have to.
15  We could have litigated that issue.  We think we're right on
16  the law.  That was a significant cost and expense to the
17  estate.  We've always tried to maintain open lines of
18  communications with the states and bring them along in the
19  process.  And so I just -- I don't think this is a situation
20  where Your Honor should have concerns about approving the sale
21  based on notice or due process.

22          They've pointed to -- I believe Ms. Milligan alluded
23  to statements from the debtor's CEO, Joe Selsavage, made in
24  congressional testimony.  I don't think I've seen any law from
25  the states that says you look outside the four corners of the

Colloquy

1    terms, the privacy policies, and those specific legal

2    documents that are incorporated therein.  But certainly, I

3    wouldn't expect that a statement made by a CEO of a company at

4    a congressional hearing is somehow incorporated into an

5    agreement with all of the company's customers.

6          On the insider point, I think I've already addressed

7    that.

8          With Tennessee and Kentucky, I think the point I

9    would make, Your Honor, is I heard them argue their

10   interpretation of GIPA.  What I didn't hear them argue is

11   anything in response to the statutory -- the rule of statutory

12   construction that you don't read statutes to create absurd

13   results.  They tell you, person means this list of things,

14   ipso facto, any transfer to a person must be prohibited unless

15   you go get opt-in consent.  But I didn't hear any argument as

16   to how you read the statute that way.

17         And then my favorite example on this is Mr.

18   Lefkowitz.  He's the chief privacy officer.  That's obviously

19   a very important function of the senior management team of a

20   direct-to-consumer genetics testing company.  In that role, at

21   least Mr. Lefkowitz -- I can't speak to all direct to consumer

22   genetic testing companies -- he often interfaces with the

23   customer care team to try to resolve customer concerns.  You

24   heard him testify today about deletions and people having

25   issues with deletions.  He's involved in that type of work.



Colloquy

1   That means he has access to the data.  If he decides to enjoy
2   early retirement, what do the debtors do?

3         We can't replace that individual until we get
4   affirmative opt-in consent from every single customer and
5   every single objecting state, or we have to delete all of
6   their data.  And how is that better for consumers?  How could
7   that be the answer that -- the legislatures enacted a statute
8   that says, you can't replace a key privacy officer of a
9   company that has all of this -- you've heard it from the
10  states -- immutable, unique, irreplaceable data for months,
11  years?

12        You heard Professor Cate talk about how long the
13  affirmative opt-in consent process could take.  I mean, I
14  don't typically like standing in front of a bankruptcy court
15  and arguing policy when we're talking about statutory
16  interpretation.  But I just think this read of the statute is
17  so dogmatic that it just misses the entire purpose of what the
18  statutes are intended to prevent, just to seek to block a sale
19  that they all admit could be done under a plan in two months'
20  time at twenty million dollars of additional expense, to the
21  detriment of our stakeholders, many of whom are customers of
22  the company.  I mean, it just --to some extent, it defies
23  logic.

24        Mr. Hunt from Kentucky, he made a lot of comments
25  about, is it really that big of a burden, opt-in consent.  I

Colloquy

 1    don't think Mr. Hunt had any evidence.  I think the evidence

 2    in the record in this sale is that it is a burden.  I don't

 3    think even the CPO, Professor Richards, disputes it's a

 4    burden.  He just says it's better based on the universe of

 5    academic literature.  But I think the record here is that

 6    affirmative opt-in consent is very expensive.  It's very

 7    ineffective.

 8            And I think my last point, Your Honor -- and then I'd

 9    just like to confer with Mr. Clareman for one second.

10            THE COURT:  Of course, yeah.

11            MR. HOPKINS:  I just want to confirm that I think you

12    have it on the nose about the gentleman from Utah's argument

13    about how this is somehow a fundamental shift in what 23andMe

14    is going to do post-acquisition.  I think the testimony in the

15    record from Ms. Wojcicki is clear, as is the understanding

16    based on the transaction documents actually laid out in the

17    APA.

18            So if you'll just give me ten seconds.

19            THE COURT:  Please do, yes.

20        (Counsel confer)

21            MR. HOPKINS:  Your Honor, no further argument unless

22    you have questions for me.  You've heard me tell you a few

23    times the Supreme Court instructs that you look to both the

24    text and structure of a congressional statute for preemption.

25            THE COURT:  Right, right.  Yeah.



Colloquy

1           MR. HOPKINS:  I do have the case.  I do have the

2    cite.  I don't believe I actually read it into the record.

3           THE COURT:  Just give me the cite, if you would.

4           MR. HOPKINS:  It's 139 S. Court 1894.

5           THE COURT:  And which case is that?

6           MR. HOPKINS:  That is Virginia Uranium, Inc. v.

7    Warren Uranium.

8           THE COURT:  Uranium.  Okay.

9           MR. HOPKINS:  And I believe we have copies, if it

10   would be helpful.

11          THE COURT:  Oh, that's okay.  Don't worry about that.

12          MR. HOPKINS:  Okay.  With that, unless there's

13   anything further from TTAM or Your Honor has any other

14   questions for me, I think I'll cede the podium.

15          THE COURT:  I don't have any other questions for you.

16   We're good there.  Okay.  All right.

17          I'm going to take this under advisement.  It's a

18   little more than I can wrangle, particularly at 7 o'clock on a

19   Friday night to rule from the bench.  I.

20          MR. HOPKINS:  I understand there's a Cardinals game

21   tonight.

22          THE COURT:  I didn't even know that, to be honest.

23   Those of you who missed your flight might want to check it

24   out.  It's within walking distance.

25          MR. HOPKINS:  Our hotel is right across the street,



Colloquy

1    so we probably will.

2           THE COURT:  Yeah, there you go.  There you go.

3           All right, so let me thank all counsel and witnesses,

4    but counsel in particular for your zealous advocacy and for

5    squeezing this in this week.  We had a little complication

6    with the holiday there.  And some of you may not be getting

7    home until tomorrow, but I think it's preferable to rolling

8    this into next week.

9           I understand the urgency here.  I will rule as

10   quickly as I reasonably can, while still being thorough and

11   making sure I catch everything in the record and dispose of

12   all the arguments that the parties have made.  But like I

13   said, I know I need to do it quickly, and I will absolutely

14   keep that in mind.

15          MR. HOPKINS:  Well, thank you very much, Your Honor.

16   And on behalf of the debtors -- and I'm sure I speak for many

17   of the other advisors in the room -- thank you and your staff

18   for staying this late on a Friday and for how prepared the

19   Court was for today.  It was really phenomenal, so thank you.

20          THE COURT:  Certainly.

21          And let me thank our security officers, who are way

22   over time.  Thank you very much for sticking around with us.

23   We really appreciate it, and of course, the court staff here,

24   as well.

25          So with that, court will be adjourned.



Colloquy

1           Yes, Mr. Adams.

2           MR. ADAMS:  Jason Adams, Kelley Drye committee.

3    Quick housekeeping.

4           THE COURT:  Yes.

5           MR. ADAMS:  There's an equity committee appointment

6    motion on the calendar for, I believe, next Tuesday.  I'm only

7    rising to tell you that I think peace has broken out.

8           THE COURT:  Okay.

9           MR. ADAMS:  So I believe that we will be advising

10   Your Honor's chambers in, hopefully -- well, it's not going to

11   be today because we're -- Friday.

12          THE COURT:  Not today.  Don't do it today.

13          MR. ADAMS:  By Monday morning.  Monday morning, I

14   believe that we will have peace in the valley on that.  So for

15   the benefit of Your Honor's chambers, I just wanted to let

16   that know so that nobody was preparing for that.  I think,

17   hopefully --

18          THE COURT:  I can devote more of my time to this

19   ruling.  Very good.

20          MR. ADAMS:  Thank you, Your Honor.

21          MR. HOPKINS:  Thank you very much, Your Honor.

22          THE COURT:  All right.  Thank you.  We'll be

23   adjourned.

24          MR. HOPKINS:  Appreciate it.

25          THE COURT:  Are we off the record?



Colloquy

 1              THE CLERK:  Yes, Judge.

 2         (Whereupon these proceedings were concluded at 7:09 p.m.)

 3

 4

 5

 6

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                        I N D E X

 2                                                              VOIR
      WITNESSES:            DIRECT   CROSS   REDIRECT   RECROSS  DIRE
 3    FOR THE DEBTORS:

 4    Fred Cate                14  51,76,102   114    41,118,119
                                      110
 5
      Peter Lefkowitz                  122,148,161
 6
      FOR THE STATE OF
 7    TEXAS:

 8    Neil Richards          174   185,188,205  218

 9    EXHIBITS:
      No.       Description                  Marked    Admitted
10    STATE OF TEXAS':
      A-18      2/28/2013 privacy policy                  97
11
      D         J. Selsavage statement         170       171
12
      E         Statement of Selsavage         171       171
13
      346       Joint stipulation              171       172
14
      718       Consumer privacy ombudsman     172       173
15              report

16    DEBTORS':
                Jami Mills Vibbert's                      121
17              declaration

18    7, 7A, 7B  Notice of winning bidder                 121

19    STATE OF CALIFORNIA'S:
      CA-2      "Your privacy comes first" page           133
20
      CA-1      23andMe blog post about the               136
21              passage of California genetic
                testing
22
      CA-4      March 31, 2022 Form 10-K                  147
23
      RULINGS:                                    PAGE    LINE
24    Prof. Cate is accepted as an expert          50      25
      Witness
25    Matter taken under advisement               391      19
```



```
 1               C E R T I F I C A T I O N

 2          I, Joseph Burstein, the court-approved transcriber,

 3     do hereby certify the foregoing is a true and correct

 4     transcript from the official electronic sound recording of the

 5     proceedings in the above-entitled matter.

 6

 7
```

                                        June 24, 2025
        _____    _____
        JOSEPH BURSTEIN (CDLT-189)             DATE

```
 1
        TTA-Certified Digital Legal Transcriber
11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

