## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MISSOURI
## EASTERN DIVISION

| | |
|---|---|
| In re:<br><br>23ANDME HOLDING CO., *et al.*,<br><br>          *Debtors.* | Bankr. Case No. 25-40976-357<br>Chapter 11<br><br>(Jointly Administered) |
| THE PEOPLE OF THE STATE OF CALIFORNIA,<br><br>          *Appellant*,<br><br>     v.<br><br>23ANDME HOLDING CO., *et al.*,<br><br>          *Appellees.* | Case No.: 4:25-cv-00999-MTS<br><br>Hon. Matthew T. Schelp |

## THE PEOPLE OF THE STATE OF CALIFORNIA'S
## <u>OPENING APPELLATE BRIEF</u>

# TABLE OF CONTENTS

I.     Introduction ................................................................. 1

II.    Oral Argument............................................................ 2

III.   Jurisdiction ................................................................ 2

IV.    Issues on Appeal & Standard of Review.................................. 2

V.     Statement of the Case ................................................... 3

VI.    Argument Summary ..................................................... 6

VII.   Argument.................................................................... 6

    A.    The People Have Standing to Appeal ............................. 6

    B.    This Appeal Is Not Moot ............................................. 6

    C.    Neither NewCo Nor TTAM Are Good-Faith Purchasers
       Under 11 U.S.C. § 363(m) ........................................... 7

        1.    NewCo Is Not a Good-Faith Purchaser ................ 8

        2.    TTAM Is Not a Good-Faith Purchaser.............. 10

    D.    The Sale Order Violated the Bankruptcy Code ............ 11

        1.    This Multi-Transaction Sale, Facilitated by the
           Creation of a Non-Debtor Entity, Is an Improper
           Use of § 363.................................................... 11

        2.    This Multi-Transaction Sale Evaded Applicable
           State-Law Transfer Restrictions in Violation of
           § 363 ............................................................. 13

VIII.  Conclusion................................................................ 15

# TABLE OF AUTHORITIES

CASES

*BBBB Bonding Corp. v. Caldwell*
   73 Cal. App. 5th 349 (2021) ...................................................................15

*Czyzewski v. Jevic Holding Corp.*
   580 U.S. 451 (2017).............................................................................13

*Fox Valley & W. Ltd. v. I.C.C.*
   15 F.3d 641 (7th Cir. 1994) ................................................................15

*Gregory v. Helvering*
   293 U.S. 465 (1935).............................................................................15

*Harrington v. Purdue Pharma L.P.*
   603 U.S. 204 (2024)............................................................................12

*In re Abbotts Dairies of Penn., Inc.*
   788 F.2d 143 (3d Cir. 1986) ................................................................8

*In re Agriprocessors, Inc.*
   465 B.R. 822 (Bankr. N.D. Iowa 2012)................................................7

*In re Borders Grp., Inc.*
   453 B.R. 477 (Bankr. S.D.N.Y. 2011)................................................10

*In re Channel One Commc'ns, Inc.*
   117 B.R. 493 (Bankr. E.D. Mo. 1990).................................................11

*In re Fieldwood Energy, LLC*
   93 F.4th 817 (5th Cir. 2024) ................................................................9

*In re Gucci*
   126 F.3d 380 (2d Cir. 1997) .........................................................3, 6, 9

*In re Lionel Corp.*
   722 F.2d 1063 (2d Cir. 1983) .............................................................12

*In re M Cap. Corp.*
   290 B.R. 743 (B.A.P. 9th Cir. 2003) ..............................................9, 10

*In re Mark Bell Furniture Warehouse, Inc.*
992 F.2d 7 (1st Cir. 1993) ................................................................................10

*In re Pursuit Holdings (NY)*
845 F. App'x 60 (2d Cir. 2021) .........................................................................9

*In re R.B.B., Inc.*
211 F.3d 475 (9th Cir. 2000) .............................................................................7

*In re Reg'l Evangelical All. of Churches, Inc.*
592 B.R. 375 (Bankr. D. Kan. 2018) ...............................................................10

*In re Rodriquez*
258 F.3d 757 (8th Cir. 2001) .............................................................................8

*In re Schauer*
835 F.2d 1222 (8th Cir. 1987) ......................................................................1, 13

*In re Tamojira, Inc.*
212 B.R. 824 (Bankr. E.D. Va. 1997) ...............................................................9

*In re Tempo Tech. Corp.*
202 B.R. 363 (D. Del. 1996) ..............................................................................7

*In re Trism, Inc.*
328 F.3d 1003 (8th Cir. 2003) ...............................................................3, 7, 8, 9

*In re Wesco Aircraft Holdings, Inc.*
No. 23-90611, 2025 WL 354858 (Bankr. S.D. Tex. Jan. 15, 2025) .................14

*In re White Crane Trading Co.*
170 B.R. 694 (Bankr. E.D. Cal. 1994) .........................................................2, 10

*Kraft, Inc. v. County of Orange*
219 Cal. App. 3d 1104 (1990) ..........................................................................14

*MOAC Mall Holdings v. Transform Holdco*
598 U.S. 288 (2023) ........................................................................................6, 7

*Norwest Bank Worthington v. Ahlers*
485 U.S. 197 (1988) ..........................................................................................13

*People v. Hudson*
    38 Cal. 4th 1002 (2006) ...................................................................14

*United Farm Workers of Am., AFL-CIO v. Dutra Farms*
    83 Cal. App. 4th 1146 (2000) ..........................................................15

*Willemain v. Kivitz*
    764 F.2d 1019 (4th Cir. 1985) ......................................................7, 11

STATUTES

11 U.S.C. § 363 ................................................................................*passim*

11 U.S.C. § 1123 .................................................................................12

28 U.S.C. § 157 .....................................................................................2

28 U.S.C. § 158 .....................................................................................2

28 U.S.C. § 1334 ...................................................................................2

Cal. Civ. Code § 56.18 ...............................................................1, 2, 13, 14

Cal. Civ. Code § 2223 .........................................................................4, 11

Cal. Civ. Code § 2224 .........................................................................4, 11

COURT RULES

Fed. R. Bankr. P. 2018 ...........................................................................6

Fed. R. Bankr. P. 8002 ...........................................................................2

OTHERS

2021 Cal. Legis. Serv. Chapter 596 .........................................................1

3 Collier on Bankruptcy ¶ 363.11 (16th ed.) ............................................7

## I.    INTRODUCTION

The bankruptcy court erred when it approved 23andMe's multi-transaction asset sale, which violated California privacy law by transferring the genetic data and biological samples of 1.8 million Californians without their separate and express consent.

In 2021, California enacted the Genetic Information Privacy Act (GIPA) specifically to safeguard Californians' "genetic data and biological samples." Cal. Civ. Code § 56.18, *et seq.* Genetic information derived from human DNA is among the most—if not the most—highly sensitive personal data that an individual has. *See, e.g.*, 2021 Cal. Legis. Serv. Ch. 596 (S.B. 41). With GIPA, California sought to protect and empower its residents by giving them the right to choose who controls their genetic information: GIPA requires that genetic-testing companies, like 23andMe, obtain an affected consumer's "separate and express consent" for "[e]ach transfer or disclosure of the consumer's genetic data or biological sample to a third party . . . ." Cal. Civ. Code § 56.181(a)(2)(D).

This appeal is about the failure of 23andMe and its affiliated debtors (collectively, "Debtors") to comply with GIPA in their transfer of nearly two million Californians' genetic information to TTAM Research Institute[1] without a single consumer's separate and express consent. It is a bedrock principle of bankruptcy law that debtors must comply with state-law transfer restrictions when selling assets under 11 U.S.C. § 363. *See, e.g.*, *In re Schauer*, 835 F.2d 1222, 1225

---

[1] On July 17, 2025, shortly after the sale closed, TTAM Research Institute changed its corporate name to "23andMe Research Institute." [Doc. 72.] For continuity, this brief refers to this entity as "TTAM."

1

(8th Cir. 1987). Here, the bankruptcy court approved a § 363 sale of Californians' genetic data and biological samples that defied GIPA. Debtors maintained that compliance with GIPA is too costly. But "[b]ankruptcy does not grant the debtor a license to eliminate the marginal cost generated by compliance with valid state laws that constrain nonbankrupt competitors." *In re White Crane Trading Co.*, 170 B.R. 694, 702 (Bankr. E.D. Cal. 1994).

For these and the reasons that follow, the People of the State of California ("People") request that the Court reverse the bankruptcy court's sale order.

## II.    ORAL ARGUMENT

The People request oral argument. This appeal raises important issues regarding bankruptcy law and state-law transfer restrictions on genetic data.

## III.    JURISDICTION

The bankruptcy court had jurisdiction under 28 U.S.C. §§ 1334 and 157(b)(2)(N). This Court has appellate jurisdiction under 28 U.S.C. § 158(a). The People timely appealed on July 3, 2025. [People's Excerpts of Record ("ER") 2300.] *See* Fed. R. Bankr. P. 8002(a)(1). The sale order is a final order. [ER 2123.]

## IV.    ISSUES ON APPEAL & STANDARD OF REVIEW

This appeal presents two central issues:

1. Did the bankruptcy court err by entering an order authorizing the sale of Californians' genetic data and biological samples without the separate and express consent of affected Californians as required by California's Genetic Information Privacy Act, Cal. Civ. Code. § 56.18, *et seq.*?

2. Did the bankruptcy court err in determining that both TTAM and NewCo—

2

the latter a non-debtor affiliate controlled by Debtors and formed by Debtors solely to facilitate the sale to TTAM—purchased in good faith within the meaning of 11 U.S.C. § 363(m)?

The first issue is a pure question of law, while the second is a mixed question of law and fact. *See, e.g.*, *In re Gucci*, 126 F.3d 380, 390 (2d Cir. 1997). The bankruptcy court's legal conclusions are reviewed *de novo*, and its factual findings for clear error. *See, e.g.*, *In re Trism, Inc.*, 328 F.3d 1003, 1006 (8th Cir. 2003).

## V.    STATEMENT OF THE CASE

23andMe was a "direct-to-consumer genetic testing company" [ER 397, 404], founded in 2006 by Anne Wojcicki and others. [ER 1453.] At its height in 2021, 23andMe was worth billions. In October 2023, however, 23andMe was the subject of a massive data breach [ER 399], which compromised more than 7 million user profiles.[2] [ER 422–23.] Genetic data from the breach was later found for sale on the dark web. [ER 812.]

On March 23, 2025, Debtors filed voluntary Chapter 11 bankruptcy petitions. [ER 274.] That same day, Ms. Wojcicki resigned as CEO after failing to take the company private. [ER 1453, 1455; ER 1408–1411.] Ms. Wojcicki remained on the board of 23andMe. [ER 1456.] According to Debtors, the goal of bankruptcy was "to effectuate a value-maximizing sale of substantially all or a portion of their assets" [ER 297], the most valuable of which were the genetic data and biological samples of more than 15 million consumers. [*See* ER 404.]

---

[2] Among other things, law-enforcement liability, including substantial civil penalties from this massive data breach, is the basis for the People's creditor status in this bankruptcy. [*See, e.g.*, 23andMe, Inc. Claim No. 258656; ER 536.]

To accomplish this, Debtors sought and obtained "first-day" orders authorizing bidding procedures to sell substantially all assets under 11 U.S.C. § 363. [ER 293, ER 471.] After marketing the assets and soliciting bids, Debtors filed a notice that a pharmaceutical company, offering $256 million for Debtors' assets, was the winning bidder. [ER 540.] Debtors selected TTAM, a nascent California non-profit controlled by Ms. Wojcicki, as the back-up bidder. [*Id.*]

Shortly after, the bankruptcy court re-opened the sale to allow "final" bids [ER 749], resulting in Debtors selecting TTAM as the new winning bidder, with a purchase price of $305 million for Debtors' assets, including millions of consumers' genetic data and biological samples. [ER 979.]

Throughout the process, the People repeatedly objected, informing Debtors and potential purchasers that any asset sale must comply with GIPA and that failure to do so would expose the purchaser to liability under California law, including "wrongful" possession of genetic data and biological samples under constructive-trust theories, Cal. Civ. Code §§ 2223, 2224. [*See, e.g.*, ER 946; ER 759; Doc. 8 at 25.] The statutory consumer-privacy ombudsperson (CPO) appointed by the bankruptcy court concurred with the People. [*E.g.*, ER 866 ("[T]he CPO cannot conclude that the sale or transfer of the Company's assets to either bidder does not violate applicable non-bankruptcy laws, unless the Company first obtains affirmative consent from the Company's customers . . . .").]

In a last-minute attempt to sidestep these and other concerns, Debtors filed a new asset-purchase agreement that added—for the first time—a brief description of an "Equity Toggle" option, which, if exercised, purported to re-structure the

4

asset sale into at least two transactions: (1) a sale of consumer genetic data and biological samples to a yet-to-be-formed non-debtor entity, "NewCo," controlled by Debtors; and (2) a sale of NewCo's equity to TTAM. [ER 1129–30.]

Three days before the sale hearing, Debtors stated that they would exercise the "Equity Toggle." [ER 1313.] The People again objected. [ER 1317.] The day before the sale hearing, Debtors filed an omnibus reply, explaining that Debtors now sought bankruptcy-court approval for *two* sale transactions under § 363: (1) authorization for Debtors to sell assets, including genetic data and biological samples, to NewCo in exchange for a promissory note "in an aggregate principal amount sufficient to provide the Debtors with cash consideration . . . equal to the Purchase Price under the TTAM" purchase agreement [ER 1340], and (2) authorization for Debtors to sell NewCo's equity to TTAM for $302.5 million, with extinguishment of the NewCo note. [ER 1340, 1331–32, 1339–41.]

Following a two-day evidentiary hearing, the bankruptcy court approved the multi-transaction sale under § 363, overruling the People's objections. [ER 2082, ER 2123.] In approving the two sales, among other things, the bankruptcy court (1) held that the transfer of genetic data and biological samples to NewCo and TTAM without separate and express consumer consent did not violate GIPA because NewCo was not a "third party" under California law and TTAM received only equity, and (2) determined that NewCo and TTAM were each good-faith purchasers within the meaning of § 363(m).

The People filed their notice of appeal on July 3. [ER 2300.] The People further sought to stay the sale, which the bankruptcy court, this Court, and the U.S.

Court of Appeals for the Eight Circuit denied. [Docs. 49, 65.] The sale closed on July 14, 2025. [ER 208.]

## VI.  ARGUMENT SUMMARY

Debtors' multi-transaction asset sale should be reversed. On the merits, the bankruptcy court legally erred by approving a sale that violates both the Bankruptcy Code and California law. Debtors will attempt to raise mootness to evade appellate review, but neither NewCo nor TTAM is entitled to good-faith–purchaser protections under 11 U.S.C. § 363(m).

## VII.  ARGUMENT

### A.  The People Have Standing to Appeal

Any suggestion that the People lack standing is meritless. The People are—and have always been—creditors. [*See, e.g.*, ER 536.] This, along with the fact that the People objected to the sale, is more than sufficient for standing.[3] *See, e.g.*, *MOAC Mall Holdings v. Transform Holdco*, 598 U.S. 288, 291 (2023) ("Interested parties may file an objection to such a sale . . . , and may appeal if the court authorizes a sale . . . over their objection."); *In re Gucci*, 126 F.3d at 388 ("Creditors ordinarily have standing to appeal bankruptcy court orders that make a disposition of estate property . . . .").

### B.  This Appeal Is Not Moot

11 U.S.C. § 363(m) is a statutory-mootness provision: "Section 363(m)

---

[3] The bankruptcy court's suggestion that the People's standing could be limited by Fed. R. Bankr. P. 2018(b) [*see* ER 2116], is misplaced. That rule is a special "intervention" rule, which state attorneys general "may" invoke when appropriate. Here, the People did not invoke that rule—nor had occasion to—because the People are indisputably creditors.

protects the reasonable expectations of good faith third-party purchasers by preventing the overturning of a completed sale, absent a stay, and it safeguards the finality of the bankruptcy sale." *In re Trism, Inc.*, 328 F.3d at 1006. Because the People challenge the good-faith determination—and objected below [ER 1321–22]—this appeal is not moot. *See, e.g.*, *In re Tempo Tech. Corp.*, 202 B.R. 363, 367 (D. Del. 1996). Accordingly, once this Court confirms that either NewCo or TTAM (or both) is not a good-faith purchaser under § 363(m), there are no "constraints" to this Court reversing the sale order. *MOAC Mall Holdings*, 598 U.S. at 299; *see also* 3 Collier on Bankruptcy ¶ 363.11 (16th ed.) ("Of course, if the appeal challenges the good faith finding itself, the appeal is not statutorily moot, because if the good faith finding is reversed, section 363(m) will not prevent an order affecting the validity of the sale.").

### C.   Neither NewCo Nor TTAM Are Good-Faith Purchasers Under 11 U.S.C. § 363(m)

Although the Bankruptcy Code does not define "good-faith purchaser," courts have adopted a traditional equitable definition: "one who purchases the assets for value, in good faith, and without notice of adverse claims." *Willemain v. Kivitz*, 764 F.2d 1019, 1023 (4th Cir. 1985); *accord, e.g.*, *In re Agriprocessors, Inc.*, 465 B.R. 822, 835–36 (Bankr. N.D. Iowa 2012) (collecting cases).

To start, the bankruptcy court's sale order ambiguously defines "Purchaser" as both NewCo and TTAM, collectively [ER 2128], which itself defeats good-faith protection. *See In re R.B.B., Inc.*, 211 F.3d 475, 480 (9th Cir. 2000) (reversing sale order and finding § 363(m) did not prevent appellate review because "as two

7

companies were ambiguously the purchaser, it cannot be concluded that an identified purchaser existed"). Regardless, neither entity purchased in good faith.

### 1. NewCo Is Not a Good-Faith Purchaser

NewCo is legally foreclosed from a good-faith determination. A precondition to good faith under § 363(m) is that the purchaser must be a "third party." *In re Trism, Inc.*, 328 F.3d at 1006 ("Section 363(m) protects the reasonable expectations of good faith third-party purchasers . . . ."); *In re Rodriquez*, 258 F.3d 757, 759 (8th Cir. 2001) (same). Debtors have steadfastly maintained—and the bankruptcy court agreed—that NewCo is *not* a third-party purchaser [ER 1385–86]: it is a non-debtor affiliate, owned and controlled by Debtors, created solely to effectuate the multi-transaction sale to TTAM. [*See, e.g.*, ER 1339–40.] NewCo's purpose was to evade the regulatory impact of state-law transfer restrictions, like GIPA, which Debtors readily acknowledge. [*See, e.g.*, *id.*]

Nonetheless, the bankruptcy court suggested that NewCo could receive good-faith protection under § 363(m) because, according to the bankruptcy court, TTAM was a good-faith purchaser (which the People dispute) and the sale of assets to NewCo was merely a "necessary part of the larger transaction" that was "integral" to the TTAM sale. [ER 2112–13.] This was legal error. No court has ever affirmed the imputation of good faith from one § 363 purchaser to another—let alone one so undeserving as NewCo—and for good reason.

It is blackletter law that good faith cannot be assumed. *See, e.g.*, *In re Abbotts Dairies of Penn., Inc.*, 788 F.2d 143, 148–49 (3d Cir. 1986). A good-faith finding under § 363(m) requires *affirmative* evidence that the purchaser acted in good

8

faith. *See, e.g.*, *In re M Cap. Corp.*, 290 B.R. 743, 747 (B.A.P. 9th Cir. 2003) ("[A]n inference of good faith drawn from a trial court record that is silent on the question would amount to inverting the burden of proof."); *In re Tamojira, Inc.*, 212 B.R. 824, 827 (Bankr. E.D. Va. 1997) ("This court certainly will not make a finding of 'good faith' under § 363(m) where, although an objection to the sale has been filed, no evidence is presented about the purchaser . . . ."). Here, the bankruptcy court imputed good faith to an entity that did not even exist at the time. This means that the bankruptcy court necessarily could not have considered NewCo's "conduct in the course of the bankruptcy proceedings[,] . . . includ[ing] the purchaser's actions in preparation for and during the sale itself," as required to make a legally sufficient good-faith determination. *In re Gucci*, 126 F.3d at 390. This was plain legal error. It is particularly egregious that the bankruptcy court skipped a good-faith analysis of the NewCo transaction when NewCo was an insider, never bid on the assets, and did not negotiate a purchase price (let alone at arm's length), among other dispositive impediments to good faith.

Moreover, the bankruptcy court legally erred in applying the "integral"-to-the-sale doctrine to infer NewCo's good-faith–purchaser status. To be sure, "[a] *provision* is integral if the provision is so closely linked to the agreement governing the sale that modifying or reversing the provision would adversely alter the parties' bargained-for exchange." *In re Trism*, 328 F.3d at 1007 (emphasis added). But this doctrine extends § 363(m) protections only to transaction *provisions* that are "integral" to a sale. *Id.*; *see also, e.g.*, *In re Fieldwood Energy, LLC*, 93 F.4th 817, 824–25 (5th Cir. 2024) ("challenged provisions"); *In re Pursuit*

9

*Holdings (NY)*, 845 F. App'x 60, 62 (2d Cir. 2021) ("integral provision"). Here, the good-faith–purchaser status of NewCo is not a transaction provision, nor could it ever be—it is an independent judicial determination that cannot be assumed. *See, e.g.*, *In re M Cap. Corp.*, 290 B.R. at 745. Accordingly, it was legal error for the bankruptcy court to relieve Debtors from their burden (one they cannot meet) to establish that NewCo was a good-faith, third-party purchaser under § 363(m). *See, e.g.*, *In re Borders Grp., Inc.*, 453 B.R. 477, 484–86 (Bankr. S.D.N.Y. 2011).

## 2. TTAM Is Not a Good-Faith Purchaser

The bankruptcy court further clearly erred in finding that TTAM was a good-faith purchaser under § 363(m). [ER 2132–34.] At bottom, TTAM participated with Debtors in a gambit to restructure a sale of massive amounts of genetic data (through the "Equity Toggle," which was never marketed) to evade state law. [*See, e.g.*, ER 1331 ("[T]he net result [of this equity sale] is that the Debtors will bring about the same result contemplated by the TTAM APA . . . using a different transactional form.").] As discussed, Debtors readily admit as much. [*See, e.g.*, ER 1339.] Complicity in such attempts is paradigmatic bad faith. *See In re White Crane Trading Co.*, 170 B.R. at 705 (no good faith where purchaser failed to "unambiguously reveal" that sale would violate state consumer-protection law "absent judicial imprimatur"); *see also, e.g.*, *In re Reg'l Evangelical All. of Churches, Inc.*, 592 B.R. 375, 384 (Bankr. D. Kan. 2018) ("bad faith" where bankruptcy filed "for the purpose of defeating the creditor's state law remedies").

Moreover, TTAM purchased these assets with "knowledge of adverse claims," which further defeats any notion of good faith. *In re Mark Bell Furniture*

10

*Warehouse, Inc.*, 992 F.2d 7, 8 (1st Cir. 1993); *Willemain*, 764 F.2d at 1023. Specifically, TTAM knew that possession of California consumers' genetic data and biological samples in violation of GIPA would expose them to remedies under California law, including constructive-trust theories, Cal. Civ. Code §§ 2223, 2224. Accordingly, TTAM was not a good-faith purchaser.

> ### D. The Sale Order Violated the Bankruptcy Code
>
> #### 1. This Multi-Transaction Sale, Facilitated by the Creation of a Non-Debtor Entity, Is an Improper Use of § 363

Debtors have repeatedly made clear that the bankruptcy's purpose was to sell all their assets. [ER 297.] While a "sale of substantially all of the Debtor's assets other than in the ordinary course of business and without the structure of a Chapter 11 Disclosure Statement and Plan is not prohibited by the Bankruptcy Code," *In re Channel One Commc'ns, Inc.*, 117 B.R. 493, 496 (Bankr. E.D. Mo. 1990), "[t]he sale must be closely scrutinized, and the proponent bears a heightened burden of proving the elements necessary for authorization." *Id.*

Here, the complex transaction approved by the bankruptcy court is a far cry from the straightforward asset sale proposed by Debtors just days before the sale hearing. In the end, the Debtors' "asset sale" required that Debtors (1) create a new non-debtor entity, NewCo, subject to various conditions; (2) "effectuate intercompany transfers" of assets and liabilities among themselves; (3) invoke § 363 to sell genetic data and biological samples (free and clear) and transfer some liabilities to NewCo in exchange for an illusory promissory note; and (4) invoke § 363 again to sell its equity in NewCo (free and clear) to TTAM in exchange for

11

$305 million along with extinguishment of the NewCo note. [ER 2288–91.]

Debtors strain to call this a "§ 363 sale." [*See* ER 1325; ER 1418.] "But word games cannot obscure the underlying reality." *Harrington v. Purdue Pharma L.P.*, 603 U.S. 204, 223 (2024). This transaction is outside the bounds of what can be accomplished through § 363. This looks like, and accomplishes, a complex corporate transaction that can be effectuated only through a Chapter 11 plan of reorganization: after internally reorganizing their assets and liabilities, Debtors simultaneously sold assets and equity free and clear, leading to a going-concern reorganization and transfer of Debtors' assets to an entity controlled by their co-founder and former CEO. Indeed, the creation of non-debtor entities to effectuate a bankruptcy transaction is expressly authorized under Chapter 11's plan-implementation provisions. 11 U.S.C. § 1123(a)(5)(B) ("[A] plan shall . . . provide adequate means for the plan's implementation, such as . . . transfer of all or any part of the property of the estate to one or more entities, whether organized before or after the confirmation of such plan . . . ."). But there is no express authority to do so under § 363.

The bankruptcy court repeatedly acknowledged that this exact structure could be accomplished through a Chapter 11 plan—just with additional cost. [ER 2087, 2098–99, 2119.] But § 363 does not grant "*carte blanche*" to swallow up Chapter 11's safeguards. *In re Lionel Corp.*, 722 F.2d 1063, 1069 (2d Cir. 1983); *id*. at 1071 ("As the Supreme Court has noted, it is easy to sympathize with the desire of a bankruptcy court to expedite bankruptcy reorganization proceedings for they are frequently protracted. The need for expedition, however, is not a

12

justification for abandoning proper standards.") (citation omitted).

Congress and the U.S. Supreme Court are clear: The Bankruptcy Code's procedures and protections matter, and neither expediency nor convenience are a reason to bypass them. *See, e.g.*, *Czyzewski v. Jevic Holding Corp.*, 580 U.S. 451, 471 (2017) (declining to "alter the balance struck by the [bankruptcy] statute," even in "rare cases") (citations omitted); *Norwest Bank Worthington v. Ahlers*, 485 U.S. 197, 207 (1988) (explaining that courts cannot deviate from the procedures "specified by the [Bankruptcy] Code," even when they sincerely "believe[] that . . . creditors would be better off").

### 2.    This Multi-Transaction Sale Evaded Applicable State-Law Transfer Restrictions in Violation of § 363

Debtors must comply with state-law transfer restrictions when selling assets under § 363. *See, e.g.*, *In re Schauer*, 835 F.2d at 1225. The bankruptcy court, however, nullified California law by grossly misinterpreting it. GIPA is a straightforward statute that, relevant here, prohibits the transfer and disclosure of "genetic data or biological samples" to third parties without the "separate and express consent" of affected consumers:

> To safeguard the privacy, confidentiality, security, and integrity of a consumer's genetic data, a direct-to-consumer genetic testing company shall . . . [o]btain a consumer's express consent for collection, use, and disclosure of the consumer's genetic data, including, at a minimum, separate and express consent for . . . [e]ach transfer or disclosure of the consumer's genetic data or biological sample to a third party other than to a service provider, including the name of the third party to which the consumer's genetic data or biological sample will be transferred or disclosed.

Cal. Civ. Code § 56.181(a)(2)(D).

The entire point of Debtors' sale was to transfer genetic data and biological

13

samples from Debtors to TTAM—unquestionably a third party. Despite this, the bankruptcy court held that the transaction did not trigger GIPA's transfer restrictions because the transaction, although a transfer, was not to a "third party." To accomplish this, the bankruptcy court presumed an extra-textual, "implicit" exception to GIPA, permitting the transfer of genetic assets to affiliates or subsidiaries, and the equity of such entities, without the separate and express consent of affected consumers.[4] [ER 2103–06.] This was legal error.

"If the language is unambiguous, we presume the Legislature meant what it said, and the plain meaning of the statute controls." *People v. Hudson*, 38 Cal. 4th 1002, 1009 (2006). Here, there is no statutory ambiguity—GIPA expressly excepts who is not a "third party." *See* Cal. Civ. Code § 56.181(a)(2)(D) ("service provider"); *id*. § 56.181(a)(2)(F) ("a public or private nonprofit postsecondary educational institution"). There is no express exemption for affiliates or subsidiaries, and no basis for the bankruptcy court to have presumed an "implicit" one without any relevant precedent. Indeed, California subscribes to the "separate entity theory," meaning that corporate affiliates and subsidiaries are necessarily "third parties" under California law. *See, e.g.*, *Kraft, Inc. v. County of Orange*, 219 Cal. App. 3d 1104, 1109 (1990) ("[C]orporations, partnerships, joint ventures, and associations have an identity apart from that of the owners.") (citation omitted).

---

[4] On this critical point, the bankruptcy court relied exclusively on a lone, unpublished bankruptcy court's report and recommendation, *In re Wesco Aircraft Holdings, Inc.*, No. 23-90611, 2025 WL 354858 (Bankr. S.D. Tex. Jan. 15, 2025). [ER 2106.] This decision, which remains a report and recommendation to date, is irrelevant. It does not purport to interpret or apply California law—rather, the court construed the term "third party" as defined in a contract between private parties— which has no bearing on the issues in this case.

Here, this further comports with California's canon that courts "must construe consumer protection statutes liberally so as to accomplish their remedial purpose." *BBBB Bonding Corp. v. Caldwell*, 73 Cal. App. 5th 349, 365 (2021). Accordingly, under the plain language of GIPA, both NewCo and TTAM are third parties. It was legal error for the bankruptcy court to conjure an "implicit" exception.

The bankruptcy court's error will have ramifications that will hurt California consumers by depriving them of the protections of GIPA. Its holding provides a blueprint for *every* genetic-testing company—whether inside or outside bankruptcy—to evade GIPA's transfer restrictions by simply forming a subsidiary, transferring the genetic assets to that subsidiary, and then selling the subsidiary's equity—*to any third party*. Any argument that the contrived sale of equity (through the "Equity Toggle") rather than assets somehow permits the evasion of GIPA "would be to exalt artifice above reality and to deprive the statutory provision in question of all serious purpose." *Gregory v. Helvering*, 293 U.S. 465, 470 (1935). It is inconceivable that the California legislature intended this critical privacy statute to be so easily nullified. *See United Farm Workers of Am., AFL-CIO v. Dutra Farms*, 83 Cal. App. 4th 1146, 1156 (2000) (rejecting statutory "interpretation [that] creates a loophole that greatly undermines the strength of the statute"); *see also Fox Valley & W. Ltd. v. I.C.C.*, 15 F.3d 641, 645 (7th Cir. 1994) (cautioning against "obvious loopholes opened by the manipulation of corporate forms," otherwise "the statute will be quickly nullified by clever lawyers").

## VIII. CONCLUSION

For these reasons, the sale order should be reversed.

15

Dated: September 5, 2025              Respectfully submitted,

                                      Rob Bonta
                                      Attorney General
                                      Nicklas A. Akers #211222 (CA)
                                      Senior Assistant Attorney General

                                      /s/ Bernard A. Eskandari
                                      _____
                                      Bernard A. Eskandari #244395(CA)
                                      Stacey D. Schesser #245735(CA)
                                      Supervising Deputy Attorneys General
                                      Yen P. Nguyen #239095(CA)
                                      Daniel M.B. Nadal #299661(CA)
                                      Deputy Attorneys General

                                      *Attorneys for Creditor the People of the State
                                      of California*

                                      CALIFORNIA DEPARTMENT OF JUSTICE
                                      455 Golden Gate Ave., Ste. 11000
                                      San Francisco, California 94102
                                      Telephone:  (213) 269-6348
                                      Facsimile:  (916) 731-2146
                                      Email:       bernard.eskandari@doj.ca.gov
                                                   stacey.schesser@doj.ca.gov
                                                   titi.nguyen@doj.ca.gov
                                                   daniel.nadal@doj.ca.gov

## CERTIFICATE OF COMPLIANCE

This document complies with the page-length requirements in the Court's Case Management Order (paragraph 6) because the brief does not exceed 15 pages. This document complies with the typeface requirements of Fed. R. Bankr. P. 8015(a)(5) and the type-style requirements of Fed. R. Bankr. P. 8015(a)(6) because this document has been prepared in a proportionally spaced typeface using "Microsoft® Word for Microsoft 365 MSO (Version 2408 Build 16.0.17928.20336) 64-bit" in 14-point Times New Roman font, set at 28-point line spacing for text.

/s/ Bernard A. Eskandari
An Attorney for the People of the State of California

17

## CERTIFICATE OF SERVICE

I certify that a true and correct copy of the foregoing document will be filed with the Clerk of the United States District Court for the Eastern District of Missouri and will be served on the parties registered to receive electronic notice via the Court's CM/ECF System.

/s/ Bernard A. Eskandari
An Attorney for the People of the State of California